**Case No. 22-2132**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

                              Plaintiff-Appellant,

    v.

NEW MEXICO ENVIRONMENT
DEPARTMENT and JAMES
KENNEY, Secretary (in his official
capacity),                      Defendants-Appellees.

**DEFENDANTS-APPELLEES'
SUPPLEMENTAL APPENDIX**

Appeal from the U.S. District Court for the District of New Mexico
Case No. 19-CV-0046 (Hon. Kenneth J. Gonzales)

RAÚL TORREZ
*New Mexico Attorney General*

William G. Grantham
Esther C. Jamison
*Assistant Attorneys General*
408 Galisteo St.
Santa Fe, NM 87501
(505) 490-4060

*Counsel for Defendant-Appellee*

## INDEX TO SUPPLEMENTAL APPENDIX

1. Docket Sheet ........................................................................................................1

2. Notice of Appeal in New Mexico Court of Appeals, Case No. A-1-CA-37887
      (filed 1/1/2019) (excerpt)..........................................................................10

3. NMED's Motion to Dismiss (ECF 4) ...............................................................13

4. U.S.' Docketing Statement in New Mexico Court of Appeals, Case No. A-1-CA-
      37887 (filed 4/12/2019) .............................................................................27

5. Permit Application (excerpt) (ECF 49-3) .........................................................31

6. Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
      Environmental Programs Worldwide: Installation-Specific Work Plan For
      Cannon AFB (ECF 49-3)..............................................................................39

7. Fact Sheet (ECF 49-3)...................................................................................137

8. Draft Permit Cover Sheet (excerpt) (ECF 49-3)..............................................145

9. Definitions from Draft Permit (excerpt) (ECF 49-3) .......................................146

10. USAF Request to Extend Comment Period (ECF 49-4) ................................150

11. NMED Notice of Extension of Comment Period (ECF 49-5) ........................151

12. Final Permit Cover Letter (ECF 49-21)..........................................................154

13. NMED Response to Comments on Draft Permit (excerpt) (ECF 49-21)........156

14. U.S.' Motion for Leave to File Amended Complaint (excerpt) (ECF 53) ......158

15. U.S.' Memo. in Support of Motion for Summary Judgment (ECF 58-1) .......164

16. NMED Response to U.S.' Motion for Summary Judgment and Cross-Motion
      for Summary Judgment (ECF 59) ..............................................................190

17. U.S.' Reply in Support of Motion for Summary Judgment and Response to
NMED's Cross-Motion for Summary Judgment (ECF 60) ........................228

18. U.S.' Response to Defendants' Request for Judicial Notice (ECF 64) ..........255

APPEAL,SMV22

# U.S. District Court
## United States District Court – District of New Mexico (Las Cruces)
### CIVIL DOCKET FOR CASE #: 2:19–cv–00046–KG–GBW

United States of America v. New Mexico Environment
Department
Assigned to: District Judge Kenneth J. Gonzales
Referred to: Chief Magistrate Jud Gregory B. Wormuth
Demand: $0
Case in other court:  USCA, 22–02132
Cause: 30:181 Environment: Review of Agency Action

Date Filed: 01/17/2019
Date Terminated: 08/18/2022
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: Federal Question

**Plaintiff**

**United States of America**     represented by

**Andrew D. Knudsen**
DOJ–Enrd
PO Box 7611
Washington, DC 20044–7611
202–353–7466
Email: andrew.knudsen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eileen McDonough**
US Department of Justice
Environmental Defense Section
PO Box 23986
Washington, DC 20026–3896
(202) 514–3144
Email: eileen.mcdonough@usdoj.gov
*TERMINATED: 05/26/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Cane**
DOJ–Enrd
Enrd
150 M Street, NE
Room 4.1131
Washington, DC 20002
202–598–9563
Email: john.cane@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael T. Chen**
DOJ–Enrd
Eds
150 M Street Northeast
Washington, DC 20002
202–598–3544
Email: michael.chen3@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shari Howard**
USDOJ
PO Box 7611
Washington, DC 20044–7611
202–305–0999
Fax: 202–514–8865
Email: shari.howard@usdoj.gov
*TERMINATED: 01/28/2021*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David D. Mitchell**
USDOJ
ENRD
601 D Street NW
Suite 8000
Washington, DC 20530
202−514−0165
Email: david.mitchell@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**New Mexico Environment Department**    represented by    **Anne Minard**
Doi Solicitor'S Office
505 Marquette Ave NW
Suite 1800
Albuquerque, NM 87102
505−248−5625
Email: anne.minard@sol.doi.gov
*TERMINATED: 01/09/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cholla Khoury**
New Mexico Attorney Genderal's Office
408 Galisteo Street
Santa Fe, NM 87501
505−827−6000
Fax: 505−827−5826
Email: ckhoury@nmag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher N. Atencio**
New Mexico Environment Department
121 Tijeras Avenue, N.E.
Suite 1000
Albuquerque, NM 87102−3400
505−827−2855
Fax: 505−383−2064
Email: christopher.atencio@state.nm.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Hower**
New Mexico Environment Department
5500 San Antonio Dr. NE
Albuquerque, NM 87109
505−222−9550
Fax: 505−222−9510
Email: jennifer.hower@state.nm.us
*TERMINATED: 03/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Fletcher Lundin**
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87501

**Supp. App. 0002**

505−303−1790
Email: rlundin@nmag.gov
*TERMINATED: 01/09/2020*
*LEAD ATTORNEY*

**William G. Grantham**
New Mexico Office of the Attorney
General
111 Lomas NW
Ste. 300
Albuquerque, NM 87102
505−222−9024
Fax: 505−222−9006
Email: wgrantham@nmag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **James Kenney** *Secretary, In his official capacity* | represented by | **Anne Minard** (See above for address) *TERMINATED: 01/09/2020* *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Cholla Khoury**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher N. Atencio**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Lynn Hower**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Fletcher Lundin**
(See above for address)
*TERMINATED: 01/09/2020*
*LEAD ATTORNEY*

**William G. Grantham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/17/2019 | 1 | COMPLAINT against New Mexico Environment Department ( Filing Fee – Waived), filed by United States. (Attachments: # 1 Exhibit Permit, # 2 Exhibit Permit Attachments 1−3)(McDonough, Eileen) (Entered: 01/17/2019) |
| 01/18/2019 | | Office code correction. Case office code has been changed from 1 (Albuquerque) to 2 (Las Cruces). (jg) (Entered: 01/18/2019) |
| 01/18/2019 | | United States Magistrate Judge Carmen E. Garza and United States Magistrate Judge Stephan M. Vidmar assigned. (jg) (Entered: 01/18/2019) |
| 01/18/2019 | 2 | PLEASE TAKE NOTICE that this case has been randomly assigned to United States Magistrate Judge Carmen E. Garza to conduct dispositive proceedings in this matter, including motions and trial. Appeal from a judgment entered by a Magistrate Judge |

| | | |
|---|---|---|
| | | will be to the United States Court of Appeals for the Tenth Circuit. **It is the responsibility of the case filer to serve a copy of this Notice upon all parties with the summons and complaint.** *Consent is strictly voluntary, and a party is free to withhold consent without adverse consequences. Should a party choose to consent, notice should be made no later than 21 days after entry of the Order setting the Rule 16 Initial Scheduling Conference.* For e−filers, visit our Web site at www.nmd.uscourts.gov for more information and instructions. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jg) (Entered: 01/18/2019) |
| 01/18/2019 | 3 | APPENDIX/SUPPLEMENT re 1 Complaint *Civil Cover Sheet* by United States of America (McDonough, Eileen) (Entered: 01/18/2019) |
| 01/22/2019 | | Summons Issued as to James Kenney, New Mexico Environment Department. (jg) (Entered: 01/22/2019) |
| 02/18/2019 | 4 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *OR FOR MORE DEFINITE STATEMENT* by New Mexico Environment Department. (Grantham, William) (Entered: 02/18/2019) |
| 02/22/2019 | 5 | AFFIDAVIT of Service for Complaint served on NM Attorney General; General Counsel NMED; and Secretary NMED on 1/24/2019, filed by United States of America. (Attachments: # 1 Exhibit)(McDonough, Eileen) (Entered: 02/22/2019) |
| 02/27/2019 | 6 | NOTICE OF CONSENT SUBMISSION DEADLINE: Pursuant to Fed. R. Civ. P. 73(b)(2), the parties are reminded that a magistrate judge was assigned as the trial judge in this matter under 28 U.S.C. 636(c). The parties are advised that the Clerk will reassign this matter to a district judge as the trial judge no later than **March 11, 2019** unless consents from all parties have been filed. The parties are free to withhold consent. *If you have already entered your consent, you need not resubmit.* (ag) (Entered: 02/27/2019) |
| 02/28/2019 | 7 | NOTICE of Appearance by Jennifer Lynn Hower on behalf of All Defendants (Hower, Jennifer) (Entered: 02/28/2019) |
| 02/28/2019 | 8 | Consent MOTION for Extension of Time to File Response/Reply as to 4 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *OR FOR MORE DEFINITE STATEMENT* by United States of America. (McDonough, Eileen) (Entered: 02/28/2019) |
| 03/01/2019 | 9 | NOTICE of Appearance by Anne Minard on behalf of All Defendants (Minard, Anne) (Entered: 03/01/2019) |
| 03/01/2019 | 10 | NOTICE of Appearance by Robert Lundin on behalf of All Defendants (Lundin, Robert) (Entered: 03/01/2019) |
| 03/01/2019 | 11 | NOTICE of Appearance by Christopher N. Atencio on behalf of All Defendants (Atencio, Christopher) (Entered: 03/01/2019) |
| 03/04/2019 | 12 | ORDER granting 8 Motion for Extension of Time to File Response to 4 Motion to Dismiss by Chief Magistrate Judge Carmen E. Garza. Plaintiff's Response is due by 3/14/2019. (ag) (Entered: 03/04/2019) |
| 03/11/2019 | 13 | NOTICE of Appearance by David D. Mitchell on behalf of United States of America (Mitchell, David) (Entered: 03/11/2019) |
| 03/12/2019 | 14 | PLEASE TAKE NOTICE that this case has been reassigned to Sr. District Judge Robert C. Brack as the trial judge. Under D.N.M.LR−Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges. ***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** Kindly reflect this change in your filings. Magistrate Judge Carmen E. Garza no longer assigned to this case. [THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (mnb) |

**Supp. App. 0004**

| | | (Entered: 03/12/2019) |
|---|---|---|
| 03/14/2019 | 15 | MEMORANDUM in Opposition re 4 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *OR FOR MORE DEFINITE STATEMENT* filed by United States of America. (Attachments: # 1 Exhibit) (McDonough, Eileen) (Entered: 03/14/2019) |
| 03/15/2019 | 16 | PLEASE TAKE NOTICE that this case has been reassigned to District Judge Kenneth J. Gonzales as the trial judge.<br><br>Under D.N.M.LR–Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges.<br><br>***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** Kindly reflect this change in your filings.<br><br>Sr. District Judge Robert C. Brack no longer assigned to this case.<br>[THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (mnb) (Entered: 03/15/2019) |
| 03/28/2019 | 17 | REPLY to Response to Motion re 4 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *OR FOR MORE DEFINITE STATEMENT* filed by James Kenney, New Mexico Environment Department. (Attachments: # 1 Exhibit MTD in NM Ct. App.) (Grantham, William) (Entered: 03/28/2019) |
| 04/08/2019 | 18 | **FILED IN ERROR** MOTION for Leave to File *Surreply in opposition to Defendants' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR FOR MORE DEFINITE STATEMENT* by United States of America. (Attachments: # 1 US Surreply) (Mitchell, David) Modified on 4/8/2019 per phone call on Help Desk (meq). (Entered: 04/08/2019) |
| 04/08/2019 | 19 | MOTION for Leave to File *Surreply in opposition to defendants' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR FOR MORE DEFINITE STATEMENT* by United States of America. (Attachments: # 1 US Surreply) (Mitchell, David) (Entered: 04/08/2019) |
| 04/10/2019 | 20 | ORDER by District Judge Kenneth J. Gonzales granting 19 Unopposed Motion for Leave to File a Surreply. (tah) (Entered: 04/10/2019) |
| 04/10/2019 | 21 | THE UNITED STATES SURREPLY IN OPPOSITION TOTHE DEFENDANTS MOTION TO DISMISS (jjs) (Entered: 04/12/2019) |
| 04/18/2019 | 22 | NOTICE of Briefing Complete by All Defendants re 4 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *OR FOR MORE DEFINITE STATEMENT* filed by New Mexico Environment Department (Grantham, William) (Entered: 04/18/2019) |
| 01/09/2020 | 23 | NOTICE by James Kenney, New Mexico Environment Department *NOTICE OF WITHDRAWAL OF COUNSEL* (Minard, Anne) (Entered: 01/09/2020) |
| 01/09/2020 | 24 | NOTICE by James Kenney, New Mexico Environment Department *NOTICE OF WITHDRAWAL OF COUNSEL* (Lundin, Robert) (Entered: 01/09/2020) |
| 01/30/2020 | 25 | NOTICE of Appearance by Shari Howard on behalf of United States of America (Howard, Shari) (Entered: 01/30/2020) |
| 03/31/2020 | 26 | MEMORANDUM OPINION AND ORDER by District Judge Kenneth J. Gonzales denying 4 Defendants' Motion to Dismiss or in the Alternative Motion for a More Definite Statement. (tah) (Entered: 03/31/2020) |
| 04/08/2020 | 27 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by New Mexico Environment Department. (Khoury, Cholla) (Entered: 04/08/2020) |
| 04/09/2020 | 28 | ORDER by District Judge Kenneth J. Gonzales granting 27 Unopposed Motion for Extension of Time to Answer. Deadline for Defendants' to file an Answer is 5/29/2020, or 14 days after the filing of an amended complaint, whichever comes later. (tah)<br>[THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] Modified to add text only language on 4/10/2020 (jjs). (Entered: 04/09/2020) |

**Supp. App. 0005**

| 05/04/2020 | 29 | NOTICE of Appearance by Andrew D. Knudsen on behalf of United States of America (Knudsen, Andrew) (Entered: 05/04/2020) |
|---|---|---|
| 05/26/2020 | 30 | NOTICE by United States of America *of Withdrawal of Attorney* (McDonough, Eileen) (Entered: 05/26/2020) |
| 05/29/2020 | 31 | *NMED & James Kenney* ANSWER to 1 Complaint *of U.S.* by New Mexico Environment Department. Related document: 1 Complaint.(Grantham, William) (Entered: 05/29/2020) |
| 06/03/2020 | 32 | ORDER by Magistrate Judge Stephan M. Vidmar SETTING telephonic Status Conference for **June 17, 2020, at 1:30 p.m. MDT**. Counsel must call Judge Vidmar's AT&T Conference Line at **(888) 363–4734 (access code: 4382538)** to connect to the proceedings. (jcm) (Entered: 06/03/2020) |
| 06/17/2020 | 33 | Clerk's Minutes for telephonic status conference held before Magistrate Judge Stephan M. Vidmar on June 17, 2020. (jcm) (Entered: 06/17/2020) |
| 08/04/2020 | 34 | ORDER by Magistrate Judge Stephan M. Vidmar DIRECTING the parties to file a status report no later than **August 11, 2020**. (jcm) (Entered: 08/04/2020) |
| 08/11/2020 | 35 | Joint Status Report by United States of America (Knudsen, Andrew) (Entered: 08/11/2020) |
| 09/03/2020 | 36 | ORDER by Magistrate Judge Stephan M. Vidmar SETTING telephonic Status Conference for **September 11, 2020, at 1:30 p.m. MDT**. Counsel must call Judge Vidmar's AT&T Conference Line at **(888) 363–4734 (access code: 4382538)** to connect to the proceedings. (rcf) (Entered: 09/03/2020) |
| 09/11/2020 | 37 | Clerk's Minutes for telephonic status conference held before Magistrate Judge Stephan M. Vidmar on September 11, 2020. (Recording Info: MARS) (rcf) (Entered: 09/15/2020) |
| 09/15/2020 | 38 | ORDER by Magistrate Judge Stephan M. Vidmar SETTING telephonic Status Conference for **October 15, 2020, at 9:30 a.m. MDT**. Counsel must call Judge Vidmar's AT&T Conference Line at **(888) 363–4734 (access code: 4382538)** to connect to the proceedings. (rcf) (Entered: 09/15/2020) |
| 10/15/2020 | 39 | Clerk's Minutes for telephonic status conference held before Magistrate Judge Stephan M. Vidmar on October 15, 2020. (Recording Info: MARS) (rcf) (Entered: 10/15/2020) |
| 10/15/2020 | 40 | ORDER by Magistrate Judge Stephan M. Vidmar SETTING telephonic Status Conference for **December 4, 2020, at 9:30 a.m. MST**. Counsel must call Judge Vidmar's AT&T Conference Line at **(888) 363–4734 (access code: 4382538)** to connect to the proceedings. (rcf) (Entered: 10/15/2020) |
| 12/04/2020 | 41 | Clerk's Minutes for telephonic status conference held before Magistrate Judge Stephan M. Vidmar on December 4, 2020. (Recording Info: MARS) (rcf) (Entered: 12/04/2020) |
| 12/08/2020 | 42 | STIPULATION *of Joint Proposed Briefing Schedule* by United States of America (Knudsen, Andrew) (Entered: 12/08/2020) |
| 12/11/2020 | 43 | NOTICE by New Mexico Environment Department *filing the Administrative Record* (Attachments: # 1 Exhibit 1– Declaration, # 2 Exhibit 2 – Index, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11) (Grantham, William) (Entered: 12/11/2020) |
| 12/11/2020 | 44 | NOTICE by New Mexico Environment Department re 43 Notice (Other), *Filing the Administrative Record Part 2* (Attachments: # 1 Exhibit 12, # 2 Exhibit 13, # 3 Exhibit 14, # 4 Exhibit 15, # 5 Exhibit 16, # 6 Exhibit 17, # 7 Exhibit 18, # 8 Exhibit 19, # 9 Exhibit 20, # 10 Exhibit 21, # 11 Exhibit 22, # 12 Exhibit 23, # 13 Exhibit 24) (Grantham, William) (Entered: 12/11/2020) |
| 01/12/2021 | 45 | ORDER by Magistrate Judge Stephan M. Vidmar ADOPTING 42 Joint Proposed Briefing Schedule. (rcf) (Entered: 01/12/2021) |
| 01/25/2021 | 46 | Joint MOTION to Amend/Correct *Briefing Schedule* by United States of America. (Knudsen, Andrew) (Entered: 01/25/2021) |

| 01/28/2021 | 47 | NOTICE by United States of America *of Withdrawal of Counsel* (Howard, Shari) (Entered: 01/28/2021) |
|---|---|---|
| 01/29/2021 | 48 | STIPULATED ORDER by Magistrate Judge Stephan M. Vidmar GRANTING 46 Joint Motion to Amend the Briefing Schedule. (rcf) (Entered: 01/29/2021) |
| 02/01/2021 | 49 | NOTICE by New Mexico Environment Department *Filing Corrected Administrative Record* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21) (Grantham, William) (Entered: 02/01/2021) |
| 02/01/2021 | 50 | NOTICE by New Mexico Environment Department re 49 Notice (Other),, *Errata in Notice of Filing the Corrected Administrative Record* (Grantham, William) (Entered: 02/01/2021) |
| 02/02/2021 | 51 | NOTICE of Appearance by John Cane on behalf of United States of America (Cane, John) (Entered: 02/02/2021) |
| 03/03/2021 | 52 | NOTICE by New Mexico Environment Department *Withdrawal of Appearance* (Hower, Jennifer) (Entered: 03/03/2021) |
| 03/18/2021 | 53 | MOTION for Leave to File *Amended Complaint* by United States of America. (Attachments: # 1 Exhibit 1 – Proposed Amended Complaint) (Knudsen, Andrew) (Entered: 03/18/2021) |
| 03/19/2021 | 54 | ORDER by District Judge Kenneth J. Gonzales granting 53 Unopposed Motion for Leave to File Amended Complaint. [THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (tah) (Entered: 03/19/2021) |
| 04/01/2021 | 55 | FILED IN ERROR: RESPONSE *(Answer) to Amended Complaint* re 54 Order on Motion for Leave to File, 53 MOTION for Leave to File *Amended Complaint* filed by James Kenney, New Mexico Environment Department. (Grantham, William) Modified on 4/2/2021 (bc). (Entered: 04/01/2021) |
| 04/02/2021 | 56 | AMENDED COMPLAINT against All Defendants., filed by United States of America. (Knudsen, Andrew) (Entered: 04/02/2021) |
| 04/02/2021 | 57 | ANSWER to 56 Amended Complaint by James Kenney, New Mexico Environment Department.(Grantham, William) (Entered: 04/02/2021) |
| 06/01/2021 | 58 | MOTION for Summary Judgment by United States of America. (Attachments: # 1 Exhibit Memorandum of Points and Authorities in Support of Plaintiff United States' Motion for Summary Judgment) (Knudsen, Andrew) (Entered: 06/01/2021) |
| 07/16/2021 | 59 | DEFENDANT'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT re 58 MOTION for Summary Judgment filed by James Kenney, New Mexico Environment Department. (Attachments: # 1 Exhibit 1) (Grantham, William) Modified on 5/4/2022 (bc). (Entered: 07/16/2021) |
| 08/16/2021 | 60 | REPLY to Response to Motion re 58 MOTION for Summary Judgment filed by United States of America. (Knudsen, Andrew) (Entered: 08/16/2021) |
| 09/15/2021 | 61 | *Defendants'* REPLY *in Support of Cross Motion for Summary Judgment* re 60 Reply to Response to Motion filed by James Kenney, New Mexico Environment Department. (Grantham, William) (Entered: 09/15/2021) |
| 09/15/2021 | 62 | NOTICE of Briefing Complete by James Kenney, New Mexico Environment Department re 58 MOTION for Summary Judgment filed by United States of America (Grantham, William) (Entered: 09/15/2021) |
| 11/05/2021 | 63 | NOTICE by James Kenney, New Mexico Environment Department *Request for Judicial Notice* (Attachments: # 1 Exhibit A, # 2 Affidavit Affidavit of William Grantham) (Grantham, William) (Entered: 11/05/2021) |

**Supp. App. 0007**

| 12/22/2021 | 64 | RESPONSE re 63 Notice (Other) filed by United States of America. (Knudsen, Andrew) (Entered: 12/22/2021) |
|---|---|---|
| 06/09/2022 | 65 | ORDER SETTING HEARING on 63 Defendant's Request for Judicial Notice by District Judge Kenneth J. Gonzales. Hearing set for 6/22/2022 at 08:30 AM (Mountain Time).<br><br>This proceeding will be held via Zoom Video/Web Conferencing with all participants appearing remotely; the Zoom ID and Passcode will be provided separately to the participants email address of record. Participants should connect to the proceeding 15 minutes prior to its scheduled start time to allow time for trouble−shooting of any connectivity issues. To ensure the record is of the best quality participants are encouraged to utilize a headset to reduce static and background noise; if not using a headset participants must ensure the audio feed at their location is muted when not speaking.<br>*** REMINDER: Recording or broadcasting of this hearing is prohibited. *** (tah) (Entered: 06/09/2022) |
| 06/10/2022 | 66 | Consent MOTION to Reset *June 22, 2022 Hearing* by United States of America. (Knudsen, Andrew) (Entered: 06/10/2022) |
| 06/13/2022 | 67 | ORDER by District Judge Kenneth J. Gonzales granting in part 66 Consent Motion to Reset June 22, 2022 Hearing. The Zoom hearing on Defendant's Request for Judicial Notice is reset for **July 20, 2022, at 1:30 p.m. (Mountain Time)**.<br>[THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (tah) (Entered: 06/13/2022) |
| 06/13/2022 |  | Set/Reset Hearings: The Zoom hearing on 63 Defendant's Request for Judicial Notice is reset for 7/20/2022 at 01:30 PM in Las Cruces − 420 Mimbres Courtroom (North Tower) − Remote before District Judge Kenneth J. Gonzales. (tah) (Entered: 06/15/2022) |
| 07/11/2022 | 68 | AMENDED ORDER by District Judge Kenneth J. Gonzales changing the time of hearing only. The Zoom hearing on Defendant's Request for Judicial Notice is reset for July 20, 2022, at **2:00 p.m. (Mountain Time)**.[THIS IS A TEXT−ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (tah) (Entered: 07/11/2022) |
| 07/20/2022 | 69 | Clerk's Minutes for proceedings held before District Judge Kenneth J. Gonzales: Hearing on Defendant's Request for Judicial Notice held on 7/20/2022. (Court Reporter Fatima Sanchez) (tah) (Entered: 07/21/2022) |
| 08/18/2022 | 70 | MEMORANDUM OPINION AND ORDER by District Judge Kenneth J. Gonzales denying 58 Plaintiff United States' Motion for Summary Judgment; denying 59 Defendants' Cross−Motion for Summary Judgment; and dismissing this case without prejudice. (tah) (Entered: 08/18/2022) |
| 08/18/2022 | 71 | JUDGMENT by District Judge Kenneth J. Gonzales. (tah) (Entered: 08/31/2022) |
| 10/28/2022 | 72 | NOTICE OF APPEAL by United States of America. (Filing Fee − Waived) (Knudsen, Andrew) (Entered: 10/28/2022) |
| 10/31/2022 | 73 | Transmission of Preliminary Record to US Court of Appeals re 72 Notice of Appeal (Attachments: # 1 Preliminary Record) (jn) (Entered: 10/31/2022) |
| 10/31/2022 | 74 | USCA Information Letter with Case Number 22−2132 for 72 Notice of Appeal filed by United States of America. (ac) (Entered: 10/31/2022) |
| 11/14/2022 | 75 | TRANSCRIPT ORDER FORM by United States of America for the 72 Notice of Appeal (Knudsen, Andrew) (Entered: 11/14/2022) |
| 11/15/2022 | 76 | NOTICE TO USCA that Record is Complete re 72 Notice of Appeal. (ac) (Entered: 11/15/2022) |
| 01/27/2023 | 77 | NOTICE of Appearance by Michael T. Chen on behalf of United States of America (Chen, Michael) (Entered: 01/27/2023) |
| 01/30/2023 | 78 | PLEASE TAKE NOTICE that this case has been reassigned to Chief United States Magistrate Judge Gregory B. Wormuth as the pretrial judge. |

Under D.N.M.LR–Civ. 10.1, the first page of each document must have the case file number and initials of the assigned judges.

***Accordingly, further documents filed in this matter must bear the case number and the judges' initials shown in the case caption and the NEF for this document.*** Kindly reflect this change in your filings.

United States Magistrate Judge Stephan M. Vidmar no longer assigned to this case. [THIS IS A TEXT–ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (jg) (Entered: 01/30/2023)

Court of Appeals of New Mexico
Filed 1/17/2019 3:47 PM

Mark Reynolds

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**UNITED STATES,**

    Appellant

**v.**

                                Ct. App. No. **A-1-CA-37887**

**NEW MEXICO ENVIRONMENT
DEPARTMENT, and JAMES KENNEY,
SECRETARY OF THE NEW MEXICO
ENVIRONMENT DEPARTMENT
(in his official capacity),**

    Appellee.

**IN THE MATTER OF UNITED STATES
DEPARTMENT OF THE AIR FORCE,
CANNON AIR FORCE BASE APPLICATION
FOR A RENEWAL OF RESOURCE
CONSERVATION RECOVERY ACT HAZARDOUS
WASTE PERMIT EPA ID # NM7572124454**

**NOTICE OF APPEAL**

Pursuant to NMSA 1978 § 74-4-14, and NMRA § 12-601,the United States, on behalf of

the Department of the Air Force, hereby gives notice of appeal from the New Mexico

Environment Department's December 19, 2018 Final Decision to Issue the Resource

Conservation and Recovery Act Permit for Cannon Air Force Base, EPA ID # NM7572124454

("Permit"). A copy of the Issuance Letter and Response to Comments and the Permit are

attached hereto as Exhibits A and B, respectively.

The United States is filing this appeal as a protective matter only and is simultaneously

filing an action in federal district court challenging the Permit. In the federal district court action,

the United States contends that certain provisions of the Permit are contrary to a federal statute,

the Resource Conservation and Recovery Act ("RCRA"), and its implementing regulations, as

well as New Mexico's Hazardous Waste Act ("HWA"), NMSA §§ 74-4-1-14..  A decision favorable to the United States in that federal district court action will moot the identical issues that would be raised by the United States in this case.  In order to ensure that this important question of federal law is decided in a federal forum and to avoid duplicative litigation, the United States will file shortly a motion to stay this case, pending resolution of the federal court action.

Respectfully submitted,

/s/  *Michael Hoses 1/17/19*
Michael Hoses, Bar No. 1207
Assistant United States Attorney
Civil Division, Chief
District of New Mexico
P.O. Box 607
Albuquerque, New Mexico 87103
505-224-1455
Michael.Hoses@usdoj.gov


Eileen T. McDonough
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
eileen.mcdonough@usdoj.gov
202-514-3126

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2019, a copy of the foregoing Notice of Appeal was

sent via U.S. Mail, first class, postage prepaid, to the following:

Jennifer L. Hower
General Counsel
New Mexico Environment Department
1190 St. Francis Drive, Room 4050 N
Santa Fe, NM  87505


> */s/ Michael H. Hoses, AUSA 1/17/19*
> MICHAEL H. HOSES
> Assistant U.S. Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　) | |
| 　　　**Plaintiff,**　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　) | |
| **v.**　　　　　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　) | **Case No.: 1-19-cv-46** |
| NEW MEXICO ENVIRONMENT　　　　　) | |
| DEPARTMENT, and JAMES KENNEY,　) | |
| Secretary (in his official capacity),　　) | |
| 　　　　　　　　　　　　　　　　　　) | |
| 　　　**Defendants.**　　　　　　　　) | |

---

**DEFENDANTS' MOTION TO DISMISS
OR IN THE ALTERNATIVE,
MOTION FOR A MORE DEFINITE STATEMENT**

---

COME NOW Defendants New Mexico Environment Department (NMED) and James

Kenney, Secretary (in his official capacity), by the undersigned counsel, and hereby move

pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss

the above-referenced Complaint, or in the alternative, for a more definite statement under Rule

12(e).

## INTRODUCTION

This litigation involves a challenge to a permit NMED issued to Cannon Air Force Base

pursuant to the New Mexico Hazardous Waste Act (HWA), NMSA 1978, Sections 74-4-1 to -14,

on December 19, 2018 (the Permit). In its single count, Plaintiff United States purports to

challenge the definition of hazardous waste included in the Permit, asserting that the definition is

inconsistent with both the HWA and the federal Resource Conservation and Recovery Act

(RCRA) and, as a consequence, falls outside the waiver of sovereign immunity in RCRA.

**Supp. App. 0013**

Plaintiff's Complaint is inadequate as a matter of law and fact because it fails to allege any specific inconsistencies between the Permit, RCRA, and the HWA, and it should be dismissed. Moreover, because there is an ongoing state court proceeding which implicates important state interests and provides an adequate forum for Plaintiff's claim, this Court should abstain from exercising jurisdiction. Alternatively, NMED moves for a more definite statement of the alleged inconsistencies between the Permit, RCRA, and the HWA.

## BACKGROUND

Congress enacted RCRA in 1976 in response to "a rising tide of scrap, discarded, and waste materials" that had become a matter of national concern. 42 U.S.C. § 6901(a)(2), (4) (1984). In enacting RCRA, Congress declared it a national policy "that, wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). Congress recognized, however, that "the collection of and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies . . . ." 42 U.S.C. § 6901(a)(4). Thus, RCRA allows any state to administer and enforce a hazardous waste program subject to authorization from the EPA. 42 U.S.C. § 6926(b) (1986).

RCRA includes a clear and unambiguous waiver of sovereign immunity:

Each [federal entity] . . . engaged in [disposal or management of hazardous waste] shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (**including any requirement for permits** or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal and management **in the same manner, and to the same extent, as any person is subject to such requirements** . . . . The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or

procedural requirement (including, but not limited to, any injunctive relief, administrative order or civil or administrative penalty or fine) . . . .

42 U.S.C. § 6961 (emphasis added).

EPA authorized New Mexico's state program pursuant to RCRA in 1985, 40 C.F.R. § 272.1601(a) (2012), and delegated to New Mexico "primary responsibility for enforcing its hazardous waste management program." 40 C.F.R. § 272.1601(b). New Mexico's HWA and regulations promulgated pursuant to it are incorporated by reference into RCRA. 40 C.F.R. § 272.1601(c)(1).

The following prohibitions and procedural requirements of the HWA and its regulations are relevant to this case. Under the HWA, no person can knowingly transport, treat, store, or dispose of any hazardous waste without an HWA or RCRA permit, Section 74-4-11(A), and hazardous waste permits issued under the HWA "shall require corrective action for all releases of hazardous waste." Section 74-4-4.2(B). The NMED Secretary must give public notice when a draft permit has been prepared and allow 45 days for review and public comment, including requests for public hearing, 20.4.1.901(A)(3) NMAC. The Secretary must also respond to comments when a permit is issued. 20.4.1.901(A)(9) NMAC. Parties may petition the Secretary for permit modification, suspension, or revocation. 20.4.1.901(B)(3) NMAC. Any person affected by a final administrative action of NMED under the HWA may appeal to the New Mexico Court of Appeals within 30 days, and all appeals "shall be upon the record before the . . . secretary." Section 74-4-14.

The Permit that Plaintiff seeks to challenge in this case is simply a renewal and revision of one previously issued in 2003—one that Plaintiff did not challenge. Complaint ¶ 2. Plaintiff does not allege that NMED failed to comply with its own administrative procedures in issuing its permit, nor does it allege that those procedures failed to fall within the express waiver of

3

**Supp. App. 0015**

sovereign immunity. Rather it appears that Plaintiff simply disagrees with the outcome of those

procedures and now seeks to collaterally attack the contents of a permit lawfully issued by

NMED under its delegated authority. Plaintiff filed the instant Complaint, as well as a concurrent

appeal with the New Mexico Court of Appeals, on January 17, 2019. *See* Notice of Appeal,

*United States v. N.M. Env't Dep't*, Case No. A-1-CA-37887 (N.M. Ct. App. Jan. 17, 2019).

## ARGUMENT

### I.      The Court Should Decline to Exercise Jurisdiction Over the Complaint

The challenged Permit in this case has been issued under the authority of NMED, a New

Mexico administrative agency, and New Mexico law provides that appeals from administrative

orders, including permits, are to be directed to the New Mexico Court of Appeals. Plaintiff

plainly states that it has availed itself of that remedy. Complaint ¶ 19. This Court should abstain

from considering Plaintiff's complaint so that the case may properly unfold in State court

proceedings.

> As this Court has explained:

> Under the abstention doctrine that the Supreme Court articulated in *Younger,* federal courts should not interfere with state court proceedings by granting equitable relief—such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings—when the state forum provides an adequate avenue for relief. *Weitzel v. Div. of Occupational & Prof'l Licensing*, 240 F.3d 871, 875 (10th Cir. 2001) (quoting *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir.1999)).

> * * *

> For *Younger* abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.

*Gerhardt v. Mares*, 179 F.Supp.3d 1006, 1045-46 (D.N.M. 2016)(internal quotation marks omitted), *See also Hunter v. Hirsig*, 660 Fed.Appx. 711, 714 (10th Cir. 2016) (same).

4

**Supp. App. 0016**

A *Younger* abstention is appropriate in this case because: 1) there is an ongoing State judicial proceeding (also initiated by Plaintiff); 2) the State forum (namely the administrative process and resulting judicial review) is sufficient to provide an adequate opportunity to address the question contained in the complaint; and 3) the State proceedings involve important State interests, that is, "matters which traditionally look to state law for their resolution or implicate separately articulated state policies." *Crown Point I, LLC v. lntermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1215 (10th Cir. 2003) (quoting *Amanatullah v. Colo. Bd. Of Med. Exam'rs,* 187 F.3d 1160, 1163 (10th Cir. 1999)). Once these requirements have been met, the *Younger* abstention is mandatory. *Goings v. Sumner Cty. Dist. Atty's Office*, 571 Fed.Appx. 634, 638 (10th Cir. 2014) (citing *Amanatullah*, 187 F.3d at 1163).

## A.    There is an Ongoing State Judicial Proceeding

Plaintiff indicated in its Complaint its intent to appeal the permit in the New Mexico Court of Appeals and did so concurrently with the filing of its Complaint in this Court. Complaint ¶ 19; Notice of Appeal. Although Plaintiff also indicates it intends to move to stay that appeal pending the outcome of this case, no such request has of yet been filed. NMED will oppose such a request, and the appellant is not entitled to a stay as a matter of right. *See Wood v. Millers Nat'l. Ins. Co.*, 632 P.2d 1163, 1166 (1981) ("The power to stay proceedings pending the outcome of other litigation is within the discretion of the court . . . ."). The proceeding is therefore ongoing.

## B.    The State Provides an Adequate Forum for Plaintiff's Federal Claims

For *Younger* purposes, a federal litigant is deemed to have an "adequate opportunity" to raise its federal claims in the state forum if such claims "may be raised in state court judicial review of administrative proceedings." *Amanatullah*, 187 F.3d at 1164; *J.B. ex rel. Hart v.*

*Valdez*, 186 F.3d 1280, 1292 (10th Cir. 1999) (adequate opportunity exists unless "state law clearly bars the interposition of the [federal statutory] and constitutional claims") (quoting *Moore v. Sims*, 442 U.S. 415, 425-26 (1979)).

It appears Plaintiff's RCRA sovereign immunity claim is entirely dependent upon, and co-extensive with, its claim that the definition of hazardous waste for purposes of corrective action is inconsistent with New Mexico's HWA. *See* Complaint ¶¶ 21-22. Because the New Mexico Court of Appeals is expressly empowered to provide judicial review of final NMED permitting actions, Section 74-4-14, this is an issue squarely within that court's competence to decide. Moreover, to the extent the federal sovereign immunity claim implicates any issue of federal law outside of the HWA, nothing in New Mexico law bars consideration of such a claim. The New Mexico Court of Appeals has routinely considered and decided HWA cases. *See Sw. Research & Info. Ctr. v. N.M. Env't Dep't*, 2014-NMCA-098, ¶ 7, 336 P.3d 404, 407 (affirming NMED permit modification for the Waste Isolation Pilot Plant); *Citizen Action v. Sandia Corp.*, 2008-NMCA-031, ¶ 1, 179 P.3d 1228, 1230 (affirming NMED decision to grant permit modification request of Sandia National Laboratories); *Sw. Research & Info. Ctr. v. State*, 2003-NMCA-012, ¶ 1, 62 P.3d 270, 271 (affirming NMED Secretary's procedural decisions regarding permit for Waste Isolation Pilot Project); *Atlixco Coal. v. Maggiore*, 1998-NMCA-134, ¶ 2, 965 P.2d 370, 372-73 (affirming in part and vacating in part an NMED-issued HWA permit for a landfill).

**C.      The State Proceeding Involves Important State Interests.**

The interests involved in the State proceeding are of the highest importance to New Mexico, as reflected in both constitutional and statutory provisions. The New Mexico Constitution provides that:

> The protection of the state's beautiful and healthful environment is hereby declared to be of fundamental importance to the public interest, health, safety and the general welfare. The legislature shall provide for control of pollution and control of despoilment of the air, water and other natural resources of this state, consistent with the use and development of these resources for the maximum benefit of the people.

N.M. Const. art. XX, § 21. The HWA is part of New Mexico's Environmental Improvement Act, the purpose of which is to provide for:

> [E]nvironmental management and consumer protection in this state in order to ensure an environment that in the greatest possible measure will confer optimum health, safety, comfort and economic and social well-being on its inhabitants; will protect this generation as well as those yet unborn from health threats posed by the environment: and will maximize the economic and cultural benefits of a healthy people.

Section 74-1-2.

The purpose of the HWA itself "is to help ensure the maintenance of the quality of the state's environment; to confer optimum health, safety, comfort and economic and social well-being on its inhabitants; and to protect the proper utilization of its lands." Section 74-4-2. *See also V-1 Oil Co. v. Wyoming*, 902 F.2d 1482, 1486 n.l (10th Cir. 1990) (protection of environment and public from pollution is substantial governmental interest).

In addition to these broad policy concerns, the State proceeding implicates more specific interests in maintaining the integrity of the RCRA permitting process, including the parameters of judicial review. In particular, the State has a strong interest in preserving the requirement that permittees exhaust their administrative remedies before invoking the jurisdiction of the courts, and that they properly preserve issues for appeal.

New Mexico law provides several opportunities for permittees to be heard in the NMED permitting process. *See* HWA, Section 74-4-4.2 (H) (requiring an opportunity for a public hearing at which all interested persons may be given a reasonable chance to submit data, views,

<div align="center">7</div>

<div align="center">**Supp. App. 0019**</div>

or arguments orally or in writing); Hazardous Waste Management Rules, 20.4.1.901(A)(5)

NMAC (same), 20.1.4.500(C)(2)-(3) NMAC) (providing for comment on a Hearing Officer's

permitting report and oral argument before the NMED Secretary). Plaintiff therefore had the

opportunity to raise its objection to the definition of hazardous waste to NMED.

In the normal course of RCRA permitting, a permittee's disagreement with an NMED

permit would be adjudicated by the New Mexico Court of Appeals. Section 74-4-14. And, under

RCRA's broad waiver of sovereign immunity, these procedural requirements are applicable to

federal entities. *See* 42 U.S.C. § 6961(a). The Complaint, however, does not indicate whether

Plaintiff ever raised its objections to the Permit condition to NMED in written or oral comments,

or whether it requested a hearing at which it could have articulated its concerns.

By bringing this collateral attack on a permit condition without first allowing NMED's

permitting process to conclude (including judicial review of such a permit in the New Mexico

Court of Appeals), Plaintiff seeks to evade RCRA's mandate that it abide by New Mexico's

procedural requirements. As recognized by the Supreme Court, exhaustion serves two important

purposes. "First, exhaustion protects administrative agency authority" by giving an agency "an

opportunity to correct its own mistakes with respect to the programs it administers before it is

haled into federal court, and . . . discourages disregard of the agency's procedures." *Woodford v.

Ngo*, 548 U.S. 81, 89 (2006) (citation omitted). Second, exhaustion promotes efficiency because

"[c]laims generally can be resolved much more quickly and economically in proceedings before

an agency than in . . . federal court." *Id.*

The three elements for a *Younger* Abstention as articulated by the court have therefore

been satisfied in this case. Judicial restraint is also warranted by principles underlying other

abstention doctrines recognized by federal courts. *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496,

501 (1941) (coining the Pullman Abstention Doctrine, "a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary"); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 815 (1976) (recognizing the Colorado River Abstention Doctrine when "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern").

Under Rule 12(b)(1) and applicable abstention doctrines, as a matter of law the federal court should abstain from exercising jurisdiction over this case. A motion to dismiss on the basis of abstention is similar to a motion to dismiss for lack of subject matter jurisdiction. *Stein v. Legal Advert. Comm.*, 272 F. Supp.2d 1260, 1276, n.3 (D.N.M. 2003). "Once a Court concludes that abstention is appropriate, it should not then adjudicate the case on the merits." *Id.* at n.4 (citing *Amanatullah*, 187 F.3d at 1163 n.4).

Therefore, because the "exercise of federal review of the question in [this case] . . . would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," *Colo. River*, 424 U.S. at 814, this Court should abstain from exercising its jurisdiction.

## II.     Failure to State a Claim on Which Relief May Be Granted

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Detailed factual allegations are not required, but the Rule does call for "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

The sole claim alleged in Plaintiff's Complaint is, "[t]he definition of 'hazardous waste' for the purposes of corrective action in Permit Section 1.12 is inconsistent with the HWA and its implementing regulations," and consequently exceeds the scope of RCRA's waiver of sovereign immunity in 42 U.S.C. Section 6961(a). Complaint ¶¶ 21-22. These conclusions of law are not entitled to a presumption of validity. *Iqbal,* 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). The Complaint is completely devoid of any facts on which such a conclusion could be based.

In the three paragraphs in which the Complaint sets forth facts, Plaintiff alleges that it owns Cannon Air Force Base, that "the challenged Permit replaces the existing permit, which, in most relevant part addresses corrective action at Cannon," and that Plaintiff intends to appeal the Permit in a New Mexico court and then move to stay that proceeding pending the resolution of this case. Complaint ¶¶ 17-19. None of these facts bear on the definition of hazardous waste or overcome the waiver of sovereign immunity subjecting Plaintiff to NMED's permitting processes.

The Complaint contains additional information in a "Statutory and Regulatory Background" section identifying certain federal and New Mexico statutory provisions. *See* Complaint ¶ 12 (EPA has authorized NMED to implement RCRA in lieu of a federal program); Complaint ¶ 15 (RCRA waives sovereign immunity "as to the application of RCRA and state hazardous waste laws such as the HWA to federal facilities like the Cannon Air Force Base");

Complaint ¶ 16 (permit is a final agency action subject to judicial review under "arbitrary and capricious standard"). While NMED does not dispute the accuracy of these statements, none shed any light on Plaintiff's contention that NMED's definition of hazardous waste for the purpose of corrective action falls outside the broad waiver of sovereign immunity provided in RCRA. In fact, the only paragraph that addresses the definition of hazardous waste simply states, "New Mexico has adopted the same definition of hazardous waste as in RCRA. *Compare* NMSA 1978, § 74-4-14(K), *with* 42 U.S.C. § 6961(a)." Complaint ¶ 15. Another paragraph merely notes that the HWA requires regulations "that are equivalent to but no more stringent than" federal RCRA regulations. Complaint ¶ 13. This provision applies to the New Mexico Environmental Improvement Board, not NMED. In any case, even viewing the facts in the light most favorable to the non-moving party (Plaintiff, here), as this Court must for this motion, the Complaint neither pleads sufficient facts to explain how this requirement is relevant to the Permit nor identifies any pertinent regulations. In sum, Plaintiff nowhere applies the statutory provisions it identifies to any facts relevant to the Permit in order to explain the alleged deficiency in the Permit.

Plaintiff's related assertion that the Permit definition of hazardous waste "exceeds the scope of RCRA's waiver of sovereign immunity," Complaint ¶ 22, is similarly unsupported. RCRA's waiver of sovereign immunity is both broad and clear. *See* 42 U.S.C. § 6961; *see also State of Colo. v. U.S. Dep't of the Army*, 707 F. Supp. 1562, 1571-2 (D. Colo. 1989) ("[I]t is difficult to imagine a clearer statement of legislative intent . . . ."). The Permit was duly issued under New Mexico's RCRA authority. Plaintiff acknowledged this authority when it entered into the previous permit that this Permit replaces. Plaintiff has failed to articulate any reason why it should now be exempted from the RCRA waiver of immunity.

**Supp. App. 0023**

Therefore, the Complaint fails to state a claim on which relief may be granted, Fed. R. Civ. P. 12(b)(6), and should be dismissed.

### III.   Alternative Motion for More Definite Statement

A Rule 12(e) motion is appropriate when a complaint "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). The Supreme Court of the United States has held that, "[i]f a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). Commentary to the federal rule adds that "the motion provided for is . . . to be obtained only in cases where the movant cannot reasonably be required to frame an answer or other responsive pleading to the pleading in question." Fed. R. Civ. P. 12 Commentary. "'Whether to grant or deny such a motion lies within the sound discretion of the court.'" *Graham v. Prudential Home Mortg. Co.*, 186 F.R.D. 651, 653 (D. Kan. 1999) (citation omitted). Federal district courts in New Mexico have granted 12(e) motions in the recent past. *See Tompkins v. LifeWay Christian Res. of S. Baptist Convention*, No. 17-CV-0460 RB/KRS, 2018 WL 6632070, at *7 (D.N.M. Dec. 19, 2018); *Serna v. Webster*, No. CV 17-0020 JB/WPL, 2017 WL 4386359, at *28 (D.N.M. Sept. 30, 2017), appeal dismissed, No. 17-2177, 2017 WL 8786138 (10th Cir. Nov. 27, 2017), reh'g denied (Dec. 5, 2017), and aff'd, No. 18-2049, 2018 WL 6574937 (10th Cir. Dec. 13, 2018).

In this case, it is impossible to ascertain from Plaintiff's Complaint which aspect of the hazardous waste definition in the Permit Plaintiff believes is problematic. In addition to its failures to meet the federal pleading standard, the Complaint as written provides no basis on which NMED may formulate a thoughtful and informed response. Therefore, if the court declines to dismiss the Complaint, NMED respectfully requests that the court order a more

definite statement from Plaintiff specifying the aspect of the Permit's hazardous waste definition that is allegedly flawed.

## CONCLUSION

Plaintiff has failed to show that this Court should assume jurisdiction over a State matter already properly before the New Mexico Court of Appeals, and the Complaint should therefore be dismissed under Rule 12(b)(1) according to abstention doctrines. Additionally, Plaintiff's Complaint is legally and factually insufficient and should be dismissed under Rule 12(b)(6). Alternatively, NMED requests that this court order a more definite statement under Rule 12(e).

Dated: February 18, 2019.

Respectfully submitted:

**NEW MEXICO ATTORNEY GENERAL
HECTOR H. BALDERAS**

*/s/William G. Grantham*
William G. Grantham
P. Cholla Khoury
Assistant Attorneys General
ckhoury@nmag.gov
wgrantham@nmag.gov
(505) 490-5042
Post Office Drawer 1508
Santa Fe, NM 87504

13
**Supp. App. 0025**

**NEW MEXICO ENVIRONMENT DEPARTMENT and JAMES KENNEY, Secretary (in his official capacity)**

*/s/Jennifer Hower*
Jennifer Hower
General Counsel
Christopher Atencio
Assistant General Counsel
Special Assistant Attorneys General
New Mexico Environment Department
121 Tijeras Ave. NE
Albuquerque, NM 87102
Phone: (505) 222-9554
Fax: (505) 383-2064

## CERTIFICATE OF SERVICE

I CERTIFY that, on February 18, 2019, I filed the foregoing using CM/ECF which caused the parties of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/William G. Grantham*
William G. Grantham

<div align="center">

14

**Supp. App. 0026**

</div>

Court of Appeals of New Mexico
Filed 4/12/2019 3:40 PM

Mark Reynolds

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**UNITED STATES,**

     Appellant

**v.**                                Ct. App. No. A-1-CA-37887

**NEW MEXICO ENVIRONMENT
DEPARTMENT, and JAMES KENNEY,
SECRETARY OF THE NEW MEXICO
ENVIRONMENT DEPARTMENT
(in his official capacity),**

     Appellee.

**IN THE MATTER OF UNITED STATES
DEPARTMENT OF THE AIR FORCE,
CANNON AIR FORCE BASE APPLICATION
FOR A RENEWAL OF RESOURCE
CONSERVATION RECOVERY ACT HAZARDOUS
WASTE PERMIT EPA ID # NM7572124454**

### DOCKETING STATEMENT

Pursuant to Rule 12-601(B) NMRA, Appellant United States submits this Docketing Statement consistent with the requirements of Rule 12-208(D) NMRA:

(1) *a statement of the nature of the proceeding;*

The United States seeks judicial review of a corrective action permit ("Permit") issued by the New Mexico Environment Division ("NMED") to the United States Air Force for Cannon Air Force Base in Clovis, New Mexico.

(2) *the date of the judgment or order sought to be reviewed, and a statement showing that the appeal was timely filed;*

The Permit was issued on December 19, 2018. The Notice of Appeal was filed on January 17, 2019, which is within the 30 days allowed for the filing of an appeal under N.M.S.A. § 74-4-14.A.

1

**Supp. App. 0027**

(3) *a concise, accurate statement of the case summarizing all facts material to a consideration of the issues presented*;

The United States maintains that the terms and requirements of the Permit identified in Paragraphs 4 and 5 below are inconsistent with the Hazardous Waste Act ("HWA"), N.M. Stat. Ann. §§ 74-4-1 *et seq.*, and relevant implementing regulations and are outside the scope of the waiver of sovereign immunity provided by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6961(a). The only material facts are contained in the administrative record, which includes the Permit.

(4) *a statement of the issues presented by the appeal, including a statement of how they arose and how they were preserved in the trial court, but without unnecessary detail. The statement of the issues should be short and concise and should not be repetitious. General conclusory statements such as "the judgment of the trial court is not supported by the law or the facts" will not be accepted;*

(a)  The specific definitions of "hazardous waste" and "hazardous constituents" in the Permit exceed the scope authorized under NMSA 74-4-4.A and adopted in the implementing regulations.

(b)  The HWA and implementing regulations do not provide for regulation of "contaminants" or permit terms addressing "contaminants."  Including the term "contaminant" in the Permit is not in accordance with law.

(c)  The definition of "corrective action" in the Permit is inconsistent with the HWA and implementing regulations because it references definitions of hazardous waste and hazardous constituents that are not in accordance with law and because it references "contaminants."

(d)  The administrative record for the Permit does not support the "cleanup levels" in the Permit or any requirements pertaining to the cleanup of substances that are not "hazardous

2

**Supp. App. 0028**

wastes" or "hazardous constituents" as those terms are defined in the HWA and implementing regulations.

(5) *for each issue, a list of authorities believed to support the contentions of the appellant and any contrary authorities known by appellant and, where known, the applicable standard of review. Argument on the law shall not be included, but a short, simple statement of the proposition for which the case or text is cited shall accompany the citation*;

NMSA § 74-4-4.A provides that the rules for managing hazardous waste, including corrective action, must be "equivalent to and no more stringent than federal regulations adopted by the federal environmental protection agency pursuant to the federal Resource Conservation and Recovery Act of 1976." New Mexico's implementing regulations, in relevant part, incorporate by reference portions of EPA's RCRA regulations at NMAC §§ 20.4.1.1 *et seq.* The HWA and NMAC §§ 20.4.1.1 *et seq.* are the primary support for issues 4(a)-(c).

The standard of review for all issues is established by NMSA § 74-4-14.C (1992). Review is limited to the administrative record. The permit shall be set aside if found by the court of appeals to be:

(1) arbitrary, capricious or an abuse of discretion;

(2) not supported by substantial evidence in the record; or

(3) or otherwise not in accordance with law.

This provision is also the primary support for issue 4(d).

Finally, all claims are supported by the limiting language in the waiver of sovereign immunity in RCRA, 42 U.S.C. § 6961(a).

(6) *a statement specifying whether the entire proceedings were audio recorded, and if not, identifying the portion of the proceedings, other than the record proper, not audio recorded*;

There were no recorded proceedings.

3

**Supp. App. 0029**

(7) *a reference to all related or prior appeals of which the party is aware, including an appropriate citation, if any; and*

The United States has filed an action against NMED in federal court seeking review of the Permit pursuant to 28 U.S.C. §§ 1331 (granting jurisdiction over federal questions) and 1345 (granting jurisdiction over actions commenced by the United States). *United States v. New Mexico Environment Dept.*, Case No. 2:19-cv-46- RB-SMV (D.N.M.). NMED has filed a motion to dismiss in that matter.

(8) *where applicable, a copy of the order appointing appellate counsel*.

Not applicable.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/  *Michael Hoses*
Michael Hoses, Bar No. 1207
Assistant United States Attorney
Civil Division, Chief
District of New Mexico
P.O. Box 607
Albuquerque, New Mexico 87103
505-224-1455
Michael.Hoses@usdoj.gov


Eileen T. McDonough
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
eileen.mcdonough@usdoj.gov
202-514-3126

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2019, a copy of the foregoing was served upon all counsel of record by the court's electronic filing system.

<div style="margin-left: 40%;">

/s/  *Michael Hoses 3/22/19*
Michael Hoses, Bar No. 1207
Assistant United States Attorney

</div>

<div style="text-align:center;">4</div>

<div style="text-align:center;">**Supp. App. 0030**</div>

000001



## DEPARTMENT OF THE AIR FORCE
### 27TH SPECIAL OPERATIONS WING (AFSOC)
### CANNON AIR FORCE BASE NEW MEXICO



RECEIVED
1 JUN 2013

1 0 JUN 2013

Colonel Albert M. Elton II
Commander
100 Air Commando Way Suite 100
Cannon AFB NM 88103-5214

Mr. Daniel Comeau
Hazardous Waste Bureau
New Mexico Environment Department
2905 Rodeo Park Drive East Bldg. 1
Santa Fe NM 87505-6063

Dear Mr. Comeau

    The Cannon Air Force Base (AFB) Resource Conservation Recovery Act (RCRA)
Hazardous Waste Permit is subject to renewal per 40 CFR 270 in 2013; Permit
#NM7572124454.  Please see the attachment for the "*RCRA Hazardous Waste Permit Part A&B
Application Cannon AFB*".  If you have any questions regarding this submittal, please contact
Mr. Ronald Lancaster, Chief, Installation Management at (575) 784-1146.

                                   Sincerely

                                   ALBERT M. ELTON II, Colonel, USAF

cc:
Environmental Protection Agency, Region VI, Ms. Wendy Jacques w/o Attachment

**Supp. App. 0031**

000002

Please print or type with ELITE type (12 characters per inch) in the unshaded areas only

Form Approved, OMB No. 2050-0034 Expires XX/XX/02
GSA No. 0248-EPA-OT

| For EPA Regional Use Only | |
|---|---|

**⬣EPA**
United States Environmental Protection Agency
Washington, DC  20460

# Hazardous Waste Permit Application Part A
*(Read the Instructions before starting)*

**Date Received**

| Month | Day | Year |
|---|---|---|

**I. Facility's EPA ID Number (Mark 'X' in the appropriate box)**

| ☐ A. First Part A Submission | ☐ B. Part A Amendment # _____ |
|---|---|

**C. Facility's EPA ID Number**

| N | M | 7 | 5 | 7 | 2 | 1 | 2 | 4 | 4 | 5 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|

**D. Secondary ID Number (If applicable)**

**II. Name of Facility**

| C | A | N | N | O | N | | A | I | R | | F | O | R | C | E | | B | A | S | E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**III. Facility Location (Physical address not P.O. Box or Route Number)**

**A. Street**

| 2 | 7 | S | O | C | E | S | | / | C | E | I | E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Street (Continued)**

| 5 | 0 | 6 | | A | I | R | | C | O | M | M | A | N | D | O | | W | A | Y |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**City or Town** | **State** | **Zip Code**

| C | A | N | N | O | N | | A | F | B | | | | | | N | M | 8 | 8 | 1 | 0 | 3 | – | 5 | 1 | 0 | 8 |

**County Code** (.1 NQRZQ) | **County Name**

| 0 | 3 | 5 | C | U | R | R | Y |

**B. Land Type** (Enter code): F

**C. Geographic Location**

LATITUDE (Degrees, minutes, & seconds): 34 23 46
LONGITUDE (Degrees, minutes & seconds): 103 18 30

**D. Facility Existence Date**

| Month | Day | Year |
|---|---|---|
| 0 1 | 0 1 | 1 9 6 7 |

**IV. Facility Mailing Address**

**Street or P.O. Box**

| S | A | M | E |
|---|---|---|---|

**City or Town** | **State** | **Zip Code**

| | | | | | | | | | | | | | | | | | | | – |

**V. Facility Contact (Person to be contacted regarding waste activities at facility)**

**Name (Last)** | **(First)**

| E | L | T | O | N | | I | I | | | | | A | L | B | E | R | T | | M. |

**Job Title** | **Phone Number (Area Code and Number)**

| 2 | 7 | S | O | W | | C | O | M | M | A | N | D | E | R | 5 7 5 – 7 8 4 – 2 7 2 7 |

**VI. Facility Contact Address (See instructions)**

**A. Contact Address**
Location  Mailing  Other
X

**B. Street or P.O. Box**

| S | A | M | E |
|---|---|---|---|

**City or Town** | **State** | **Zip Code**

| | | | | | | | | | | | | | | | | | | | – |

EPA Form 8700-23 (Rev. XX/XX/99)

- 1 of 7-

**Supp. App. 0032**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 3 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 36

000003

Please print or type with ELITE type (12 characters per inch) in the unshaded areas only

Form Approved, OMB No. 2050-0034 Expires XX/XX/02
GSA No. 0248-EPA-OT

**EPA ID Number (Enter from page 1)**
N M 7 5 7 2 1 2 4 4 5 4

**Secondary ID Number (Enter from page 1)**

## VII. Operator Information (See instructions)

**Name of Operator**
2 7 T H   S P E C I A L   O P E R A T I O N S   W I N G

**Street or P.O. Box**
1 0 0   S   A I R   C O M M A N D O   W A Y   S T E   1 0 0

**City or Town**
C A N N O N   A F B

**State** N M   **ZIP Code** 8 8 1 0 3 — 5 2 1 4

**Phone Number (Area Code and Number)**
5 7 5 — 7 8 4 — 2 7 2 7

| B. Operator Type | C. Change of Operator | | | |
|---|---|---|---|---|
| | Indicator | Month | Day | Year |
| F | Yes   No X | | | |

## VIII. Facility Owner (See instructions)

**A. Name of Facility's Legal Owner**
2 7   S O W / C C

**Street or P.O. Box**
1 0 0   S   A I R   C O M M A N D O   W A Y

**City or Town**
C A N N O N   A F B

**State** N M   **ZIP Code** 8 8 1 0 3 — 5 2 1 4

**Phone Number (Area Code and Number)**
5 7 5 — 7 8 4 — 2 7 2 7

| B. Owner Type | C. Change of Owner | | | |
|---|---|---|---|---|
| | Indicator | Month | Day | Year |
| F | Yes   No X | | | |

## IX. NAICS Codes (in order of significance; start in left box)

**First** 9 7 1 1
(Description) NATIONAL DEFENSE

**Third**
(Description)

**Second** 4 5 2 2
(Description) AIR TRANSPORTATION, NON SCHEDULED

**Fourth**
(Description)

## X. Other Environmental Permits (See instructions)

| A. Permit Type (Enter code) | B. Permit Number | C. Description |
|---|---|---|
| N | D P - 8 7 3 | GROUND WATER DISCHARGE PERMIT |
| E | 1 5 1 7 - M 4 R 1 | AIR QUALITY PERMIT |
| N | N M 0 0 3 0 2 3 6 | WASTEWATER NPDES PERMIT |
| | | |
| | | |
| | | |

EPA Form 8700-23 (Rev. XX/XX/99)

- 2 of 7-

**Supp. App. 0033**

Please print or type with ELITE type (12 characters per inch) in the unshaded areas only

Form Approved, OMB No. 2050-0034 Expires XX/XX/02
GSA No. 0248-EPA-OT

**EPA ID Number (Enter from page 1)**

| N | M | 7 | 5 | 7 | 2 | 1 | 2 | 4 | 4 | 5 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|

**Secondary ID Number (Enter from page 1)**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

### XI. Nature of Business (Provide a brief description)

Plan and execute specialized and contingency operations using advanced aircraft, tactics, and air refueling techniques to infiltrate, exfiltrate, and resupply special operations forces and provide intelligence, surveillance and reconnaissance, and close air support in support of SOF operations.

### XII. Process Codes and Design Capacities

A. **PROCESS CODE** - Enter the code from the list of process codes below that best describes each process to be used at the facility. Thirteen lines are provided for entering codes. If more lines are needed, attach a separate sheet of paper with the additional information. For "other" processes (i.e., D99, S99, T04 and X99), describe the process (including its design capacity) in the space provided in item XIII.

B. **PROCESS DESIGN CAPACITY** - For each code entered in column A, enter the capacity of the process.
1. **AMOUNT** - Enter the amount. In a case where design capacity is not applicable (such as in a closure/post-closure or enforcement action) enter the total amount of waste for that process.
2. **UNIT OF MEASURE** - For each amount entered in column B(1), enter the code from the list of unit measure codes below that describes the unit of measure used. Only the units of measure that are listed below should be used.

C. **PROCESS TOTAL NUMBER OF UNITS** - Enter the total number of units used with the corresponding process code.

| PROCESS CODE | PROCESS | APPROPRIATE UNITS OF MEASURE FOR PROCESS DESIGN CAPACITY |
|---|---|---|
| | **Disposal:** | |
| D79 | Underground Injection Well Disposal | Gallons; Liters; Gallons Per Day; or Liters Per Day |
| D80 | Landfill | Acre-feet; Hectare-meter; Acres; Cubic Meters; Hectares; Cubic Yards |
| D81 | Land Application | Acres or Hectares |
| D82 | Ocean Disposal | Gallons Per Day or Liters Per Day |
| D83 | Surface Impoundment Disposal | Gallons; Liters; Cubic Meters; or Cubic Yards |
| D99 | Other Storage | Any Unit of Measure Listed Below |
| | **Storage:** | |
| S01 | Container | Gallons; Liters; Cubic Meters; or Cubic Yards |
| S02 | Tank Storage | Gallons; Liters; Cubic Meters; or Cubic Yards |
| S03 | Waste Pile | Cubic Yards or Cubic Meters |
| S04 | Surface Impoundment Storage | Gallons; Liters; Cubic Meters; or Cubic Yards |
| S05 | Drip Pad | Gallons; Liters; Acres; Cubic Meters; Hectares; or Cubic Yards |
| S06 | Containment Building Storage | Cubic Yards or Cubic Meters |
| S99 | Other Disposal | Any Unit of Measure Listed Below |
| | **Treatment:** | |
| T01 | Tank Treatment | Gallons Per Day; Liters Per Day; Short Tons Per Hour; Gallons Per Hour; Liters Per Hour; Pounds Per Hour; Short Tons Per Day; Kilograms Per Hour; Metric Tons Per Day; or Metric Tons Per Hour |
| T02 | Surface Impoundment Treatment | Gallons Per Day; Liters Per Day; Short Tons Per Hour; Gallons Per Hour; Liters Per Hour; Pounds Per Hour; Short Tons Per Day; Kilograms Per Hour; Metric Tons Per Day; or Metric Tons Per Hour |
| T03 | Incinerator | Short Tons Per Hour; Metric Tons Per Hour; Gallons Per Hour; Liters Per Hour; Btu Per Hour; Pounds Per Hour; Short Tons Per Day; Kilograms Per Hour; Gallons Per Day; Liters Per Day; Metric Tons Per Hour; or Million Btu Per Hour |
| T04 | Other Treatment | Gallons Per Day; Liters Per Day; Pounds Per Hour; Short Tons Per Hour; Kilograms Per Hour; Metric Tons Per Day; Metric Tons Per Hour; Short Tons Per Day; Btu Per Hour; Gallons Per Day; Liters Per Hour; or Million Btu Per Hour |
| T80 | Boiler | Gallons; Liters; Gallons Per Hour; Liters Per Hour; Btu Per Hour; or Million Btu Per Hour |

| PROCESS CODE | PROCESS | APPROPRIATE UNITS OF MEASURE FOR PROCESS DESIGN CAPACITY |
|---|---|---|
| T81 | Cement Kiln | Gallons Per Day; Liters Per Day; Pounds Per Hour; Short Tons Per Hour; Kilograms Per Hour; Metric Tons Per Day; Metric Tons Per Hour; Short Tons Per Day; Btu Per Hour; Liters Per Hour; Kilograms Per Hour; or Million Btu Per Hour |
| T82 | Lime Kiln | |
| T83 | Aggregate Kiln | |
| T84 | Phosphate Kiln | |
| T85 | Coke Oven | |
| T86 | Blast Furnace | |
| T87 | Smelting, Melting, Or Refining Furnace | Gallons Per Day; Liters Per Day; Pounds Per Hour; Short Tons Per Hour; Kilograms Per Hour; Metric Tons Per Day; Metric Tons Per Hour; Short Tons Per Day; Btu Per Hour; Gallons Per Hour; Liters Per Hour; or Million Btu Per Hour |
| T88 | Titanium Dioxide Chloride Oxidation Reactor | |
| T89 | Methane Reforming Furnace | |
| T90 | Pulping Liquor Recovery Furnace | |
| T91 | Combustion Device Used In The Recovery Of Sulfur Values From Spent Sulfuric Acid | |
| T92 | Halogen Acid Furnaces | |
| T93 | Other Industrial Furnaces Listed in 40 CFR §260.10 | |
| T94 | Containment Building - Treatment | Cubic Yards; Cubic Meters; Short Tons Per Hour; Gallons Per Hour; Liters Per Hour; Btu Per Hour; Pounds Per Hour; Short Tons Per Day; Kilograms Per Hour; Metric Tons Per Day; Gallons Per Day; Liters Per Day; Metric Tons Per Hour; or Million Btu Per Hour |
| | **Miscellaneous (Subpart X):** | |
| X01 | Open Burning/Open Detonation | Any Unit of Measure Listed Below |
| X02 | Mechanical Processing | Short Tons Per Hour; Metric Tons Per Hour; Short Tons Per Day; Metric Tons Per Day; Pounds Per Hour; Kilograms Per Hour; Gallons Per Hour; Liters Per Hour; or Gallons Per Day |
| X03 | Thermal Unit | Gallons Per Day; Liters Per Day; Pounds Per Hour; Short Tons Per Hour; Kilograms Per Hour; Metric Tons Per Day; Metric Tons Per Hour; Short Tons Per Day; Btu Per Hour; or Million Btu Per Hour |
| X04 | Geologic Repository | Cubic Yards; Cubic Meters; Acre-feet; Hectare-meter; Gallons; or Liters |
| X99 | Other Subpart X | Any Unit of Measure Listed Below |

| UNIT OF MEASURE | UNIT OF MEASURE CODE |
|---|---|
| Gallons | G |
| Gallons Per Hour | E |
| Gallons Per Day | U |
| Liters | L |
| Liters Per Hour | H |
| Liters Per Day | V |

| UNIT OF MEASURE | UNIT OF MEASURE CODE |
|---|---|
| Short Tons Per Hour | D |
| Metric Tons Per Hour | W |
| Short Tons Per Day | N |
| Metric Tons Per Day | S |
| Pounds Per Hour | J |
| Kilograms Per Hour | R |
| Million Btu Per Hour | X |

| UNIT OF MEASURE | UNIT OF MEASURE CODE |
|---|---|
| Cubic Yards | Y |
| Cubic Meters | C |
| Acres | B |
| Acre-feet | A |
| Hectares | Q |
| Hectare-meter | F |
| Btu Per Hour | I |

**Supp. App. 0034**

000005

Please print or type with ELITE type (12 characters per inch) in the unshaded areas only

Form Approved, OMB No. 2050-0034 Expires XX/XX/02
GSA No. 0248-EPA-OT

**EPA ID Number (Enter from page 1)**

| N | M | 7 | 5 | 7 | 2 | 1 | 2 | 4 | 4 | 5 | 4 |

**Secondary ID Number (Enter from page 1)**

### XII. Process Codes and Design Capabilities (Continued)

EXAMPLE FOR COMPLETING ITEM XII (shown in line number X-1 below): A facility has a storage tank, that can hold 533.788 gallons.

| Line Number | A. Process Code (From list above) | B. PROCESS DESIGN CAPACITY — 1. Amount (Specify) | 2. Unit Of Measure (Enter code) | C. Process Total Number Of Units | For Official Use Only |
|---|---|---|---|---|---|
| X 1 | S 0 2 | 5 3 3 . 7 8 8 | G | 0 0 1 | |
| 1 | | . | | | |
| 2 | | . | | | |
| 3 | | . | | | |
| 4 | | . | | | |
| 5 | | . | | | |
| 6 | | . | | | |
| 7 | | . | | | |
| 8 | | . | | | |
| 9 | | . | | | |
| 1 0 | | . | | | |
| 1 1 | | . | | | |
| 1 2 | | . | | | |
| 1 3 | | . | | | |

NOTE: If you need to list more than 13 process codes, attach an additional sheet(s) with the information in the same format as above. Number the lines sequentially; taking into account any lines that will be used for "other" processes (i.e., D99, S99, T04 and X99) in item XIII.

### XIII. Other Processes (Follow instructions from item XII for D99, S99, T04 and X99 process codes)

| Line Number (Enter #s in seg w/XII) | A. Process Code (From list above) | B. PROCESS DESIGN CAPACITY — 1. Amount (Specify) | 2. Unit Of Measure (Enter code) | C. Process Total Number Of Units | D. Description Of Process |
|---|---|---|---|---|---|
| 1 | | N/A | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |

EPA Form 8700-23 (Rev. XX/XX/99)

- 4 of 7–

**Supp. App. 0035**

Please print or type with ELITE type (12 characters per inch) in the unshaded areas only

Form Approved, OMB No. 2050-0034 Expires XX/XX/02
GSA No. 0248-EPA-OT

| EPA ID Number (Enter from page 1) | Secondary ID Number (Enter from page 1) |
|---|---|
| N M 7 5 7 2 1 2 4 4 5 4 | |

## XIV. Description of Hazardous Wastes

**A. EPA HAZARDOUS WASTE NUMBER** - Enter the four-digit number from 40 CFR, Part 261 Subpart D of each listed hazardous waste you will handle. For hazardous wastes that are not listed in 40 CFR, Part 261 Subpart D, enter the four-digit number(s) from 40 CFR, Part 261 Subpart C that describes the characteristics and/or the toxic contaminants of those hazardous wastes.

**B. ESTIMATED ANNUAL QUANTITY** - For each listed waste entered in column A estimate the quantity of that waste that will be handled on an annual basis. For each characteristic or toxic contaminant entered in column A estimate the total annual quantity of all the non-listed waste(s) that will be handled that possess that characteristic or contaminant.

**C UNIT OF MEASURE** - For each quantity entered in column B enter the unit of measure code. Units of measure that must be used and the appropriate codes are:

| ENGLISH UNIT OF MEASURE | CODE | METRIC UNIT OF MEASURE | CODE |
|---|---|---|---|
| POUNDS | P | KILOGRAMS | K |
| TONS | T | METRIC TONS | M |

If facility records use any other unit of measure for quantity, the units of measure must be converted into one of the required units of measure taking into account the appropriate density or specific gravity of the waste.

**D. PROCESSES**

**1. PROCESS CODES:**

For listed hazardous waste: For each listed hazardous waste entered in column A select the code(s) from the list of process codes contained in item XII A. on page 3 to indicate how the waste will be stored, treated, and/or disposed of at the facility.

For non-listed hazardous waste: For each characteristic or toxic contaminant entered in column A, select the code(s) from the list of process codes contained in item XII A. on page 3 to indicate all the processes that will be used to store, treat, and/ or dispose of all the non-listed hazardous wastes that possess that characteristic or toxic contaminant.

NOTE: THREE SPACES ARE PROVIDED FOR ENTERING PROCESS CODES. IF MORE ARE NEEDED:

1. Enter the first two as described above.
2. Enter "000" in the extreme right box of item XIV-D(1).
3. Use additional sheet, enter line number from previous sheet, and enter additional code(s) in item XIV-E.

**2. PROCESS DESCRIPTION:** If a code is not listed for a process that will be used, describe the process in the space provided on the form (D.(2)).

NOTE: HAZARDOUS WASTES DESCRIBED BY MORE THAN ONE EPA HAZARDOUS WASTE NUMBER - Hazardous wastes that can be described by more than one EPA Hazardous Waste Number shall be described on the form as follows:

1. Select one of the EPA Hazardous Waste Numbers and enter it in column A. On the same line complete columns B, C and D by estimating the total annual quantity of the waste and describing all the processes to be used to treat, store, and/or dispose of the waste.

2. In column A of the next line enter the other EPA Hazardous Waste Number that can be used to describe the waste. In column D(2) on that line enter "included with above" and make no other entries on that line.

3. Repeat step 2 for each EPA Hazardous Waste Number that can be used to describe the hazardous waste.

EXAMPLE FOR COMPLETING ITEM XIV (shown in line numbers X-1, X-2, X-3, and X-4 below) - A facility will treat and dispose of an estimated 900 pounds per year of chrome shavings from leather tanning and finishing operation. In addition, the facility will treat and dispose of three non-listed wastes. Two wastes are corrosive only and there will be an estimated 200 pounds per year of each waste. The other waste is corrosive and ignitable and there will be an estimated 100 pounds per year of that waste. Treatment will be in an incinerator and disposal will be in a landfill.

| Line Number | | A. EPA HAZARD WASTE NO. (Enter code) | | | | B. ESTIMATED ANNUAL QUANTITY OF WASTE | C. UNIT OF MEASURE (Enter code) | D. PROCESS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (1) PROCESS CODES (Enter) | | | | | | | | (2) PROCESS DESCRIPTION (If a code is not entered in D(1)) | |
| X | 1 | K | 0 | 5 | 4 | 900 | p | T | 0 | 3 | D | 8 | 0 | | | | |
| X | 2 | D | 0 | 0 | 2 | 400 | P | T | 0 | 3 | D | 8 | 0 | | | | |
| X | 3 | D | 0 | 0 | 1 | 100 | P | T | 0 | 3 | D | 8 | 0 | | | | |
| X | 4 | D | 0 | 0 | 2 | | | | | | | | | | | Included With Above | |

EPA Form 8700-23 (Rev. XX/XX/99)

- 5 of 7–

**Supp. App. 0036**

000007

Please print or type with ELITE type (12 characters per inch) in the unshaded areas only

Form Approved, OMB No. 2050-0034 Expires XXJXXJ02
GSA No. 0248-EPA-OT

| EPA ID Number *(Enter from page 1)* | Secondary ID Number *(Enter from page 1)* |
|---|---|
| NM7572124454 | |

XIV. Description of Hazardous Wastes *(Continued; use additional sheets as necessary)*

● ● ● ● ● ● ● ● ● ● ● ● ●

| Line Number | A. EPA Hazardous Waste No. *(Enter code)* | B. Estimated Annual Quantity of Waste | C. Unit of Measure *(Enter code)* | D. PROCESSES (1) PROCESS CODES *(Enter code)* | D. PROCESSES (2) PROCESS DESCRIPTION *(If a code is not entered in D(1))* |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |

EPA Form 8700-23 (Rev. XX/XX/99)

- 6 of 7-

**Supp. App. 0037**

Case 2:19-cv-00046-KG-SMV  Document 49-3  Filed 02/01/21  Page 8 of 316
Appellate Case: 22-2132  Document: 35  Date Filed: 11/27/2024  Page: 41

000008

Please print or type with ELITE type (12 characters per inch) in the unshaded areas only

Form Approved, OMB No. 2050-0034 Expires XX/XX/02
GSA No. 0248-EPA-OT

**EPA ID Number (Enter from page 1)**

N M 7 5 7 2 1 2 4 4 5 4

**Secondary ID Number (Enter from page 1)**

## XV. Map

Attach to this application a topographic map, or other equivalent map, of the area extending to at least one mile beyond property boundaries. The map must show the outline of the facility, the location of each of its existing and proposed intake and discharge structures, each of its hazardous waste treatment, storage, or disposal facilities, and each well where it injects fluids underground. Include all springs, rivers and other surface water bodies in this map area. See instructions for precise requirements.

## XVI. Facility Drawing

All existing facilities must include a scale drawing of the facility (See instructions for more detail).

## XVII. Photographs

All existing facilities must include photographs (aerial or ground-level) that clearly delineate all existing structures; existing storage, treatment and disposal areas; and sites of future storage, treatment or disposal areas (see instructions for more detail).

## XVIII. Certification(s)

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

| Owner Signature | Date Signed |
|---|---|
| | 10 Jun 13 |

Name and Official Title (Type or print)
Albert M. Elton II, Colonel, 27th Special Operations Wing Commander

| Owner Signature | Date Signed |
|---|---|

Name and Official Title (Type or print)

| Operator Signature | Date Signed |
|---|---|

Name and Official Title (Type or print)

| Operator Signature | Date Signed |
|---|---|

Name and Official Title (Type or print)

## XIX. Comments

**Note:  Mail completed form to the appropriate EPA Regional or State Office. (Refer to instructions for more information)**

EPA Form 8700-23 (Rev. XX/XX/99)

- 7 of 7–

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 34 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 42

000034

**DEPARTMENT OF THE AIR FORCE**
**27TH SPECIAL OPERATIONS CIVIL ENGINEER SQUADRON (AFSOC)**
**CANNON AIR FORCE BASE NEW MEXICO**

ENTERED

NMED
Hazardous Waste Bureau

RECEIVED

JUL 2 7 2017

26 Jul 17

Steven Leonard Palmer
Restoration Program Manager
AFCEC/CZO
402 S. Chindit Blvd.
Cannon AFB NM 88103-5003

Mr. Gabriel Acevedo
Environmental Scientist & Specialist-Operational
New Mexico Environment Department
Hazardous Waste Bureau
2905 Rodeo Park Drive East, Bldg. 1
Santa Fe NM 87501

Dear Mr. Acevedo:

Cannon Air Force Base is pleased to provide the "*Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas Environmental Programs Worldwide Installation-Specific Work Plan*" for Cannon AFB. This document is provided to NMED as a courtesy to keep you informed of the environmental restoration activities on Cannon AFB in relation to the emerging contaminants contained in AFFF.

Cannon AFB appreciates the valued working relationship established with you and your department. If you have further comments or questions pertaining to the referenced work plan, please contact Steven Palmer, steven.palmer@us.af.mil (575) 904-6744 or Sheen T. Kottkamp, sheen.kottkamp.ctr@us.af.mil (575) 904-6743.

Sincerely,

Steven Leonard Palmer

Attachment:
Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas Environmental Programs Worldwide Installation-Specific Work Plan

**AIR COMMANDOS**

**Supp. App. 0039**

000035

# *FINAL*

# *INSTALLATION-SPECIFIC WORK PLAN*

# *CANNON AIR FORCE BASE, NM*

## Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas Environmental Programs Worldwide



### Contract FA8903-16-D-0027
### Task Order 0004

*Prepared for:*

**Air Force Civil Engineer Center**
**JBSA Lackland, Texas**

**July 2017**

*Submitted by:*



**Supp. App. 0040**

000036

**FINAL**

**SITE INSPECTION OF AQUEOUS FILM FORMING FOAM (AFFF) RELEASE AREAS**
**ENVIRONMENTAL PROGRAMS WORLDWIDE**
**INSTALLATION-SPECIFIC WORK PLAN**

**CANNON AIR FORCE BASE**
**CLOVIS, NEW MEXICO**

**Prepared for:**
**Air Force Civil Engineer Center**
**Joint Base San Antonio – Lackland, Texas**

 

**Prepared by:**



**Amec Foster Wheeler Environment & Infrastructure, Inc.**

**Contract FA8903-16-D-0027**
**Task Order 0004**

**July 2017**

**Supp. App. 0041**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 37 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 45

000037

This page intentionally left blank.

Supp. App. 0042

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page i

**TABLE OF CONTENTS**

ACRONYMS ............................................................................................................................. iv

1.0    PROJECT OVERVIEW ................................................................................................... 1

    1.1    PER- AND POLYFLUORINATED ALKYL SUBSTANCES OVERVIEW ........................................ 1

    1.2    INSTALLATION MISSION AND HISTORY ................................................................ 2

    1.3    PRELIMINARY ASSESSMENT ............................................................................ 3

    1.4    SITE INSPECTION OBJECTIVES AND SCOPE ...................................................... 6

2.0    REFERENCES ............................................................................................................. 13

QAPP WORKSHEET #9: PROJECT PLANNING SESSION SUMMARY ......................................... 15

QAPP WORKSHEET #10: CONCEPTUAL SITE MODEL .......................................................... 21

QAPP WORKSHEET #11: PROJECT/DATA QUALITY OBJECTIVES ......................................... 23

QAPP WORKSHEET #13: SECONDARY DATA USES AND LIMITATIONS ................................. 27

QAPP WORKSHEET #14/16: PROJECT TASKS AND SCHEDULE ........................................... 29

    INSTALLATION SCOPING VISIT ............................................................................... 29

    PRE-MOBILIZATION ACTIVITIES ............................................................................. 29

        Health and Safety Plan Preparation .......................................................... 29

        Base Access .............................................................................................. 29

        Utility Clearance ...................................................................................... 29

        Area-Specific Regulations/Permits ........................................................... 30

        Field Readiness Review ............................................................................ 30

    MOBILIZATION/DEMOBILIZATION ......................................................................... 30

    ENVIRONMENTAL SAMPLING ................................................................................. 30

        Soil Boring Advancement/Abandonment and Soil Sampling ..................... 31

        Monitoring Well Development and Sampling ............................................ 31

        Sediment Sample Collection .................................................................... 32

        Surface Water Sample Collection ............................................................. 32

    PFAS SAMPLING CONSIDERATIONS ...................................................................... 32

    SURVEYING ........................................................................................................ 33

    INVESTIGATION-DERIVED WASTE MANAGEMENT ................................................... 33

        Soil IDW ................................................................................................... 33

        Liquid IDW ............................................................................................... 34

    PROPOSED SITE INSPECTION SCHEDULE ............................................................... 34

QAPP WORKSHEET 17: SAMPLING DESIGN AND RATIONALE .............................................. 37

    PROPOSED SCOPE OF WORK ................................................................................ 37

        AFFF Release Area 1: Former FTA No. 2 .................................................. 37

        AFFF Release Area 2: Former FTA No. 3 .................................................. 37

        AFFF Release Area 3:  Former FTA No. 4 .................................................. 37

        AFFF Release Area 4:  Hangars 119 and 133 ............................................ 38

        AFFF Release Area 5: Former Sewage Lagoons ....................................... 38

        AFFF Release Area 6: North Playa Lake Outfall ........................................ 38

        AFFF Release Area 7: South Playa Lake Outfall ........................................ 38

        AFFF Release Area 8: Whispering Winds Golf Course ............................... 39

**Supp. App. 0043**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 39 of 316

Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 47

000039

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **ii**

AFFF Release Area 9: Hangar 109 ................................................................................ 39
AFFF Release Area 10: Landfill #4 ............................................................................... 39
AFFF Release Area 11: Active FTA ............................................................................... 39
AFFF Release Area 12: Perimeter Road Fuel Spill ....................................................... 39
AFFF Release Area 13: Flightline Aircraft Crashes ...................................................... 40
Basewide Groundwater Sampling ............................................................................... 40

**QAPP WORKSHEET #18-1: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 1: FORMER FTA NO. 2 ..................................................................................................... 43**

**QAPP WORKSHEET #18-2: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 2: FORMER FTA NO. 3 ..................................................................................................... 44**

**QAPP WORKSHEET #18-3: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 3: FORMER FTA NO. 4 ..................................................................................................... 45**

**QAPP WORKSHEET #18-4: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 4: HANGARS 119 AND 133 ................................................................................................. 46**

**QAPP WORKSHEET #18-5: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 5: FORMER SEWAGE LAGOONS ............................................................................................ 47**

**QAPP WORKSHEET #18-6: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 6: NORTH PLAYA LAKE OUTFALL .............................................................................................. 48**

**QAPP WORKSHEET #18-7: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 7: SOUTH PLAYA LAKE OUTFALL .............................................................................................. 49**

**QAPP WORKSHEET #18-8: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 8: WHISPERING WINDS GOLF COURSE ............................................................................... 50**

**QAPP WORKSHEET #18-9: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 9: HANGAR 109 ............................................................................................................. 51**

**QAPP WORKSHEET #18-10: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 10: LANDFILL #4 ........................................................................................................... 52**

**QAPP WORKSHEET #18-11: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 11: ACTIVE FTA ........................................................................................................... 53**

**QAPP WORKSHEET #18-12: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 12: PERIMETER ROAD FUEL SPILL ............................................................................... 54**

**QAPP WORKSHEET #18-13: SAMPLING LOCATIONS AND METHODS  AFFF RELEASE AREA 13: FLIGHTLINE AIRCRAFT CRASHES .......................................................................... 55**

**QAPP WORKSHEET #18-14: SAMPLING LOCATIONS AND METHODS  BASEWIDE GROUNDWATER SAMPLING ............................................................................................................... 56**

**QAPP WORKSHEET #20: FIELD QC SUMMARY ........................................................................ 59**

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **iii**

## FIGURES

Figure 1      Site Location Map

Figure 2      Proposed AFFF Release Areas for Site Inspection

Figure 3a     Proposed AFFF Release Areas for Site Inspection - June 2014 Groundwater Elevation Contour Map

Figure 3b     Proposed AFFF Release Areas for Site Inspection - September 2014 Groundwater Elevation Contour Map

Figure 4      Proposed Sampling Locations: Former FTA No. 2 - AFFF Release Area 1

Figure 5      Proposed Sampling Locations: Former FTA No. 3 - AFFF Release Area 2

Figure 6      Proposed Sampling Locations: Former FTA No. 4 - AFFF Release Area 3

Figure 7      Proposed Sampling Locations: Hangars 119 and 133 - AFFF Release Area 4

Figure 8      Proposed Sampling Locations: Former Sewage Lagoons - AFFF Release Area 5

Figure 9      Proposed Sampling Locations: North Playa Lake Outfall - AFFF Release Area 6

Figure 10     Proposed Sampling Locations: South Playa Lake Outfall - AFFF Release Area 7

Figure 11     Proposed Sampling Locations: Whispering Winds Golf Course Outfall - AFFF Release Area 8

Figure 12     Proposed Sampling Locations: Hangar 109 - AFFF Release Area 9

Figure 13     Proposed Groundwater Sample Location: Landfill #4 - AFFF Release Area 10

Figure 14     Proposed Sampling Locations: Active FTA - AFFF Release Area 11

Figure 15     Proposed Sampling Locations: Perimeter Road Fuel Spill - AFFF Release Area 12

Figure 16     Proposed Sampling Locations: Former Crash Sites - AFFF Release Area 13

Figure 17     Proposed Groundwater Sampling Locations: Basewide

## TABLES

Table 1. Regulatory Screening Values. ..................................................................................... 8

Table 2. List of UFP-QAPP Worksheets. ................................................................................... 9

Table 3. Proposed Samples per Media at Each AFFF Release Area. ....................................... 41

## APPENDICES

Appendix A   Installation-Specific Health and Safety Plan

**Supp. App. 0045**

## ACRONYMS

| | |
|---|---|
| AFB | Air Force Base |
| AFCEC | Air Force Civil Engineer Center |
| AFFF | aqueous film forming foam |
| AFSOC | Air Force Special Operations Command |
| Amec Foster Wheeler | Amec Foster Wheeler Environment & Infrastructure, Inc. |
| ASTM | ASTM International |
| | |
| bgs | below ground surface |
| BRAC | Base Realignment and Closure |
| | |
| CE | Civil Engineering |
| CFR | Code of Federal Regulations |
| CSM | conceptual site model |
| CY | cubic yard |
| | |
| DO | dissolved oxygen |
| DoD | Department of Defense |
| DOT | Department of Transportation |
| DQO | data quality objective |
| DRO | diesel range organics |
| | |
| EOD | Explosive Ordnance Disposal |
| | |
| FAA | Federal Aviation Administration |
| FTA | fire training area |
| FTS | fluorotelomer sulfonate |
| | |
| GPS | Global Positioning System |
| GRO | gasoline range organics |
| | |
| HA | Health Advisory |
| HDPE | high-density polyethylene |
| HGL | HydroGeologic, Inc. |
| HSP | Health and Safety Plan |
| | |
| IDW | investigation-derived waste |
| ISWP | Installation-Specific Work Plan |
| | |
| JP | jet propellant |
| | |
| LC-MS/MS | liquid chromatography-tandem mass spectrometry |
| | |
| µg/kg | milligrams per kilogram |
| µg/L | micrograms per liter |

**Supp. App. 0046**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 42 of 316
000042
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 50
Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **v**

| MW | Monitoring Well |
|---|---|
| NEtFOSAA | n-ethyl perfluorooctanesulfonamidoacetic acid |
| NMED | New Mexico Environmental Department |
| NMeFOSAA | n-methyl perfluorooctanesulfonamidoacetic acid |
| OWS | oil/water separator |
| ORP | oxidation-reduction potential |
| PA | Preliminary Assessment |
| PCB | polychlorinated biphenyl |
| PFAS | per-and polyfluorinated alkyl substances |
| PFBA | perfluorobutyric acid |
| PFBS | perfluorobutanesulfonic acid |
| PFDA | perfluorodecanoic acid |
| PFDoA | perfluorododecanoic acid |
| PFHpA | perfluoroheptanoic acid |
| PFHxA | perfluorohexanoic acid |
| PFHxS | perfluorohexane sulfonic acid |
| PFNA | perfluorononanoic acid |
| PFOA | perfluorooctanoic acid |
| PFOS | perfluorooctanesulfonic acid |
| PFTA | perfluorotetradecanoic acid |
| PFTrDA | perfluorotridecanoic acid |
| PFUnA | perfluoroundecanoic acid |
| pH | potential of hydrogen |
| PPE | personal protective equipment |
| QA | quality assurance |
| QAPP | Quality Assurance Project Plan |
| QC | quality control |
| QPP | Quality Program Plan |
| RPM | Remedial Program Manager |
| RSL | Regional Screening Levels |
| SI | Site Inspection |
| SIR | Site Inspection Report |
| SOP | Standard Operating Procedure |
| SOW | Special Operations Wing |
| SVOC | semi-volatile organic compound |
| SWMU | Solid Waste Management Unit |
| TAC | Tactical Air Command |
| TFW | Tactical Fighter Wing |
| THQ | Total Hazard Quotient |

**Supp. App. 0047**

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **vi**

| | |
|---|---|
| TO | Task Order |
| TOC | total organic carbon |
| TPH | total petroleum hydrocarbons |
| | |
| UFP | Uniform Federal Policy |
| USAF | United States Air Force |
| USCS | Unified Soil Classification System |
| USEPA | United States Environmental Protection Agency |
| USFS | United States Fish and Wildlife |
| | |
| VOC | volatile organic compound |
| | |
| WWTP | waste water treatment plant |

**Supp. App. 0048**

## 1.0 PROJECT OVERVIEW

This Installation-Specific Work Plan (ISWP) was prepared under Contract No. FA8903-16-D-0027, Task Order (TO) 0004 between Amec Foster Wheeler Programs, Inc. and the Air Force Civil Engineer Center (AFCEC), and is provided as an addendum to the General Quality Program Plan (QPP) (Amec Foster Wheeler Environment and Infrastructure, Inc. [Amec Foster Wheeler], 2017).  This ISWP describes Site Inspection (SI) activities to be conducted at aqueous film forming foam (AFFF) areas located at Cannon Air Force Base (AFB) to determine, through environmental media sampling, if a release of per- and polyfluorinated alkyl substances (PFAS) may have occurred.  The AFFF areas proposed for inspection under this ISWP were identified during Preliminary Assessment (PA) research activities as locations where AFFF was released to the environment (HydroGeoLogic, Inc. [HGL], 2015), and during a scoping visit conducted by Amec Foster Wheeler in October 2016.

This ISWP and the QPP have been prepared to: (1) clearly identify the SI objectives and data quality objectives (DQOs) for this project; (2) ensure that field investigations and survey protocols are documented and reviewed in a consistent manner; and (3) describe the means and methods necessary to achieve the SI objectives and DQOs and to provide data that is scientifically valid and legally defensible. Specific Uniform Federal Policy (UFP) Quality Assurance Project Plan (QAPP) worksheets are provided in the following sections to accompany the General QPP.  The Installation-Specific Health and Safety Plan (HSP) is provided in **Appendix A** of this ISWP.

### 1.1 PER- AND POLYFLUORINATED ALKYL SUBSTANCES OVERVIEW

PFAS are a class of synthetic organofluorine compounds that possess a chemical structure that gives them unique properties, including thermal stability and the ability to repel both water and oil.  These chemical properties make them useful components in a wide variety of consumer and industrial products, including non-stick cookware, food packaging, waterproof clothing, fabric stain protectors, lubricants, paints, and firefighting foams such as AFFF.  AFFF concentrate contains fluorocarbon surfactants to meet required performance standards for fire extinguishing agents (Department of Defense [DoD] Military Specification MIL-F-24385F [SH], Amendment 1, 5 August 1984).  The United States Air Force (USAF) began purchasing and using AFFF containing PFAS (perfluorooctanesulfonic acid [PFOS] and/or perfluorooctanoic acid [PFOA]) for extinguishing petroleum fires and firefighting training activities in 1970, as confirmed by the following federal government documents:

- Military Specification for AFFF (MIL-F-24385), formally issued in 1969;
- General Accounting Office determination on sole source award protest to provide AFFF to the Navy in December 1969; and,
- *A History of USAF Fire Protection Training at Chanute Air Force Base*, 1964-1976 (Coates, 1977).

AFFF was primarily used on USAF installations at fire training areas (FTAs), but may have also been used, stored or released from hangar fire suppression systems, at firefighting equipment testing and maintenance areas, and during emergency response actions for fuel spills and aircraft mishaps.  The USAF

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 45 of 316
000045
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 53
Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **2**

is actively replacing their current inventory of AFFF with more formulations based on shorter carbon chains, which may be less persistent and bioaccumulative in the environment. However, the potential exists for an incident or future contributing source of PFAS until the USAF completely replaces their inventory of AFFF.

The United States Environmental Protection Agency (USEPA) Office of Water issued lifetime drinking water Health Advisory (HA) values for PFOS and PFOA in May 2016 to protect humans from potential risk of exposure to these chemicals through drinking water; the 2016 HA values replace 2009 Provisional HA values.  The HA values for PFOS and PFOA are 0.07 micrograms per liter (μg/L) for each constituent; however, when these two chemicals co-occur in a drinking water source, a conservative and health-protective approach is recommended that compares the sum of the concentrations (PFOS + PFOA) to the HA value (0.07 μg/L).  The HA values identify the concentration of a contaminant in drinking water at which adverse health effects are not anticipated to occur over specific exposure durations (e.g., 1 day, 10 days, a lifetime).  They serve as informal technical guidance to assist federal, state, and local officials, and managers of public or community water systems in protecting public health when emergency spills or other contamination situations occur.  The HA documents provide information on the environmental properties, health effects, analytical methodology, and treatment technologies for removing drinking water contaminants.  HA values are not to be construed as legally enforceable federal standards and are subject to change as new information becomes available (USEPA, 2016a and USEPA, 2016b).

Currently, the USEPA has not published Regional Screening Levels (RSLs) for PFOS or PFOA for soil or sediment; however, for this project, a screening level of 1,260 micrograms per kilogram (μg/kg) for soil and sediment was calculated using the USEPA RSL calculator (https://epa-prgs.ornl.gov/cgi-bin/chemicals/csl_search).  The toxicity value input for the calculator is the Tier 3 value reference dose of 0.00002 milligrams per kilogram per day derived by USEPA in their Drinking Water HA values for both PFOS and PFOA (USEPA, 2016a and USEPA, 2016b).  The New Mexico Environment Department (NMED) has not issued screening criteria or promulgated standards for any PFAS constituent to date.

## 1.2  INSTALLATION MISSION AND HISTORY

Cannon AFB is located in eastern New Mexico, approximately 7 miles southwest of the City of Clovis, in Curry County, New Mexico, and encompasses approximately 3,789 acres (**Figure 1**).  The installation is comprised of two perpendicular active runways in the central and southwestern portions; maintenance, support, and operational facilities west of the central runway/flightline; supplemental hangars and apron areas in the south-central region; a wastewater treatment plant to the east; and, a golf course and residential and service facilities in the northwestern portion (HGL, 2015).

Cannon AFB dates to 1929 when Portair Field was established as a civilian passenger terminal.  The Army Air Corps took control of the civilian airfield in 1942, and it became known as the Clovis Army Air Base. The installation was renamed Clovis Army Air Field in early 1945, where flying, bombing, and gunnery classes continued until the installation was deactivated in May 1947.  The installation was reassigned to the Tactical Air Command (TAC) and formally reactivated as Clovis AFB in 1951.  The installation became

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 46 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 54

000046

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **3**

permanent in June 1957 and was renamed Cannon AFB in honor of the late General John K. Cannon, a former commander of the TAC.  The 312th Tactical Fighter Wing (TFW) was deactivated in 1959 and replaced at Cannon by the 27th TFW.  The installation mission changed in 1965 to that of a replacement training unit (Versar, 2013).

The Secretary of Defense recommended the closure of Cannon AFB to the Base Realignment and Closure (BRAC) Commission in May 2005.  The BRAC Commission recommended that the installation remain open until the end of 2009 or until a new mission was found.  The 27th Special Operation Wing (SOW) was activated at Cannon AFB in 2006 under the control of the Air Force Special Operations Command (AFSOC). The 27th SOW continues to be the host unit at Cannon AFB, supporting the USAF in conducting sensitive special operations missions including close air support, unmanned aerial vehicle operations, non-standard aviation in response to the Secretary of Defense (Versar, 2013).

## 1.3  PRELIMINARY ASSESSMENT

HGL was contracted by AFCEC to prepare a PA of FTA and non-FTA sites at Cannon AFB to identify locations where PFAS may have been used and released into the environment, and to provide an initial assessment of possible migration pathways and receptors of potential contamination (HGL, 2015).  Twenty-one potential AFFF release areas were identified during the PA research, with the following 10 potential AFFF release areas recommended for SI (**Figure 2**):

- Former FTA No. 2 (Installation Restoration Program [IRP] Site ID FT-07 and Solid Waste Management Unit [SWMU] No. 106 [SWMU-106]): Former FTA No. 2 is located in the southeast corner of the installation, approximately 1,000 feet south of the active FTA, and was used for fire training exercises from approximately 1968 to 1974.  The area consisted of two round depressions in the land surface, each measuring approximately 100 feet in diameter.  Fire training exercises were conducted twice per quarter using approximately 300-gallons of unused jet propellant (JP)-4.  No specific AFFF use was reported at former FTA No. 2; however, since the FTA operated after initial use of AFFF at the installation, it is likely that AFFF was used at this location.

- Former FTA No. 3 (IRP Site ID FT-08 and SWMU-107): Former FTA No. 3 is located in the southeast corner of the installation, approximately 800 ft southeast of the active FTA, and was used concurrently with FTA No. 2 between approximately 1968 and 1974.  Training exercises were conducted twice per quarter in an unlined, half-moon shaped area, approximately 100 feet in length.  No specific use of AFFF at former FTA No. 3 was recorded; however, since the FTA operated after initial use of AFFF at the installation (1970), it is likely that AFFF was used.

- Former FTA No. 4 (IRP Site ID FTA-4 and SWMU's 109, 110, 111, and 112): Former FTA No. 4 was used from 1974 through approximately 1995 for fire training exercises.  Training activities were conducted twice per quarter, during which an unknown volume of AFFF was used.  FTA No. 4 consisted of an unlined circular area approximately 400 feet in diameter with a mock aircraft located in the center.  Prior to 1985, JP-4 and AFFF runoff generated during fire training exercises collected in an unlined pit.  The pit was backfilled in 1985 and a new, lined pit with an oil/water

000047

separator (OWS) was installed to handle collected runoff.  The OWS was subsequently removed in 1996.

- Hangar 119: General storage warehouse/hangar located in the west central portion of the installation, west of the flight apron, with three accidental AFFF releases.  The first incident occurred in September 2006 when approximately 60 gallons of AFFF discharged into a storm drain after the AFFF system was accidentally activated, possibly due to a corroded valve.  The second incident occurred in September 2012 when a "significant amount" of AFFF was discharged into bay number one and flowed onto the asphalt on the north side of the structure between Hangar 119 and Building 102.  Incident reports indicated that a "huge amount" of AFFF entered a storm drain while the rest was left to evaporate.  The third incident occurred in July 2013 when an unknown quantity of AFFF was discharged onto the concrete flight ramp near Hangar 119.  It is unclear if AFFF entered a storm drain during this release. Currently, the only outlets for AFFF at Hangar 119 are storm drains on the flight ramp outside the bays, which convey liquid directly to the South Playa Lake.  Due to the large quantity of AFFF reportedly released at Hangar 119, there is the potential that AFFF migrated to grassy areas to the south and southwest of the structure.

- Hangar 133: Small aircraft hangar located in the west central portion of the installation, immediately southwest of Hangar 119,  with two accidental AFFF releases.  Several hundred gallons of AFFF were reportedly released during a scheduled rinsing of the hangar fire system in December 2000 and entered a nearby storm drain.  Approximately 200 gallons of AFFF were released into a hangar bay following a power outage in July 2001.  Most of the AFFF entered a floor trench and was routed to the wastewater treatment plant (WWTP); however, AFFF that did not enter the floor trench was washed to nearby infield soil and allowed to evaporate.

- Hangar 204:  A CV-22 aircraft storage and maintenance hangar located in the north central portion of the installation, with an accidental AFFF release reported in May 2002 when the AFFF fire suppression system activated after a building heater caused a birds nest to catch fire.  Approximately 700 gallons of AFFF were discharged onto the nearby concrete ramp and were left to evaporate.

- Former Sewage Lagoons: The former sewage lagoons consisted of two unlined surface impoundments that were used from 1966 to 1998 and received sanitary and industrial waste from base facilities prior to the construction of the WWTP.  The former sewage lagoons would have received any AFFF that entered the sanitary sewer system from 1966 to 1998.  Documented releases of AFFF to the sanitary sewer system from Hangars 199 and 208 were reported prior to and during 1998.  As such, there is evidence that AFFF was released to the environment at the former sewage lagoons.

- North Playa Lake Outfall:  North Playa Lake, located southeast of the WWTP, received all of Cannon AFB sanitary and industrial wastewater from 1943 to 1966.  Currently, all treated effluent from the WWTP is released primarily to North Playa Lake with a portion also released to the golf course for irrigation.  Since there is no accepted wastewater treatment process for PFAS, any wastewater collected at the WWTP containing PFAS would be passed on to North Playa Lake.

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 48 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 56

000048

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **5**

- South Playa Lake Outfall:  South Playa Lake is located in the southwestern portion of Cannon AFB and serves as the installation's primary stormwater collection point.  The lake has received stormwater runoff from portions of the flightline area since 1943.  Solvents, fuels, oils, greases, and AFFF are all potential contaminants that would have discharged to the lake from the flightline area.  Documented releases of AFFF in the hangars resulted in AFFF entering storm drains with liquid being subsequently routed to South Playa Lake.

- Whispering Winds Golf Course Outfall:  The installation golf course (officially known as Whispering Winds Golf Course) began receiving a portion of the treated effluent from the WWTP to fill ponds and irrigate the greens in approximately 2002.  According to the golf course supervisor, the golf course is irrigated 5 nights per week for approximately 4 hours per night using a sprinkler system.  Any wastewater collected at the WWTP containing AFFF therefore has the potential to be released at the golf course.

Hangar 204 was identified as an area for additional investigation due to the release of AFFF outside the structure; however, it was determined during the scoping visit that based on surface topography surrounding the hangar, any AFFF released from hangar doors would drain directly to storm drains in the apron or would evaporate on the concrete apron.  Any AFFF that entered the storm drain would have been routed to South Playa Lake.  Infiltration of AFFF into soils in the vicinity of Hangar 204 is unlikely and, therefore, Hangar 204 was removed from further investigation.

The following five additional areas were recommended for investigation based on data obtained during the scoping visit conducted on 24 and 25 October 2016 (see **Figure 2** and **Worksheet #9**):

- Hangar 109: Parking and general maintenance hangar located in the west central portion of Cannon AFB, with two accidental AFFF releases.  The first release occurred in December 1999 when an office fire activated the AFFF fire suppression system, releasing approximately 500 gallons of AFFF in the hangar bay that reported entered the floor trench and was routed to the WWTP.  No AFFF was reportedly released outside the hangar in 1999.  A second release of approximately 20 to 30 gallons of AFFF solution occurred in 2016.  Installation personnel identified that AFFF was released outside the hangar and was allowed to evaporate west and southwest of the hangar.

- Landfill #4:  Closed landfill covering approximately 7 acres in the east central portion of Cannon AFB that was only operational for one year between 1967 and 1968.  The landfill received domestic and industrial wastes including solvents, paints, thinners, and waste oils.  Disposal activities consisted of placing waste material into a trench, burning the accumulated waste, and then covering the burned material with soil.  Due to the period of operation, AFFF would not have been included in landfilled refuse; however, during the scoping visit, Amec Foster Wheeler was informed that the landfill cover was revegetated and used water from North Playa Lake, located immediately south of Landfill #4, which receives treated effluent from the WWTP.

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 49 of 316

Appellate Case: 22-2132    Document: 35    Date Filed: 11/27/2024    Page: 57

000049

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **6**

- Active FTA: Active FTA located in the southeast portion of the installation, immediately northwest of FT-07, FT-08, and FTA-4.  The FTA became operational in 1997 and consists of a circular lined burn pit with a mockup of a large aircraft, a propane fuel tank, a control panel and a lined evaporation pond.  Fire training exercises are conducted at the active FTA approximately monthly using water or AFFF.  The fire department also conducts annual vehicle foam checks at the FTA.  Liquids discharged into the lined burn pit, including water and AFFF, drain to the lined evaporation pond located approximately 300 ft southwest of the pit and are left to evaporate.  According to installation personnel, the liner of the evaporation pond has required repairs in the past, and any breaches in the liner would allow AFFF to infiltrate into the soils beneath the liner.  Additionally, storms in May 2015 resulted in significant flash flooding across the installation, which likely resulted in any residual AFFF located in the evaporation basin to overflow and be released to the surrounding environment.

- Perimeter Road Fuel Spill: According to Cannon AFB Fire Chief, Mr. Bruce Ford, a fuel tanker truck overturned while traveling along Perimeter Road in the southeast corner of the installation where the road curves south of Landfill #5.  All fuel from the tanker was released on the southeast side of the road.  The fire department responded with crash trucks and reportedly sprayed AFFF on the fuel spill.  The response was conducted over several days with multiple fire trucks discharging the entire supply of AFFF on the release.  Installation personnel identified that contaminated soils were excavated; however, the excavation depth was unknown.

- Flightline Crashes: During the scoping visit, Cannon AFB Fire Department personnel identified three aircraft crashes that had occurred along the flightline where the fire department responded with the use of AFFF.  Two incidents involving F-16 aircraft were identified at the southern end of the flightline, and a third incident involving an F-111 aircraft occurred at the north end of the flightline.  No records regarding the crash responses had been maintained and no information regarding the amount of AFFF released was known.  Although the exact AFFF release areas were unknown, Chief Ford identified approximate crash areas that are depicted on **Figure 2**.

## 1.4 SITE INSPECTION OBJECTIVES AND SCOPE

In accordance with DoD Instruction 4715.18, "Emerging Contaminants (ECs)" (DoD, 2009), the *Interim USAF Guidance on Sampling and Response Actions for Perfluorinated Compounds at Active and Base Realignment and Closure (BRAC) Installations* (USAF, 2012), and the *SAF/IE Policy on Perfluorinated Compounds of Concern* (USAF, 2016) the USAF will:

1) Identify locations where there is a reasonable expectation that there may have been a release of PFAS (defined below) associated with USAF actions;

2) Determine if there is unacceptable risk to human health and the environment; and,

3) Address releases that pose an unacceptable risk including offsite migration.

The primary objectives of this study are to:

1) Determine if PFAS are present in groundwater, soil, or surface water/sediments at AFFF areas selected for inspection;

2) Determine if a release of PFAS has occurred at each AFFF area at concentrations exceeding USEPA HA values, RSL values, or other applicable state or federal standards; and,

3) Identify potential receptor pathways with immediate impacts to human health.

An installation-specific SI report (SIR) will be prepared to meet the objectives described above via the collection of chemical, physical, and hydrologic data, as well as appropriate environmental samples. The SIR will also include recommendations regarding the need for further delineation of confirmed AFFF releases where there are receptor pathways with potential impacts to human health.

As a result of the initial SI, follow-on objectives may include the following:

1) Conduct a well survey on the installation and on private property to assess the locations of downgradient drinking water supplies to identify potential receptor pathways with immediate impacts to human health.

2) Conduct follow-on investigation and step-out sampling (to include delineation of plumes as necessary) in areas determined necessary by the USAF. The follow-on investigations will:

   a. Further evaluate the distribution of PFAS concentrations at areas where additional characterization is determined to be necessary by USAF personnel;

   b. delineate downgradient groundwater plumes (as applicable);

   c. define the environmental setting including potential mechanisms for PFAS migration for each area where PFAS exceed applicable criteria; and,

   d. identify AFFF release areas with potential impacts to down-stream and/or downgradient receptors;

3) Perform initial and follow-up sampling of off-Base public/private drinking water wells to identify and verify where PFAS releases have occurred (as defined below)and evaluate potential exposure pathways with immediate threats to human health; and,

4) Apply mitigation measures to private drinking water wells that present an imminent threat to human health from PFAS.

Follow-on objectives and sampling design and rationale, if applicable, will be defined and described in addenda to this ISWP.

In accordance with Interim USAF Guidance on Sampling and Response Actions for Perfluorinated Compounds at Active and BRAC Installations (USAF, 2012) and USEPA lifetime drinking water HA values for PFOS (USEPA, 2016a) and PFOA (USEPA, 2016b), a release will be considered confirmed if exceedances of the following concentrations are identified:

000051

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **8**

**PFOS**

- 0.07 µg/L in groundwater/surface water that is used as, or contributes to, a drinking water source.

- 1,260 µg/kg in soil (calculated using a total hazard quotient [THQ] of 1.0, in the absence of RSL values).

- 1,260 µg/kg in sediment (calculated in the absence of RSL values).

**PFOA**

- 0.07 µg/L in groundwater/surface water that is used as, or contributes to, a drinking water source.

- 1,260 µg/kg in soil (calculated using a THQ of 1.0, in the absence of RSL values).

- 1,260 µg/kg in sediment (calculated in the absence of RSL values).

**PFOS + PFOA**

- 0.07 µg/L in groundwater/surface water that is used as, or contributes to, a drinking water source.

While PFOS and PFOA are the focus of the HA and provide specific targets for the USAF to address in the SI, USEPA has also derived RSL values for perfluorobutanesulfonic acid (PFBS) for which there is a Tier 2 toxicity value (Provisional Peer Review Toxicity Value).  The USAF will also consider a release to be confirmed if exceedances of the following concentrations are identified:

**PFBS**

- 380 µg/L in groundwater/surface water.
- 1,600,000 µg/kg in soil and sediment.

**Table 1** summarizes screening values for analytical results comparison.

**Table 1. Regulatory Screening Values.**

| Parameter | Chemical Abstract Number | USEPA Regional Screening Level Table (May 2016)[a] | | | Calculated RSL for Soils and Sediments[b] (µg/kg) | USEPA Health Advisory for Drinking Water (Surface Water or Groundwater) (µg/L)[c] |
|---|---|---|---|---|---|---|
| | | Residential Soil (µg/kg) | Industrial Soil (µg/kg) | Tap Water (µg/L) | | |
| perfluorobutanesulfonic acid (PFBS) | 375-73-5 | 1.6E+6 | 2.3E+7 | 380 | NL | NL |
| perfluorooctanoic acid (PFOA) | 335-67-1 | NL | NL | NL | 1,260 | 0.07[d] |
| perfluorooctanesulfonic acid (PFOS) | 1763-23-1 | NL | NL | NL | 1,260 | |

**Supp. App. 0056**

000052

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **9**

**Notes:**

a    USEPA Regional Screening Levels (May 2016) [https://www.epa.gov/risk/regional-screening-levels-rsls-generic-tables-may-2016].  RSLs shown are calculated using a THQ of 1.0.

b    Screening levels calculated using the USEPA Regional Screening Level calculator [https://epa-prgs.oml.gov/egi-bin/chemicals/csl_search] using a THQ of 1.0.

c    USEPA, May 2016a. "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" and EPA, May 2016b. "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)."

d    When both PFOA and PFOS are both present, the combined concentrations of PFOA and PFOS should be compared with the 0.07 μg/L health advisory level.

μg/kg = micrograms per kilogram

μg/L = micrograms per liter

NL = not listed

RSL = risk-based screening level

USEPA = United States Environmental Protection Agency

The proposed sampling approach for Cannon AFB is detailed in **Worksheets #9, #10, #11, #13, #14/16, #17, #18, and #20** of this ISWP.  The QAPP consists of 37 prescriptive worksheets documenting aspects of the environmental investigation process of the SI and to guide the fieldwork.  **Table 2** presents the required elements of the QAPP, the worksheets where these elements can be found, and the document containing the worksheet.

**Table 2. List of UFP-QAPP Worksheets.**

| Required Element | UFP-QAPP Worksheet Number | Contents of Worksheet(s) | Presented in QPP | Presented in ISWP |
|---|---|---|---|---|
| Title and Approval Page | 1 and 2 | Identifies the principal points of contact for all organizations having decision-making authority in the project and documents their commitment to implement the QAPP. | X | |
| Project Organization and QAPP Distribution | 3 and 5 | Identifies key project personnel, lines of authority, and lines of communication among the lead agency, prime contractor, subcontractors, and regulatory agencies. | X | |
| Personnel Qualifications and Sign-Off Sheet | 4, 7, and 8 | Identifies key project personnel for each organization performing tasks defined in the QAPP and documents their commitment to implementing the QAPP. | X | |
| Communication Pathways and Procedures | 6 | Documents specific issues (communication drivers) that will trigger the need to communicate with other project personnel or stakeholders. | X | |
| Project Planning Session Summary | 9 | Provides a record of the notes taken during the site scoping visit. | | X |
| Conceptual Site Model (CSM) | 10 | Presents the installation-wide CSM with information on each AFFF release area. | | X |
| Project/Data Quality Objectives (DQOs) | 11 | Documents the DQOs, the environmental decisions that need to be made, and the level of data quality needed to ensure that those decisions are based on sound scientific data using USEPA's seven-step DQO process. | | X |

**Supp. App. 0057**

000053

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **10**

| Required Element | UFP-QAPP Worksheet Number | Contents of Worksheet(s) | Presented in QPP | Presented in ISWP |
|---|---|---|---|---|
| Measurement Performance Criteria | 12 | Documents the quantitative measurement performance criteria in terms of precision, bias, and sensitivity for field and laboratory measurements and is used to guide the selection of appropriate measurement techniques and analytical methods. | X | |
| Secondary Data Uses and Limitations | 13 | Identifies sources of secondary data and summarizes information relevant to their uses for the current project. | | X |
| Project Tasks and Schedule | 14 and 16 | Presents the proposed installation-specific schedule for the SI activities, specific tasks, the group responsible for their execution, and planned start and end dates. | | X |
| Project Action Limits and Laboratory-Specific Detection/Quantitation Limits | 15 | This worksheet is completed for each matrix, analyte, and analytical method. The purpose is to make sure the selected analytical laboratory and method can provide accurate data at the project action limit. | X | |
| Sampling Design and Rationale | 17 | Describes the sampling design and the basis for selection of each AFFF release area for SI. | | X |
| Sampling Locations and Methods | 18 | Provides a completeness check for field personnel and auditors for all samples anticipated for collection during the SI.  It will facilitate checks to ensure all planned samples have been collected and appropriate methods have been used.  The worksheet lists each individual sample that is planned to be collected, including field quality control (QC) samples. | | X |
| Sample Containers, Preservation, and Hold Times | 19 and 30 | Worksheets serve as a reference guide for field personnel. They are also an aid to completing the chain of custody forms and shipping documents. | X | |
| Field Quality Control | 20 | Provides a summary of the types of samples to be collected and analyzed for the project to show the relationship between the number of field samples and associated QC samples. | | X |
| Field Standard Operating Procedures (SOPs) | 21 | Documents the specific field procedures being implemented. The QPP contains detailed descriptions of procedures for all field activities, including sample collection; sample preservation; equipment cleaning and decontamination; equipment testing, maintenance, and inspection; and sample handling and custody. | X | |

**Supp. App. 0058**

000054

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **11**

| Required Element | UFP-QAPP Worksheet Number | Contents of Worksheet(s) | Presented in QPP | Presented in ISWP |
|---|---|---|---|---|
| Field Equipment Calibration, Maintenance, Testing and Inspection | 22 | Documents procedures for calibrating, maintaining, testing, and/or inspecting all field equipment. | X | |
| Analytical Standard Operating Procedures | 23 | Documents information about the specific sample preparation and analytical procedures to be used. | X | |
| Analytical Instrument Calibration | 24 | Documents the laboratory calibration procedures and is completed for all analytical instruments referencing the project laboratory quality manual. | X | |
| Analytical Instrument and Equipment Maintenance, Testing, and Inspection | 25 | Documents the procedures for maintaining, testing, and inspecting laboratory analytical equipment and was completed referencing the project laboratory quality manual. | X | |
| Sample Handling, Custody, and Disposal | 26 and 27 | Documents responsibilities for maintaining custody of samples from sample collection through disposal. | X | |
| Analytical Quality Control and Corrective Action | 28 | Ensures that the selected analytical methods are capable of meeting the project-specific measurement performance criteria. | X | |
| Project Documents and Records | 29 | Records information for all documents and records that will be generated for the project. It describes how information will be collected, verified, and stored.  The purpose is to support data completeness, data integrity, and ease of retrieval. | X | |
| Assessments and Corrective Action | 31, 32, and 33 | Documents responsibilities for conducting project assessments, responding to assessment findings, and implementing corrective action. | X | |
| Data Verification and Validation Inputs | 34 | Lists the inputs that will be used during data verification and validation. | X | |
| Data Verification Procedures | 35 | Documents procedures that will be used to verify project data. | X | |
| Data Validation Procedures | 36 | Documents procedures that will be used to validate project data. | X | |
| Data Usability Assessment | 37 | Documents procedures that will be used to perform the data usability assessment. | X | |

**Notes:**

AFFF – aqueous film forming foam

DQOs – data quality objectives

QAPP – Quality Assurance Project Plan

QPP – Quality Program Plan

SOP – Standard Operating Procedure

USEPA – United States Environmental Protection Agency

CSM – conceptual site model

ISWP – Installation-Specific Work Plan

QC – Quality Control

SI – Site Inspection

UFP – Unified Federal Program

**Supp. App. 0059**

This page intentionally left blank.

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **13**

## 2.0 REFERENCES

AECOM, 2011.  *Facility-Wide Long Term Groundwater Monitoring Plan.*  January.

Amec Foster Wheeler, 2017.  *Final Site Inspection of Film Forming Foam (AFFF) Release Areas Quality Program Plan.*  March.

CH2M Hill, 1983.  *Installation Restoration Program Records Search for Cannon AFB, New Mexico.*  August.

Coates, C.Y.  1977*.  A History of USAF Fire Protection Training at Chanute Air Force Base, 1964-1976*.  Chanute Technical Training Center, Chanute AFB, Illinois.  February.

Department of Defense (DoD), 2009.  Department of Defense, Instruction Number 4715.18 Emerging Contaminants (ECs), June 11.

HydroGeologic, Inc. (HGL), 2015, Final Preliminary Assessment Report for Perfluorinated Compounds at Cannon Air Force Base, New Mexico. October.

Radian Corporation, 1986. Installation Restoration Program Phase II – Confirmation/Quantification, Stage 1. Volume 1. September.

United States Department of Agriculture (USDA), 2017.  Soil Survey, Natural Resources Conservation Service, Web Soil Survey.  https://websoilsurvey.nrcs.usda.gov

United States Geological Survey (USGS), 2006.  Ground-Water Hydrology and Water Quality of the Southern High Plains Aquifer, Cannon Air Force Base, Curry County, New Mexico, 1994-2005.

United States Air Force (USAF), 2012.  Interim USAF Guidance on Sampling and Response Actions for Perfluorinated Compounds at Active and Base Realignment and Closure (BRAC) Installations.  17 September.

USAF, 2016.  SAF/IE Policy on Perfluorinated Compounds (PFCs) of Concern, August.

United States Department of Agriculture (USDA), 2017.  *Soil Survey, Natural Resources Conservation Service, Web Soil Survey* https://websoilsurvey.nrcs.usda.gov

United States Environmental Protection Agency (USEPA), 2006.  *Ecoregions of New Mexico.* ftp://newftp.epa.gov/EPADataCommons/ORD/Ecoregions/nm/nm_pg.pdf

USEPA, 2016a.  *Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS).*  May.

USEPA, May 2016b.  *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA).*  May.

United States Fish and Wildlife (USFS), 2016. Environmental Conservation Online System at https://ecos.fws.gov/ecp0/reports/species-by-current-range-county?fips=35009, visited 10 January.

Versar, 2013.  *Comprehensive Site Evaluation Phase II Report – Version 3.0 (Final), Cannon Air Force Base, New Mexico.*  September.

This page intentionally left blank.

### QAPP WORKSHEET #9: PROJECT PLANNING SESSION SUMMARY

**Date of planning session:** Installation Scoping Visit conducted on 24 and 25 October 2016.

**Location:** Cannon AFB, Clovis, New Mexico

**Purpose:** The purpose of the Installation Scoping Visit was to (1) inspect potential AFFF release areas identified in the PA (HGL, 2015) to confirm if sampling is warranted during the TO 0004 investigation, (2) understand site logistics so that they could be incorporated into this ISWP, and (3) understand existing conditions so that they could be used to develop the investigation strategy and be factored into this ISWP and subcontractor scopes of work.  The results of the Installation Scoping Visit were used to develop the sampling plan as detailed in **Worksheets #17** and **#18**.

**Attendees:**

- Ron Lancaster, Chief of Asset Management Flight, 27th SOCES
- CMsgt Ralph Sprout, 27th SOCES/CEF
- Bruce Ford, Fire Chief, 27th SOCES/CEF
- Sheen Kottkamp, Environmental Program Manager AGEISS Inc., SOCES/CEIER
- Anita Lafuente, AFSOC 27th SOCES/CEIE
- Cornell Long, AFCEC Technical Lead AFCEC/CZTE
- Emma Driver, Amec Foster Wheeler Base Lead
- Shannon Williams, Amec Foster Wheeler Field Team

**24 October 2016:** Amec Foster Wheeler personnel (Ms. Emma Driver and Ms. Shannon Williams) arrived at Cannon AFB and obtained necessary visitor badging for the 2-day installation scoping visit.  Amec Foster Wheeler conducted a project in-brief meeting with attendees identified above to discuss the objectives for the installation scoping visit, provide an overview of the general SI scope requirements, and to provide an overview of the AFFF release areas proposed for investigation.

During the project in-brief, Mr. Kottkamp informed Amec Foster Wheeler of two additional releases of AFFF that occurred after completion of the PA report.  The first release was a release of approximately 20 to 30 gallons of 3 percent (%) AFFF solution at Hangar 109.  The AFFF was released outside the hangar with evidence of impacts to soil west-southwest of the hangar bay door.  No investigation has been conducted relative to the release.  A second release of 3% AFFF solution was reported at Hangar 197.  The release again consisted of approximately 20 to 30 gallons of solution that was released from the mechanical room on the north side of the building and drained toward the grassy area, north of Liberator Avenue.  The release was contained, and the soil was excavated, containerized, and disposed of off-site as a special waste.

**Supp. App. 0063**

Installation representatives expressed concern in installing monitoring wells at each of the identified AFFF release areas since groundwater at Cannon AFB is regulated basewide by NMED rather than evaluating groundwater impacts specific to an area of concern.  It was determined that the SI would focus on determination of PFAS presence or absence utilizing existing monitoring wells that are already approved by NMED as part of the Cannon Basewide Groundwater Monitoring Program.  Mr. Kottkamp provided copies of groundwater elevation contour maps depicting groundwater flow direction in June and September 2014 (**Figure 3a** and **3b**).

Mr. Ford, Cannon AFB Fire Chief, also informed Amec Foster Wheeler that AFFF has been used at the installation in response to aircraft crashes and fuel spills.  Although Mr. Ford could not recall the exact locations of all fire department response activities along the flightline, he did identify the general location of three aircraft crashes **(Figure 2).**  Two crashes involving F-16 aircraft were noted to have occurred at the southern end of the flightline, including one at the intersection of Runway 13/31 and Runway 22/04, and another at the end of Runway 22/04 at the intersection of Taxiway F (**Figure 2**).  A third crash involving an F-111 aircraft occurred at the northeastern end of Taxiway A.  According to Mr. Ford, no incident records for these crashes have been maintained and therefore the amount of AFFF released was unknown.

Mr. Ford also provided details of an incident involving a fuel tanker truck that overturned in the southeast corner of the installation releasing "a significant amount" of fuel directly on the ground, southeast of Perimeter Road.  The fire department responded with crash trucks utilizing AFFF on the fuel spill.  The fire department response reportedly occurred over several days with multiple trucks spraying AFFF onto the spill to prevent a fire.  Contaminated soils were subsequently excavated; however, the excavation depth was unknown.

Mr. Lancaster also provided details of a significant storm event that occurred at Cannon AFB in May 2015 that resulted in most of the installation being flooded.

On the first day of the scoping visit, Amec Foster Wheeler and AFCEC personnel visited the following AFFF release areas to determine potential sampling locations and any utility/site conflicts with said locations.  The following AFFF release area summaries provide information discussed and clarified during the visit.

**Former FTA No. 2:** Former FTA FTA-02 is located south of an abandoned taxiway and south of the active Explosive Ordnance Disposal (EOD) area.  A gravel access road is present immediately north of former FTA.  Surface topography slopes downward from the access road towards the south; however, no defined surface drainage pathway was evident in the vicinity of former FTA No. 2.  The area was observed to be an open area with limited grasses and shrubs (Plains-Mesa grassland).  Two topographic depressions were observed that were likely the former burn pit areas where fire training occurred.  SI activities in this area would require coordination/scheduling with EOD personnel prior to drilling.  Two proposed soil boring locations were identified, one in the center of each of the burn pit depressions.

**Former FTA No. 3:** Former FTA No. 3area is located on the east side of the abandoned North-South runway, northeast of the active EOD area.  Fire training activities were originally conducted in an unlined

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 60 of 316

000060

Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 68

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **17**

pit that was surrounded by a berm.  Previous remedial activities have been conducted at former FTA No. 3, including excavation of approximately 250 cubic yards (CY) of petroleum-contaminated soil.  Mr. Kottkamp provided map documentation showing excavation limits that were incorporated into the sample design and rationale (**Worksheet #17** and **#18**).  According to Mr. Kottkamp, the surface topography in this area had been affected by recent subsidence associated with previous excavation activities.  The general surface topography in the vicinity of former FTA No. 3 slopes downward to the east-southeast.  Two soil borings will be completed in this area at locations outside of the previous excavation footprint.

**Former FTA-4:** Former FTA-4 is located southeast of the abandoned North-South runway and immediately north of Landfill #5.  The FTA formerly consisted of a mock aircraft on a concrete pad in the center of the area, an automobile chassis in the northwest portion of the area, an unlined collection pit, and an OWS; however, no evidence of former structures remain at former FTA-4.  The area is currently covered with grass/shrub type vegetation and crushed gravel fill material.  Excavation activities have been conducted at FTA-4 in multiple phases.  Approximately 740 tons of petroleum contaminated soil were excavated from the former fire training pit in 2005 and, based on results from confirmation sampling, an additional 2,235 cubic yards of soil were excavated in 2009.  The depth of excavation varied across the area; however, previous reports identified the maximum excavation depth was 15 ft below ground surface (bgs).  Three proposed soil boring locations were identified at FTA-4 including one at the former fire training pit, one at the OWS location, and one at the former automobile chassis location where fire training was also conducted.

**Active FTA:** The active FTA is located in the southeast portion of the installation, immediately northwest of FT-07, FT-08 and FTA-4.  The FTA consists of a circular lined burn pit with a mockup of a large aircraft, a propane fuel tank, a control panel, and a lined evaporation pond surrounded by fencing.  According to installation personnel, the liner of the evaporation pond has required repairs in the past.  Additionally, storms in May 2015 resulted in significant flash flooding across the installation, which likely resulted in any residual AFFF located in the evaporation basin to overflow and be released to the surrounding environment.  The surface topography slopes to the south away from the evaporation pond.  Ground cover around the FTA was predominantly gravel with limited shrubs and desert grasses south of the evaporation pond.  Three soil borings are proposed to be completed including one on the east side, one on the south side and one on the west side of the evaporation basin.

**North Playa Lake Outfall:** North Playa Lake is located in the east central portion of the base.  At the time of the scoping visit, water was present in the playa.  Discharge from the WWTP enters North Playa Lake through a drainage pipe that outfalls on the west side of the playa.  An apparent berm structure was visible that was reportedly an artifact from previous dredging activities.  According to installation personnel, water from North Playa Lake was used to support revegetation of the cover on Landfill #4 that is located on the north side of the playa.  Two sediment and surface water samples are proposed to be collected from the playa lake.  One existing monitoring well (MW-Oa) was identified downgradient (southeast) of North Playa Lake.

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 61 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 69

000061

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **18**

**Landfill #4:**  Landfill #4 is an approximate 7-acre, closed landfill in the east-central portion of Cannon AFB, immediately north of North Playa Lake.  The landfill was only operational for one year between 1967 and 1968.  Installation personnel identified that between August and October 2014, water from North Playa Lake was applied to the landfill cover in support of a revegetation project.  It was indicated that  a total of 1,305,300 gallons of water from North Playa Lake was applied directly to the landfill surface.  One existing monitoring well (MW-Na) was identified downgradient (southeast) of Landfill #4.  Investigation activities at Landfill #4 will consist of collecting groundwater samples from existing monitoring well MW-Na.  No soil sampling is required relative to the landfill.

**South Playa Lake Outfall:**  South Playa Lake is located in the southwestern portion of Cannon AFB and serves as the installation's primary stormwater collection point.  The lake has received stormwater runoff and wastewater discharge from the flightline, apron, and industrial area of the installation since 1943.  Three separate storm sewer outfalls are present: one on the west side, one on the south side, and one of the east side of the playa.  No water was present in the playa at the time of the installation scoping visit and no outfalls exist from the playa.  Four proposed soil boring locations were identified: one at each of the outfall locations, and one in the center of the playa where water would accumulate and eventually infiltrate into the soil.  If water is present at the South Playa Lake during the SI, sediment and surface water sampling will be conducted.  SI activities at this location would require additional coordination with operations personnel.

**Whispering Winds Golf Course Outfall:**  The golf course began receiving treated effluent from the WWTP to fill two ponds and irrigate the greens in 2002.  Treated effluent is piped to a 9 million gallon tank located on the eastern portion of the golf course.  The effluent in the storage tank is then discharged to the larger of two ponds located in the north central portion of the golf course.  The northern pond is connected to the pond located further southeast via piping.  A sediment and a surface water sample are proposed to be collected from each of the golf course ponds.

**Hangar 109:**  Hangar 109 is a parking and general maintenance hangar operated by the 27th SOW.  The hangar is located in the west central portion of Cannon AFB and is bordered to the south by a restricted flight ramp, and to the east by Hangar 119.  A grassy area is present on the northwest side of the hangar.  An accidental release of AFFF occurred in the mechanical room in the spring of 2016.  The AFFF flowed to the grassy area north and west of the hangar.  Evidence of ground staining in the grassy area northwest of the building was observed during the scoping visit.  Two proposed soil boring locations were identified in the grassy area northwest of the building.

**Hangars 119 and 133:**  Hangars 119 and 133 are located in the west-central portion of Cannon AFB that have reported releases of AFFF.  The hangars are located at the southwest end of the aircraft parking apron, with Hangar 133 located at the southern end and Hangar 119 located immediately northeast of Hangar 133.  Based on surface topography, accidental releases of AFFF on the northeast side of Hangar 119 would have drained to storm drains in the concrete parking apron or would have evaporated directly

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 62 of 316

000062

Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 70

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **19**

on the apron.  Any AFFF released on the southwest side has the potential to drain via surface flow to the grassy area on the northwest side of Hangar 133.

Two accidental AFFF releases were reported at Hangar 133, including a release of approximately 200 gallons of AFFF that discharged from the hangar and was washed to nearby infield soil (likely the grassy area on the northwest side of the hangar) and allowed to evaporate.

It was determined that AFFF releases from hangars 119 and 133 should be combined into a single area for SI activities.  Two proposed soil boring locations were identified in the grassy area northwest of Hangar 133 and southwest of Hangar 119.

**25 October 2016:** Day two of the scoping visit included site visits for remaining AFFF areas and additional interviews with installation personnel regarding SI logistics.

Information required for inclusion on the Entry Authorization List for base access for Amec Foster Wheeler and all subcontract personnel will be submitted to Mr. Kottkamp approximately 30 days prior to the initiation of SI activities.  All personnel will be required to complete flightline drivers training and radio training if driving on the flightline is required.  The subject training needs to be conducted prior to the initiation of SI activities.

Dig permits will be required for each location.  Amec Foster Wheeler will provide Mr. Kottkamp with the proposed soil boring/monitoring well locations and the drill rig specifications, who will then submit the required dig permits for review/approval.  New Mexico State One Call (NM 811) will be contacted to locate underground telephone and cable lines, while the Base Civil Engineering (CE) office will locate water, electric, gas, sewer, and any other base-owned utility lines.  All CE utility locating will require completion of a CE Work Clearance Request (Form 103).  All daily activities will need to be coordinated with the airfield manager.

Amec Foster Wheeler was informed that Federal Aviation Administration (FAA) permits may be required for activities in several of the proposed AFFF areas due to boring locations and the anticipated mast height of the drill rig.  Upon approval of the ISWP, Amec Foster Wheeler will work with Mr. Kottkamp and Base Operations personnel to complete final FAA permit determination.  An airfield waiver form must be completed and approved prior to the onset of SI activities.

The following AFFF release area summaries provide information discussed and clarified during day two of the visit.

**Former Sewage Lagoons:** The former sewage lagoons consisted of two unlined surface impoundments that were used from 1966 to 1998 and received sanitary and industrial waste from installation facilities prior to the construction of the WWTP.  Sludge and the underlying contaminated soil from the north lagoon were excavated and consolidated into the south lagoon in 2003.  The cover design assumed that the contaminated medium at the site consisted of approximately two feet of sludge overlying a one-foot-thick layer of soil.  The former sewage lagoon area is covered with grass and shrubs and is a secured area

000063

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 63 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 71
Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **20**

that is surrounded by a fencing with a locked gate on the south end.  Four monitoring wells were identified in the vicinity of the former sewage lagoons including Well F, Well G, Well H and Well Pa.

**Hangar 204:** Hangar 204 is located in the north-central portion of the installation bordered on three sides by concrete apron.  A small grassy area is present on the northwest side of the structure.  An accidental discharge of AFFF was reported in May 2002, where approximately 700 gallons of AFFF were discharged from the hangar onto the concrete ramp and were left to evaporate.  A storm drain is present in the flight apron, northeast of the hangar bay doors, that would capture liquid released from the structure and subsequently route the liquids to South Playa Lake.  Based on the surface topography, it is unlikely that any AFFF released would flow towards the grassy area on the northwest side of the structure.  Based on observations made during the scoping visit, no subsurface investigation was recommended relative to Hangar 204; however, investigation activities will be conducted at South Playa Lake.  No existing monitoring wells were identified in the vicinity of Hangar 204.

**Perimeter Road Fuel Spill:** According to Cannon AFB Fire Chief, Mr. Bruce Ford, a fuel tanker truck overturned along Perimeter Road in the southeast corner of the installation where the road curves south of Landfill #5.  All fuel from the tanker was released on the southeast side of the road.  The area was observed to be a depression on the southeast side of Perimeter Road covered with grass and shrubs.  The depression was a results of excavation activities that occurred as part of the fuel spill response. Monitoring well S was observed immediately northwest of the fuel spill area; however, due to declining groundwater levels, the monitoring well is no longer a viable groundwater monitoring well and is tentatively scheduled to be replaced in 2017.  One proposed soil boring location was identified in the center of the depression area.  Since soil potentially impacted with AFFF was excavated as part of spill response activities, it is unlikely that PFAS impacted groundwater at this location.  As a result, investigation activities will be limited to sampling native soil (i.e., beneath fill material placed after excavation).  If PFAS impacts are identified in soil, groundwater sampling downgradient of the spill location may be warranted as part of follow-on activities.

000064

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **21**

**QAPP WORKSHEET #10: CONCEPTUAL SITE MODEL**

An installation-wide Preliminary Conceptual Site Model (CSM) with information regarding AFFF release areas is presented below.  The preliminary CSM will be revised based upon the information and data collected during the site inspections, additional research, well surveys, and follow-on inspections, and presented as a narrative in the SIRs.

| Facility Profile | Physical Profile | Release Profile | Land Use and Exposure Profile | Ecological Profile |
|---|---|---|---|---|
| **Installation Description/History:**<br>• Years of operation: 1942 to the present.<br>• Size: Approximately 3,789 acres.<br>• Location: Eastern New Mexico, approximately 7 miles southwest of the City of Clovis, in Curry County, New Mexico.<br>• Layout: The installation is comprised of two perpendicular active runways in the central and southwestern portions; maintenance, support, and operational facilities west of the central runway/flightline; supplemental hangars and apron areas in the south-central region; a wastewater treatment plant to the east; and, a golf course and residential and service facilities in the northwestern portion (HGL, 2015).<br>• History: Cannon AFB dates to 1929 when Portair Field was established as a civilian passenger terminal.  The Army Air Corps took control of the civilian airfield in 1942 and it became known as the Clovis Army Air Base.  The installation was renamed Clovis Army Air Field in early 1945, where flying, bombing, and gunnery classes continued until the installation was deactivated in May 1947. The installation was reassigned to the TAC and formally reactivated as Clovis AFB in 1951, and subsequently renamed Cannon AFB in 1957 (Versar, 2013).<br>• Current Mission: Home to the 27th SOW where it conducts infiltration/exfiltration, combat support, tilt-rotor operations, helicopter aerial refueling, close air support, unmanned aerial vehicle operations, non-standard aviation, and other special missions. It directs the deployment, employment, training, and planning for squadrons that operate the AC-130W, MC-130J, CV-22B, C-146A, U-28A, MQ-1, MQ-9, and provides operational support to flying operations (Versar, 2013).<br>**AFFF Use:**<br>•AFFF containing PFAS was used for firefighting training activities, testing of firefighting equipment, extinguishing petroleum fires, and in fire suppression systems at several installation buildings.<br>•Thirteen potential AFFF release areas are recommended for SI at Cannon AFB:<br>  • Former FTA No. 2;<br>  • Former FTA No. 3;<br>  • Former FTA-4;<br>  • Hangars 119 and 133; | **Topography:**<br>•The installation is situated in the Southern High Plains Physiographic Province near the center of the Llano Estacado subprovince. This area is a nearly flat plain sloping gently (10 to 15 feet per mile) to the east and southeast. In the vicinity of Cannon AFB, elevations range from 4,250 to 4,350 feet above mean sea level (AECOM, 2011).<br>**Vegetation:**<br>•Vegetation at Cannon AFB is typical of semiarid, short grass prairies (Plains-Mesa grassland) and is limited by water availability (CH2MHill, 1983).<br>•Much of the Llano Estacado (80-90%) has been tilled for agriculture, with farmers producing cotton, corn, and wheat under dryland agriculture or irrigated with water pumped from the Ogallala Aquifer (USEPA, 2006).<br>**Surface Water:**<br>•Permanent surface water streams are non-existent in the Cannon AFB vicinity. Running Water Draw, located approximately 10 miles north of the installation, is the nearest drainage feature and is dry for much of the year.<br>•Historically, surface runoff at Cannon AFB has drained into four natural, ephemeral, playas. Two of the northern playas were converted into plastic-lined golf course ponds. The southern playa, known as South Playa Lake, occupies approximately 9 acres south of the intersection of the main jet runways and is approximately 15 feet deep. Since 1943, stormwater runoff from the flightline has collected in this playa where it either evaporates or percolates into the soil. The northern playa, known as North Playa Lake, was bermed on the north, west, and south sides with topsoil and concrete debris. It covers approximately 13 acres and received treated effluent from the former sewage lagoons (AECOM, 2011).<br>**Soils:**<br>• Soils at Cannon AFB are predominantly fine sandy loams of the Amarillo series, which consists of very deep, well drained, moderately permeable soils derived from loamy eolian sediments from the Blackwater Draw Formation of the Pleistocene (United States Department of Agriculture [USDA], 2017).<br>**Geology:**<br>•The subsurface geology of the Southern High Plains aquifer at Cannon AFB includes the Chinle, Ogallala, and Blackwater Draw Formations.<br>• The Chinle Formation of Triassic Age forms the bottom of the unconfined Southern High Plains Aquifer in this area, and consists primarily of clay with some intermixed sand and silt, and ranges in thickness from 0 to 400 feet in eastern New Mexico.<br>• The Ogallala Formation of Tertiary Age is the main water-yielding unit of the Southern High Plains Aquifer and lies unconformably atop the upper unit of the eastward-dipping Chinle Formation. The Ogallala Formation consists of eolian sand and silt and fluvial and lacustrine sand, silt, clay, and gravel, and ranges in thickness from 30 to 600 ft in eastern New Mexico and west Texas. | **Contaminants of Potential Concern:**<br>•PFAS are the contaminants of potential concern for this investigation.<br>•Fuel related compounds and chlorinated solvents are historical site contaminants.<br>**Media of Potential Concern:**<br>•Soil, sediment, surface water, and groundwater.<br>**Confirmed AFFF Releases:**<br>•No historical sampling for PFAS.<br>•Former FTA No. 2: Possible AFFF use from 1970 to 1974 in unlined FTA with an unknown volume of AFFF used for firefighting training.<br>•Former FTA No. 3: Possible AFFF use from 1970 to 1974 in an unlined FTA with an unknown volume of AFFF used for firefighting training.<br>•Former FTA-4: Possible AFFF use from 1974 to 1995 with an unknown volume of AFFF used for firefighting training.<br>•Hangar 119: Three accidental releases of AFFF inside the hangar likely discharged to grassy areas outside the hangar.<br>•Hangar 133: Two accidental releases of AFFF inside the hangar including one release where AFFF was discharged outside the hangar and "washed" to nearby infield soil.<br>•Former Sewage Lagoons: Operated between 1966 and 1998; during operation, lagoons received any AFFF that entered the sanitary sewer system. Evidence of AFFF releases in hangars during this time period, which may have entered the sanitary sewer system and been routed to the former sewage lagoons.<br>•North Playa Lake Outfall: Any wastewater collected at the WWTP containing AFFF would be passed on to North Playa Lake. Several releases of AFFF from hangars entered the sanitary sewer system and were routed to the WWTP. There is no accepted wastewater treatment process for AFFF or PFAS.<br>•South Playa Lake Outfall: Any stormwater or wastewater containing AFFF that enters storm drains near the flightline is routed to South Playa Lake. Several releases of AFFF from hangars entered nearby storm drains and were routed to the lake. | **Current Land Use:**<br>•Occupied by Cannon AFB.<br>**Future Land Use:**<br>•Land use is not expected to change in the future.<br>**Potential Receptors:**<br>•Potential receptors associated with current and future land use include USAF personnel and residents, grounds maintenance workers, utility workers, construction workers.<br>•Recreational users of Whispering Winds Golf Course. | **Potential Ecological Receptors:**<br>•Inland and aquatic plant species, reptiles, birds, soil invertebrates, and mammals that inhabit or migrate through the installation.<br>**Threatened and Endangered Species:**<br>•Threatened species that were identified in Curry County and may exist at Cannon AFB include the following:<br>  • Lesser prairie-chicken (*Tympanuchus pallidicinctus*) – under review. |

Supp. App. 0069

000065

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page 22

Case 2:19-cv-00046-KG-SMV  Document 49-3  Filed 02/01/21  Page 65 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 73

Supp. App. 0070

| | | |
|---|---|---|
| • Former Sewage Lagoons;<br>• North Playa Lake Outfall;<br>• South Playa Lake Outfall; and,<br>• Whispering Winds Golf Course Outfall.<br>• Hangar 109;<br>• Active FTA;<br>• Landfill #4;<br>• Perimeter Road Fuel Spill; and,<br>• Flightline Crash Areas. | • The Blackwater Draw Formation of Quaternary Age generally overlies the Ogallala Formation at Cannon AFB. The Blackwater Draw Formation is composed primarily of eolian sand deposits, and ranges in thickness from 0 to 80 feet in eastern New Mexico.<br>• A caliche layer is typically present in the unsaturated zone of the Blackwater or Ogallala Formations in New Mexico.<br>**Hydrogeology:**<br>•The lower portion of the Ogallala Formation is the primary regional aquifer for both potable and irrigation water.<br>•The Ogallala Aquifer is part of the Southern High Plains Aquifer that extends across parts of southeast New Mexico and northwest Texas, which in turn is part of the larger High Plains Aquifer that extends continuously from Wyoming and South Dakota into New Mexico and Texas.<br>•At Cannon AFB, the depth to groundwater is approximately 300 feet bgs. The saturated thickness in 1990 ranged from 93 to 143 feet, but continues to decrease. Groundwater flow is generally from northwest to southeast (FPM, 2014).<br>•Cannon AFB is underlain by the portion of the Ogallala Aquifer designated the Curry County Underground Water Basin. The Ogallala Aquifer is a water table, or unconfined, aquifer with the underlying Chinle redbeds serving as the basal confining layer in eastern New Mexico.<br>**Meteorology:**<br>•Average annual rainfall is 17.9 inches/year in Clovis, New Mexico.<br>•Average number of days with measureable rainfall is 54 days.<br>•Average high temperature of 92°F occurs in July, while an average low of 23.4°F occurs in January. | •Whispering Winds Golf Course Outfall: The golf course began receiving effluent from the WWTP plant in approximately 2002. Currently, the golf course stores effluent in a storage tank on the eastern portion of the course. Effluent is regularly used for golf course irrigation and filling the two golf course ponds. A release of AFFF into any of the hangar floor trenches or fire station stalls would be routed through the WWTP. As such, effluent from the WWTP used at the golf course may contain AFFF.<br>•Hangar 109: A recent release of AFFF inside the hangar/mechanical rooms resulted in AFFF being released outside the hangar and draining o grassy areas outside the hangar.<br>•Active FTA: Lined evaporation pond located south of the FTA where AFFF/water mix is collected and left to evaporate has been repaired in the past. Any damage to liner would result in AFFF being released to environment. Extreme flood event in May 2015 likely resulted in the evaporation pond overflowing and also allowing residual AFFF to infiltrate into surrounding soil.<br>•Landfill No. 4: Landfill is located immediately north of the North Playa Lake. Cover was irrigated using water from North Playa Lake where wastewater from WWTP (potentially including AFFF) was discharged.<br>•Perimeter Road Fuel Spill: AFFF was sprayed from crash fire trucks onto a fuel spill associated with an overturned tanker trunk on the southeast side of Perimeter Road.<br>•Flightline Crash Areas: Cannon AFB Fire Department noted three separate crash areas along the flightline where AFFF was released during crash response activities.<br>**Primary Release Pathways:**<br>•Release or application of AFFF to the ground at potential source areas.<br>•Infiltration of PFAS deeper into the soil column over time potentially reaching groundwater.<br>•AFFF washed into drainage, stormwater, and sewer systems.<br>**Secondary Release Pathways:**<br>•Irrigation utilizing water from the WWTP. |

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **23**

## QAPP WORKSHEET #11: PROJECT/DATA QUALITY OBJECTIVES

The following presents site-specific DQOs for the proposed investigation at Cannon AFB.  These DQOs were developed using USEPA *Guidance on Systematic Planning Using the Data Quality Objectives Process* USEPA QA/G-4 (USEPA, 2006).

### Step 1: State the Problem

AFFF containing PFAS was stored, used, and/or released at Cannon AFB during firefighting testing and training activities, and while suppressing petroleum fires.

### Step 2: Identify the Goals of the Study

The objectives of this investigation are to:

- Conduct an initial SI at AFFF release areas selected for inspection to determine if a confirmed release of PFOS and PFOA has occurred;

- Determine if PFOS and PFOA are present in groundwater, soil, or surface water/sediments at each AFFF area at concentrations exceeding USEPA HA values, or other applicable state or federal standards; and,

- Identify potential receptor pathways with immediate impacts to human health.

### Step 3: Identify Information Input

The following data and informational needs are required to achieve the initial project goals:

- Collection and laboratory analysis of soil samples from soil borings advanced at areas where AFFF was released at Cannon AFB;
- Collection and laboratory analysis of groundwater samples using existing monitoring wells located downgradient of areas where AFFF was released at Cannon AFB;
- Collection and laboratory analysis of sediment samples from surface water bodies/drainage structures where AFFF may have been discharged at Cannon AFB; and,
- Collection of surface water samples from surface water bodies where AFFF may have been discharged at Cannon AFB.

Follow-on objectives and informational inputs, as applicable, will be provided in addenda to this ISWP as needed.

### Step 4: Define the Boundaries of Data Collection

The 13 AFFF release areas at Cannon AFB include locations where AFFF was determined to be released. The investigation boundaries are depicted in **Figures 3** through **16** that illustrate the features and proposed sampling locations at the AFFF release areas at Cannon AFB.  The investigation is defined vertically by the depth of groundwater.

**Supp. App. 0071**

000067

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **24**

**Step 5: Develop the Analytical Approach**

The following 16 PFAS will be analyzed by Modified USEPA Method 537.1 (USEPA SOP 00894), using liquid chromatography-tandem mass spectrometry (LC-MS/MS):

- PFOS;

- PFOA;

- PFBS;

- Perfluoroheptanoic acid (PFHpA);

- Perfluorohexanesulfonic acid (PFHxS);

- Perfluorononanoic acid (PFNA);

- N-Ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA);

- N-Methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA);

- Perfluorodecanoic acid (PFDA);

- Perfluorotetradecanoic acid (PFTA);

- Perfluorododecanoic acid (PFDoA);

- Perfluorohexanoic acid (PFHxA);

- Perfluorotridecanoic acid (PFTrDA);

- Perfluoroundecanoic acid (PFUnA);

- 6:2 fluorotelomer sulfonate (6:2 FTS); and,

- 8:2 fluorotelomer sulfonate (8:2 FTS).

One composite surface soil sample and one composite subsurface soil sample per AFFF release area will also be collected and submitted for analyses of physiochemical properties, including soil pH (USEPA Method 9045B), particle size analysis (ASTM International D422), and total organic carbon (TOC) content (USEPA 9060 or Lloyd Kahn Method).

Release Determination: In accordance with Interim USAF Guidance on Sampling and Response Actions for Perfluorinated Compounds at Active and BRAC Installations (USAF, 2012) and USEPA HA values for PFOS (USEPA, 2016a) and PFOA (USEPA, 2016b), a release will be considered confirmed if exceedances of the following concentrations are identified:

**PFOS**

- 0.07 µg/L in groundwater/surface water that is used as, or contributes to, a drinking water source.

**Supp. App. 0072**

000068

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **25**

- 1,260 µg/kg in soil (calculated, in the absence of RSL values).

- 1,260 µg/kg in sediment (calculated in the absence of RSL values).

**PFOA**

- 0.07 µg/L in groundwater/surface water that is used as, or contributes to, a drinking water source.

- 1,260 µg/kg in soil (calculated, in the absence of RSL values).

- 1,260 µg/kg in sediment (calculated, in the absence of RSL values).

**PFOS + PFOA**

- 0.07 µg/L in groundwater/surface water that is used as, or contributes to, a drinking water source.

While PFOS and PFOA are the focus of the HA and provide specific targets for the USAF to address in the SI, USEPA has also derived RSL values for PFBS for which there is a Tier 2 toxicity value (Provisional Peer Review Toxicity Value). The USAF will also consider a release to be confirmed if exceedances of the following concentrations are identified:

**PFBS**

- 380 µg/L in groundwater/surface water.

- 1,600,000 µg/kg in soil and sediment.

Further Evaluation: If PFAS concentrations exceed USEPA HA values, RSLs, and/or concentrations established by state regulations, then the USAF will be informed of the results of follow-on data collection to evaluate the need to conduct further investigation to delineate PFAS concentrations, identify potential migration pathways, and identify downstream and/or downgradient receptors. Follow-on investigation and step-out sampling will be conducted to evaluate the extent of PFAS concentrations, delineate downgradient groundwater plumes (as applicable), further define the environmental setting, and identify AFFF areas with potential impacts to down-stream and/or downgradient receptors. Follow-on objectives and sampling design and rationale will be defined and described in addenda to this ISWP.

Drinking Water Source Assessment: If a PFAS release is verified, as defined above,, and a potential migration pathway is identified to downgradient drinking water supplies, then public/drinking water wells will be sampled. The public/ drinking water well sampling design and rationale will be defined and described in addenda to this ISWP.

Protect Human Health: If a PFAS release is verified, as defined above, then the USAF will be contacted to evaluate the mitigation measures that may be necessary. Mitigation measures will be applied to private drinking water wells that present an imminent threat to human health from PFAS related to USAF activities

**Supp. App. 0073**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 69 of 316

Appellate Case: 22-2132    Document: 35    Date Filed: 11/27/2024    Page: 77

000069

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **26**

at the installation.  The mitigation measures design rationale will be defined and described in addenda to this ISWP.

**Step 6: Specify Performance or Acceptance Criteria**

- Daily standardized PFAS personal protective equipment (PPE)/equipment checklist (provided in the PFAS protocol standard operating procedure [SOP]) will be completed by the field manager. The quality assurance (QA) manager will review and accept the final checklist.

- QA manager or designee will verify field procedures defined in the QPP and ISWP are properly followed through field audits.  Any deviations will be promptly communicated, addressed, and documented.

- Analytical laboratories will carry the current DoD Environmental Laboratory Accreditation Program certification and any required state accreditations.

- The laboratories will analyze proficiency testing samples to demonstrate capability prior to the sampling program beginning.  The laboratories will identify and quantify proficiency testing samples within acceptance limits to verify reporting of PFAS.  Any findings or recommendations will be addressed prior to collection of field samples.

**Step 7: Develop the Detailed Plan for Obtaining Data**

The detailed plan for obtaining the data is presented in Worksheets **#13, #14/16, #17, #18**, and **#20** of this ISWP.  SOPs for collecting environmental samples (groundwater, soil, surface water, and sediment) that will be used during this investigation are provided in Appendix D of the General QPP.

### QAPP WORKSHEET #13: SECONDARY DATA USES AND LIMITATIONS

The primary sources of data used to generate the history, meteorology, hydrogeology, hydrology, ecological receptors, and AFFF use at Cannon AFB that are included in this ISWP are identified below.

| Data Type | Source | Data Uses Relative to Current Project | Factors Affecting the Reliability of Data and Limitations on Data Use |
|---|---|---|---|
| Site history, Installation History, | *HGL, 2015, Final Preliminary Assessment Report for Perfluorinated Compounds at Cannon Air Force Base, New Mexico. October.* | Provided background information regarding Cannon AFB. | None known. |
| Geology and Hydrogeology | *USGS, 2006. Ground-Water Hydrology and Water Quality of the Southern High Plains Aquifer, Cannon Air Force Base, Curry County, New Mexico, 1994-2005.*<br>FPM, 2014. *2014 Biennial Groundwater Monitoring and Annual Landfill Inspection Report, Cannon Air Force Base, New Mexico. December* | Provided geologic and hydrogeologic setting.<br><br>Provide recent groundwater level information and background information regarding existing monitoring wells. | None known.<br><br>Groundwater level information is presented from 2014; however, may not be representative of current conditions due to declining water levels. |
| AFFF Use | *HGL, 2015, Final Preliminary Assessment Report for Perfluorinated Compounds at Cannon Air Force Base, New Mexico. October.* | Provided history of AFFF use and a background of AFFF release areas identified for follow on SI activities | Assessment did not include all areas identified for SI. No information about fire department responses for aircraft crashes or fuel spills was included in the PA report.<br>AFFF release area determination based on reporting of others/interviews of base personnel. |

000071

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **28**

This page intentionally left blank.

Supp. App. 0076

### QAPP WORKSHEET #14/16: PROJECT TASKS AND SCHEDULE

To meet the project goals defined in Worksheet #11 of the General QPP, the Cannon AFB SI will include the results of the installation scoping visit to determine the sampling activities, as well as the collection of soil, sediment, surface water, and groundwater samples to confirm if a release of PFAS has occurred.  The approach to conducting the SI will include the activities identified in **QAPP Worksheet #14/16** and described below.  Fieldwork will be conducted in accordance with the SOPs provided in Appendix D of the General QPP.

### INSTALLATION SCOPING VISIT

An installation scoping visit was held on 24 and 25 October 2016 by Amec Foster Wheeler personnel to review available data, interview applicable Cannon AFB personnel, and visit proposed AFFF areas to identify site-specific sampling locations and constraints.  Thirteen potential AFFF areas are proposed for further investigation.  Refer to **QAPP Worksheet #9** for details.

### PRE-MOBILIZATION ACTIVITIES

The following activities will be completed prior to mobilization to Cannon AFB to perform SI field activities.

#### Health and Safety Plan Preparation

The Installation-Specific HSP is included in **Appendix A**, and is a supplement to the General HSP found in Appendix A of the General QPP.  The HSP will be reviewed and updated, as necessary, prior to field mobilization based on final personnel assignments.  The HSP has been prepared in accordance with the Occupational Safety and Health Administration's Hazardous Waste Operations and Emergency Response Standard (29 Code of Federal Regulations [CFR] 1910.120 CFR).

Amec Foster Wheler will also review all subcontractor HSPs and training records for subcontracted personnel to ensure compliance with Amec Foster Wheeler's General HSP.

#### Base Access

Amec Foster Wheeler field personnel and their drilling subcontractor will provide Mr. Kottkamp with all personal information required for access to Cannon AFB a minimum of 30 days prior to initiation of field activities.  Thirty-day passes will be obtained at the Cannon AFB main gate Visitor Center on the first day of mobilization upon presentation of a valid identification in accordance with the REAL ID Act, registration/rental vehicle contract, and insurance certificate/documentation for all vehicles.  Flightline drivers and radio training will be required for all on-site personnel who will be conducting work in the flightline areas.  Training will be required prior to the initiation of SI activities.  All applicable training will be coordinated with Mr. Kottkamp and Base Operations prior to mobilization to Cannon AFB.

#### Utility Clearance

Amec Foster Wheeler will pre-mark all proposed boring locations.  Utility clearance at each location will be obtained by completing the following activities:

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **30**

- Obtain utility clearances and a dig permit ticket through New Mexico One-Call System (New Mexico 811) a minimum of 7 days prior to mobilization of drilling equipment;
- Complete and submit a Base CE Work Clearance Request (Form 103);
- Notify Cannon AFB CE department of all utility clearances;
- Review available utility plans for identification of potential utilities in work areas; and,
- Clearing of all intrusive locations by the drilling subcontractor using a hand auger or post-hole digger to a minimum depth of 5 ft bgs.

**Area-Specific Regulations/Permits**

A FAA permit is required for all soil boring/monitoring well installations utilizing a drill rig on the active airfield at Cannon AFB. Amec Foster Wheeler will submit all required information to Mr. Kottkamp a minimum of 60 days prior to fieldwork initiation, including anticipated fieldwork dates and duration, boring/well Global Positioning System (GPS) coordinates and elevations, drill rig type and mast heights (lowered and raised), and well development method.

SI activities at Hangars 109, 119 and 133, and the South Playa Lake, will require additional coordination and scheduling with Base Operations. SI activities to be conducted at FTA No. 2 and FTA No. 3 will require additional coordination and scheduling with EOD personnel.

**Field Readiness Review**

Amec Foster Wheeler will conduct a Field Readiness Review that will include the preparation of a checklist to ensure all permits, procurement items, and notifications have been submitted and/or approved. This information will be discussed during a teleconference with the Remedial Program Manager (RPM) and AFCEC personnel a minimum of 2 weeks prior to fieldwork mobilization. Any required notification to the NMED will be provided by the RPM within the applicable timeframe.

**MOBILIZATION/DEMOBILIZATION**

Two mobilizations to the installation will be required to complete the SI work. The first mobilization will be to mark boring locations and verify utility clearance with the Base CE, while the second mobilization will be to advance soil borings, complete monitoring well development, collect soil, groundwater, surface water, and sediment samples, and conduct surveying of sampling locations.

**ENVIRONMENTAL SAMPLING**

Soil, sediment, surface water, and/or groundwater samples will be collected at the 13 identified AFFF release areas at Cannon AFB. The goal of site-specific sampling is to determine the presence or absence of PFAS within media of concern. **QAPP Worksheets #18-1** through **#18-14** and **Figures 3** through **15** provide the sampling details and locations, respectively, for each potential AFFF release area at Cannon AFB. All environmental samples collected will be analyzed for the analytical suite of 16 PFAS, identified in **QAPP Worksheet #11.**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 74 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 82

000074

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **31**

One composite surface soil sample and one composite subsurface soil sample per AFFF release area will also be collected and submitted for analysis of physiochemical properties, including soil pH (USEPA Method 9045B), particle size analysis (ASTM D422), and TOC (USEPA 9060 or Lloyd Kahn Method). The General QPP provides the SOPs and descriptions for sampling activities, while a summary of the proposed field sampling activities is described in the following sections.

### Soil Boring Advancement/Abandonment and Soil Sampling

Twenty-four soil borings will be advanced by a New Mexico licensed driller using either direct push technology or hollow stem auger, to identify the presence or absence of PFAS in soil at nine of the AFFF release areas, as well as to characterize subsurface conditions. Soil cores will be continuously collected to the appropriate depth, screened with a photoionization detector equipped with a 10.6 electron volt lamp for volatile organic vapors, and logged by a qualified geoscientist in accordance with the Unified Soil Classification System (USCS).

Discrete surface and subsurface vadose-zone soil samples will be collected from each of the soil borings at specified depths during soil boring advancement for laboratory analysis. Surface soil samples will be collected from the surface or immediately below the vegetative layer to 6 inches bgs. Subsurface soil samples will be collected to assess PFAS presence in the vadose zone at a total depth of approximately 30 ft bgs. Specific details and procedures related to soil sample collection can be found in SOP AFW-02, *Soil Sampling* (Appendix D, General QPP). The boreholes will be abandoned in accordance with SOP AFW-06, *Borehole Abandonment* (Appendix D, General QPP). **QAPP Worksheets #17** and **#18** provide further discussion of sample locations and rationale. Soil sample collection details will be recorded in field logs and soil sample collection logs, while boring lithology will be recorded on drilling logs (Appendix E, General QPP).

### Monitoring Well Development and Sampling

Fifteen existing monitoring wells will be sampled for PFAS during the SI since no new monitoring wells will be installed as part of the SI. Groundwater at Cannon AFB is regulated basewide by NMED rather than evaluating groundwater impacts specific to an area of concern. It was determined that the SI would focus on determination of PFAS presence or absence utilizing existing monitoring wells that are already approved by NMED as part of the Cannon Basewide Groundwater Monitoring Program. Prior to sampling, all monitoring wells proposed for sampling will be redeveloped. Existing sampling equipment including dedicated tubing will be removed from the monitoring wells and staged for future use.

The monitoring wells will be developed using a stainless steel submersible pump outfitted with disposable high-density polyethylene (HDPE) tubing, in accordance with SOP AFW-05, *Monitoring Well Development* (Appendix D, General QPP). Water quality parameters (pH, specific conductance, temperature, oxidation-reduction potential [ORP], dissolved oxygen [DO], and turbidity) of the development water will be measured and recorded on well development logs. Well development will continue until the water quality

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **32**

parameters have stabilized and the development water is generally sediment-free or clear (i.e., less than 50 nephelometric turbidity units).

Static depth to groundwater measurements will be collected from all available existing monitoring wells for use in potentiometric level calculation and groundwater contouring prior to initiating groundwater development, purging, and sampling activities.  Low-flow groundwater purging and sampling will be conducted from each monitoring well with a submersible pump outfitted with disposable HDPE tubing.  Water levels and quality parameters (pH, specific conductance, temperature, ORP, and DO) will be periodically measured with a multi-purpose water quality meter and turbidity meter until all parameters stabilize in accordance with SOP AFW-03, *Groundwater Sampling* (Appendix D, General QPP).  The water levels and quality parameter measurements will be recorded on groundwater sample collection logs during purging activities.  A summary of proposed groundwater samples is provided in **Worksheet #18**.

**Sediment Sample Collection**

Four sediment samples will be collected at two AFFF release areas at Cannon AFB to determine the presence or absence of PFAS in sediment at and adjacent to AFFF areas.  Sediment samples will be collected using either a core sampler or by hand using stainless steel spoons or cups mounted on poles as necessary, depending on location-specific conditions.  A summary of proposed sediment samples is provided in **Worksheet #18,** and specific details and procedures related to sediment sample collection can be found in SOP AFW-07 (PFAS), *Sediment Sampling* (Appendix D, General QPP).

**Surface Water Sample Collection**

Four surface water samples will be collected at two AFFF areas at Cannon AFB, if present, to determine the presence or absence of PFAS in surface water.  Surface water samples will be collected using the immersion method.  A summary of proposed surface water samples is provided in **Worksheet #18,** and specific details and procedures related to surface water sample collection can be found in SOP AFW-08 (PFAS), *Surface Water Sampling* (Appendix D, General QPP).

**PFAS SAMPLING CONSIDERATIONS**

Given the low detection limits associated with PFAS analysis and the many potential sources of trace levels of PFAS, field personnel will follow strict protocols to help mitigate the potential for false detections of PFAS.  A list of prohibited and acceptable clothing/equipment for sampling at PFAS sites is provided in Table 5 of the General QPP.  Specific details and procedures related to sampling for analysis of PFAS can be found in SOP AFW-01 (PFAS), *PFC-Specific Procedures* (Appendix D, General QPP).

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 76 of 316

000076

Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 84

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **33**

**SURVEYING**

Amec Foster Wheeler personnel will locate, survey, and mark all proposed soil borings and monitoring well locations using a handheld GPS unit for utility clearance. After well sampling activities are completed, all monitoring wells will be surveyed by a licensed land surveyor. In order to ensure accuracy, existing monitoring wells will be re-surveyed to enable accurate placement of well locations on a map and to provide accurate data for calculating groundwater elevations. Horizontal coordinates will be surveyed to the nearest 0.1 ft and referenced to the relevant State Plane Coordinate System using the North American Datum of 1983, as adjusted in 1991. Elevation measurements will be made at ground surface and at the top of casing at each of the monitoring wells. Elevations will be surveyed to the nearest 0.01 ft and referenced to the North American Vertical Datum of 1988.

**INVESTIGATION-DERIVED WASTE MANAGEMENT**

Investigation-derived waste (IDW) will consist of soil cuttings from soil boring advancement, well development water, groundwater sampling purge water, decontamination water, disposable PPE, and other miscellaneous refuse. Used PPE and other miscellaneous refuse will be placed in plastic bags and discarded in an on-site sanitary trash container for disposal at a sanitary landfill. Soil IDW will be placed into Department of Transportation (DOT)-approved 55-gallon, open-top steel drums with locking lids and staged in the designated laydown area, pending analysis and disposal. Liquid IDW generated from equipment decontamination, and monitoring well development and purging activities will be placed into a frac tank pending analysis and disposal. IDW containers will be appropriately labeled with site/contact information and contents, and will be staged in the designated laydown area at an area designated by Cannon AFB personnel. Based upon waste characterization results, soil will be transported off-site by a licensed waste hauler to a permitted disposal facility. Depending on the liquid IDW characterization, it will either be profiled and transported off-site by a licensed waste hauler to a permitted disposal facility or discharged to the surface (non-hazardous). A designated USAF representative will oversee IDW loading for transport and disposal and will sign all manifests/bills of lading. Copies of the bills of lading/manifests will be included in the SIR.

**Soil IDW**

An aliquot of soil will be collected from each soil core during soil boring advancement and stored in a separate 5-gallon plastic container. A composited soil sample will be collected from the container at the conclusion of drilling activities and transferred directly into laboratory-provided containers, labeled, packed on ice in insulated coolers, and delivered under chain-of-custody protocol to the selected laboratory. The samples will be analyzed for volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), pesticides, herbicides, and metals, polychlorinated biphenyls (PCBs), TPH-gasoline range organics (GRO), TPH-diesel range organics (DRO), flashpoint, pH, sulfide, and cyanide, to determine the applicable disposal option.

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **34**

**Liquid IDW**

The liquid IDW will be collected in a fracture tank from monitoring well development/purge water and equipment decontamination water. A composite sample will be retrieved from the tank at the conclusion of drilling and sampling activities using a disposable bailer. The samples will be decanted directly into laboratory-provided containers, labeled, packed on ice in insulated coolers, and delivered under chain-of-custody protocol to the selected laboratory. The samples will be analyzed for VOCs, SVOCs, pesticides, herbicides, metals, PCBs, TPH-GRO and, TPH-DRO, flashpoint, pH, sulfide, and cyanide, to determine the applicable disposal option.

 **PROPOSED SITE INSPECTION SCHEDULE**

The projected schedule for completion of SI activities is summarized below.

**QAPP WORKSHEET #14/16:  PROPOSED SCHEDULE OF SI ACTIVITIES.**

| Activities | Organization | Dates (MM/DD/YY) | | Deliverable | Deliverable Due Date |
| | | Actual or Anticipated Date of Initiation | Actual or Anticipated Date of Completion | | |
|---|---|---|---|---|---|
| **Installation Scoping Visit** – A scoping visit was made to the installation to conduct interviews with personnel familiar with AFFF use, review information and inspect potential AFFF release areas, and determine logistical information required for the SI fieldwork. | Amec Foster Wheeler | 10/24/2016 | 10/25/2016 | Scoping visit notes for all interviews, activities planned for each of the AFFF release areas, and installation logistical information. | 1/31/2017 |
| **Installation-Specific Work Plan** – This report will be generated using information gathered from the installation scoping visit, including information provided by AFCEC and Cannon AFB personnel. | Amec Foster Wheeler | 2/3/2017 | 4/14/2017 | Installation-Specific Work Plan. | 6/30/2017 |
| **Readiness Review** – A readiness review will be conducted prior to mobilization to the installation to ensure that the field crew has the proper sampling equipment, sample containers, PPE, site clearances, sample locations, and any miscellaneous materials necessary to conduct the SI fieldwork. | Amec Foster Wheeler | 7/31/17 | 7/31/17 | Results of the readiness reviews will be included in the SIR. | 4/27/2018 |
| **Utility Clearance** – All soil boring and monitoring well locations will be located and marked, and verified to ensure no underground utilities will be compromised. | Amec Foster Wheeler | 8/14/17 | 8/16/17 | Description of the utility clearance activities will be included in the SIR. | 4/27/2018 |

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **35**

| Activities | Organization | Dates (MM/DD/YY) | | Deliverable | Deliverable Due Date |
|---|---|---|---|---|---|
| | | **Actual or Anticipated Date of Initiation** | **Actual or Anticipated Date of Completion** | | |
| **SI Field Activities** – Field activities will be conducted at the 13 AFFF release areas, including soil boring advancement, monitoring well development, collection of soil, groundwater, surface water and sediment samples for PFAS analysis, and oversight of the monitoring well top of casing elevation survey. | Amec Foster Wheeler<br><br>Drilling subcontractor<br><br>Subcontracted Surveyor | 9/18/17 | 12/1/2017 | SI field information will be included in the SIR. | 4/27/2018 |
| **Laboratory Data Validation** – Validation of the field sampling analytical data will be conducted for each sample data group. | Amec Foster Wheeler | 1/05/2018 | 1/24/2018 | Information to be included in the SIR. | 4/27/2018 |
| **SI Report** – This report will be prepared based upon the data generated during the SI field activities, and will include, at a minimum, geology/hydrogeology, CSM, sampling locations and depths, validated analytical results, and recommendations for further investigation of each AFFF release area. | Amec Foster Wheeler | 12/4/17 | 3/2/2018 | SIR. | 4/27/2018 |
| **ERPIMS** – Field notes, sampling logs, boring coordinates, etc. generated during the SI will be upload to the USAF ERPIMS database. | Amec Foster Wheeler | 1/24/2018 | 2/23/2018 | ERPIMS Data Upload | 3/30/2018 |

**Notes:**
AFB – Air Force Base
AFCEC – Air Force Civil Engineer Center
AFFF – aqueous film forming foam
CSM – conceptual site model
DD – day
ERPIMS — Environmental Resources Program Information Management System
MM – month
NA – not applicable
PFAS – per- and polyfluorinated alkyl substances
PPE – personal protective equipment
RPM – Remedial Project Manager
SI – Site Inspection
SIR – Site Inspection Report
USAF – United States Air Force
YY – year

**Supp. App. 0083**

000079

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **36**

This page intentionally left blank.

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **37**

## QAPP WORKSHEET 17: SAMPLING DESIGN AND RATIONALE

**PROPOSED SCOPE OF WORK**

Amec Foster Wheeler has developed a sampling program designed to evaluate the potential release of AFFF from FTAs, firefighting equipment testing areas, fire suppression systems, and AFFF discharge locations at Cannon AFB. The sampling plan is based on:

- Discussions between Amec Foster Wheeler and AFCEC during the installation visit from 24 through 25 October 2016;
- Review of background documents; and,
- Development of a preliminary Base-wide CSM (**Worksheet #10**).

Sampling at Cannon AFB is being performed at the locations most likely to have been previously impacted with AFFF from USAF activities, as well as from select existing monitoring wells located hydraulically downgradient of AFFF release areas. The sampling rationale and locations for each of the 13 AFFF release areas are detailed below and presented in **Worksheet 18**. Where applicable, existing monitoring wells are identified by area below; however, since groundwater quality at Cannon AFB is managed across the installation rather than on an area-by-area basis, basewide groundwater sampling is presented separately in **Worksheet #18-14**).

**AFFF Release Area 1: Former FTA No. 2**

Two soil borings will be advanced within the centers of the west and east burn pits where AFFF may have been released during fire training activities. Surface and subsurface soil samples will be collected from each of the borings advanced. Groundwater will be sampled as part of basewide groundwater sampling activities. The proposed soil sample locations for former FTA No. 2 are illustrated on **Figure 4.**

**AFFF Release Area 2: Former FTA No. 3**

Two soil borings will be advanced at former FTA No. 3 including, one soil boring in the approximate center of the former FTA and the second will be advanced in a location down-slope of the former FTA. Surface and subsurface soil samples will be collected from two borings advanced at FT-08. Groundwater will be sampled as part of basewide groundwater sampling activities. The proposed soil sample locations for former FTA No. 3are illustrated on **Figure 5.**

**AFFF Release Area 3:  Former FTA No. 4**

Three soil borings will be advanced at the former FTA-4 location, including one soil boring beneath the former mock aircraft burn area; one soil boring at the location of the former unlined discharge pit/OWS location; and one soil boring in the northwest portion of the FTA in the location where fire training was conducted on vehicle chassis. Surface and subsurface soil samples will be collected from three borings at this location. The subsurface soil samples will be collected in native material beneath identified fill material (where applicable). Groundwater will be sampled as part of basewide groundwater sampling activities. The proposed soil sample locations for former FTA-4 are illustrated on **Figure 6**.

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **38**

**AFFF Release Area 4:  Hangars 119 and 133**

SI activities for hangars 119 and 133 have been grouped into a single area of investigation due to the proximity of the hangars.  Two soil borings will be completed at AFFF Area 4 including; one soil boring on the north side of the grassy area, immediately downslope (southwest) of Hangar 119 and one soil boring on the south side of the grassy area, adjacent Hangar 133 in a location where AFFF released from the hangar likely accumulated after being directed to the in-field soil.  Surface and subsurface soil samples will be collected from two borings.  No existing monitoring wells are present in the vicinity of, or immediately downgradient of hangars 119 or 133; however, basewide groundwater monitoring will be conducted including sampling of monitoring wells downgradient of AFFF Area 4.  The proposed soil sample locations are illustrated on **Figure 7**.

**AFFF Release Area 5: Former Sewage Lagoons**

Five soil borings will be completed at the former sewage lagoon area.  The five soil borings are proposed at locations across the southern lagoon area.  Two subsurface samples are proposed to be collected from each boring, including a shallow subsurface sample immediately below the sludge/soil layer and a second sample at a depth of 10 ft bgs.  Existing monitoring wells MW-F, MW-G, MW-H, and MW-Pa are located downgradient of the former sewage lagoon areas and will be sampled for PFAS as part of basewide sampling activities.  The proposed soil sample locations are illustrated on **Figure 8**.

**AFFF Release Area 6: North Playa Lake Outfall**

Two sediment and two surface water samples will be collected from North Playa Lake; one pair of samples will be collected at the WWTP outfall location on the west side of the playa and the second will be collected from the northeast portion of the playa.  Monitoring well MW-Oa is located downgradient (southeast) of the North Playa Lake and will be sampled for PFAS as part of basewide groundwater sampling.  The proposed sediment and surface water sample locations for North Playa Lake Outfall are illustrated on **Figure 9**.

**AFFF Release Area 7: South Playa Lake Outfall**

Four soil borings are proposed at the South Playa Lake for surface and subsurface soil sampling.  One soil boring is proposed at each of sewer outfalls from the flightline area; one located on the west side of the playa, a second located along the northern perimeter of the playa, and a third located in the northeastern portion of the playa.  A fourth soil boring is proposed in the center of the South Playa Lake at an area where water, if present, would pond.  No sediment or surface water sampling is proposed at this time; however, if water is present at the South Playa during SI activities, a surface water and sediment sample will be collected at each of the proposed soil boring locations as an alternative to surface and subsurface soil samples.  Groundwater will be sampled as part of basewide groundwater sampling activities.  The proposed sampling locations for South Playa Lake are illustrated on **Figure 10.**

000082

**AFFF Release Area 8: Whispering Winds Golf Course**

One sediment and one surface water sample will be collected from each of the two ponds located at the golf course.  In the northern pond, the sediment and surface water sample will be collected near the effluent pipe outlet from the WWTP/effluent tank.  The sediment and surface water sample in the eastern pond will be collected near the pipe outlet that discharges from the larger pond.  No soil or groundwater samples are proposed at the golf course.  The proposed sediment and surface water sampling locations are illustrated on **Figure 11**.

**AFFF Release Area 9: Hangar 109**

Surface and subsurface soil samples will be collected from two borings completed in the grassy area located on the northwest side of Hangar 109.  One soil boring will be completed in the grassy area west of the hangar in an area where AFFF staining was observed on the concrete apron extending into the grassy area.  The second boring will be completed on the northwest side of the hangar in a grassy area across from the mechanical room where AFFF was released.  No existing monitoring wells are present in the vicinity of, or immediately downgradient of Hangar 109; however, basewide groundwater sampling will be conducted including sampling of monitoring wells downgradient of AFFF Area 9.  The proposed soil sample locations are illustrated on **Figure 12**.

**AFFF Release Area 10: Landfill #4**

SI activities relative to Landfill #4 are limited to collecting one groundwater sample from downgradient monitoring well MW-Na, located southeast of the landfill to evaluate potential PFAS impacts in groundwater associated with historical practice of applying water from North Playa Lake to support revegetation of the landfill cover.  No soil samples are required relative to Landfill #4.  The proposed groundwater sampling location is illustrated on **Figure 13** and **Figure 17**.

**AFFF Release Area 11: Active FTA**

Surface and subsurface samples will be collected from three soil borings located around the  evaporation pond located on the south side of the active FTA.  One boring will be completed west of the evaporation basin, one boring will be completed south of the evaporation basin and one basin will be completed east of the evaporation basin.  Existing monitoring well MW-A is located downgradient of the active FTA and will be sampled as part of basewide groundwater sampling for PFAS.  The proposed soil borings and existing monitoring wells to be sampled are illustrated on **Figure 14**.

**AFFF Release Area 12: Perimeter Road Fuel Spill**

Two subsurface samples will be collected from one soil boring located in the center of the fuel spill area located southeast of Perimeter Road.  The first subsurface sample will be collected in native material beneath the fill that was placed following excavation activities.  The second subsurface sample will be collected at a depth of approximately 30 ft bgs to evaluate potential downward migration of PFAS.  The proposed soil sampling location is shown on **Figure 15.**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 83 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 91

000083

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **40**

**AFFF Release Area 13: Flightline Aircraft Crashes**

SI activities proposed relative to the aircraft crash response sites are limited to groundwater sampling of existing monitoring wells located downgradient of the flightline/runway areas. Since the exact locations of the crash response and AFFF release areas were unknown, source soil sampling could not be adequately located. Five existing monitoring wells MW-A, MW-E, MW-Rb, MW-X, and MW-W will be sampled as monitoring wells located downgradient of the crash sites. Monitoring wells MW-E, MW-Rb and MW-W are also considered upgradient of all AFFF release areas with the exception of those along the flightline/apron area, therefore allowing a determination of whether AFFF use/releases on the flightline have resulted in PFAS presence at the installation. The proposed groundwater sampling locations are illustrated on **Figure 16.**

**Basewide Groundwater Sampling**

Groundwater at Cannon AFB is regulated installation-wide by the NMED rather than on an area-by-area basis. At the request of Cannon AFB personnel, the determination of PFAS presence or absence in groundwater will therefore be limited to sampling of existing monitoring wells approved by NMED in the Cannon AFB Groundwater Monitoring Program. These monitoring wells were installed to evaluate background groundwater quality and groundwater conditions downgradient of industrial/operational areas of the base.

The groundwater sampling plan presented in this ISWP has been developed to evaluate presence or absence of PFAS in groundwater downgradient of known AFFF release areas. A total of 15 existing monitoring wells will be sampled for PFAS, including one monitoring well (MW-V) serving as a background monitoring well. The background monitoring well is located in the northwest corner of the installation, upgradient of all AFFF release areas. The remaining 14 monitoring wells (MW-A through MW-H, MW-Na, MW-Oa, MW-Pa, MW-Rb, MW-W, and MW-X) are located downgradient of one or more AFFF release areas. The locations of monitoring wells to be sampled are illustrated on **Figure 16**.

The proposed number of samples by media (surface soil, subsurface soil, groundwater, surface water, and sediment) to be collected at each AFFF release area described above are summarized in **Table 3**.

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 84 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 92

000084

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **41**

**Table 3. Proposed Samples per Media at Each AFFF Release Area.**

| Site | Surface Soil Samples | Subsurface Soil Samples | Groundwater Samples | Surface Water Samples | Sediment Samples |
|---|---|---|---|---|---|
| **FT-07** (AFFF Release Area 1) | 2 | 2 | BW | 0 | 0 |
| **FT-08** (AFFF Release Area 2) | 2 | 2 | BW | 0 | 0 |
| **FTA-4** (AFFF Release Area 3) | 3 | 3 | BW | 0 | 0 |
| **Hangars 119 and 133** (AFFF Release Area 4) | 2 | 2 | BW | 0 | 0 |
| **Former Sewage Lagoons** (AFFF Release Area 5) | 0 | 10 | BW | 0 | 0 |
| **North Playa Lake Outfall** (AFFF Release Area 6) | 0 | 0 | BW | 2 | 2 |
| **South Playa Lake Outfall** (AFFF Release Area 7) | 4 | 4 | BW | 2* | 2* |
| **Whispering Winds Golf Course** (AFFF Release Area 8) | 0 | 0 | BW | 2 | 2 |
| **Hangar 109** (AFFF Release Area 9) | 2 | 2 | BW | 0 | 0 |
| **Landfill #4** (AFFF Release Area 10) | 0 | 0 | BW | 0 | 0 |
| **Active FTA** (AFFF Release Area 11) | 3 | 3 | BW | 0 | 0 |
| **Perimeter Road Fuel Spill** (AFFF Release Area 12) | 0 | 2 | BW | 0 | 0 |
| **Flightline Aircraft Crashes** (AFFF Release Area 13) | 0 | 0 | BW | 0 | 0 |
| **Basewide Groundwater** | 0 | 0 | 15 | 0 | 0 |
| **Total Primary Samples** | 18 | 30 | 15 | 6 | 6 |
| **Field Duplicates** | 2 | 3 | 2 | 1 | 1 |
| **Matrix Spike/Matrix Spike Duplicates** | 1 | 2 | 1 | 1 | 1 |
| **Field Blanks (Equipment Rinsate Blanks)** | 10 | 11 | 4 | 1 | 1 |
| **Total Samples** | **31** | **46** | **22** | **9** | **9** |

**Notes:**
*Surface water and sediment samples collected only if surface water is present.
AFFF – aqueous film forming foam
BW – Proposed groundwater sample included in basewide total
FTA – fire training area

**Supp. App. 0089**

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **42**

This page intentionally left blank.

000086

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **43**

## QAPP WORKSHEET #18-1: SAMPLING LOCATIONS AND METHODS

## AFFF RELEASE AREA 1: FORMER FTA NO. 2

Sample locations are illustrated on **Figure 4**.  The proposed sampling summary for AFFF Release Area 1 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB01001 | CANON01-SO-001 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the area of the western former burn pit. |
| | CANON01-SO-002 | Subsurface Soil | 28 | 30 | DPT Core/ Split Spoon | New | |
| SB01002 | CANON01-SO-003 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the area of the eastern former burn pit. |
| | CANON01-SO-004 | Subsurface Soil | 28 | 30 | DPT Core/ Split Spoon | New | |

**Notes:**

AFFF – aqueous film forming foam          DPT – direct push technology          ft bgs – feet below ground surface
ID – identification          PFAS – per- and polyfluorinated alkyl substances          SO – soil

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 1 are provided in Worksheet #18-14 basewide groundwater sampling.

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 86 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 94

Supp. App. 0091

000087

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **44**

Case 2:19-cv-00046-KG-SMV  Document 49-3  Filed 02/01/21  Page 87 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 95

**QAPP WORKSHEET #18-2: SAMPLING LOCATIONS AND METHODS**

**AFFF RELEASE AREA 2: FORMER FTA NO. 3**

Sample locations are illustrated on **Figure 5**.  The proposed sampling summary for AFFF Release Area 2 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB02001 | CANON02-SO-001 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the area of the former burn area. |
| | CANON02-SO-002 | Subsurface Soil | 28 | 30 | DPT Core/ Split Spoon | New | |
| SB02002 | CANON02-SO-003 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in a downgradient (southeast) location from the former burn area. |
| | CANON02-SO-004 | Subsurface Soil | 28 | 30 | DPT Core/ Split Spoon | New | |

**Notes:**
AFFF – aqueous film forming foam          DPT – direct push technology          ft bgs – feet below ground surface
ID – identification          PFAS – per- and polyfluorinated alkyl substances          SO – soil

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 2 are provided in Worksheet #18-14 basewide groundwater sampling.

Supp. App. 0092

000088

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **45**

**QAPP WORKSHEET #18-3: SAMPLING LOCATIONS AND METHODS**

**AFFF RELEASE AREA 3: FORMER FTA NO. 4**

Sample locations are illustrated on **Figure 6**. The proposed sampling summary for AFFF Release Area 3 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB03001 | CANON03-SO-001 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the area of the former mock aircraft burn area. |
| | CANON03-SO-002 | Subsurface Soil | 48 | 50 | DPT Core/ Split Spoon | New | |
| SB03002 | CANON03-SO-003 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the area of the former OWS/unlined discharge pit. |
| | CANON03-SO-004 | Subsurface Soil | 48 | 50 | DPT Core/ Split Spoon | New | |
| SB03003 | CANON03-SO-005 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the northwest portion of the FTA in the area of vehicle chassis training. |
| | CANON03-SO-006 | Subsurface Soil | 48 | 50 | DPT Core/ Split Spoon | New | |

**Notes:**
AFFF – aqueous film forming foam      DPT – direct push technology      ft bgs – feet below ground surface
FTA – fire training area      ID – identification      OWS – oil-water separator
PFAS – per- and polyfluorinated alkyl substances      SO – soil

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 3 are provided in Worksheet #18-14 basewide groundwater sampling.

## QAPP WORKSHEET #18-4: SAMPLING LOCATIONS AND METHODS

## AFFF RELEASE AREA 4: HANGARS 119 AND 133

Sample locations are illustrated on **Figure 7**.  The proposed sampling summary for AFFF Release Area 4 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB04001 | CANON04-SO-001 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in a grassy area where surface flow from Hangar 119 could have collected. |
| | CANON04-SO-002 | Subsurface Soil | 28 | 30 | DPT Core/ Split Spoon | New | |
| SB04002 | CANON04-SO-003 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in a grassy area where surface flow from Hangar 133 could have collected. |
| | CANON04-SO-004 | Subsurface Soil | 28 | 30 | DPT Core/ Split Spoon | New | |

**Notes:**

| | | |
|---|---|---|
| AFFF – aqueous film forming foam | DPT – direct push technology | ft bgs – feet below ground surface |
| ID – identification | PFAS – per- and polyfluorinated alkyl substances | SO – soil |

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 4 are provided in Worksheet #18-14 basewide groundwater sampling.

000090

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **47**

**QAPP WORKSHEET #18-5: SAMPLING LOCATIONS AND METHODS**

**AFFF RELEASE AREA 5: FORMER SEWAGE LAGOONS**

Sample locations are illustrated on **Figure 8**. The proposed sampling summary for AFFF Release Area 5 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB05001 | CANON05-SO-001 | Subsurface Soil | 4 | 5 | DPT Core | New | Assess PFAS presence in sludge in the former southern lagoon below the engineered cap |
| SB05001 | CANON05-SO-002 | Subsurface Soil | 9 | 10 | DPT Core | New | |
| SB05002 | CANON05-SO-003 | Subsurface Soil | 4 | 5 | DPT Core | New | |
| SB05002 | CANON05-SO-004 | Subsurface Soil | 9 | 10 | DPT Core | New | |
| SB05003 | CANON05-SO-005 | Subsurface Soil | 4 | 5 | DPT Core | New | |
| SB05003 | CANON05-SO-006 | Subsurface Soil | 9 | 10 | DPT Core | New | |
| SB05004 | CANON05-SO-007 | Subsurface Soil | 4 | 5 | DPT Core | New | |
| SB05004 | CANON05-SO-008 | Subsurface Soil | 9 | 10 | DPT Core | New | |
| SB05005 | CANON05-SO-009 | Subsurface Soil | 4 | 5 | DPT Core | New | |
| SB05005 | CANON05-SO-010 | Subsurface Soil | 9 | 10 | DPT Core | New | |

**Notes:**
AFFF – aqueous film forming foam          DPT – direct push technology          ft bgs – feet below ground surface
ID – identification          PFAS – per- and polyfluorinated alkyl substances          SO – soil

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 5 are provided in Worksheet #18-14 basewide groundwater sampling.

Case 2:19-cv-00046-KG-SMV  Document 49-3  Filed 02/01/21  Page 90 of 316
Appellate Case: 22-2132  Document: 35  Date Filed: 11/27/2024  Page: 98

Supp. App. 0095

000091

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **48**

## QAPP WORKSHEET #18-6: SAMPLING LOCATIONS AND METHODS

## AFFF RELEASE AREA 6: NORTH PLAYA LAKE OUTFALL

Sample locations are illustrated on **Figure 9**. The proposed sampling summary for AFFF Release Area 6 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SD/SW06001 | CANON06-SD-001 | Sediment | 0 | 0.5 | Grab | New | Assess PFAS presence in sediment and surface water in North Playa Lake at the WWTP outfall. |
| | CANON06-SW-001 | Surface Water | 0 | 0.5 | Grab | New | |
| SD/SW06002 | CANON06-SD-002 | Sediment | 0 | 0.5 | Grab | New | Assess PFAS presence in sediment and surface water along the northern perimeter of North Playa Lake. |
| | CANON06-SW-002 | Surface Water | 0 | 0.5 | Grab | New | |

**Notes:**

AFFF – aqueous film forming foam                ft bgs – feet below ground surface                ID – identification
PFAS – per- and polyfluorinated alkyl substances    SD – sediment                                SW – surface water
WWTP – waste water treatment plant

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 6 are provided in Worksheet #18-14 basewide groundwater sampling.

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 91 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 99

Supp. App. 0096

000092

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **49**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 92 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 100

**Supp. App. 0097**

## QAPP WORKSHEET #18-7: SAMPLING LOCATIONS AND METHODS

## AFFF RELEASE AREA 7: SOUTH PLAYA LAKE OUTFALL

Sample locations are illustrated on **Figure 10**.  The proposed sampling summary for AFFF Release Area 7 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB07001 | CANON07-SO-001 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in South Playa Lake in the area of the western sewer outfall. |
| | CANON07-SO-002 | Subsurface Soil | 23 | 25 | DPT Core/ Split Spoon | New | |
| SB07002 | CANON07-SO-003 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in South Playa Lake in the area of the northern sewer outfall. |
| | CANON07-SO-004 | Subsurface Soil | 23 | 25 | DPT Core/ Split Spoon | New | |
| SB07003 | CANON07-SO-005 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in South Playa Lake in the area of the eastern sewer outfall. |
| | CANON07-SO-006 | Subsurface Soil | 23 | 25 | DPT Core/ Split Spoon | New | |
| SB07004 | CANON07-SO-007 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the approximate center of South Playa Lake. |
| | CANON07-SO-008 | Subsurface Soil | 23 | 25 | DPT Core/ Split Spoon | New | |

**Notes:**
AFFF – aqueous film forming foam   DPT- direct push technology   ft bgs – feet below ground surface
ID – identification   PFAS – per- and polyfluorinated alkyl substances   SO – soil

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 7 are provided in Worksheet #18-14 basewide groundwater sampling.

000093

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **50**

**QAPP WORKSHEET #18-8: SAMPLING LOCATIONS AND METHODS**

**AFFF RELEASE AREA 8: WHISPERING WINDS GOLF COURSE**

Sample locations are illustrated on **Figure 11**.  The proposed sampling summary for AFFF Release Area 8 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SD/SW08001 | CANON08-SD-001 | Sediment | 0 | 0.5 | Grab | New | Assess PFAS presence in sediment and surface water in the western golf course pond. |
| | CANON08-SW-001 | Surface Water | 0 | 0.5 | Grab | New | |
| SD/SW08002 | CANON08-SD-002 | Sediment | 0 | 0.5 | Grab | New | Assess PFAS presence in sediment and surface water in the eastern golf course pond. |
| | CANON08-SW-002 | Surface Water | 0 | 0.5 | Grab | New | |

**Notes:**
AFFF – aqueous film forming foam                    ft bgs – feet below ground surface                    ID – identification
PFAS – per- and polyfluorinated alkyl substances    SD – sediment                    SW – surface water

Supp. App. 0098

000094

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **51**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 94 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 102

Supp. App. 0099

## QAPP WORKSHEET #18-9: SAMPLING LOCATIONS AND METHODS

## AFFF RELEASE AREA 9: HANGAR 109

Sample locations are illustrated on **Figure 12**.  The proposed sampling summary for AFFF Release Area 9 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB09001 | CANON09-SO-001 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the stained area northwest of the hangar. |
|  | CANON09-SO-002 | Subsurface Soil | 28 | 30 | DPT Core/ Split Spoon | New |  |
| SB09002 | CANON09-SO-003 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil in the stained area north of the hangar. |
|  | CANON09-SO-004 | Subsurface Soil | 28 | 30 | DPT Core/ Split Spoon | New |  |

**Notes:**

| | | |
|---|---|---|
| AFFF – aqueous film forming foam | DPT- direct push technology | ft bgs – feet below ground surface |
| ID – identification | PFAS – per- and polyfluorinated alkyl substances | SO – soil |

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 9 are provided in Worksheet #18-14 basewide groundwater sampling.

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **52**

**QAPP WORKSHEET #18-10: SAMPLING LOCATIONS AND METHODS**

**AFFF RELEASE AREA 10: LANDFILL #4**

The sample location is illustrated on **Figure 13**.  The proposed sampling summary for AFFF Release Area 10 is limited to sampling groundwater from one existing monitoring well.  Proposed sampling summary for groundwater is included in **QAPP Worksheet #18-14**.

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 96 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 104

Supp. App. 0101

**QAPP WORKSHEET #18-11: SAMPLING LOCATIONS AND METHODS**

**AFFF RELEASE AREA 11: ACTIVE FTA**

Sample locations are illustrated on **Figure 14**.  The proposed sampling summary for AFFF Release Area 11 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB11001 | CANON11-SO-001 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil on the west side of the FTA evaporation basin. |
| SB11001 | CANON11-SO-002 | Subsurface Soil | 23 | 25 | Split Spoon | New | Assess PFAS presence in soil on the west side of the FTA evaporation basin. |
| SB11002 | CANON11-SO-003 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil on the south side of the FTA evaporation basin. |
| SB11002 | CANON11-SO-004 | Subsurface Soil | 23 | 25 | Split Spoon | New | Assess PFAS presence in soil on the south side of the FTA evaporation basin. |
| SB11003 | CANON11-SO-005 | Surface Soil | 0 | 0.5 | Hand Auger | New | Assess PFAS presence in soil on the east side of the FTA evaporation basin. |
| SB11003 | CANON11-SO-006 | Subsurface Soil | 23 | 25 | Split Spoon | New | Assess PFAS presence in soil on the east side of the FTA evaporation basin. |

**Notes:**
AFFF – aqueous film forming foam          ft bgs – feet below ground surface          FTA – fire training area
ID – identification          PFAS – per- and polyfluorinated alkyl substances          SO - soil

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 11 are provided in Worksheet #18-14 basewide groundwater sampling.

**QAPP WORKSHEET #18-12: SAMPLING LOCATIONS AND METHODS**

**AFFF RELEASE AREA 12: PERIMETER ROAD FUEL SPILL**

Sample locations are illustrated on **Figure 15**.  The proposed sampling summary for AFFF Release Area 12 is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| SB12001 | CANON12-SO-001 | Subsurface Soil | 10 | 12 | Split Spoon | New | Assess PFAS presence in soil in the area of the fuel spill, below the limits of the remedial excavation. |
|  | CANON12-SO-002 | Subsurface Soil | 28 | 30 | Split Spoon | New |  |

**Notes:**

AFFF – aqueous film forming foam                    ft bgs – feet below ground surface                    ID – identification
PFAS – per- and polyfluorinated alkyl substances       SO – soil

Existing monitoring wells that will be sampled to determine PFAS presence relative to AFFF Area 12 are provided in Worksheet #18-14 basewide groundwater sampling.

Case 2:19-cv-00046-KG-SMV  Document 49-3  Filed 02/01/21  Page 97 of 316
Appellate Case: 22-2132    Document: 35    Date Filed: 11/27/2024    Page: 105

Supp. App. 0102

000098

**QAPP WORKSHEET #18-13: SAMPLING LOCATIONS AND METHODS**

**AFFF RELEASE AREA 13: FLIGHTLINE AIRCRAFT CRASHES**

Sample locations are illustrated on **Figure 16**.  The proposed sampling summary for AFFF Release Area 13 is limited to sampling groundwater from existing monitoring wells.  Proposed sampling summary for groundwater is included in **QAPP Worksheet #18-14**.

000099

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **56**

## QAPP WORKSHEET #18-14: SAMPLING LOCATIONS AND METHODS

### BASEWIDE GROUNDWATER SAMPLING

Sample locations are illustrated on **Figure 17**.  The proposed sampling summary for basewide groundwater sampling for PFAS is presented below.

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| MW-A | CANON11-GW-001 | Groundwater | 320 | 340 | SP | Existing | Sampled to assess potential PFAS presence in groundwater downgradient of the active FTA and South Playa Lake. |
| MW-B | CANON14-GW-002 | Groundwater | 350 | 365 | SP | Existing | Sampled to assess potential PFAS presence in groundwater in the southeast corner of the CANONn AFB that serves as downgradient most location for all AFFF areas. |
| MW-C | CANON14-GW-003 | Groundwater | 350 | 370 | SP | Existing | Sampled to assess potential PFAS presence in groundwater in the southeast corner of the CANONn AFB that serves as downgradient most location for all AFFF areas. |
| MW-D | CANON14-GW-004 | Groundwater | 340 | 360 | SP | Existing | Sampled to assess potential PFAS presence in groundwater downgradient of the FTA sites and South Playa Lake. |
| MW-E | CANON14-GW-005 | Groundwater | 330 | 350 | SP | Existing | Assess PFAS presence in groundwater downgradient (southeast) of flightline crash sites and hangars located at the northern end of the parking apron. |
| MW-F | CANON14-GW-006 | Groundwater | 350 | 370 | SP | Existing | Assess PFAS presence downgradient (southeast) of the former sewage lagoon area. |

Supp. App. 0104

000100

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **57**

Supp. App. 0105

Case 2:19-cv-00046-KG-SMV Document 49-3 Filed 02/01/21 Page 100 of 316
Appellate Case: 22-2132 Document: 35 Date Filed: 11/27/2024 Page: 108

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| MW-G | CANON14-GW-007 | Groundwater | 350 | 370 | SP | Existing | Assess PFAS presence downgradient (southeast) of the former sewage lagoon area and hangars (109, 119 and 133) located at the southern end of parking apron. |
| MW-H | CANON14-GW-008 | Groundwater | 330 | 350 | SP | Existing | Assess PFAS presence downgradient (southeast) of the former sewage lagoon area and hangars (109, 119 and 133) located at the southern end of parking apron. |
| MW-Na | CANON14-GW-009 | Groundwater | 300 | 320 | SP | Existing | Assess PFAS presence in groundwater downgradient (southeast) of landfill #4. |
| MW-Oa | CANON14-GW-010 | Groundwater | 300 | 360 | SP | Existing | Assess PFAS presence in groundwater downgradient (southeast) of North Playa Lake. |
| MW-Pa | CANON14-GW-011 | Groundwater | 300 | 360 | SP | Existing | Assess PFAS presence downgradient (southeast) of the former sewage lagoon area. |
| MW-Rb | CANON14-GW-012 | Groundwater | 300 | 330 | SP | Existing | Assess PFAS presence in groundwater downgradient (southeast) of the F-111 crash area at the north end of the runway. The monitoring well is also downgradient of hangar/apron areas where AFFF has been released. |
| MW-V | CANON14-GW-013 | Groundwater | 310 | 370 | SP | Existing | Background monitoring well located in northwest corner of the installation, upgradient of all AFFF areas. |

000101

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **58**

Case 2:19-cv-00046-KG-SMV  Document 49-3  Filed 02/01/21  Page 101 of 316
Appellate Case: 22-2132  Document: 35  Date Filed: 11/27/2024  Page: 109

Supp. App. 0106

| Location ID | Sample ID | Matrix | Start Depth (ft bgs) | End Depth (ft bgs) | Sample Method | New or Existing Location | Sample Rationale |
|---|---|---|---|---|---|---|---|
| MW-W | CANON14-GW-014 | Groundwater | 300 | 360 | SP | Existing | Assess PFAS presence in groundwater downgradient (southeast) of the F-111 crash area at the north end of the runway. The monitoring well is also downgradient of hangar/apron areas where AFFF has been released |
| MW-X | CANON14-GW-015 | Groundwater | 270 | 330 | SP | Existing | Assess PFAS presence in groundwater in the vicinity of an F-16 aircraft crash at the south-western end of the runway. |

**Notes:**
AFFF – aqueous film forming foam
GW – groundwater
PFAS – per- and polyfluorinated alkyl substances
ft bgs – feet below ground surface
ID – identification
SP – submersible pump
FTA – fire training area
MW – monitoring well

000102

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **59**

**QAPP WORKSHEET #20: FIELD QC SUMMARY**

The installation wide field QC summary is presented below.  Equipment rinsate blanks will be collected at a rate of one per non-dedicated piece of equipment, per day, per crew.   As a result, the number of equipment rinsate blanks will be determined in the field.  Field blanks will be determined in the field based on the media sampled and sources of PFAS-free water.

| Matrix | Analyte | Primary Samples | Field Duplicates (1:10 Basewide) | Equipment Rinsate (1:10 for each piece of equipment per day) | Field Blanks (1 per lot of PFAS-free water) | MS/MSDs (1:20 Basewide) | Total Samples |
|---|---|---|---|---|---|---|---|
| Soil | PFAS | 48 | 5 | 21 | 0 | 3 | 73 |
| Groundwater | PFAS | 15 | 2 | 2 | 2 | 1 | 22 |
| Sediment | PFAS | 6 | 1 | 1 | 0 | 1 | 9 |
| Surface Water | PFAS | 6 | 1 | 1 | 0 | 1 | 9 |
| **TOTALS** | | **71** | **9** | **25** | **2** | **6** | **113** |

**Notes:**
MS/MSD – matrix spike/matrix spike duplicate
PFAS – per- and polyfluorinated alkyl substances

**Supp. App. 0107**

Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas
Final Installation-Specific Work Plan, Cannon Air Force Base
July 2017
Page **60**

This page intentionally left blank.

**FIGURES**

000105



**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M. Vavra   Date: 4/12/2017

0   1,000   2,000   4,000 Feet

**Symbol Key**

Cannon Air Force Base Installation Boundary

**Supp. App. 0110**

**FIGURE 1**
**Site Location Map**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

000106

**Figure 2
Proposed AFFF Release Areas
for Site Inspection
Cannon Air Force Base
Clovis, New Mexico**

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra    Date: 4/28/2017

0   500   1,000   2,000 Feet

**Symbol Key**

⊕ Existing Monitoring Well

⊕ Existing Monitoring Well (Dry, To Be Replaced)

— Roads

— Streams

☐ Potential AFFF Release

☐ Potential AFFF Release Area (Approximate)

☐ Cannon Air Force Base Installation Boundary

▨ Landfill 5 Area

**Site Inspection of Aqueous
Film Forming Foam (AFFF)
Release Areas
Environmental Programs Worldwide
Installation-Specific Work Plan**

**Supp. App. 0111**

Case 2:19-cv-00046-KG-SMV Document 49-3 Filed 02/01/21 Page 107 of 316
Appellate Case: 22-2132 Document: 35 Date Filed: 11/22/2024 Page: 115

000107

Figure 3a
Proposed AFFF Release Areas for Site Inspection - June 2014 Groundwater Elevation Contour Map
Cannon Air Force Base
Clovis, New Mexico

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra    Date: 4/28/2017

0    500    1,000    2,000 Feet

**Symbol Key**

⊕ Existing Monitoring Well

⊕ Existing Monitoring Well (Dry, To Be Replaced)

— Roads

— Streams

— Approximate Groundwater Elevation Contour - Summer (USGS, 2016)

→ Approximate Groundwater Flow Direction

▭ Potential AFFF Release

▭ Potential AFFF Release Area (Approximate)

▭ Cannon Air Force Base Installation Boundary

Site Inspection of Aqueous
Film Forming Foam (AFFF)
Release Areas
Environmental Programs Worldwide
Installation-Specific Work Plan

**Supp. App. 0112**



Figure 3b
Proposed AFFF Release Areas
for Site Inspection -
September 2014 Groundwater
Elevation Contour Map
Cannon Air Force Base
Clovis, New Mexico

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra     Date: 4/28/2017

0    500    1,000    2,000 Feet

**Symbol Key**

- Existing Monitoring Well
- Existing Monitoring Well (Dry, To Be Replaced)
- Roads
- Streams
- Approximate Groundwater Elevation Contour - Winter (USGS, 2016)
- Approximate Groundwater Flow Direction
- Potential AFFF Release
- Potential AFFF Release Area (Approximate)
- Cannon Air Force Base Installation Boundary

Site Inspection of Aqueous
Film Forming Foam (AFFF)
Release Areas
Environmental Programs Worldwide
Installation-Specific Work Plan

**Supp. App. 0113**

000109

Well A

5030

Approximate Burn Pit

SB01001

SB01002

Former FTA No. 2

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra | Date: 4/28/2017

0   50   100   200 Feet

**Symbol Key**

- ● Proposed Soil Boring
- ⊕ Existing Monitoring Well
- — Ground Surface Elevation Contour (ft amsl)
- --- Historic Features
- → Approximate Groundwater Flow Direction
- ▭ Potential AFFF Release Area

**Supp. App. 0114**

**FIGURE 4
Proposed Sampling Locations
Former FTA No. 2
AFFF Release Area 1
Cannon Air Force Base
Clovis, New Mexico**

**Site Inspection of Aqueous
Film Forming Foam (AFFF)
Release Areas
Environmental Programs Worldwide
Installation-Specific Work Plan**

000110

Former FTA No. 3

SB02001

SB02002

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra        Date: 4/28/2017

0   25   50   100   150 Feet

**Symbol Key**

- ● Proposed Soil Boring
- — Ground Surface Elevation Contour (ft amsl)
- → Approximate Groundwater Flow Direction
- ▭ Potential AFFF Release Area
- ▨ 2013 Excavation Area

**Supp. App. 0115**

**FIGURE 5**
**Proposed Sampling Locations**
**Former FTA No. 3**
**AFFF Release Area 2**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

Path: C:\Workspace\GIS Projects\775303101 - USAF Active PFCs\V0006 Cannon\MXDs\WorkPlan\Figure 5 - AFFF Area 2 - Former FTA No.3.mxd

Case 2:19-cv-00046-KG-SMV  Document 49-3  Filed 02/01/21  Page 111 of 316
Appellate Case: 22-2132  Document: 35  Date Filed: 11/27/2024  Page: 119

000111

Former OWS Pit

SB03002

SB03003

Former Waste Oil UST

SB03001

Former Fire Training Pit

Former FTA No. 4

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra    Date: 4/28/2017

0  25  50  100  150 Feet

**Symbol Key**

🟡  Proposed Soil Boring

—  Ground Surface Elevation
    Contour (ft amsl)

----  Historic Features

→  Approximate Groundwater
    Flow Direction

◻  Potential AFFF Release
    Area

▨  Limits of 2005 Excavation

▧  Limits of 2009 Excavation

**FIGURE 6**
**Proposed Sampling Locations**
**Former FTA No. 4**
**AFFF Release Area 3**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

**Supp. App. 0116**

Path: C:\Workspace\GIS_Projects\775303101_USAF_Active_PFCs\0006_Cannon\MXDs\WorkPlan\Figure 6 - AFFF Area 3 - Former FTA No.4.mxd

000112



00109

E Terminal Ave

4299

S Torch Blvd

4298

00124

00125

00102

4298

SB04001

Hangar 119

4295

4296

SB04002

4297

Hangar 133

4296

4295

4294

4293

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra    Date: 4/26/2017

0   25   50   100   150 Feet

**Symbol Key**

🟡 Proposed Soil Boring

— Water Line

— Sanitary Sewer Line

— Storm Sewer Line

— Ground Surface Elevation Contour (ft amsl)

→ Approximate Groundwater Flow Direction

▭ Potential AFFF Release Area

**FIGURE 7**
**Proposed Sampling Locations**
**Hangars 119 and 133**
**AFFF Release Area 4**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

**Supp. App. 0117**



FIGURE 8
Proposed Sampling Locations
Former Sewage Lagoons
AFFF Release Area 5
Cannon Air Force Base
Clovis, New Mexico

Site Inspection of Aqueous
Film Forming Foam (AFFF)
Release Areas
Environmental Programs Worldwide
Installation-Specific Work Plan

Supp. App. 0118

000114

North Playa Lake Outfall

WWTP Outfall Location

SD/SW06001

SD/SW06002

Well Na

Well Oa

02129
02154
02149
02148
02146
02127
02125
02126
02300

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra   Date: 4/26/2017

0    100    200    400 Feet

**Symbol Key**

△ Proposed Sediment /
Surface Water Sample

⊕ Existing Monitoring Well

— Water Line

— Sanitary Sewer Line

— Ground Surface Elevation
Contour (ft amsl)

→ Approximate Groundwater
Flow Direction

☐ Potential AFFF Release
Area

☐ Cannon Air Force Base
Installation Boundary

**FIGURE 9**
**Proposed Sampling Locations**
**North Playa Lake Outfall**
**AFFF Release Area 6**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

**Supp. App. 0119**

000115

03020

4270 SB07002

SB07001

SB07003

SB07004

South Playa Lake Outfall

03050

2381   02379   02320   02323 02329

2371

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra    Date: 4/26/2017

0  50  100    200    300 Feet

**Symbol Key**

🟡 Proposed Soil Boring

— Water Line

— Sanitary Sewer Line

— Storm Sewer Line

— Ground Surface Elevation
    Contour (ft amsl)

➙ Approximate Groundwater
    Flow Direction

⬜ Potential AFFF Release
    Area

**Supp. App. 0120**

**FIGURE 10**
**Proposed Sampling Locations**
**South Playa Lake Outfall**
**AFFF Release Area 7**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

Pond 1

Whispering Winds Golf Course Outfall

SD/SW08001

05076

01403

01399

01402

01398

Pond 1 Outfall

01400

SD/SW08002

Pond 2

Casablanca Ave

Olympic

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra | Date: 4/26/2017

0   100   200   400 Feet

**Symbol Key**

⚠ Proposed Sediment /
Surface Water Sample

— Water Line

— Sanitary Sewer Line

— Storm Sewer Line

— Ground Surface Elevation
Contour (ft amsl)

➤ Approximate Groundwater
Flow Direction

☐ Potential AFFF Release
Area

**Supp. App. 0121**

**FIGURE 11**
**Proposed Sampling Locations**
**Whispering Winds Golf**
**Course Outfall**
**AFFF Release Area 8**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

Path: H:\Projects\775303101 - USAF - Active- PFCs\0006_Cannon\MXDs\WorkPlan\Figure 11 - AFFF Area 8 - Golf Course Outfall.mxd

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 117 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 125

000117

Hangar 109

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra   Date: 4/26/2017

0   25   50   100 Feet

**Symbol Key**

⬤ Proposed Soil Boring
— Water Line
— Sanitary Sewer Line
— Storm Sewer Line
— Ground Surface Elevation Contour (ft amsl)
→ Approximate Groundwater Flow Direction
▭ Potential AFFF Release Area

**Supp. App. 0122**

**FIGURE 12**
**Proposed Sampling Locations**
**Hangar 109**
**AFFF Release Area 9**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 118 of 316
Appellate Case: 22-2132   Document: 55   Date Filed: 11/27/2024   Page: 136

000118

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra        Date: 6/6/2017

0    50    100        200 Feet

**Symbol Key**

⊕ Existing Monitoring Well To Be Sampled

— Ground Surface Elevation Contour (ft amsl)

→ Approximate Groundwater Flow Direction

☐ Potential AFFF Release Area

▧ Landfill

⬜ Cannon Air Force Base Installation Boundary

** Note - No soil samples are required for Landfill #4.

**Supp. App. 0123**

**FIGURE 13**
**Proposed Groundwater Sample Location - Landfill #4**
**AFFF Release Area 10**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous Film Forming Foam (AFFF) Release Areas Environmental Programs Worldwide Installation-Specific Work Plan**

000119

Active FTA

Evaporation Basin

SB11001

SB11003

SB11002

Well A

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra    Date: 6/6/2017

0    50    100    200 Feet

**Symbol Key**

⬤ Proposed Soil Boring

⊕ Existing Monitoring Well

— Water Line

— Ground Surface Elevation
Contour (ft amsl)

➜ Approximate Groundwater
Flow Direction

▭ Potential AFFF Release
Area

**FIGURE 14
Proposed Sampling Locations
Active FTA
AFFF Release Area 11
Cannon Air Force Base
Clovis, New Mexico**

**Site Inspection of Aqueous
Film Forming Foam (AFFF)
Release Areas
Environmental Programs Worldwide
Installation-Specific Work Plan**

**Supp. App. 0124**

000120

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 120 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 128

4266 4270 4266 4266 4266 4268 4268 4268 4264 4268 4266 4272 4270 4268 4266 4264 4264 4262 4266 4264 4262 4264 4266 4264

Well U

Well B

Well T

Well S

SB12001

Well C

S Perimeter Rd

Curry Rd P

Perimeter Road Fuel Spill

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra    Date: 4/26/2017

0    50    100    200 Feet

**Symbol Key**

⬤ Proposed Soil Boring

⊕ Existing Monitoring Well

⊕ Existing Monitoring Well
(Dry, To Be Replaced)

Ground Surface Elevation
Contour (ft amsl)

➜ Approximate Groundwater
Flow Direction

▢ Potential AFFF Release
Area

▢ Cannon Air Force Base
Installation Boundary

▨ Landfill 5 Area

**Supp. App. 0125**

**FIGURE 15**
**Proposed Sampling Locations**
**Perimeter Road Fuel Spill**
**AFFF Release Area 12**
**Cannon Air Force Base**
**Clovis, New Mexico**

Site Inspection of Aqueous
Film Forming Foam (AFFF)
Release Areas
Environmental Programs Worldwide
Installation-Specific Work Plan

Path: H:\Projects\775303101 - USAF - Active - PFCs\0006_Cannon\MXDs\WorkPlan\Figure 15 - AFFF Area 12 - Fuel Spill Area.mxd

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 121 of 316
Appellate Case: 22-2152   Document: 35   Date Filed: 11/27/2024   Page: 129

000121

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra     Date: 4/26/2017

0     500   1,000        2,000 Feet

**Symbol Key**

⊕ Existing Monitoring Well

⊕ Existing Monitoring Well (Dry, To Be Replaced)

— Roads

— Streams

— Approximate Groundwater Elevation Contour - Summer (USGS, 2016)

→ Approximate Groundwater Flow Direction

▨ Potential AFFF Release Area (Approximate)

▭ Cannon Air Force Base Installation Boundary

**Figure 16
Proposed Sampling Locations
Former Crash Sites
AFFF Release Area 13
Cannon Air Force Base
Clovis, New Mexico**

**Site Inspection of Aqueous
Film Forming Foam (AFFF)
Release Areas
Environmental Programs Worldwide
Installation-Specific Work Plan**

**Supp. App. 0126**

**Figure 17**
**Proposed Groundwater**
**Sampling Locations**
**Basewide**
**Cannon Air Force Base**
**Clovis, New Mexico**

**Site Inspection of Aqueous**
**Film Forming Foam (AFFF)**
**Release Areas**
**Environmental Programs Worldwide**
**Installation-Specific Work Plan**

**Air Force Civil Engineer Center**

2261 Hughes Avenue
Building 171, Suite 155
JBSA Lackland, Texas 78236

Disclaimer: For general reference purposes only.

Project: 775303101.0006

By: M.Vavra    Date: 4/28/2017

0    500    1,000    2,000 Feet

**Symbol Key**

- Existing Monitoring Well to be Sampled
- Existing Monitoring Well (Dry, To Be Replaced)
- Roads
- Streams
- Approximate Groundwater Elevation Contour - Summer (USGS, 2016)
- Approximate Groundwater Flow Direction
- Potential AFFF Release
- Potential AFFF Release Area (Approximate)
- Cannon Air Force Base Installation Boundary

**Supp. App. 0127**

This page intentionally left blank.

000124

# APPENDIX A

# Installation-Specific Health and Safety Plan

*The Installation-Specific HSP provided in this appendix supplement the General HSP included as Appendix A to the General QPP.  Refer to the HSP and QPP for all job hazard analyses, site control requirements, personal protective equipment needs, safety mitigation measures, and standard operating procedures.*

**Supp. App. 0129**

This page intentionally left blank.

| Site: | Cannon AFB, Clovis, New Mexico | | |
|---|---|---|---|
| Prepared by: | Cory Vowles | Date: | 01/23/17 |
| Reviewed by: | Emma Driver | | 03/20/17 |

**Dates of Required Training and Medical Surveillance:**

| Job duties | Field Team Lead/HSO | Field Team | Base Lead |
|---|---|---|---|
| **Name** | Cory Vowles | Shannon Williams | Emma Driver |
| **First Aid** | 4/21/16 | -- | -- |
| **CPR** | 4/21/16 | -- | -- |
| **Hazard Communication** | 10/19/16 | -- | 10/19/16 |
| **HAZWOPER** | 12/02/16 | | 12/02/16 |
| **Construction Safety & Health (30hr OSHA)** | 09/17/16 | | -- |

At least one worker must be trained in First Aid/CPR and should receive bloodborne pathogen training.
Required for Field Lead and Site Health and Safety Officer.

**Notes:**

CPR – cardiopulmonary resuscitation
HAZWOPER – hazardous waste operations and emergency response
HSO – health and safety officer
NA – not available

**Known or Suspected Contaminants (include permissible exposure limits [PELs]/threshold limit values [TLVs]):**

| Contaminants of Concern (COC) (Attach Fact Sheets*) | Maximum Concentrations | | PEL/TLV |
|---|---|---|---|
| | Soil (mg/kg) | Water/Groundwater (µg/L) | |
| Per- and Polyfluorinated Alkyl Substances (PFAS) | TBD | TBD | N/A |
| Benzene | TBD | TBD | 1 ppm |
| Toluene | TBD | TBD | 200 ppm |
| Ethylbenzene | TBD | TBD | 100 ppm |
| Xylenes | TBD | TBD | 100 ppm |
| cis-1,2-Dichloroethene | TBD | TBD | 100 ppm |
| Trichloroethene | TBD | TBD | 100 ppm |
| Vinyl Chloride | TBD | TBD | 1 ppm |

**Notes:**

µg/L – micrograms per liter          PFOA – perfluorooctanoic acid          TLV – threshold limit value
mg/kg – milligrams per kilogram      PFOS – perfluorooctanesulfonic acid
N/A = not applicable                 ppm – parts per million
PEL – permissible exposure limit     TBD – to be determined

A-1

**Supp. App. 0131**

000127

**EMERGENCY CONTACTS**

| NAME | TELEPHONE NUMBERS | | DATE OF PRE-EMERGENCY NOTIFICATION (if applicable) |
|---|---|---|---|
| Fire Department: | 911 | | |
| Hospital: **Plains Regional Medical Center 2100 North Doctor Martin Luther King Boulevard Clovis, NM 88101** | 575-769-2141 | | |
| Police/Ambulance/Fire: | 911 | | |
| Client Contact: **Sheen Kottkamp** | (O): 575-904-6743 | (C): 806-463-0811 | |
| Client Contact (Alternate: **Steven Palmer** | (O): 575-904-6744 | (C): 850-218-1544 | |
| Regional Lead: **Emma Driver** | (O): 612-252-3641 | (C): 612-381-7845 | |
| Site Health And Safety Officer: **Cory Vowles** | (O): 612-252-3789 | (C): 850-597-1308 | |
| Group Health Safety and Environment (HSE) Manager: **Cynthia Sundquist** | (O): 207-828-3309 | (C): 207-650-7593 | |

A-2

**Supp. App. 0132**

**EMERGENCY PROCEDURES**

- The health and safety officer (HSO) or alternate should be immediately notified via the on-site communication system. The HSO assumes control of the emergency response.

- The HSO notifies the project manager and client contact of the emergency. The HSO shall then contact the group health, safety, and environment (HSE) manager who will then contact the corporate HSE manager.

- If applicable, the HSO shall notify off-site emergency responders (e.g. fire department, hospital, police department, etc.) and shall inform the response team as to the nature and location of the emergency on-site.

- If applicable, the HSO evacuates the site. Site workers should move to the predetermined evacuation point (See Site Map).

- For small fires, flames should be extinguished using the fire extinguisher. Large fires should be handled by the local fire department.

- In an unknown situation or if responding to toxic gas emergencies, appropriate PPE, including self-contained breathing apparatus (SCBA) if available, should be donned. If appropriate PPE is unavailable, site workers should evacuate and call in emergency personnel.

- If chemicals are accidentally spilled or splashed into eyes or on skin, use eyewash and wash affected area. Site worker should shower as soon as possible after incident.

- If a worker is injured, first aid shall be administered by certified first aid provider. See AMEC Triage Program below

- If the emergency involves toxic gases, workers will back off and reassess. Prior to re-entering the work zone, the area must be determined to be safe. Entry will be using Level B PPE and utilize appropriate monitoring equipment to verify that the site is safe.

- Within 24 hours after any emergency response, the Incident Analysis Report (and Vehicle Incident Report if vehicle incident) shall be completed and returned to the group HSE manager, who will forward a copy to the corporate HSE manager. Injuries requiring medical treatment beyond first aid (as well as work-related vehicle incidents) will require the employee to submit a post incident drug and alcohol test.

**AMEC WorkCare Program**

- If the emergency involves an injury to an AMEC employee, the local HSE coordinator, field lead are to implement the AMEC WorkCare program. Employees whose injuries are true emergencies and who need immediate medical attention will initially bypass this program and are to be immediately sent/taken to the hospital identified in the routes to emergency medical facilities section below.

- For non-emergency injuries, the supervisor field lead and the injured employee will contact the AMEC WorkCare 24/7 Hotline at 1-888-449-7787 and speak to a nurse case manager. The nurse case manager will perform the intake process and ask for information including the following:

  o Explain the process to the caller

  o Determine the nature of the concern

  o Provide appropriate medical advice to the caller

  o Determine the appropriate path forward with the caller

  o Maintain appropriate medical confidentiality

  o Help caller to execute path forward – including a referral to the appropriate local medical facility

  o Send an email notification to the corporate safety contact

- From this, a collaborative decision will be made between the nurse case manager and the injured employee on the most appropriate place for treatment; either the hospital, the clinic, or onsite first aid

- If the employee is to be sent to a clinic or hospital, the nurse will call ahead to explain the situation, the need for testing, and advises options to avoid OSHA recordable & considerations for return to work & transitional/modified duty. The nurse will also arrange for drug and alcohol testing to be conducted at the hospital/clinic. If the employee is to be treated on site (First Aid), the nurse will advise the employee to call if injury gets worse. Attached is a flow diagram that describes this procedure.

# Incident flow chart

Call immediately



amec
foster
wheeler



*Verbally contact one HSE representative below within 2 hours*

## E&I Corporate HSE department contact list

| Name/email | Office location | Contact information |
|---|---|---|
| Bruce Voss<br>bruce.voss@amecfw.com | Cathedral City, CA | 760.202.3737 (office)<br>951.897.6381 (cell) |
| Chad Barnes<br>chad.barnes@amecfw.com | Phoenix, AZ | 602.733.6000 (office)<br>480.495.9846 (cell) |
| Cindy Sundquist<br>cynthia.sundquist@amecfw.com | Portland, ME | 207.828.3309 (office)<br>207.650.7593 (cell)<br>207.892.4402 (home) |
| Gabe Sandholm<br>gabe.sandholm@amecfw.com | Minneapolis, MN | 612.252.3785 (office)<br>206.683.9190 (cell) |
| John Mazur<br>john.mazur@amecfw.com | Wilmington, NC | 910.444.2978 (office)<br>910.431.2330 (cell)<br>910.681.0538 (home) |
| Lori Dowling<br>lori.dowling@amecfw.com | Prince George, BC | 250.564.3243 (office) |
| Philip Neville<br>philip.neville@amecfw.com | Thorold, ON | 905.687.6616 (office)<br>905.380.4465 (cell) |
| Tim Kihn<br>tim.kihn@amecfw.com | Edmonton, AB | 780.944.6363 (office)<br>780.717.5058 (cell) |
| Vladimir Ivensky (can call 24/7)<br>vladimir.ivensky@amecfw.com | Plymouth Meeting, PA | 610.877.6144 (office)<br>484.919.5175 (cell)<br>215.947.0393 (home) |
| Kirby Lastinger<br>kirby.lastinger@amecfw.com | Lakeland, FL | 836-667-2345 x207 (office)<br>863-272-4775 (cell) |

High potential near misses, subcontractor incidents, regulatory inspections, spills, and property damage should be reported within 60 minutes to one of the above HSE Representatives.

*Supervisor Responsible For:

• D&A Testing Coordination as per client and AmecFW requirements, Local/Client Notifications, and Completing Initial IAR within 24 hours and forwarding to Corporate HSE.

Rev. Oct 2015

**Supp. App. 0134**

000130

A-5

**FIELD TEAM REVIEW:**  I acknowledge that I understand the requirements of this HSP, and agree to abide by the procedures and limitations specified herein.  I also acknowledge that I have been given an opportunity to have my questions regarding the HSP and its requirements answered prior to performing field activities.  Health and safety training and medical surveillance requirements applicable to my fieldactivities at this site are current and will not expire during on-site activities.

Name: _____     Date: _____

Name: _____     Date: _____

Name: _____     Date: _____

Name: _____     Date: _____

Name: _____     Date: _____

A-5

**Supp. App. 0135**

Case 2:19-cv-00046-KG-SMV   Document 49-3   Filed 02/01/21   Page 131 of 316
Appellate Case: 22-2132   Document: 35   Date Filed: 11/27/2024   Page: 139

000131

**ROUTES TO EMERGENCY MEDICAL FACILITIES**

**HOSPITAL (for immediate emergency treatment):**

| | |
|---|---|
| Facility Name: | Plains Regional Medical Center |
| Address: | 2100 North Doctor Martin Luther King Boulevard |
| | Clovis, NM 88101 |
| Telephone Number: | 575-769-2141 |



Cannon AFB
New Mexico

Get on US-60 E/US-84 E from Chindit Blvd

1. Head northeast on Liberator Ave toward Kermit Evans Ave
   ⚠ Restricted usage road
2. Turn left onto Kermit Evans Ave
   ⚠ Restricted usage road
3. Turn right at the 1st cross street onto Chindit Blvd
   ⚠ Partial restricted usage road
4. Take the ramp onto US-60 E/US-84 E
5. Merge onto US-60 E/US-84 E

Follow N Wheaton St and W 21st St to your destination

6. Turn left onto N Wheaton St
7. Turn right onto W 21st St
8. Turn left onto M.L.K. Jr Blvd
9. Turn left
   ⓘ Destination will be on the right

Plains Regional Medical Center
2100 North Doctor Martin Luther King Boulevard, Clovis, NM 88101





*State of New Mexico*
***ENVIRONMENT DEPARTMENT***

***Hazardous Waste Bureau***

2905 Rodeo Park Drive East, Building 1
Santa Fe, New Mexico 87505-6313
Phone (505) 476-6000    Fax (505) 476-6030
*www.env.nm.gov*

**SUSANA MARTINEZ**
**Governor**

**JOHN A. SANCHEZ**
**Lieutenant Governor**

**BUTCH TONGATE**
**Cabinet Secretary**

**J. C. BORREGO**
**Deputy Secretary**

**FACT SHEET**

## INTENT TO ISSUE A HAZARDOUS WASTE FACILITY PERMIT UNDER THE NEW MEXICO HAZARDOUS WASTE ACT TO CANNON AIR FORCE BASE
### EPA ID NUMBER: NM7572124454

**October 2017**

## A. GENERAL BACKGROUND

The New Mexico Environment Department (NMED) intends to issue a hazardous waste permit to United States Air Force, the owner and operator of Cannon Air Force Base (Facility), to conduct corrective action in accordance with New Mexico's Hazardous Waste Act (§74-4 New Mexico Statutory Authority [NMSA] 1978) and its associated Hazardous Waste Management Regulations (HWMR) listed at 20.4.1 New Mexico Administrative Code [NMAC], which incorporates the Resource Conservation and Recovery Act (RCRA) and its implementing federal regulations listed in 40 Code of Federal Regulations (CFR) 260 through 280. The United States Air Force is the "Applicant."  The action to be taken by NMED would renew an existing permit. NMED is charged with issuing a permit that will ensure that corrective actions taken at the Facility to investigate and remediate sites where contaminants have been released to the environment are properly completed in order to protect human health and the environment.  If an applicant meets all of the conditions required for a RCRA-regulated facility, the NMED will issue a permit.

The draft permit is a renewal of the permit that was issued in October 2003.  The permit authorized the Facility to conduct corrective action for releases identified at various solid waste management units (SWMUs) and areas of concern (AOCs) at the Facility.

Prior to issuing a permit, NMED is required by regulation to release a draft of the permit for public comment in accordance with 20.4.1.900 and 901 NMAC.  NMED is also required to issue a fact sheet which serves two functions: 1) to facilitate public review of the draft permit; and 2) to provide the basis for any specific requirements in the permit.

This Fact Sheet describes the general background for the draft permit, including; a physical description of the Facility, its hazardous waste activities, and how the public may participate in the permitting process.

Cannon Air Force Base
Draft Hazardous Waste Permit
October 2017

New Mexico Environment Department
Fact Sheet
Page 2 of 8

## Cannon Air Force Base

The Facility is located in eastern New Mexico on approximately 4,320 acres of land owned by the federal government in Curry County, New Mexico.  The site is located seven miles west of Clovis, fifteen miles north of Portales, New Mexico, and south of United States Highway 64/84.  Based on World Grid System 1984 (WGS84) the Facility is located at a latitude of 34 degrees, 22 minutes, and 46.168 seconds and a longitude of 103 degrees, 18 minutes, and 30.459 seconds.  The Applicant's primary contact and address for this action is: Colonel Stewart A. Hammons, 110 East Alison Avenue, Suite 1098, Cannon Air Force Base, New Mexico, 88103.

## Permit Contents

The Permit addresses and authorizes corrective action at the Facility.  The Applicant does not seek a permit to treat, store, or dispose of hazardous waste.  The permit requires the Applicant to conduct detection and compliance monitoring and corrective action activities at the Facility.  This permit establishes the general and specific standards for these activities, pursuant to the New Mexico Hazardous Waste Act (HWA) and the New Mexico Hazardous Waste Management Regulations (HWMR).

The draft permit includes six Parts (1 through 6) and three Attachments (1 through 3).  The permit Parts address how the facility is to conduct cleanup of contaminated soil, surface water, and groundwater (referred to as "corrective action").  The permit Parts also include general requirements common to all hazardous waste permits throughout New Mexico (*e.g.,* duration of a permit); and general requirements that apply to the Facility (*e.g.,* characterization of waste, security, preparedness, and prevention).  The permit also requires the Applicant to maintain a program that minimizes the amount of wastes generated at the Facility and reduces the toxicity of those wastes.

## Public Participation

The HWMR and 40 CFR 270.42 require an opportunity for public involvement any time there is a modification to change a permit or when the NMED issues a new or renewal permit.  That process involves public notice and includes an opportunity for public comment on major permit modifications or permit issuance or rejection.  Public notices are provided in local newspapers and are included with written correspondence to individuals on the Facility mailing list.  The Facility mailing list is maintained by the NMED and any interested person may request to be placed on the list to be informed of such actions.

There are significant opportunities for the public to learn about and become involved in the regulation of hazardous waste at the Facility, including major permit-related actions and corrective action activities.  Documents pertinent to permitting and corrective action activities submitted to or issued by NMED are available for public review in the Administrative Record maintained by the NMED at the address provided below, which describes how the public may comment on the draft permit.

## B. PUBLIC REVIEW OF THE ADMINISTRATIVE RECORD

A copy of the administrative record may be reviewed at the following location:

NMED - Hazardous Waste Bureau
2905 Rodeo Park Drive East, Building 1

**Supp. App. 0138**

Cannon Air Force Base
Draft Hazardous Waste Permit
October 2017

New Mexico Environment Department
Fact Sheet
Page 3 of 8

Santa Fe, New Mexico 87505-6313
Monday - Friday from 8:00 a.m. to 5:00 p.m.
Contact: Pam Allen (505) 476-6000

A copy of the draft permit, the Public Notice, and this Fact Sheet are also available on NMED's website at www.nmenv.state.nm.us/HWB/cafbperm.html.  To obtain a copy of the administrative record or a portion thereof, or for further information, contact Mr. Dave Cobrain at (505) 476-6000 or at the address given below.

The 60-day public comment period begins on **October 6, 2017 and ends on December 5, 2017**.  Any person who wishes to comment on this action or request a Public Hearing should submit written or electronic mail (e-mail) comment(s) with the commenter's name and address to the respective address below.  Only comments or requests received on or before **5:00 p.m. December 5, 2017** will be considered. Written comments may be sent to:

Dave Cobrain, Program Manager
Hazardous Waste Bureau - New Mexico Environment Department
2905 Rodeo Park Drive East, Building 1
Santa Fe, NM 87505-6313
Email: dave.cobrain@state.nm.us

Ref: Cannon Air Force Base Draft Permit Public Comments

Written comments must be based on the information available for review and include, to the extent practicable, all referenced factual materials.  Documents in the administrative record need not be re-submitted if expressly referenced by the commenter.  Requests for a Public Hearing shall provide: (1) a clear and concise factual statement of the nature and scope of the interest of the person requesting the hearing; (2) the name and address of all persons whom the requester represents; (3) a statement of any objections to the permit; and (4) a statement of the issues which the commenter proposes to raise for consideration at the hearing.  NMED will provide a minimum 30 days notice of a Public Hearing, if scheduled.

All comments submitted will be considered in formulating a final decision and may cause the draft permit to be modified.  NMED will respond in writing to the comments.  This response will specify which provisions, if any, of the draft permit have been changed in the final decision and the reasons for the changes.  All persons who have submitted written comments or who requested notification of the final decision will be notified of the decision by mail.  These responses also will be posted on the NMED website.

After consideration of all written public comments received, NMED may issue a final permit.  The NMED will make the final decision publicly available and will notify the Applicants by certified mail.  All persons that submitted written comments, requested a hearing, or requested notification of the final decision will be notified of the decision by first class mail.  NMED's decision will constitute a final agency decision and may be appealed as provided by the HWA (Chapter 74, Article 4 NMSA 1978).

**Arrangements for Persons with Disabilities**

Any person with a disability requiring assistance or auxiliary aid to participate in this process should contact Donna Wright by 10 days prior to the end of the public comment period at the following address: New Mexico Environment Department, P.O. Box 5469, 1190 St. Francis

Cannon Air Force Base                                    New Mexico Environment Department
Draft Hazardous Waste Permit                             Fact Sheet
October 2017                                             Page 4 of 8

Drive, Santa Fe, New Mexico, 87502-6110, (505) 827-9769. TDD or TDY users please access Ms. Wright's number via the New Mexico Relay Network at 1 (800) 659-8331.

**Non-Discrimination Statement**

NMED does not discriminate on the basis of race, color, national origin, disability, age or sex in the administration of its programs or activities, as required by applicable laws and regulations. NMED is responsible for coordination of compliance efforts and receipt of inquiries concerning non-discrimination requirements implemented by 40 C.F.R. Part 7, including Title VI of the Civil Rights Act of 1964, as amended; Section 504 of the Rehabilitation Act of 1973; the Age Discrimination Act of 1975, Title IX of the Education Amendments of 1972, and Section 13 of the Federal Water Pollution Control Act Amendments of 1972. If you have any questions about this notice or any of NMED's non-discrimination programs, policies or procedures, you may contact:

Kristine Pintado, Non-Discrimination Coordinator
New Mexico Environment Department
1190 St. Francis Dr., Suite N4050
P.O. Box 5469
Santa Fe, NM 87502
(505) 827-2855
NMED.NDC@state.nm.us

If you believe that you have been discriminated against with respect to a NMED program or activity, you may contact the Non-Discrimination Coordinator identified above or visit our website at https://www.env.nm.gov/non-employee-discrimination-complaint-page/ to learn how and where to file a complaint of discrimination.

## C. REGULATORY BACKGROUND

In 1976, the Resource Conservation and Recovery Act (RCRA) was passed by the U.S. Congress to regulate "cradle to grave" management of hazardous waste. RCRA was enacted as an amendment to the Solid Waste Disposal Act of 1965, and mandated the development of regulations governing the actions of owners or operators of facilities that generate, transport, treat, store, or dispose of solid and hazardous wastes.

On November 19, 1980, the RCRA regulations became effective, and it became unlawful under certain conditions to treat, store, or dispose of hazardous waste without having, or having applied for, a permit. For then-existing treatment, storage, or disposal facilities (TSDFs), the requirement to submit a permit application was satisfied by submitting the "Part A" portion of the application; the "Part B" portion could be submitted at a later time. The roles of these application parts are clarified in 40 Code of Federal Regulations (CFR) §§ 270.1(b) and 270.10.

The United States Environmental Protection Agency (EPA) has authorized the State of New Mexico to implement and enforce hazardous waste management requirements, including corrective action requirements, under its own hazardous waste management program. The State's authority for the program is the HWA, which: (1) authorizes the State's Environmental Improvement Board (EIB) to adopt hazardous waste management regulations, and (2) authorizes the NMED to implement and enforce regulations issued under the HWA. These regulations are known as the HWMR.

Cannon Air Force Base                               New Mexico Environment Department
Draft Hazardous Waste Permit                        Fact Sheet
October 2017                                          Page 5 of 8

The EIB has adopted regulations concerning hazardous waste management and the issuance of hazardous waste permits.  These regulations incorporate by reference pertinent sections of the CFR – 40 CFR Parts 260 through 270, 273, and 280 – and are codified in the HWMR at 20.4.1 NMAC.

Whenever the permit cites a provision of 20.4.1 NMAC or Title 40 CFR, the permit is meant to incorporate the citation by reference, including all subordinate provisions of the cited provision, and make binding the full text of the cited provision.  The federal hazardous waste management regulations, 40 CFR Parts 260 through 273, are generally cited rather than the HWMR.  The federal regulations are cited because only the federal regulations set forth the detailed regulatory requirements; the State regulations incorporate by reference, with certain exceptions, the federal regulations in their entirety.  Citing only the federal regulations also serves to avoid encumbering each citation with references to two sets of regulations.  However, it is the State regulations that are legally applicable and enforceable.  Therefore, for the purpose of the draft permit, and enforcement of its terms and conditions when finalized, all references to provisions of federal regulations that have been incorporated into the State regulations are deemed to include the State incorporation of those provisions.  The same method of citation of the regulations apply to this Fact Sheet - the federal hazardous waste management regulations, 40 CFR Parts 260 through 273, are generally cited rather than the HWMR.

The HWA and HWMR require corrective action for all releases of hazardous waste or hazardous constituents, regardless of when waste was placed in such a unit, from any SMWU at a facility seeking a permit.  [42 United Sates Code § 6924(u); NMSA 1978 § 74-4-4.2(B); 20.4.1.500 NMAC, incorporating 40 CFR § 264.101(a)].  RCRA facilities also must conduct corrective action at AOCs.  An AOC is an area to be investigated for potential releases.  Depending on the type and extent of contamination, an AOC may subsequently be designated as a SWMU.  Corrective action is required to be conducted beyond the facility boundary (42 U.S.C. § 6924(v); 20.4.1.500 NMAC, incorporating 40 CFR § 264.101(c)) where necessary to protect human health or the environment.  There are currently one-hundred and twenty-three SWMUs and fifty-six AOCs at the Facility. Of these sites, corrective action is still required at 51 SWMUs and AOCs.

On January 26, 1983, "units" managing and disposing of hazardous waste became subject to the closure and post-closure standards of 40 CFR Part 264, Subpart G and Part 265, Subpart G, requiring a post-closure care permit in some circumstances.

On January 25, 1985, the State of New Mexico received authorization from the EPA to implement its hazardous waste program under the HWA.  *See* 50 Fed. Reg. 1515 (Jan. 11, 1985). Subsequent program revisions were approved effective on April 10, 1990; July 25, 1990; December 4, 1992; August 23, 1994; December 21, 1994; July 10, 1995; January 2, 1996; March 10, 1997; July 13, 1998; October 9, 2001; October 16, 2007, May 26, 2009, and December 27, 2010.

On July 25, 1990, the State received from EPA authorization to expand its hazardous waste program under the HWA, including the authority to regulate the hazardous component of mixed waste.  *See* 55 Fed. Reg. 28397 (July 11, 1990).

Cannon Air Force Base
Draft Hazardous Waste Permit
October 2017

New Mexico Environment Department
Fact Sheet
Page 6 of 8

On January 2, 1996, the State received authorization from the EPA to implement a corrective action program under the HWA. *See* 60 Fed. Reg. 53708 (Oct. 17. 1995); 61 Fed. Reg. 2450 (Jan. 26, 1996).

## D. PERMIT APPLICATION REQUIREMENTS

Owners or operators of hazardous waste facilities are required to submit a comprehensive permit application covering all aspects of design, operation, maintenance, and closure of their facilities. A permit application consists of Parts A and B. Part A is a standard form that requires the name and location of the owner/operator, a list of the types of wastes managed, a facility layout diagram, and the activities requiring a permit. Part B application includes general and specific information for all SWMUs and AOCs at the Facility. The Part B application also includes information necessary to establish corrective action requirements for releases of hazardous waste or hazardous constituents to the environment.

## E. CANNON AIR FORCE BASE PERMIT HISTORY

An initial Facility Operating Permit (Permit), issued in 1989, authorized the storage of hazardous waste at an on-site container storage unit (CSU) and established reporting requirements for corrective action of releases at identified SWMUs, AOCs, and newly discovered releases as required by the RCRA program for hazardous waste storage facilities. The Permit facilitated the additional waste storage time necessary for accumulation of waste at the CSU for a period greater than 90 days, but less than one-year. The CSU consisted of a 4,000-square foot structure (Facility Building 226) where containerized hazardous wastes generated during Facility operations were accumulated prior to off-site treatment and disposal at appropriate facilities. Stored waste included materials such as paint related products, solvents, lead-acid batteries, and other waste materials identified as RCRA characteristic and/or listed hazardous wastes.

A Permit renewal was initiated by the Facility on January 20, 2000 upon submittal of the required Permit Application Parts A and B. NMED issued a request for supplemental information on November 6, 2001 following review of the application. The Facility provided the requested supplemental information on December 10, 2001. However, deficiencies attributed to the Facility waste analysis plan for hazardous waste storage were identified by NMED, resulting in the issuance of a Notice of Deficiency (NOD) on December 9, 2002. On February 7, 2003, the facility issued a Notice of Intent (NOI) for Closure of the CSU and provided a response to the original NOD. The NOI also established the Facility's intent to discontinue hazardous waste storage beyond 90 days at the Facility. NMED issued a corrective action only permit for the Facility on October 15, 2003. The corrective action only Permit established the general requirements governing continued operation and maintenance practices as a preventative measure to release of hazardous wastes at the Facility; retention of records and documents relevant to corrective actions activities and operational practices; reporting requirements for continued investigation associated with SWMUs, AOCs, and newly discovered releases; and a compliance schedule for investigation reporting.

On June 10, 2013, the Facility submitted an application for renewal of the corrective action only permit. NMED determined the application to be administratively complete on June 9, 2016.

Following issuance of the draft permit and completion of the required public comment period, a final permit for the Facility may be issued by NMED. The finalized permit will be effective for a

Cannon Air Force Base                                    New Mexico Environment Department
Draft Hazardous Waste Permit                             Fact Sheet
October 2017                                                            Page 7 of 8

term of ten years but remains in effect if a timely renewal application is submitted by the Permittee to the NMED (40 CFR 270.51(a)(2)).

## F. PART A APPLICATION

On June 10, 2013, the Applicant submitted to the NMED a Part A application concurrently with their Part B application for renewal of the corrective actions only permit.  Proposed non-permitted units at the Facility are 90-day generator storage units and satellite accumulation points for waste generated onsite during the operation of the Facility.  These units are not permitted, but are subject to regulation under 40 CFR § 262.  The Facility does not currently manage hazardous waste beyond 90 days at the storage and satellite accumulation areas. In addition, the Applicant may store waste military munitions for periods longer than 90 days provided that the provisions of 40 CFR 266.205 are met.

## G. PART B APPLICATION

On June 10, 2013, the Applicant also submitted a Part B application for renewal of their current permit for corrective action only for the Facility SWMUs and AOCs.  The Part B application addresses corrective action at the identified Facility SWMUs and AOCs and any newly-discovered releases at the Facility.

## H. TYPES OF HAZARDOUS WASTES MANAGED AT THE FACILITY

The Facility is a large quantity generator of hazardous waste and does not currently manage hazardous waste beyond 90 days.  Storage of hazardous waste for less than 90 days or storage of waste military munitions as referenced in Section F above does not require permitting.

## I. PERMIT ORGANIZATION

The draft permit comprises permit Parts 1 through 6 and permit Attachments 1 through 3. The Parts contain requirements that the Applicant must adhere to during management of hazardous waste, operation and maintenance of equipment, and conducting corrective action at the Facility.

Permit requirements are established to ensure compliance with New Mexico's HWA and HWMRs and are derived from applicable regulatory requirements, the Applicant's commitments in their permit application, or additional facility or unit-specific requirements established by the NMED to ensure adherence with the regulations or to protect human health or the environment as provided at 20.4.1.500 and 900 NMAC, incorporating 40 CFR Parts 264 and 40 CFR §270.32(b)(2), respectively.

## J. PERMIT PARTS:  Each draft Permit Part is briefly described below.

**Permit Part 1: General Permit Conditions,** provides the regulatory authority and basis for the permit including modification and compliance requirements, definitions and general permit conditions regarding duties and requirements that apply to corrective action at the Facility, most of which are based upon mandatory permit conditions set forth at 40 CFR Parts 264 and 270.

**Permit Part 2: General Facility Conditions,** contains permit conditions for operation, maintenance, and general facility standards as set forth in 40 CFR Part 264, Subparts B through E. The conditions include security, inspection requirements, personnel training, provisions for waste sources accumulation and off-site disposal of hazardous waste, recordkeeping, emergency preparedness and prevention, and recordkeeping and reporting.

**Supp. App. 0143**

Cannon Air Force Base                                      New Mexico Environment Department
Draft Hazardous Waste Permit                                      Fact Sheet
October 2017                                                          Page 8 of 8

**Permit Part 3: Corrective Action for Solid Waste Management Units and Areas of Concern,** describes the process the Applicant must follow to implement corrective action as necessary to protect human health and the environment for all releases of hazardous waste and hazardous constituents pursuant to sections 3004(u) and 3013 of the RCRA, Sections 74-4-4.A.5.h and 74-4-4.2 of the HWA, 40 CFR § 264.101, and 42 U.S.C. § 6924(u) and (v). Requirements also include corrective action beyond the Facility property boundary, where necessary to protect human health and the environment pursuant to Section 3004(v) of RCRA, Section 74-4-4.A5.i of the HWA and 40 CFR § 264.101(c). This Part includes sections discussing cleanup levels applicable to both human and ecological receptors. Part 3 also discusses the process for conducting corrective action from initial assessment and interim measures through corrective action investigation and corrective measures selection and implementation.

**Permit Part 4: Investigation and Sampling Methods and Procedures,** contains the requirements for methods and procedures to conduct site investigation, remediation, and monitoring activities sufficient to fulfill the requirements of the permit and provide valid data for the evaluation of site conditions, determining the nature and extent of contamination, and for remedy selection and implementation, where necessary. The methods presented in permit Part 4 are minimum requirements for environmental investigation and sampling, and are not intended to include all methods that may be necessary to fulfill the requirements of the permit. The methods for conducting investigations, corrective action, and monitoring at the Facility must be determined based on the conditions and contaminants that exist at each location where a release of contaminants has occurred.

**Permit Part 5: Monitoring Well Construction Requirements,** contains the requirements for construction of groundwater monitoring wells at the Facility. General drilling procedures are presented in permit Part 5.1 and monitoring well construction requirements are presented in permit Part 5.2.

**Permit Part 6: Reporting Requirements,** contains general reporting requirements and report formats for corrective action activities under the permit. The reporting requirements listed in Part 6 do not include all types of work plans or reports that may be necessary to address activities conducted pursuant to the permit.

**PERMIT ATTACHMENTS**

**Attachment 1, Facility Description,** provides a brief description of Facility physiographic location information, general historic information, adjacent land usage information, and any hazardous waste management permitting information for the Facility.

**Attachment 2, Facility Site Plan,** provides a Facility site plan which depicts the layout of the Facility and the location of SWMUs and AOCs subject to corrective action.

**Attachment 3, Corrective Action Units Table,** provides Tables, 1, 2, and 3 which list the identified Facility SWMUs and AOCs. Table 1 provides a list of SWMUs and AOCs that require corrective action; Table 2 provides a list of SWMUs and AOCs with corrective action complete with controls status; and Table 3 provides a list of SWMUs and AOCs with corrective action complete without controls status.

# CANNON AIR FORCE BASE

## Resource Conservation and Recovery Act
## Permit
EPA ID # NM7572124454

New Mexico Environment Department – Hazardous Waste Bureau

DRAFT
October 6, 2017

**Supp. App. 0145**

000157

## 1.12    Definitions

For the purposes of this Permit, terms used herein shall have the same meanings as those in the Hazardous Waste Act, the Resource Conservation and Recovery Act, and their implementing regulations, unless this Permit specifically provides otherwise.  Where a term is not defined in the Hazardous Waste Act, RCRA, or pursuant to regulations, EPA guidelines or publications, or this Permit, the meaning associated with such a term shall be defined by a standard dictionary reference or the generally accepted scientific or industrial meaning of the term.

*Administrative Record* means the administrative record supporting and otherwise relating to the requirements of this Permit, compiled as of the effective date of this Permit, which forms the basis for the terms of this Permit. The Administrative Record includes the full record and those documents submitted in writing by the NMED, the Permittee, EPA or the public, as of the effective date of the Permit for inclusion in the Administrative Record.

*Area of Concern (AOC)* means any area having a known or suspected release of hazardous waste or hazardous constituents that is not from a solid waste management unit and that NMED has determined may pose a current or potential threat to human health or the environment. An AOC may include buildings, structures, and other locations at which releases of hazardous waste or constituents have not been remediated, including releases resulting from one time and accidental events.

*Contaminant* means any hazardous constituent listed in 40 CFR Part 261, appendix VIII and 40 CFR Part 264, appendix IX; any groundwater contaminant listed in the New Mexico WQCC Regulations at 20.6.2.3103 NMAC; any toxic pollutant listed in the New Mexico WQCC Regulations a 20.6.2.7.WW NMAC; methyl tertiary-butyl ether; perchlorate; polychlorinated biphenyls (PCBs); dioxins and furans; perfluorinated compounds including perfluorooctane sulfonate and perfluorooctanoic acid; and any other substance present in soil, sediment, rock, surface water, groundwater, or air for which the NMED determines that monitoring, other investigation, or a remedy is necessary to carry out the purposes of this Permit.

*Corrective Action* means all corrective action, as defined in 20.4.2.7.I NMAC, necessary to protect human health and the environment for all releases of hazardous waste or hazardous constituents, or other contaminants defined by this Permit Section (I.12), to the environment as required under HWA § 74-4-4.2 (B) and 40 CFR § 264.101. Corrective action may address releases to air, soil, sediment, surface water, or groundwater.

*Corrective Action Complete* means the requirements for corrective action have been satisfied by the Permittee as determined by the NMED.

*Discharge* means the accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of solid waste or hazardous waste into or onto any land or water.

*Disposal* means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwater.

15

**Supp. App. 0146**

000158

New Mexico Environment Department                                    Cannon Air Force Base
DRAFT October 2017_                                              RCRA Permit No. NM7572124454

***EPA*** means the United States Environmental Protection Agency and any successor or predecessor agencies.

***Extent of Contamination*** means the horizontal and vertical area in which the concentrations of hazardous waste or constituents in the environmental media being investigated are above detection limits or background concentrations indicative of the region, whichever is appropriate, as determined by the NMED.

***Facility*** means Cannon Air Force Base, EPA ID Number NM7572124454, owned by the United States Department of the Air Force, located in Curry County, New Mexico, including all contiguous land, structures, other appurtenances, and improvements on the land used for storage or disposal of hazardous waste. For the purpose of implementing corrective action under 40 CFR § 264.101, or RCRA Section 3008(h), or the HWA, NMSA 1978, § 74-4-10(E), "Facility" means all contiguous property under the control of the owner or operator.

***Groundwater*** means interstitial water, which occurs in saturated earth material.

***Hazardous Constituent*** or ***Hazardous Waste Constituent*** means: 1) any constituent identified in 40 CFR Part 261 Appendix VII that causes EPA to list a hazardous waste in 40 CFR Part 261 Subpart D; or 2) any constituent identified in 40 CFR Part 261, Appendix VIII and any constituent identified in 40 CFR Part 264 Appendix IX.

***Hazardous Waste***, for the purposes of corrective action for solid waste management units and areas of concern conducted pursuant to § 74-4-4.2(B) of the HWA, 40 CFR part 264, subpart F, or 40 CFR § 270.32(b)(2), means a hazardous waste as defined in § 74-4-3(I) of the HWA. Hazardous waste, for the purposes of corrective action, includes, without limitation any hazardous waste as defined in 40 CFR § 261.3, any ground water contaminant listed in the Water Quality Control Commission (WQCC) Regulations in 20.6.2.3103 NMAC, any toxic pollutant listed in 20.6.2.WW NMAC, any contaminant  defined in this Permit Section (1.12) or for which the EPA has promulgated a maximum contaminant level (MCL) at 40 CFR parts 141 and 143, perchlorate, methyl tertiary butyl ether, polychlorinated biphenyls (PCBs), dioxins, furans, perfluorinated compounds including perfluorooctane sulfonate and perfluorooctanoic acid, and munitions constituents as defined in 10 U.S.C.§ 2710(e)(3).

***Hazardous Waste*** for all other purposes of this Permit, means a hazardous waste as defined in 40 CFR § 261.3.

***Hazardous Constituent*** means any constituent identified in 40 CFR Part 261, Appendix VIII and any constituent identified in 40 CFR Part 264 Appendix IX.

***HWA*** means the New Mexico Hazardous Waste Act, NMSA 1978, §§ 74-4-1 to 74-4-14.

***Hazardous Waste Management Regulations (HWMR)*** means the New Mexico Hazardous Waste Management Regulations, 20.4.1 NMAC and all provisions of 40 CFR Parts 260 through 273 incorporated therein

16

**Supp. App. 0147**

000159

New Mexico Environment Department
DRAFT October 2017_

Cannon Air Force Base
RCRA Permit No. NM7572124454

***Maximum Contaminant Level (MCL)*** means a maximum contaminant level under the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-26, and the drinking water regulations promulgated thereunder.

***NMED*** means the New Mexico Environment Department.

***Operator*** means the person responsible for the overall operation of the Facility. The U.S. Department of the Air Force is the operator of Cannon Air Force Base.

***Owner*** means the person who owns the Facility or part of a Facility. The U.S. Department of the Air Force is the owner of Cannon Air Force Base.

***Permittee*** means the U.S. Department of the Air Force Cannon Air Force Base.

***RCRA*** means the Federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 to 6992k, also known as the Solid Waste Disposal Act.

***Release***, for the purposes of this Permit, means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of any solid waste, hazardous waste, or hazardous constituent into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing solid waste, hazardous waste, or hazardous constituents).

***Solid Waste Management Unit (SWMU)*** means any discernable unit or area at the Facility at which solid waste has been placed at any time, and from which NMED determines there may be a risk of a release of hazardous waste or constituents, irrespective of whether the unit was intended for the management of solid waste. Such units include any area at which solid waste has been routinely or systematically placed.

***Senior Unexploded Ordnance Supervisor (SUXOS)*** (as the position designation may be updated) means a person in charge of all Munitions and Explosives of Concern (MEC) operations. The SUXOS is qualified as defined in Department of Defense Explosives Safety Board, Technical Paper 18 "Minimum Qualifications for UXO Technicians and Personnel".

***Target Analyte List (TAL) Metals*** means the list of 23 inorganic target analytes defined by the EPA Contract Laboratory Program Statement of Work. The list consists of the following: aluminum, antimony, arsenic, barium, beryllium, cadmium, calcium, chromium, cobalt, copper, iron, lead, magnesium, manganese, mercury, nickel, potassium, selenium, silver, sodium, thallium, vanadium, and zinc.

***Unexploded Ordinance (UXO)*** means military Munitions that have been primed, fused, armed, or otherwise prepared for action, and have been fired, dropped, launched, projected, or placed in such a manner as to constitute a hazard to operations, installation properties, personnel, or material and remain unexploded either by malfunction, design, or any other cause (10 U.S.C. 101(e) (5) (A) through (C)).

**Supp. App. 0148**

New Mexico Environment Department                                         Cannon Air Force Base
DRAFT October 2017_                                                       RCRA Permit No. NM7572124454

***Waste Military Munitions (WMM)*** includes military munitions as defined in 240 CFR 260.10, which are solid waste as described in 40 CFR 266.202.

***Water Quality Control Commission (WQCC)*** means the New Mexico Water Quality Control Commission, and any successor agencies, boards, or commissions.

***Water Quality Control Commission Regulations*** means the regulations at 20.6.2 NMAC promulgated by the New Mexico Water Quality Control Commission governing the Quality of Ground Water and Surface Water in New Mexico.

## 1.13    Duties and Requirements

### 1.13.1  Duty to Comply

The Permittee shall comply with all sections in this Permit, except to the extent and for the duration such noncompliance is authorized in an emergency permit, in accordance with the requirements of 40 CFR § 270.61.  Any permit noncompliance, except under the terms of an emergency permit, constitutes a violation of the HWA and RCRA and may subject the Permittee, its successors and assigns, officers, directors, employees, parents, or subsidiaries, to an administrative or civil enforcement action (40 CFR § 270.30(a)), including civil penalties and injunctive relief, as provided in Permit Section 1.7, or permit modification request under § 74-4-4.2 of the HWA and 40 CFR §§ 270.41 and 270.43.

No delegation or assignment of the Permittee's responsibilities under this permit can be made to any person or entity, including a separately organized agency, without the written permission of the NMED; this prohibition does not preclude the Permittee's use of contractors for remediation.

The Permittee shall not allow any person or entity which currently exists or may be created, including a separately organized agency, to interfere with the performance of its obligations or responsibilities under this Permit.

### 1.13.2  Duty to Reapply

If the Permittee wishes or is required to continue an activity regulated by this permit after the expiration date of this permit, then the Permittee shall apply for and obtain a new permit at least 180 calendar days before the expiration date of this permit, unless permission for a later date has been granted by the NMED, pursuant to 40 CFR §§ 270.10(h)(1) and 270.30(b).  NMED will not grant permission for applications to be submitted later than the expiration date of the existing permit.

### 1.13.3  Transfer of Permit

The Permittee shall not transfer this permit to any person except after prior written notice and receipt of approval from the NMED.

This Permit may be transferred by the Permittee to a new owner or operator only if the Permit has been modified or revoked and reissued, in accordance with the requirements of 40 CFR §§

000430

ENTERED

**DEPARTMENT OF THE AIR FORCE**
**27TH SPECIAL OPERATIONS CIVIL ENGINEER SQUADRON (AFSOC)**
**CANNON AIR FORCE BASE NEW MEXICO**



16 Nov 2017

Steven Leonard Palmer
Restoration Program Manager
AFCEC/CZO
402 S. Chindit Blvd.
Cannon AFB NM 88103-5003

RECEIVED

Mr. Dave Cobrain
Program Manager
New Mexico Environment Department
Hazardous Waste Bureau
2905 Rodeo Park Drive East, Bldg. 1
Santa Fe NM 87505-6313

NOV 17 2017

**NMED**
Hazardous **Waste Bureau**

Dear Mr. Cobrain:

Re: Draft RCRA Permit #NM7572124454: In order to compile comments that completely address all the proposed changes to both the body of the Permit and the respective Tables, Cannon Air Force Base is respectfully requesting a sixty (60) day extension to the public comment period for the *Draft Resource Conservation and Recovery Act Hazardous Waste Permit for Cannon Air Force Base* from 5 Dec 2017 to 3 Feb 2018. There are a great many sites to consider at Cannon AFB, and unfortunately neither NMED's nor the Air Force's databases allow for easy research. The upcoming holidays will further stretch our manpower resources as well. An extension will allow us at Cannon AFB to deliver more thoroughly researched and referenced comments, thereby allowing NMED to issue a Permit that accurately reflects the status of sites at Cannon.

Cannon AFB appreciates the valued working relationship established with you and your department. If you have further comments or questions pertaining to our request, please contact Steven Palmer, steven.palmer@us.af.mil (575) 904-6744 or Sheen T. Kottkamp, sheen.kottkamp.ctr@us.af.mil (575) 904-6743.

Sincerely,

Steven Leonard Palmer

**AIR COMMANDOS**

**Supp. App. 0150**

000480





**State of New Mexico**
*ENVIRONMENT DEPARTMENT*

*Hazardous Waste Bureau*

**SUSANA MARTINEZ**
Governor

**JOHN A. SANCHEZ**
Lieutenant Governor

2905 Rodeo Park Drive East, Building 1
Santa Fe, New Mexico 87505-6313
Phone (505) 476-6000    Fax (505) 476-6030
*www.env.nm.gov*

**BUTCH TONGATE**
Cabinet Secretary

**J. C. BORREGO**
Deputy Secretary

**RECEIVED**

DEC 15 2017

**NMED**
Hazardous Waste Bureau

**PUBLIC NOTICE No. 17-14**

**NEW MEXICO ENVIRONMENT DEPARTMENT
HAZARDOUS WASTE BUREAU
SANTA FE, NEW MEXICO**
December 14, 2017

**NOTICE OF PUBLIC COMMENT PERIOD AND OPPORTUNITY TO REQUEST A
PUBLIC HEARING ON A DRAFT HAZARDOUS WASTE PERMIT FOR CANNON
AIR FORCE BASE, EPA ID NUMBER: NM7572124454**

The New Mexico Environment Department (NMED) issued a public notice on October 6, 2017 concerning the intend to issue a Hazardous Waste Permit to the United States Air Force as the owner and operator of Cannon Air Force Base (Facility) to conduct corrective action at the Facility under the federal Resource Conservation and Recovery Act (RCRA), the New Mexico Hazardous Waste Act (Chapter 74, Article 4 NMSA 1978 or the HWA), and their implementing regulations.  The action to be taken by NMED would renew an existing permit.  The Facility currently consists of an active United States Air Force Base hosted by the 27TH Special Operations Wing.  NMED is charged with issuing a permit that will ensure that the Facility's hazardous waste operations are properly managed to protect human health and the environment. If an applicant meets all of the conditions required for a RCRA facility, the state will issue a permit.  NMED is extending the public comment period through **5:00 p.m. MST on January 22, 2018**, to receive additional comment on this action.

The Facility is located in eastern New Mexico on approximately 4,320 acres of land owned by the federal government in Curry County, New Mexico.  The site is located approximately seven miles west of Clovis, and fifteen miles north of Portales, New Mexico and south of United States Highway 64/84.  The Applicant's primary contact and address for this action is: Colonel Stewart A. Hammons, 110 East Alison Avenue, Suite 1098, Cannon Air Force Base, New Mexico, 88103.

NMED also announces the availability of a Fact Sheet providing the basis for the proposed action on the draft permit and the significant factual and regulatory issues considered in preparing the draft permit.  The Fact Sheet explains the basis for the draft permit and permit conditions, including applicable statutory and regulatory support.

**PUBLIC REVIEW OF THE ADMINISTRATIVE RECORD**

**Supp. App. 0151**

000481

The Administrative Record for this proposed action consists of the Permit application, the draft Permit, this Public Notice, Fact Sheet, and supporting documentation. The Administrative Record may be reviewed, with prior appointment, at the following location during the public comment period. A copy of the administrative record may be reviewed at the following location:

NMED - Hazardous Waste Bureau
2905 Rodeo Park Drive East, Building 1
Santa Fe, New Mexico 87505-6313
Monday - Friday from 8:00 a.m. to 5:00 p.m.
Contact: Pam Allen
(505) 476-6000

A copy of the draft Permit, this Public Notice, and the Fact Sheet are also available on NMED's website at https://www.env.nm.gov/hazardous-waste/cafb/. To obtain a copy of the administrative record or a portion thereof, or for further information, contact Mr. Dave Cobrain at (505) 476-6055 or at the address given below.

The 60-day public comment period is extended until **January 22, 2018**. Any person who wishes to comment on this action or request a Public Hearing should submit written or electronic mail (e-mail) comment(s) with the commenter's name and address to the respective address below. Only comments or requests received on or before **5:00 p.m. MST on January 22, 2018** will be considered. Written comments may be sent to:

Dave Cobrain, Program Manager
Hazardous Waste Bureau - New Mexico Environment Department
2905 Rodeo Park Drive East, Building 1
Santa Fe, NM 87505-6313
Ref: Cannon Air Force Base Draft Permit Public Comments
Email: dave.cobrain@state.nm.us

Written comments must be based on the information available for review and include, to the extent practicable, all referenced factual materials. Documents in the administrative record need not be re-submitted, if expressly referenced by the commenter. Requests for a Public Hearing shall provide: (1) a clear and concise factual statement of the nature and scope of the interest of the person requesting the hearing; (2) the name and address of all persons whom the requester represents; (3) a statement of any objections to the draft permit; and (4) a statement of the issues which the commenter proposes to raise for consideration at the hearing. NMED will provide a minimum 30-day notice of a Public Hearing, if scheduled.

NMED must ensure that the draft permit is consistent with the New Mexico Hazardous Waste Management Regulations. All written comments submitted will be considered in formulating a final decision and may result in NMED modifying the draft permit. NMED will respond in writing to all public comments received. This response will specify which provisions, if any, of the draft permit have been changed in the final decision and the reasons for the change, and will provide a brief description of all public comments. All persons presenting written comments or who request notification in writing will be notified of the decision by mail. The final decision also will be posted on the NMED website.

**Supp. App. 0152**

After consideration of all the written public comments received, NMED will issue, or modify and issue, the draft permit. If NMED modifies the draft permit, NMED will provide to the Permittee a copy of the modified draft permit and a detailed written statement containing the reasons for the modifications by mail. NMED will make the final decision publicly available and will notify the Permittee by certified mail. The final decision will constitute a final agency decision and may be appealed as provided by the HWA.

**ARRANGEMENTS FOR PERSONS WITH DISABILITIES**

Any person with a disability requiring assistance or auxiliary aid to participate in this process should contact Donna Wright no less than 15 days prior to the end of the public comment period at the following address: New Mexico Environment Department, P.O. Box 5469, 1190 St. Francis Drive, Santa Fe, New Mexico, 87502-6110, (505) 827-9769. TDD or TDY users please access Ms. Wright's number via the New Mexico Relay Network at 1 (800) 659-8331.

**Non-Discrimination Statement**

NMED does not discriminate on the basis of race, color, national origin, disability, age or sex in the administration of its programs or activities, as required by applicable laws and regulations. NMED is responsible for coordination of compliance efforts and receipt of inquiries concerning non-discrimination requirements implemented by 40 C.F.R. Part 7, including Title VI of the Civil Rights Act of 1964, as amended; Section 504 of the Rehabilitation Act of 1973; the Age Discrimination Act of 1975, Title IX of the Education Amendments of 1972, and Section 13 of the Federal Water Pollution Control Act Amendments of 1972. If you have any questions about this notice or any of NMED's non- discrimination programs, policies or procedures, you may contact:

Kristine Pintado, Non-Discrimination Coordinator
New Mexico Environment Department
1190 St. Francis Dr., Suite N4050
P.O. Box 5469
Santa Fe, NM 87502
(505) 827-2855
NMED.NDC@state.nm.us

If you believe that you have been discriminated against with respect to a NMED program or activity, you may contact the Non-Discrimination Coordinator identified above or visit our website at https://www.env.nm.gov/non-employee-discrimination-complaint-page/ to learn how and where to file a complaint of discrimination.





# NEW MEXICO
# ENVIRONMENT DEPARTMENT

*Hazardous Waste Bureau*

**SUSANA MARTINEZ**
**Governor**

**JOHN A. SANCHEZ**
**Lieutenant Governor**

2905 Rodeo Park Drive East, Building 1
Santa Fe, New Mexico 87505-6313
Phone (505) 476-6000   Fax (505) 476-6030
www.env.nm.gov

**BUTCH TONGATE**
**Cabinet Secretary**

**BRUCE YURDIN**
**Acting Deputy Secretary**

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

December 19, 2018

Colonel Stewart Hammons
Commander, 27th Special Operations Wing
110 E. Alison Avenue, Suite 1098
Cannon Air Force Base
New Mexico 88103

RE:   **ISSUANCE OF RESOURCE CONSERVATION AND RECOVERY ACT**
**HAZARDOUS WASTE PERMIT FOR CANNON AIR FORCE BASE**
**CANNON AIR FORCE BASE, NEW MEXICO**
**EPA ID #NM7572124454**
**HWB-CAFB-16-003**

Dear Colonel Hammons:

The New Mexico Environment Department (NMED or Department) issues the attached
Hazardous Waste Corrective Action Only Permit, for corrective action at Cannon Air Force Base
to the U.S. Air Force (the Air Force or Permittee) owner and operator of Cannon Air Force Base
(the Facility) located in Curry County, New Mexico, pursuant to the New Mexico Hazardous
Waste Act (HWA), NMSA 1978, §§ 74-4-1 through 74-4-14, in accordance with the New
Mexico Hazardous Waste Management Regulations (HWMR) 20.4.1 NMAC.  The Permit
requires the Permittee to conduct corrective action pursuant to the HWA and the HWMR

This Permit is a renewal of, and supersedes, the permit that was previously issued to the
Permittee in October 2003.

An 60-day public comment period was held from October 6, 2017 to December 5, 2017.  The
comment period was subsequently extended to January 22, 2018 at the request of the Permittee.
The only comments received during the comment period were from the Air Force.  The draft
permit was modified in response to the comments received.  With the exception of typographical
corrections, the modifications were limited to the tables in Permit Attachments 1 thought 3.
Written responses to all comments received are attached.

**Supp. App. 0154**

011260

Ms. Colonel Hammons
December 19, 2018
Page 2

This Permit is based on information submitted in Parts A and B of the Permit Application dated June 2013 submitted by the Permittee, and subsequent revisions and supplemental information, herein referred to as the Application.

This Permit shall be effective for a fixed term of ten years from its effective date, except as provided in Permit Section 1.8.3 (40 CFR § 270.50(a) and (b)). In accordance with 20.4.1.901.A(10) NMAC, the effective date of this Permit is January 18, 2019, 30 days after issuance of this notice to the Permittee.

Signed this 19th day of December 2018.

By _____
Bruce Yurdin
Acting Deputy Secretary
New Mexico Environment Department

File: CAFB-2018 Permit

011261

**New Mexico Environment Department
Response to Comments for
the Draft Resource Conservation and Recovery Act
Hazardous Waste Permit for Cannon Air Force Base
December 2018**

On October 6, 2017, the New Mexico Environment Department (NMED) issued a draft Resource Conservation and Recovery Act (RCRA) hazardous waste permit to the United States Air Force (Permittee), the owner and operator of Cannon Air Force Base (the Facility), to conduct corrective action in accordance with New Mexico's Hazardous Waste Act (74-4 New Mexico Statutory Authority [NMSA] 1978) and its associated Hazardous Waste Management Regulations (HWMR) listed at 20.4.1 New Mexico Administrative Code [NMAC], which incorporates RCRA and its implementing federal regulations listed in 40 Code of Federal Regulations (CFR) 260 through 280 (Permit). The U.S. Environmental Protection Agency (EPA) authorized NMED to issue permits to ensure that corrective actions taken at the Facility to investigate and remediate sites where contaminant releases have occurred, with the intent of protecting human health and the environment in January 1996. The Permit requires the Permittee to conduct corrective action for releases identified at various solid waste management units (SWMUs) and areas of concern (AOCs) at the Facility. This includes any newly discovered or identified SWMUs and AOCs.

Prior to issuing a permit, NMED is required by regulation to release a draft permit for public comment in accordance with 20.4.1.900 and 901 NMAC.  A 60-day comment period was initiated by NMED on October 6, 2017. The Permittee requested an extension to the original 60-day comment period. The Permittee's formal request for a comment period extension was received by NMED on November 16, 2017. NMED extended the public comment period on December 14, 2017 to January 22, 2018. Comments in response to the draft permit were only received from the Permittee and are referenced in Table 1: *Submitted Draft Permit Public Comment Response Documents* below. The NMED response to the Permittee's comments are provided in Table 2.

**Table 1: Submitted Draft Permit Public Comment Response Documents**

| Document Code | Document Title | Document Submittal Date |
|:---:|:---:|:---:|
| 1 | Common Comment and Response Worksheet | January 5, 2018 |
| 2 | Table 1: SWMUs to Remove | January 5, 2018 |
| 3 | CAFB Triple Letter (+ZZ) AOC Descriptions | January 5, 2018 |
| 4 | Table 1: AOC Comments | January 19, 2018 |

**Supp. App. 0156**

011262

NMED Response to Public Comments on Cannon Air Force Base Draft Permit, December 2018
Page 2 of 74

| 5 | Table 2: Sites to Move to Table 3 | January 22, 2018 |

**Supp. App. 0157**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> NEW MEXICO ENVIRONMENT DEPARTMENT, and JAMES KENNEY, Secretary (in his official capacity), <br><br> Defendants. | Case No. 2:19-cv-46-KG-SMV |

### MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

Plaintiff the United States respectfully moves for leave to file an amended complaint, attached as Exhibit 1. Counsel for the United States has conferred with counsel for the Defendants New Mexico Environment Department and Secretary James Kenney ("NMED"), who represented that NMED takes no position on this Motion.

### BACKGROUND

The United States filed its original complaint on January 17, 2019. Doc. 1. The complaint challenges NMED's December 19, 2018 issuance of a permit to Cannon Air Force Base under New Mexico's Hazardous Waste Act ("HWA"). On February 18, 2019, NMED filed a motion to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), or in the alternative, for a more definite statement under Rule 12(e). The Court denied NMED's motion on March 31, 2020. *United States v. New Mexico Env't Dep't*, No. 19-cv-46, 2020 WL 1536151 (D.N.M. Mar. 31, 2020). NMED filed an answer to the United States' complaint on May 29, 2020. Doc. 31.

The Court held a status conference on June 17, 2020, at which the United States indicated that it was considering amending its complaint. *See* Doc. 33. The Court directed the parties to

**Supp. App. 0158**

confer to propose a briefing schedule and a deadline for NMED to file the administrative record. *Id.* In an August 11, 2020 joint status report and at the September 11, 2020 status conference, the United States indicated that it was working diligently to consider potential amendments to its complaint, but that these deliberations were delayed by pandemic-related restrictions and the need for approval from appropriate government officials. *See* Docs. 35, 37. At the October 15, 2020 status conference, the parties requested additional time to discuss potential settlement of this case before submitting a proposed case management schedule to the Court. *See* Doc. 39. At the December 4, 2020 status conference, the parties informed the Court that they planned to continue settlement discussions informally without seeking a stay of the case, and submitted a proposed case management schedule orally and in a subsequent motion. *See* Docs. 41, 42. The Court entered an order adopting the proposed schedule on January 12, 2021. Doc. 45.

NMED filed the administrative record in this case on December 11, 2020. Docs. 43, 44. In light of various errors in the record and NMED's intent to file a corrected administrative record, the parties submitted a joint motion to amend the briefing schedule, which the Court granted on January 29, 2021. Docs. 46, 48. NMED filed its corrected administrative record on February 1, 2021. Doc. 49. Under the current schedule, the United States' motion for leave to amend the complaint is due on March 18, 2021.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading "with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The rule provides that the Court "should freely give leave when justice so requires." *Id.* In the Tenth Circuit, courts "generally refuse leave to amend only on a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by

amendments previously allowed, or futility of amendment." *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005) (internal quotation marks omitted); *see also Valencia v. Armada Skilled Home Care of NM, LLC*, No. 18-cv-1071, 2019 WL 6054497 at *2 (D.N.M. Nov. 15, 2019) (Gonzales, J.).

## ARGUMENT

The United States respectfully requests leave to file the proposed amended complaint. Nothing in this case weighs against following the Tenth Circuit's "liberal policy" in favor of granting motions for leave to amend under Rule 15(a). *See Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 706 (10th Cir. 2014). The proposed amended complaint would not be futile, would not unduly prejudice NMED, and is not the result of undue delay or bad faith.

First, the United States' proposed amended complaint would not be "futile." *See Valencia*, 2019 WL 6054497 at *3 (stating amendment is futile if complaint "would be subject to dismissal") (internal quotation marks omitted). This Court has already denied NMED's previous motion to dismiss the original complaint. *See United States v. New Mexico Env't Dep't*, No. 19-cv-46, 2020 WL 1536151 (D.N.M. Mar. 31, 2020). The proposed amended complaint provides additional factual and legal support for the claim pleaded in the original complaint and alleges additional claims arising from the same factual circumstances. These allegations are sufficient to assert a well-pleaded complaint and thus amendment would not be futile.

Second, amendment would not prejudice NMED. The allegations in the proposed amended complaint arise from the same subject matter set forth in the original complaint: NMED's issuance of the Permit to Cannon Air Force Base. *See Valencia*, 2019 WL 6054497 at *3 (stating prejudice "[m]ost often … occurs when the amended claims arise out of a subject

matter different from what was set forth in the complaint and raise significantly new factual

issues"). The new allegations do not raise "significantly new factual issues or claims." *Id.*

Indeed, many of the proposed amendments provide precisely what NMED requested in its

Motion to Dismiss: additional factual and legal support regarding which of the Permit's terms

are deficient and how they are deficient. *See* Doc. 4.

The proposed amendments also would not expand the scope of this case beyond review

of the Permit's terms based on the administrative record that has already been submitted to the

Court. *See* Doc. 49. Nor would amendment alter the current case management schedule or delay

resolution of this case. The Court has already entered a scheduling order, submitted jointly by

the parties, that accounts for potential amendment of the United States' complaint. *See* Doc. 48.

Third, the United States is not seeking leave to amend its complaint after undue delay or

as a result of bad faith. In the time since the Court denied NMED's motion to dismiss and

NMED filed its answer to the original complaint, the parties have repeatedly engaged in talks

regarding the case management schedule, including the appropriate time for the United States to

seek leave to amend its complaint. During that time, the United States worked diligently to

consider potential amendments to its complaint and seek approval for any such amendments

from the appropriate government officials. *See* Doc. 35. The parties then requested additional

time from the Court to explore potential settlement of this case before submitting a case

management schedule. *See* Doc. 39. In December 2020, the parties submitted (and the Court

adopted) a schedule that provided an opportunity for the United States to review the

administrative record prepared by NMED before seeking leave to amend its complaint. *See*

Docs. 42, 45. And in January 2021, the Court extended the schedule—including the deadline for

the United States to seek leave to amend—in light of various errors in the administrative record

initially filed by NMED.  *See* Docs. 46, 48.  Accordingly, this motion is being filed at an appropriate stage in these proceedings.

<div align="center">**CONCLUSION**</div>

For the foregoing reasons, the United States respectfully requests that it be granted leave to amend its complaint.  A copy of the United States' proposed amended complaint is attached as Exhibit 1.

Respectfully submitted,

Dated: March 18, 2021

/s/  *Andrew D. Knudsen*
Andrew D. Knudsen
John Cane
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
andrew.knudsen@usdoj.gov
john.cane@usdoj.gov
(202) 353-7466

<div align="center">5

**Supp. App. 0162**</div>

## CERTIFICATE OF SERVICE

I certify that on March 18, 2021, a copy of the foregoing was served by electronic means

on all counsel of record by the Court's CM/ECF system.

/s/ Andrew D. Knudsen
ANDREW D. KNUDSEN

6
**Supp. App. 0163**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>NEW MEXICO ENVIRONMENT DEPARTMENT, and JAMES KENNEY, Secretary (in his official capacity),<br><br>    Defendants. | Case No. 2:19-cv-46-KG-SMV |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Dated: June 1, 2021

JEAN E. WILLIAMS
Acting Assistant Attorney General

ANDREW D. KNUDSEN
JOHN M. CANE
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 353-7466
Andrew.Knudsen@usdoj.gov
John.Cane@usdoj.gov

*Counsel for Plaintiff United States of America*

**Supp. App. 0164**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

GLOSSARY .................................................................................................................... vii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF JURISDICTION.................................................................................... 1

BACKGROUND ................................................................................................................ 2

    I.    Statutory and Regulatory Background................................................................ 2

        A.  The Resource Conservation and Recovery Act ("RCRA") ........................... 2

        B.  New Mexico Hazardous Waste Act ............................................................. 3

    II.   Factual and Procedural Background .................................................................. 4

        A.  The Cannon Air Force Base Corrective Action Permit...................................... 4

        B.  Litigation Background.................................................................................... 6

STANDARD OF REVIEW ................................................................................................ 7

ARGUMENT..................................................................................................................... 8

I.   The Permit's Definition of "Hazardous Waste" for Purposes of Corrective Action Is Contrary to New Mexico Law and Unsupported by the Administrative Record. ...................... 8

    A.  The HWA limits NMED's corrective action authority to only those substances identified as hazardous waste under EPA's regulations. ....................................... 9

    B.  Even if NMED's corrective action authority extended to all statutory hazardous waste, the administrative record does not support the Permit's definition of hazardous waste. ..... 12

II.  The Permit's Application of Corrective Action Requirements to "Contaminants" Exceeds NMED's Authority under the HWA and Implementing Regulations. ................................... 14

III.   The Challenged Permit Terms Are Not a Valid Exercise of NMED's Omnibus Permitting Authority. ................................................................................................... 17

CONCLUSION................................................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Citizens for Alternatives to Radioactive Dumping v. CAST Transp., Inc.*,
No. CIV 99-321 MCA/ACT, 2004 WL 7338006 (D.N.M. Sept. 30, 2004) ............................... 7

*Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*,
485 F.3d 1091 (10th Cir. 2007) ........................................................................... 7

*Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*,
124 P.3d 1164 (N.M. Ct. App. 2005) .................................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................................... 18

*N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*,
946 F.3d 1138 (10th Cir. 2019) ........................................................................... 8

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) ......................................................................... 7, 8

*Regents of the Univ. of Cal. v. N.M. Water Quality Control Comm'n*,
94 P.3d 788 (N.M. Ct. App. 2004) ...................................................................... 12

*Sw. Research & Info. Ctr. v. N.M. Env't Dep't,*
336 P.3d 404 (N.M. Ct. App. 2014) ...................................................................... 8

*W. Watersheds Project v. Bureau of Land Mgmt.*,
721 F.3d 1264 (10th Cir. 2013) ........................................................................... 8

**Statutes**

5 U.S.C. § 706(2) ............................................................................................. 7

10 U.S.C. § 2710(e)(3) ...................................................................................... 5

28 U.S.C. § 1331 .............................................................................................. 1

28 U.S.C. § 1335 .............................................................................................. 1

42 U.S.C. § 6903(5) .......................................................................................... 2

42 U.S.C. §§ 6921-39g ...................................................................................... 2

42 U.S.C. § 6921(b) .......................................................................................... 2

42 U.S.C. § 6925(c)(3)................................................................................. 18

42 U.S.C. § 6926(b) ....................................................................................... 2

42 U.S.C. § 6961(a) ....................................................................................... 3

**State Statutes**

N.M. Stat. Ann. § 74-4-1 *et seq.* ............................................................... 1, 3

N.M. Stat. Ann. § 74-4-3(C) ................................................................ 4, 9, 17

N.M. Stat. Ann. § 74-4-3(K)................................................................. passim

N.M. Stat. Ann. § 74-4-4 ............................................................................... 3

N.M. Stat. Ann. § 74-4-4 ............................................................................... 3

N.M. Stat. Ann. § 74-4-4(A)(1) ..................................................................... 3

N.M. Stat. Ann. § 74-4-4(A)(5)(h) .............................................................. 16

N.M. Stat. Ann. § 74-4-4(A)(6) ..................................................................... 3

N.M. Stat. Ann. § 74-4-4.2 ............................................................................ 3

N.M. Stat. Ann. § 74-4-4.2(B)................................................................. 4, 16

N.M. Stat. Ann. § 74-4-4.2(C) .............................................................. 17, 19

N.M. Stat. Ann. § 74-4-14 ............................................................................. 6

N.M. Stat. Ann. § 74-4-14(C) ......................................................... 7, 9, 12, 14

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................... 7

**Code of Federal Regulations**

40 C.F.R. § 260.1 *et seq.*............................................................................... 2

40 C.F.R. § 260.10 ..................................................................................... 4, 10

40 C.F.R. pt. 261 ...................................................................................... 2, 11

40 C.F.R. pt. 261 subpt. C................................................................... 2, 11

40 C.F.R. pt. 261 subpt. D ............................................................................................ 2, 11

40 C.F.R. § 261.3 ....................................................................................................... passim

40 C.F.R. § 261.3(a)(2) ..................................................................................................... 2

40 C.F.R. § 261.24 .......................................................................................................... 17

40 C.F.R. pt. 264 ............................................................................................................... 5

40 C.F.R. § 264.101 ................................................................................................... passim

40 C.F.R. § 270.32(b) ..................................................................................................... 18

40 C.F.R. § 270.32(b)(2) ........................................................................................... 17, 18

40 C.F.R. § 272.1601 ........................................................................................................ 3

**State Administrative Code**

N.M. Admin. Code § 20.4.1 ............................................................................................... 3

N.M. Admin. Code § 20.4.1.100 ................................................................................... 4, 10

N.M. Admin. Code § 20.4.1.200 ................................................................................... 4, 10

N.M. Admin. Code § 20.4.1.500 ............................................................................. 4, 10, 17

N.M. Admin. Code § 20.4.1.900 ................................................................................. 18, 19

N.M. Admin. Code § 20.4.1.901.A(2) ......................................................................... 13, 14

N.M. Admin. Code § 20.4.1.901.D(1) ......................................................................... 13, 14

N.M. Admin. Code § 20.4.1.901.D(2)(c) .......................................................................... 13

**Administrative Decisions**

*In re Ash Grove Cement Co.*,
  7 E.A.D. 387 (EAB 1997) ............................................................................................ 18

*In re Caribe Gen. Elec. Products, Inc.*,
  8 E.A.D. 696 (EAB 2000) ....................................................................................... 18, 19

*In re Chem. Waste Mgmt. of Indiana, Inc.*,
  6 E.A.D. 144 (EAB 1995) ............................................................................................ 18

**Supp. App. 0168**

**Federal Register**

56 Fed. Reg. 7134 ................................................................................................................. 18

vi

## GLOSSARY

| | |
|---|---|
| Area of Concern | AOC |
| Administrative Procedure Act | APA |
| New Mexico Environmental Improvement Board | Board |
| Cannon Air Force Base | Cannon |
| U.S. Environmental Protection Agency | EPA |
| New Mexico Hazardous Waste Act | HWA |
| New Mexico Environment Department | NMED |
| Perfluorooctanoic Acid | PFOA |
| Perfluorooctane Sulfonate | PFOS |
| Resource Conservation and Recovery Act | RCRA |
| Solid Waste Management Unit | SWMU |

**INTRODUCTION**

On December 19, 2018, the New Mexico Environment Department ("NMED") issued a renewal of Cannon Air Force Base's Corrective Action Permit ("Permit") under the New Mexico Hazardous Waste Act ("HWA"), N.M. Stat. Ann. § 74-4-1 *et seq*.  The United States brought suit against NMED challenging the Permit's definition of "hazardous waste" for the purpose of corrective action and the Permit's application of Permit requirements to "contaminants," and alleged that the Permit contains terms that are inconsistent with the scope of "corrective action" as defined by New Mexico law, and that are not supported by the administrative record.

For four independent reasons, the Court should grant the United States' motion for summary judgment on Counts I and II of its Amended Complaint.  First, the HWA limits NMED's corrective action authority to only those substances identified as "hazardous waste" under EPA's RCRA regulations.  By defining "hazardous waste" for the purpose of corrective action in a manner that exceeds the grant of authority in the HWA, the Permit definitions at issue in this case are unlawful.  Second, the administrative record fails to articulate the reasoning for determining that the enumerated categories of substances in the Permit meet the statutory definition of hazardous waste, which was arbitrary and capricious under the circumstances.  Third, the Permit unlawfully extends corrective action requirements to releases of "contaminants," which exceeds NMED's authority under the HWA and its implementing regulations.  Finally, NMED has not explained why or how the record supports that the disputed Permit terms are necessary to protect human health and the environment pursuant to NMED's omnibus authority.

**STATEMENT OF JURISDICTION**

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1345.

1

**Supp. App. 0171**

**BACKGROUND**

I.    **Statutory and Regulatory Background**

A.  **The Resource Conservation and Recovery Act ("RCRA")**

Subtitle C of RCRA, 42 U.S.C. §§ 6921-39g, provides requirements for the cradle to grave management of hazardous waste.  The U.S. Environmental Protection Agency ("EPA") administers the RCRA hazardous waste program and issues implementing regulations.  *See* 40 C.F.R. § 260.1 *et seq.*  However, EPA may authorize a state to administer and enforce a state hazardous waste program that operates in lieu of the federal hazardous waste regulatory program. 42 U.S.C. § 6926(b).

RCRA defines "hazardous waste" broadly as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."  *Id.* § 6903(5).  For purposes of RCRA's Subtitle C regulatory program, Congress directed EPA to "promulgate regulations identifying the characteristics of hazardous waste, and listing particular hazardous wastes . . . , which shall be subject to the provisions of" Subtitle C.  *Id.* § 6921(b).  EPA gave effect to this requirement by promulgating 40 C.F.R. part 261.  A solid waste is a "hazardous waste" under part 261 if it has been specifically listed by EPA (known as a "listed hazardous waste") or if it exhibits the characteristics of ignitability, corrosivity, reactivity, or toxicity (known as a "characteristic hazardous waste").  40 C.F.R. § 261.3(a)(2); *id.* subpt. C (specifying characteristics), subpt. D (listing specific hazardous wastes).

RCRA contains a limited waiver of the United States' sovereign immunity as to "Federal, State, interstate, and local requirements, both substantive and procedural . . . respecting control and abatement of solid waste or hazardous waste disposal and management."  42 U.S.C. § 6961(a).  The United States "shall be subject to, and comply with," those requirements "in the same manner, and to the same extent, as any person is subject to such requirements."  *Id.*

### B.  New Mexico Hazardous Waste Act

New Mexico operates an EPA-authorized state hazardous waste management program under the HWA, N.M. Stat. Ann. §§ 74-4-1 *et seq.*, and implementing regulations, N.M. Admin. Code § 20.4.1.  *See* 40 C.F.R. § 272.1601 (authorizing state program).  The HWA's statutory definition of "hazardous waste" is materially identical to RCRA's.  *See* N.M. Stat. Ann. 74-4-3(K) (defining "hazardous waste" with certain exclusions not relevant here).  The HWA directs New Mexico's Environmental Improvement Board ("Board") to promulgate rules establishing standards and permit requirements for hazardous waste management.  *Id.* § 74-4-4.  It also directs the Board to promulgate rules "for the identification and listing of hazardous wastes" taking into account various factors, but prohibits the Board from identifying or listing "any solid waste or combination of solid wastes as a hazardous waste that has not been listed and designated as a hazardous waste by" EPA.  *Id.* § 74-4-4(A)(1).

NMED is tasked with implementing New Mexico's hazardous waste management program under the HWA and the Board's regulations, including administration of the hazardous waste permitting program.  *See id.* § 74-4-4.2.  That program requires the owner or operator of a hazardous waste treatment, storage, or disposal facility to obtain a permit under the HWA.  *See id.* § 74-4-4(A)(6).  Hazardous waste permits under the HWA "shall require corrective action for all releases of hazardous waste or constituents from any solid waste management unit" at the permitted facility.  *Id.* § 74-4-4.2(B).  New Mexico defines "corrective action" as "an action

3

**Supp. App. 0173**

taken in accordance with rules of the [B]oard to investigate, minimize, eliminate or clean up a release to protect the public health, safety and welfare or the environment." *Id.* § 74-4-3(C).

The "rules of the [B]oard" governing corrective action requirements incorporate EPA's RCRA regulations by reference, with limited exceptions not relevant here. Those regulations require a facility seeking a permit to "institute corrective action as necessary to protect human health and the environment for all releases of hazardous waste or constituents from any solid waste management unit at the facility, regardless of the time at which waste was placed in such unit." 40 C.F.R. § 264.101; N.M. Admin. Code § 20.4.1.500 (incorporating 40 C.F.R. pt. 264 by reference). For purposes of 40 C.F.R. § 264.101, "hazardous waste" is a defined term meaning a listed or characteristic hazardous waste under 40 C.F.R. § 261.3. *See* 40 C.F.R. § 260.10 (defining hazardous waste "[w]hen used in parts 260 through 273" to mean "a hazardous waste as defined in §261.3"); N.M. Admin. Code § 20.4.1.100-200 (incorporating 40 C.F.R. pts. 260 and 261 by reference).

## II.   Factual and Procedural Background

### A. The Cannon Air Force Base Corrective Action Permit

Cannon Air Force Base ("Cannon") is an Air Force installation located on approximately 4,320 acres of land in Curry County, NM. Fact Sheet at 2, AR000136. Before the Permit was issued, Cannon was subject to a corrective action permit issued on October 15, 2003. *Id.* at 6, AR000140.[1]

Cannon applied to renew its corrective action permit in June 2013. *Id.* at 6, AR000140. NMED found the renewal permit application administratively complete in June 2016. *Id.* As a result, NMED issued a draft permit and accompanying fact sheet in October 2017 and initiated a

---

[1] The 2003 permit is accessible on NMED's website at https://www.env.nm.gov/wp-content/uploads/sites/12/2019/10/CAFB_Final_Perm_as_modified_2-2006.pdf.

public comment period and the opportunity to request a hearing.  *Id.* at 1-8, AR000135-000142.

On December 19, 2018, New Mexico issued the final Permit, with an effective date of January

18, 2019.  Permit Issuance Memo at 1-2, AR011259-011260.  The Permit will be effective for

ten years.  Fact Sheet at 6-7, AR000140-000141.

The Permit defines "hazardous waste" for the purposes of corrective action as follows:

> *Hazardous Waste*, for the purposes of corrective action for solid waste
> management units and areas of concern conducted pursuant to 74-4-4.2(B) of the
> HWA, 40 CFR part 264, subpart F, or 40 CFR 270.32(b)(2), means a hazardous
> waste as defined in 74-4-3(I) of the HWA.[2]  Hazardous waste, for the purposes
> of corrective action, includes, *without limitation* any hazardous waste as defined
> in 40 CFR 261.3, any groundwater contaminant listed in the Water Quality
> Control Commission (WQCC) Regulations in 20.6.2.3103 NMAC, any toxic
> pollutant listed in 20.6.2.WW NMAC, any contaminant defined in this Permit
> Section (1.12) or for which the EPA has promulgated a maximum contaminant
> level (MCL) at 40 CFR parts 141 and 143, perchlorate, methyl tertiary butyl ether,
> polychlorinated biphenyls (PCBs), dioxins, furans, perfluorinated compounds
> including perfluorooctane sulfonate and perfluorooctanoic acid, and munitions
> constituents as defined in 10 U.S.C. 2710(e)(3).

Permit at 16, AR011350 (emphasis added); *see also* Doc. 56 at 24.  The Permit also defines

"contaminant" as follows:

> *Contaminant* means any hazardous constituent listed in 40 CFR Part 261,
> appendix VIII and 40 CFR Part 264, appendix IX; any groundwater contaminant
> listed in the New Mexico WQCC Regulations at 20.6.2.3103 NMAC; any toxic
> pollutant listed in the New Mexico WQCC Regulations a 20.6.2.7.WW NMAC;
> methyl tertiary-butyl ether; perchlorate; polychlorinated biphenyls (PCBs);
> dioxins and furans; perfluorinated compounds including perfluorooctane sulfonate
> and perfluorooctanoic acid; *and any other substance present in soil, sediment,
> rock, surface water, groundwater, or air for which the NMED determines that
> monitoring, other investigation, or a remedy is necessary to carry out the
> purposes of this Permit.*

Permit at 15, AR011349 (emphasis added); *see also* Doc. 56 at 23.

---

[2] The citation appears to be in error.  The definition of "hazardous waste" is at Section 74-4-3(K)
of the HWA.  N.M. Stat. Ann. § 74-4-3(K).

These disputed permit provisions are applied throughout the Permit, most notably in Part 3, which imposes both broad and detailed requirements for corrective action at solid waste management units ("SWMUs") and areas of concern ("AOCs") and beyond the facility boundary and for newly discovered SWMUs or AOCs.  Permit at 32-33, 36-37, AR011366-011367, 011370-011371.[3]  The corrective action provisions in the Permit also outline detailed requirements for the phased corrective action process, including requirements related to remedial investigation, risk assessment, corrective measures, the use and implementation of interim cleanup measures, selection and implementation of final remedies, and the relevant cleanup levels that are to apply to various environmental media (soil, groundwater, and so forth).  *Id.* at 32-82, AR011366-011416.

## B.  Litigation Background

After New Mexico issued the final Permit, with an effective date of January 18, 2019, the United States timely filed a challenge to the Permit by filing a complaint in this Court.[4]  *See* Permit Issuance Memo at 1-2, AR011259-11260; Doc. 1.  NMED moved to dismiss the complaint, but that motion was denied.  *See* Doc. 26.  After NMED filed its corrected administrative record on February 1, 2021, the United States filed an unopposed motion for leave to file an amended complaint on March 18, 2021, which this Court granted the next day.  Docs.

_____

[3] The Permit defines an SWMU as any "discernable unit or area at the Facility at which solid waste has been placed at any time, and from which NMED determines there may be a risk of a release of hazardous waste or constituents, irrespective of whether the unit was intended for the management of solid waste…"  Permit at 17, AR011351.  The Permit defines an AOC as "any area having a known or suspected release of hazardous waste or hazardous constituents that is not from a solid waste management unit and that NMED has determined may pose a current or potential threat to human health or the environment…"  *Id.* at 15, AR011349.

[4] The United States also filed a protective petition for review in state court to ensure compliance with N.M. Stat. Ann. § 74-4-14.  *United States v. N.M. Env't Dep't*, No. A-1-CA-37887 (N.M. Ct. App. filed Jan. 17, 2019).  The state court petition is stayed pending the outcome of the federal suit.

6

49, 53, 54. The United States filed the Amended Complaint on April 2, 2021, and NMED filed its answer on the same day. Docs. 56, 57.

## STANDARD OF REVIEW

Under the HWA, a permitting decision may be set aside if the action was (1) arbitrary, capricious, or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law. N.M. Stat. Ann. § 74-4-14.C. Judicial review of NMED's actions under the HWA is "based on the administrative record and a standard of review similar to that provided in Section 706 of the Administrative Procedure Act" ("APA"). *Citizens for Alternatives to Radioactive Dumping v. CAST Transp., Inc.*, No. CIV-99-32 MCA/ACT, 2004 WL 7338006, at *18 (D.N.M. Sept. 30, 2004), *aff'd sub nom. Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091 (10th Cir. 2007); *see* 5 U.S.C. § 706(2) (authorizing courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence").

Summary judgment is appropriate where a party can show that, as to any part of any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Neither this Court nor the Tenth Circuit has addressed the standard of review for a motion for summary judgment on a claim under the HWA. However, in the analogous context of reviewing federal agency actions under the APA, the Tenth Circuit has held that the standard procedures for adjudicating summary judgment motions do not apply. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994). Under *Olenhouse*, a district court reviewing agency action "acts as an appellate court" and "employs summary judgment to decide, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1138,

1161 (10th Cir. 2019) (internal quotation marks and alteration omitted).  This review is limited to

the administrative record before the agency at the time the decision was made.  *Id.* at 1161-62.

Agency action is arbitrary and capricious if it is "unreasonable or without a rational basis,

when viewed in light of the whole record."  *Sw. Research & Info. Ctr. v. N.M. Env't Dep't*, 336

P.3d 404, 411 (N.M. Ct. App. 2014) (citing *Gila Res. Info. Project v. N.M. Water Quality

Control Comm'n*, 124 P.3d 1164, 1168 (N.M. Ct. App. 2005)); *see also W. Watersheds Project v.

Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013) (stating agency decision is

"arbitrary and capricious" under APA where agency, *inter alia*, "failed to base its decision on

consideration of the relevant factors" or "made a clear error of judgment").  In performing

arbitrary and capricious review, a court may not "rel[y] on the *post hoc* rationalizations of

counsel or attempt[] itself to supply a reasoned basis for agency action without regard to the

contents of the administrative record."  *Olenhouse*, 42 F.3d at 1580.

## ARGUMENT

**I.   The Permit's Definition of "Hazardous Waste" for Purposes of Corrective Action Is Contrary to New Mexico Law and Unsupported by the Administrative Record.**

The HWA and its implementing regulations apply corrective action requirements to

releases of listed and characteristic hazardous waste as defined at 40 C.F.R. § 261.3.  But the

Permit's definition of "hazardous waste" for the purposes of corrective action improperly adopts

the HWA's broader statutory definition of hazardous waste and proceeds to identify numerous

categories of substances that purportedly meet that statutory definition.  The Permit's definition

of "hazardous waste" and application of that definition in the corrective action requirements are

thus "not in accordance with law" because they extend corrective action beyond listed and

characteristic hazardous wastes.  N.M. Stat. Ann. § 74-4-14(C).  Moreover, even if NMED's use

of the statutory definition of hazardous waste in the Permit were permissible, NMED failed to

demonstrate in the Permit, fact sheet, or elsewhere in the administrative record that the specific categories of substances it identified actually meet that statutory definition. Thus, the Permit's inclusion of those enumerated categories is by definition arbitrary and capricious.

**A. The HWA limits NMED's corrective action authority to only those substances identified as hazardous waste under EPA's regulations.**

The Permit defines "hazardous waste" for the purposes of corrective action by reference to the HWA's statutory definition of "hazardous waste" at section 74-4-3(K). Permit at 16, AR011350. The Permit also enumerates several specific substances or categories of substances—*in addition to* "hazardous waste as defined in 40 CFR 261.3"—that NMED believes fall within the Permit's definition. *Id.* And through its incorporation of "contaminants" as defined elsewhere in the Permit, the definition includes a "catch all" provision allowing NMED to reach additional substances at its discretion without regard for the relevant statutory and regulatory constraints. This definition exceeds the scope of NMED's corrective action authority, which the HWA and its implementing regulations limit to listed or characteristic hazardous wastes as defined at 40 C.F.R. § 261.3. Accordingly, the Permit's definition of "hazardous waste" for the purposes of corrective action is unlawful.

The HWA's statutory definition of "hazardous waste" is broad. *See* N.M. Stat. Ann. § 74-4-3(K). But NMED's corrective action authority does not extend to the outer limits of that statutory definition. Instead, the HWA delineates the scope of "corrective action" requirements by reference to the "rules of the [B]oard." *Id.* § 74-4-3(C) (defining "corrective action"). Those "rules of the [B]oard" include provisions establishing corrective action requirements and identifying the hazardous wastes that are subject to those requirements.

Specifically, New Mexico's rules incorporate by reference EPA's regulations outlining corrective action requirements and defining hazardous waste for purposes of corrective action

under those regulations. N.M. Admin. Code § 20.4.1.100, 200, 500 (incorporating 40 C.F.R. pts.

260, 261, and 264, respectively); *see* Fact Sheet at 5, AR000139 (explaining that the Cannon

Permit cites federal regulations, not New Mexico regulations, because "only the federal

regulations set forth the detailed regulatory requirements; the State regulations incorporate by

reference, with certain exceptions, the federal regulations in their entirety."). The regulatory

corrective action requirements for releases of hazardous waste or constituents are codified at 40

C.F.R. § 264.101.[5] And for purposes of that provision, "hazardous waste" means "a hazardous

waste as defined in [40 C.F.R.] § 261.3," *i.e.,* a listed or characteristic hazardous waste. 40

C.F.R. § 260.10 (defining "hazardous waste" "[w]hen used in parts 260 through 273").

This regulatory definition of "hazardous waste" is decidedly narrower than the HWA's

statutory definition used in the Permit. Because NMED's corrective action authority does not

extend beyond the "rules of the [B]oard," it does not extend to hazardous wastes that are not

listed or characteristic hazardous wastes under 40 C.F.R. § 261.3. The Permit nonetheless

defines "hazardous waste" for the purposes of corrective action by reference to the HWA's

broader statutory definition. As a result, the Permit purports to apply corrective action

requirements to substances that do not fall within the regulatory definition of "hazardous waste,"

and it therefore exceeds NMED's authority under the HWA.[6]

Moreover, the Permit includes an extensive list of substances purportedly meeting its

definition of "hazardous waste" for the purposes of corrective action that expressly expands upon

the definition set forth at 40 C.F.R § 261.3 and incorporated by reference into the Board's rules.

---

[5] The United States does not challenge the Permit's application of corrective action to hazardous constituents or the Permit's definition of hazardous constituents.

[6] By contrast, for "all other purposes" besides corrective action, the Permit properly defines hazardous waste "as defined in 40 CFR 261.3." Permit at 16, AR011350.

Permit at 16, AR011350.  Moreover, even these categories are purportedly listed "without limitation."  *Id.*  The Permit's inclusion of these substances exceeds NMED's authority under the HWA because it extends corrective action requirements to substances that are not listed or characteristic hazardous wastes.  Nowhere in the record did NMED even attempt to demonstrate that any of the enumerated categories of substances are hazardous wastes as defined at 40 C.F.R. § 261.3.[7]  Indeed, some demonstrably are not.  For example, the Permit lists "perfluorinated compounds including perfluorooctane sulfonate ["PFOS"] and perfluorooctanoic acid ["PFOA"]" among the substances it considers "hazardous waste" for the purposes of corrective action.  *Id.*  But EPA has not listed any perfluorinated compounds, including PFOS or PFOA, as hazardous wastes under 40 C.F.R. § 261.3.  *See* 40 C.F.R. pt. 261 subpt. D (specifying listed hazardous wastes).  And NMED has not shown that perfluorinated compounds exhibit any of the characteristics set forth in part 261.  *See id.* pt. 261 subpt. C.

Further, the Permit stretches its definition of "hazardous waste" to include "any contaminant defined in this Permit Section (1.12)."  Permit at 16, AR011350.  In addition to incorporating many of the same substances already enumerated in the Permit's definition of "hazardous waste," the term "contaminant" includes a catch-all provision encompassing "any other substance present in soil, sediment, rock, surface water, groundwater, or air for which the NMED determines that monitoring, other investigation, or a remedy is necessary to carry out the purposes of this Permit."  Permit at 15, AR011349.  As discussed in Section II below, NMED's corrective action authority under 40 C.F.R. § 264.101 is limited to hazardous wastes and hazardous constituents, and does not cover "contaminants."  This catch-all provision is

---

[7] Still less has NMED shown that whatever additional unidentified substances it may attempt to reach "without limitation" in the future satisfy the regulatory definition.  Permit at 16, AR011350.

untethered from both the statutory and regulatory definitions of hazardous waste, allowing

NMED to extend corrective action to additional substances at its discretion without regard for 40

C.F.R. § 261.3 or the other "rules of the [B]oard" defining NMED's corrective action authority.

Accordingly, the Permit's definition of "hazardous waste" for the purposes of corrective

action is inconsistent with the HWA and its implementing regulations, and the Permit is

unlawful.

**B. Even if NMED's corrective action authority extended to all statutory hazardous waste, the administrative record does not support the Permit's definition of hazardous waste.**

The disputed Permit terms should also be set aside because they are arbitrary, capricious,

or an abuse of discretion. N.M. Stat. Ann § 74-4-14(C); *see also Regents of the Univ. of Cal. v.*

*N.M. Water Quality Control Comm'n*, 94 P.3d 788, 795 (N.M. Ct. App. 2004). Even assuming

*arguendo* that the "rules of the [B]oard" authorized corrective action for all statutory hazardous

wastes, NMED has made no effort to demonstrate that any of the specific categories of

substances listed in the Permit's definition of hazardous waste meet the HWA's statutory

definition.[8] *See* N.M. Stat. Ann. § 74-4-3(K).

As discussed above, *supra* p. 8, with certain exceptions not relevant here, the HWA

defines "hazardous waste" as "any solid waste or combination of solid wastes that because of

their quantity, concentration or physical, chemical or infectious characteristics may: (1) cause or

significantly contribute to an increase in mortality or an increase in serious irreversible or

incapacitating reversible illness; or (2) pose a substantial present or potential hazard to human

health or the environment when improperly treated, stored, transported, disposed of or otherwise

---

[8] The Air Force does not argue here that any or all of the enumerated categories of substances could not meet that definition, only that NMED has not shown that they do in the administrative record for this Permit.

**Supp. App. 0182**

managed." *Id.* Nowhere in the Permit or its administrative record, however, did NMED even attempt to demonstrate that the specific substances or categories of substances listed in its definition of "hazardous waste" actually satisfy the HWA's statutory criteria. Permit at 16, AR011350; N.M. Stat. Ann. § 74-4-3(K).

Critically, under New Mexico's permitting process, a draft permit "shall be accompanied by a fact sheet and shall be based on the administrative file" that explains NMED's preliminary permitting decision and sets forth the "principal facts and the significant factual[,] legal, methodological and policy questions considered in preparing the draft permit." N.M. Admin. Code § 20.4.1.901.A(2)/D(1). The fact sheet must also include a "brief summary of the basis for the draft permit conditions including references to applicable statutory and regulatory provisions." N.M. Admin. Code § 20.4.1.901.D(2)(c). In this case, however, the Fact Sheet does not refer to or invoke New Mexico's statutory definition of hazardous waste when describing the requirements contained in the draft Permit. *See generally* Fact Sheet at 1-8, AR000135-000142. Indeed, when describing Part 1 of the Permit, NMED states in the Fact Sheet that the "General Permit Conditions" provide the "*regulatory* authority and basis for the permit including modification and compliance requirements, definitions, and general permit conditions regarding duties and requirements that apply to corrective action at the Facility . . . ." *Id.* at 7, AR000141 (emphasis added).

The Fact Sheet similarly does not explain the principal facts and significant factual, methodological and policy questions considered when NMED decided to include the disputed Permit provisions. *See* N.M. Admin. Code § 20.4.1.901.A(2)/D(1). It includes no background or explanation as to why the Permit requires corrective action as to the additional substances covered by the disputed Permit provisions or why those substances satisfy the statutory

definition of hazardous waste. N.M. Stat. Ann. § 74-4-3(K); *see generally* Fact Sheet at 1-8, AR000135-000142.

NMED has failed to articulate its reasoning for determining that the enumerated categories of substances that it believes meet the HWA's statutory definition of hazardous waste actually meet that definition, or to refer to any evidence in the record that would support such a determination. *See* N.M. Stat. Ann. § 74-4-3(K); Permit at 16, AR011350. Accordingly, NMED's decision to include these categories of substances within the Permit's definition of hazardous wastes for the purposes of corrective action was arbitrary and capricious. N.M. Stat. Ann. § 74-4-14(C).

## II. The Permit's Application of Corrective Action Requirements to "Contaminants" Exceeds NMED's Authority under the HWA and Implementing Regulations.

The HWA limits NMED's corrective action authority to releases of hazardous waste and hazardous constituents.[9] But the Permit unlawfully extends corrective action requirements to releases of "contaminants," a defined term in the Permit that does not appear in the HWA, RCRA, or relevant regulations. Indeed, in some places it even applies corrective action to contaminants *in lieu of* hazardous waste or hazardous constituents. This is inconsistent with the HWA and its implementing regulations.

The Permit defines "contaminant" as a term separate and apart from "hazardous waste" and "hazard constituent." Permit at 15, AR011349. As defined, it includes some (but not all) hazardous constituents as defined in the Permit, and some (but not all) of the categories of substances NMED identified in its definition of "hazardous waste" for the purposes of corrective action. *Id.* But it does *not* include "hazardous waste as defined in 40 CFR 261.3." *Compare id.*;

---

[9] The only possible exception to this rule would be invocation of the omnibus provision, which, as discussed in Section III below, does not support the Permit terms challenged here.

14

**Supp. App. 0184**

*with* Permit at 16, AR011350 (defining "hazardous waste" for purposes of corrective action). And it includes a catch-all provision extending the definition to "any other substance present in soil, sediment, rock, surface water, groundwater, or air for which the NMED determines that monitoring, other investigation, or a remedy is necessary to carry out the purposes of this Permit." Permit at 15, AR011349.

Many of the Permit's terms extend corrective action requirements to these "contaminants." For example, the Permit defines "corrective action" as action "necessary to protect human health and the environment for all releases of hazardous waste or hazardous constituents, *or other contaminants defined by the Permit Section (1.12)*, to the environment as required under HWA 74-4-4.2(B) and 40 CFR 264.101." *Id.* (emphasis added). In some of the Permit's key operative provisions, the Permit even applies corrective action requirements to contaminants *instead of* hazardous waste and hazardous constituents. For example, Section 3.10 states that NMED "will require corrective measures at a site if the NMED determines . . . that there has been a release of *contaminants* into the environment at the site and that corrective action is necessary to protect human health and the environment." Permit at 41, AR011375 (emphasis added). Numerous other provisions tie corrective action requirements to the release of contaminants. *See* Permit at 40, AR011374 (requiring Investigation Work Plan to address "pathways of contaminant releases"); Permit at 41, AR011375 (requiring Investigation Report to identify cleanup levels "for each contaminant found during a site investigation"); Permit at 42, AR011376 (requiring Corrective Measures Evaluation Report to evaluate remedy alternatives based on, *inter alia*, whether remedy would "reduce or eliminate . . . further releases of contaminants"); *see also* Permit at 83-110, AR011417-011444 (providing detailed requirements for Investigation Work Plans, Risk Assessment Reports, and Corrective Measures Evaluations).

The Permit's application of corrective action requirements to "contaminants" is unlawful, as nothing in the HWA or its implementing regulations authorizes NMED to extend those requirements to "contaminants." Indeed, the term "contaminant" does not appear in the HWA. Instead, the plain text of that statute provides that hazardous waste permits "shall require corrective action for all releases of *hazardous waste or constituents* from any solid waste management unit at a treatment, storage or disposal facility seeking a permit." N.M. Stat. Ann. § 74-4-4.2(B) (emphasis added). Likewise, the HWA directs the Board to promulgate regulations for "the taking of corrective action for all releases of *hazardous waste or constituents* from" such facilities. *Id.* § 74-4-4(A)(5)(h) (emphasis added).

Further, as discussed in Section I.A above, the HWA defines the scope of its corrective action requirements by reference to the "rules of the [B]oard." *Id.* § 74-4-3(C). Those rules require corrective action "as necessary to protect human health and the environment for all releases of *hazardous waste or constituents* from any solid waste management unit at the facility, regardless of the time at which waste was placed in such unit." 40 C.F.R. § 264.101 (emphasis added); N.M. Admin. Code § 20.4.1.500 (incorporating 40 C.F.R. pt. 264). Nothing in New Mexico's regulations or the federal regulations they incorporate extends corrective action requirements to "contaminants."[10] And as discussed below, nowhere in the administrative record does New Mexico explain its reasons for requiring corrective action as to these additional "contaminants." *See infra* at 21-23.

---

[10] Part 261 of EPA's regulations refers to certain specific listed "contaminants" (without defining the term) in order to identify those substances that qualify as characteristic hazardous wastes based on the toxicity characteristic. 40 C.F.R. § 261.24. But that provision does not authorize direct regulation of those contaminants as hazardous waste or hazardous constituents per se. In any event, the "contaminants" listed in that provision of EPA's regulations do not align with the Permit's definition.

Accordingly, the Permit's provisions applying corrective action requirements to contaminants are inconsistent with the HWA and are unlawful.

### III.   The Challenged Permit Terms Are Not a Valid Exercise of NMED's Omnibus Permitting Authority.

The Permit's general terms passingly allude to NMED's omnibus authority under N.M. Stat. Ann. § 74-4-4.2(C) and 40 C.F.R. § 270.32(b)(2). *See* Permit at 11, AR011345. This provision of the HWA authorizes NMED to issue a hazardous waste permit "subject to any conditions necessary to protect human health and the environment for the facility." N.M. Stat. Ann. § 74-4-4.2(C). New Mexico's regulations likewise provide that permits "shall contain terms and conditions as the [Secretary] determines necessary to protect human health and the environment." 40 C.F.R. § 270.32(b)(2); N.M. Admin. Code § 20.4.1.900 (adopting 40 C.F.R. pt. 270). This authority allows the regulator to impose conditions on a case-by-case basis that are more stringent than those specified by the substantive regulation. 42 U.S.C. § 6925(c)(3); 40 C.F.R. § 270.32(b); *see also In re: Ash Grove Cement Co.*, 7 E.A.D. 387, 396 (EAB 1997).

To survive judicial review "an agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 48 (1983); *see id.* at 43 (holding agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks and citation omitted). Accordingly, in order to exercise its omnibus authority, NMED was required to justify its decision in the administrative record. *See* 56 Fed. Reg. 7134, 7147 n.15 (Feb. 21, 1991) (discussing similar federal authority, and stating that "permit writers must justify in the administrative record supporting the permit any decisions based on omnibus authority"); *see also In re Caribe Gen. Elec. Products, Inc.*, 8 E.A.D. 696, 703, 708 (EAB 2000) (requiring fact-specific and site-specific justification for provisions based

17

**Supp. App. 0187**

on federal omnibus authority).  Indeed, EPA's Environmental Appeals Board has held that

reliance on RCRA's omnibus authority provision "must be adequately explained and justified."[11]

*In re Ash Grove Cement Co.*, 7 E.A.D. 387 (EAB 1997). The omnibus authority "may only be

exercised if the record contains a *properly supported finding* that the permit condition is

necessary to protect human health or the environment."  *In re Chem. Waste Mgmt. of Indiana,*

*Inc.*, 6 E.A.D. 144 (EAB 1995) (emphasis added).

In the instant case, the administrative record is devoid of any finding that the challenged

Permit terms are necessary to protect human health and the environment under NMED's

omnibus authority.  *See* N.M. Admin. Code § 20.4.1.900 (adopting 40 C.F.R. pt. 270); N.M. Stat.

Ann. § 74-4-4.2(C).  The Fact Sheet that accompanied the Permit purported to identify the

statutory and regulatory authority for the proposed permit requirements.  Fact Sheet at 1,

AR000135.  With respect to Permit Part 1, which includes the definitions of "Hazardous Waste"

and "Contaminant," NMED stated only that "most [of these conditions] are based upon

mandatory permit conditions set forth at 40 CFR Parts 264 and 270."  Fact Sheet at 7,

AR000141.  However, nothing in the Fact Sheet or elsewhere in the administrative record

explains why NMED believes that the exercise of omnibus authority to adopt the challenged

Permit terms in this case is necessary to protect human health and the environment.

The Permit itself likewise contains only unsubstantiated boilerplate language in the

"Authority" section noting that it "contains terms and conditions that the NMED has determined

are necessary to protect human health and the environment in accordance with 20.5.1.900

NMAC incorporating 40 Code of Federal Regulations (CFR) 270.32 (b) (2)."  Permit at 11,

---

[11] The Environmental Appeals Board, by delegation, exercises the EPA Administrator's
authority to render final decisions on behalf of EPA in administrative appeals from permit and
other administrative decisions under RCRA and its implementing regulations.

AR011345.  Despite this statement, nowhere in the administrative record or later in the Permit does NMED articulate why the terms challenged here are necessary in order to protect human health and the environment.  NMED's blanket assertions are insufficient to justify the exercise of NMED's omnibus authority, especially given the "fact-specific and site-specific justification" required to support the use of omnibus authority in other administrative proceedings.  *In re Caribe Gen. Elec. Products, Inc.*, 8 E.A.D. at 703, 708.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion for summary judgment in favor of the United States on Counts I and II of its Amended Complaint.

Respectfully submitted,

Dated: June 1, 2021

JEAN E. WILLIAMS
Acting Assistant Attorney General

*/s/  Andrew D. Knudsen*
ANDREW D. KNUDSEN
JOHN M. CANE
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 353-7466
Andrew.Knudsen@usdoj.gov
John.Cane@usdoj.gov

*Counsel for Plaintiff United States of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No.: 2:19-cv-00046-KG-SMV** |
| **NEW MEXICO ENVIRONMENT** ) | |
| **DEPARTMENT, and JAMES KENNEY,** ) | |
| **Secretary (in his official capacity),** ) | |
| ) | |
| **Defendants.** ) | |

---

## DEFENDANTS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

## AND CROSS MOTION FOR SUMMARY JUDGMENT

---

P. CHOLLA KHOURY
WILLIAM G. GRANTHAM
Assistant Attorneys General
Office of the New Mexico Attorney
General
Post Office Drawer 1508
Santa Fe, NM 87504
(505) 717-3520
ckhoury@nmag.gov
wgrantham@nmag.gov

CHRISTOPHER ATENCIO
Assistant General Counsel
Special Assistant Attorney General
New Mexico Environment Department
121 Tijeras Ave. NE
Albuquerque, NM 87102
(505) 222-9554
christopher.atencio@state.nm.us

**Supp. App. 0190**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................... iv

CROSS MOTION FOR SUMMARY JUDGMENT ........................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................1

BACKGROUND ...................................................................................................2

I.    Statutory and Regulatory Background...............................................................2

II.    Procedural Background.....................................................................................3

STANDARD OF REVIEW .....................................................................................5

ARGUMENT ........................................................................................................6

I.    THE PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT SHOULD BE DENIED
BECAUSE PLAINTIFF FAILED TO PRESERVE ITS ISSUES FOR APPEAL ........................6

II.    THE PERMIT'S DEFINITION OF HAZARDOUS WASTE IS IN ACCORDANCE WITH LAW
AS PROVIDED IN THE NEW MEXICO HAZARDOUS WASTE ACT AND REGULATIONS ...............10

    A.  The definition of hazardous waste for purpose of corrective action
comports with longstanding EPA Guidance based on EPA's
Interpretation of RCRA.................................................................................10

    B.  The definition of hazardous waste for purposes of corrective action is
consistent with the New Mexico Hazardous Waste Act and Hazardous
Waste Regulations  ......................................................................................12

**TABLE OF CONTENTS** (continued)

Page

III.  THE PERMIT'S IDENTIFICATION OF PARTICULAR SUBSTANCES IN THE DEFINITION OF HAZARDOUS WASTES FOR PURPOSES OF CORRECTIVE ACTION IS NOT ARBITRARY OR CAPRICIOUS ...................................................................................................14

    A. Plaintiffs failed to develop the issue of the evidentiary sufficiency of the record...........16

    B. NMED sufficiently supported inclusion of substances as meeting the definition of hazardous waste...............................................................................17

IV.  THE PERMIT'S APPLICATION OF CORRECTIVE ACTION TO "CONTAMINANTS" IS CONSISTENT WITH STATE AND FEDERAL LAW ...............................................................................19

V.  THE PERMIT'S CITATION TO RCRA OMNIBUS AUTHORITY DOES NOT INVALIDATE THE DISPUTED PROVISIONS....................................................................................22

CONCLUSION.................................................................................................24

**Supp. App. 0192**

# TABLE OF AUTHORITIES

**Cases**

*Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993).................................................. 17

*Carr v. Saul, 141 U.S. 1352 (2021)* ............................................................................................. 7

*Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1176 (10th Cir. 2008)*........... 5

*Citizens for Alternatives to Radioactive Dumping v. CAST Transportation, Inc., 2004 WL 7338006, at \*18 (D. N.M. 2004)*.................................................................................................. 5

*Colo. Health Care Ass'n v. Colo. Dep't of Soc. Serv., 842 F.2d 1158, 1164 (10th Cir.1988)*........ 5

*Cummings v. Norton, 393 F.3d 1186 (10th Cir. 2005)*..................................................................... 7

*E.P.A. v. EME Homer City Generation, L.P., 572 U.S. 489, 524, (2014)*.................................... 21

*Gzaskow v. Public Employees Retirement Board, 2017-NMCA-064, ¶ 18, 403 P.3d 694*............. 9

*Judulang v. Holder, 565 U.S. 42, 52–53 (2011)* ............................................................................ 5

*Krafczek v. Exide Corp.,(E.D. Pa., Aug. 9, 2000, No. CIV. A. 00-CV-1965) 2000 WL 1130088, at \*3* ............................................................................................................................................ 13

*N.M. ex rel. Richardson v. Bureau of Land Management, 565 F.3d 683, 708*............................. 17

*Nat'l-Standard Co. v. Adamkus, 881 F.2d 352, 360 (7th Cir. 1989)*............................................ 12

*New Energy Econ., Inc. v. Shoobridge, 2010-NMSC-049, ¶ 10, 243 P.3d 746* ............................ 9

*Northern New Mexico Stockman's Association v. United States Fish & Wildlife Service, 494 F.Supp.3d 850, 1009–1011(D. N.M. 2020)* .................................................................................. 9

*Olenhouse v. Commodity Credit Corp, 42 F.3d 1560 (10th Cir. 1994)* ........................... 5, 6, 8, 18

*Owen Elec. Steel Co. of S.C., Inc. v. Browner, 37 F.3d 146 (4th Cir. 1994)* ............................... 12

*Sims v. Apfel, 530 U.S. 103 (2000)* ............................................................................................ 7, 8

*Smith v. City of Santa Fe, 2007-NMSC-055, ¶ 26,171 P.3d 300*..................................................... 9

*Teets v. Great-W. Life & Annuity Ins. Co., 921 F.3d 1200, 1211 (10th Cir. 2019)* ........................ 6

*Tele-Communications, Inc. v. C.I.R.,104 F.3d 1229 (10th Cir. 1997)*............................................. 7

*True v. U.S.,190 F.3d 1165 (10th Cir. 1999)* .................................................................................. 7

*U.S. v. New Mexico*, 1992 WL 437983 (D. N.M. 1992) at \*2........................................................... 5

*U.S. v. New Mexico*, 32 F.3d 494 (10th Cir. 1994)......................................................................... 5

*Unemployment Compensation Com'n of Alaska v. Aragon,* 329 U.S. 143 (1946) .......................... 7

*US Magnesium, LLC v. U.S. E.P.A.*, 690 F.3d 1157 (10th Cir. 2012)............................................. 7

**Statutes**

5 U.S.C. §§ 551-9 ................................................................................................. 5

42 U.S.C. § 6901 *et seq.* ............................................................................... 2, 14, 21

42 U.S.C. § 6924(u) ......................................................................................... 2, 11

42 U.S.C. § 6972 ................................................................................................. 4

42 U.S.C. § 6924(a) ........................................................................................... 12

42 U.S.C. § 6925(a) ........................................................................................... 12

**New Mexico Statutes**

NMSA 1978, § 74-4-3 ........................................................................................ 13

NMSA 1978, § 74-4-3(C) .............................................................................. 12,14

NMSA 1978, § 74-4-3(K) .............................................................................. 17,19

NMSA 1978, §§ 74-4-1 to -14 (1977, as amended through 2021) .......................... 2, 3

NMSA 1978 § 74-4-4 (A)..............................................................................2, 3

NMSA 1978, § 74-4-4(A)(2)(g) ......................................................................... 14

NMSA 1978, § 74-4-4(A)(3) ............................................................................. 14

NMSA 1978, § 74-4-4(A)(5)(h) .................................................................. 3, 13, 14

NMSA 1978, § 74-4-4(A)(6) ............................................................................. 14

NMSA 1978, § 74-4-4.2(A) .............................................................................. 14

NMSA 1978, § 74-4-4.2(A)(1) .......................................................................... 14

NMSA 1978, § 74-4-4.2(B) ...................................................................... 13, 14, 22

NMSA 1978, § 74-4-4.2(C) .............................................................................. 22

NMSA 1978, § 74-4-4.2(H) ............................................................................... 8

NMSA 1978, § 74-4-11(A)(1) ........................................................................... 14

NMSA 1978, § 74-4-11(A)(2) ........................................................................... 14

NMSA 1978, § 74-4-11(A)(6) ........................................................................... 14

NMSA 1978, § 74-4-14(A) .............................................................................. 4, 9

NMSA 1978, § 74-4-14(C) ................................................................................ 5

**Rules**

Fed. R. App. P. 10(b)(2) .................................................................................... 8

Fed. R. Civ. P. 56 ................................................................................... 1, 5, 6, 18

**Code of Federal Regulations**

40 C.F.R. pt. 141 .................................................................................................. 18

40 C.F.R. pt. 143 .................................................................................................. 18

40 C.F.R. § 261 ......................................................................................... 18,19, 21

40 C.F.R. § 261.3 ................................................................................................. 18

40 C.F.R. pt. 264 ................................................................................... 13, 18, 21, 22

40 C.F.R.§ 264.101 .............................................................................................. 13

40 C.F.R § 270.32 ................................................................................................ 22

40 C.F.R. § 270.32(b)(2) ................................................................................. 22, 23

**New Mexico Administrative Code**

20.4.1.500 NMAC ................................................................................................ 13

20.4.1.901 NMAC .................................................................................................. 4

20.4.1.901(A)(3) NMAC ........................................................................................ 3

20.4.1.901(A)(5)(b) NMAC ................................................................................... 8

20.4.1.901(A)(9) NMAC ..................................................................................... 4,8

20.4.1.901(D)(1) – (2) NMAC ............................................................................. 16

20.4.1.901(D)(3) NMAC ..................................................................................... 16

20.4.1.901(F) NMAC ............................................................................................ 8

20.4.1.901(H) NMAC ............................................................................................ 9

20.4.1.901(H)(2) NMAC .................................................................................. 8, 16

20.6.2.WW NMAC .............................................................................................. 18

20.6.2.3103 NMAC ............................................................................................. 18

20.6.2.3103(A)(1) NMAC .................................................................................... 18

20.6.2.3103(A)(2) NMAC .................................................................................... 19

20.6.2.7(T)(2) NMAC .................................................................................... 18, 19

20.6.2.7(T)(2)(s)(ii)—(iii) NMAC ....................................................................... 18

**Federal Register**

55 Fed. Reg. 30798 (July 27, 1990) .................................................................... 2, 11

55 Fed. Reg. 30809 (August 6, 1990) ...................................................................... 21

61 Fed. Reg. 19432 (May 1, 1996) ......................................................................... 11

64 Fed. Reg. 54,604 (Oct. 7, 1999) ...................................................................... 3, 11

**Other Authorities**

"Use of Corrective Action Advance Notice of Proposed Rulemaking as Guidance," Jan. 17, 1997, p. 2, https://rcrapublic.epa.gov/files/14021.pdf ................................................................ 11

https://www.epa.gov/hw/key-rulemakings-related-resource-conservation-and-recovery-act-rcra-corrective-action-program, (last visited July 13, 2021) ............................................................ 11

*In Re Ash Grove Cement Co.*, 7 E.A.D. 387, 1997 WL 732000, at *4 ......................................... 23

*In Re Caribe General Elec. Products, Inc.*, 8 E.A.D. 696, 2000 WL 136800, at *10 .................. 23

**Supp. App. 0196**

**CROSS MOTION FOR SUMMARY JUDGMENT**

Defendants New Mexico Environment Department ("NMED" or "Department") and James Kenney, Secretary (in his official capacity) move for summary judgment pursuant to Federal Rule of Civil Procedure 56. As set forth in the following memorandum, Defendants are entitled to judgment as a matter of law because the Permit issued by NMED to Cannon Air Force Base complies with the New Mexico Hazardous Waste Act ("HWA"), the federal Resource Conservation and Recovery Act ("RCRA"), and applicable regulations and guidance and is not arbitrary or capricious or otherwise unlawful.

**MEMORANDUM OF POINTS AND AUTHORITIES**

In this case, the United States, on behalf of the Department of the Air Force ("Plaintiff") challenges the provisions of a permit issued by the NMED that, in accordance with guidance issued by the U.S. Environmental Protection Agency ("EPA"), require corrective action for releases of substances meeting the statutory definition of hazardous waste.  The challenged provisions were contained, in identical form, in the draft permit that was subject to a comment period of over 100 days (almost half of which were due to an extension granted at the request of the permittee).  The Air Force, in hundreds of pages of comments submitted during the comment period, raised no objections and made no comments on the permit conditions it now challenges, nor did it request a hearing on the permit, as it was entitled to under New Mexico regulations.  Plaintiff also challenges NMED's alleged failure to justify the identification in the Permit of certain substances as meeting the statutory definition of hazardous waste – though Plaintiff expressly states that it does not challenge whether those substances *could* meet the definition.  In the simplest terms, Plaintiff seeks to invalidate conditions in the permit because NMED failed to answer questions that the Air Force did not ask.  This case is thus a textbook example of the waste of judicial and party resources that the doctrines of exhaustion of administrative remedies and issue exhaustion were designed to

1

**Supp. App. 0197**

address.  In any case, Plaintiff has not shown that it is in entitled to relief as a matter of law, and in some instances has not demonstrated the absence of genuine issues of material fact.

## BACKGROUND

### I.        Statutory and Regulatory Background

This Court has previously recognized the statutory and regulatory context in which the EPA has delegated to New Mexico the authority to implement a state program in lieu of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, through the New Mexico Hazardous Waste Act ("HWA"), NMSA 1978, §§ 74-4-1 to -14 (1977, as amended through 2021),  and under which the hazardous waste Permit challenged here was issued. *See* ECF No. 26, Memo. Op. and Order, at 1-3. That overarching background need not be repeated here.  It should be noted however that, pursuant to amendments to the HWA effective July 1, 2021, hazardous waste regulations adopted by the Environmental Improvement Board must be "at least as stringent" as EPA regulations, rather than the "no more stringent" standard previously prescribed.  NMSA 1978 § 74-4-4 (A) (2021).

Although RCRA famously provides for "cradle to grave" regulation of hazardous waste, ECF No. 26 at 2, the permit conditions at issue in this case are focused solely on the "grave" end of the spectrum.  Specifically, they implement the requirements for "corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a treatment, storage, or disposal facility seeking a permit under [RCRA]."  RCRA § 3004(u), 42 U.S.C. § 6924(u).  This provision was added to the statute in 1984 and "substantially expanded corrective action authorities for…permitted RCRA facilities."   55 Fed. Reg. 30798 (July 27, 1990), *Corrective Action for Solid Waste Management Units (SWMUs) at Hazardous Waste Management*

2

**Supp. App. 0198**

*Facilities.*   The language of Section 3004(u) is mirrored nearly verbatim in HWA NMSA 1978, Section 74-4-4(A)(5)(h) (mandating the Environmental Improvement Board adopt rules requiring corrective action).  EPA has determined that comprehensive regulations governing corrective action are unnecessary in order to implement Section 3004(u).  64 Fed. Reg. 54,604 (Oct. 7, 1999). Instead as discussed in section II *infra*, EPA has established guidance that, among other things, interprets RCRA § 3004(u) as employing a statutory rather than regulatory definition of hazardous waste for purposes of corrective action.

## II.    Procedural Background

As Plaintiff notes, Cannon Air Force Base applied to renew its RCRA permit in June 2013; the application was found administratively complete in June 2016; and a draft permit and fact sheet were issued for public comment in October 2017.  MSJ 4.  The draft permit contained definitions of "contaminant," "corrective action," and "hazardous waste" – the provisions challenged in this action – that were identical to the definitions in the final permit.  *Compare* AR 157-158 to AR 11349-11350.

The initial 60-day public comment period ran from October 6 to December 5, 2017.  AR 410.  (This period exceeded the minimum requirement of 45 days as provided in 20.4.1.901 (A)(3) NMAC).  On November 17, 2017, the Air Force requested a 60-day extension in the comment period, stating that the extension would allow the applicant to "deliver more thoroughly researched and referenced comments."  AR 430.  NMED granted a 49-day extension.  See AR 432 (announcement of extension of comment period from December 5, 2017 to January 22, 2018).

Cannon AFB submitted 42 pages of comments on the permit in December 2017, AR 434-475, and another 180 pages of comments in January and February 2018.  AR 506—685.  None of the comments raised any of the objections to the Permit that Plaintiff now presses in this litigation.

**Supp. App. 0199**

In addition, on July 26, 2017, Cannon AFB submitted a work plan for a site inspection of Aqueous Film Forming Foam ("AFFF") release areas at the facility.   AR 34—134.   NMED provided comments on the work plan on September 15, 2017,  AR 132-134, and Cannon AFB submitted the draft final investigation report on September 9, 2018.  AR 686—10922.   AFFF releases were investigated because AFFF utilize per- and polyfluorinated alkyl substances ("PFAS") to achieve their fire-fighting properties.  AR 44.  PFAS are "emerging contaminants" that the Department of Defense is investigating nationwide to determine if releases have occurred at concentrations exceeding EPA Health Assessment values, Regional Screening Levels, or other applicable state or federal standards.  AR 49-50.  PFAS are one category of specific substances made subject to corrective action by the Permit conditions Plaintiff challenges in this action.  AR 11349—350.

As required by NMSA 1978, Section 74-4-14(A) (1992) and 20.4.1.901 NMAC, the public notice provided for the opportunity to request a public hearing, which must be held if a request is submitted and not withdrawn. *See* e.g., AR 410 (Notice of Public Comment Period and Opportunity to Request Public Hearing published in The Eastern New Mexico News).  No request for public hearing was received from the applicant or any other party.

The final Permit was issued on December 19, 2018, and in accordance with 20.4.1.901(A)(9) NMAC, NMED provided responses to all comments received.  AR  11261—11334. Plaintiff filed its initial complaint on January 17, 2019.[1]

---

[1] In light of the Permittee's resistance to addressing corrective active action for PFAS under the Permit, NMED and New Mexico brought a separate action in this court under RCRA § 7002, 42 U.S.C. § 6972, alleging that releases of PFAS are creating an imminent and substantial endangerment, and seeking certain injunctive relief.  *New Mexico et al. v. U.S. et al*, 6:19-cv-178.  On June 2, 2020 that action was transferred, over New Mexico's objections, to an MDL in the District of South Carolina, where it remains pending.  *In RE: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2873 (U.S. JPML) Doc. No. 650. On June 16, 2021, the Fourth Circuit denied New Mexico's petition for writ of mandamus seeking vacatur of the JPML's June 2, 2020 transfer order. *In re: STATE OF NEW MEXICO; NEW MEXICO ENVIRONMENT DEPARTMENT,* No. 21-1121, Doc. 29.

## STANDARD OF REVIEW

Pursuant to NMSA 1978, Section 74-4-14(C) , the New Mexico Court of Appeals shall set aside an action of the Department under the HWA "*only* if it is found to be: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." (emphasis added).  As Plaintiff notes, this standard is similar to that provided by the federal Administrative Procedures Act (APA), 5 U.S.C. §§ 551-559.  MSJ 7 (citing *Citizens for Alternatives to Radioactive Dumping v. CAST Transportation, Inc*. 2004 WL 7338006, at \*18 (D. N.M. 2004).  Under the APA, the scope of review under the arbitrary and capricious standard is "narrow … a court is not to substitute its judgment for that of the agency.*" Judulang v. Holder,* 565 U.S. 42, 52–53 (2011).  Moreover, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Serv.*, 842 F.2d 1158, 1164 (10th Cir.1988)).

Contrary to Plaintiff's assertion, MSJ 7, this Court and the Tenth Circuit *have* addressed the standard of review for summary judgment under the HWA.  In a challenge to a permit issued to Los Alamos National Laboratories under the HWA, this Court applied the usual standard under Federal Rule of Civil Procedure 56 and decided the case on cross motions for summary judgment supported by affidavits and exhibits.   *U.S. v. New Mexico*, 1992 WL 437983 (D. N.M. 1992) at \*2.  The Tenth Circuit affirmed the decision on the merits, applying the same standard de novo. *U.S. v. New Mexico*, 32 F.3d 494 (10th Cir. 1994).

Plaintiff cites to *Olenhouse v. Commodity Credit Corp*, 42 F3d 1560 (10th Cir. 1994) for the proposition that the usual standards for summary judgment do not apply to review of agency action and that such review is limited to the record before the agency at the time of decision.  MSJ

5

**Supp. App. 0201**

7-8.  To the extent *Olenhouse* is applicable,[2] its rationale is premised on the district court acting as an appellant court.  Therefore, to the extent Plaintiff's motion for summary judgment raises issues outside of that appellant function, the usual standards under Rule 56 should govern.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56.  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1211 (10th Cir. 2019).

## ARGUMENT

### I.   THE PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT SHOULD BE DENIED BECAUSE PLAINTIFF FAILED TO PRESERVE ITS ISSUES FOR APPEAL

As a threshold matter, this Court must address the fact that Plaintiff completely failed to raise any of its objections to the Permit with NMED before proceeding directly to this lawsuit.  Applying the requirements of issue exhaustion, this Court should refuse to consider any of Plaintiff's claims that were not preserved in proceedings below.  Because that encompasses all of Plaintiff's claims, Plaintiff's motion for summary judgment should be denied, and New Mexico's motion for summary judgment should be granted.

In its discussion of the standard of review, Plaintiff points to *Olenhouse v. Commodity Credit Corp*, 42 F.3d 1560 (10th Cir. 1994) for the proposition that a district court reviewing agency action acts as an appellate court and reviews the record before the agency at the time of decision.  MSJ 7-8.  Assuming arguendo that *Olenhouse* governs here, a corollary of this Court acting in an

---

[2] Plaintiff cites no cases applying *Olenhouse* to review of the action of a *state* administrative agency. Applying *Olenhouse* strictly would be inconsistent with Plaintiff's agreement to decide this case by cross motions for summary judgment.  See *Olenhouse*, 42 F.3d at 1579 (summary judgment process is "inconsistent with the standards for judicial review of agency action under the APA").

6

**Supp. App. 0202**

appellate function is that it should not hear issues that were not preserved below. *Tele-Communications, Inc. v. C.I.R.* (10th Cir. 1997) 104 F.3d 1229, 1232 ("Generally, an appellate court will not consider an issue raised for the first time on appeal.") *Accord Cummings v. Norton*, 393 F.3d 1186, 1190–91 (10th Cir. 2005), *Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.* 413 F.3d 1163, 1167 (10th Cir. 2005).

This principle has long applied in the context of federal court review of agency action. *See Unemployment Compensation Com'n of Alaska v. Aragon* 329 U.S. 143, 155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action."); *True v. U.S.* 190 F.3d 1165, 1173 (10th Cir. 1999) (citing *Aragon* in holding: "We will not usurp the Internal Revenue Service's function by resolving a collateral estoppel claim not previously considered in the administrative proceeding"). *US Magnesium, LLC v. U.S. E.P.A.*, 690 F.3d 1157, 1167 (10th Cir. 2012)("[A]bsent exceptional circumstances, a reviewing court will not consider contentions which were not pressed upon the administrative agency.") The rationale for the issue-exhaustion requirement is dependent on the nature of the proceeding below and is "at its greatest" where "the parties are expected to develop the issues in an adversarial administrative proceeding." *Sims v. Apfel*, 530 U.S. 103, 110 (2000); *Accord Carr v. Saul* 141 U.S. 1352, 1358 n. 3 (2021).

Here, in contrast to many federal rulemakings that are conducted solely through the notice-and-comment process, New Mexico's procedure for issuing a contested permit involves an adversarial, quasi-adjudicative process. By statute, no permit may be issued without an opportunity for a public hearing "at which all interested persons shall be given a reasonable chance to submit data, views or arguments orally or in writing and to examine witnesses testifying at the

7

**Supp. App. 0203**

hearing." NMSA 1978 § 74-4-4.2 (H) (2006). By regulation, an evidentiary hearing must be held if requested by any person opposed to the permit; testimony by the applicant, Department, and persons opposed and supporting the permit is presented; a transcript is generated; and, significantly, the burden of proof is placed on the applicant or permittee. 20.4.1.901(A)(5)(b), 901(F) NMAC. After the hearing, the Department is required to respond to all comments received on a draft permit, 20.4.1.901(A)(9) NMAC; and the hearing transcript, NMED's responses to comments, and all related correspondence are included in the record for appeal. 20.4.1.901(H)(2) NMAC. In short, New Mexico employs "an adversarial administrative proceeding" where "the parties are expected to develop the issues" – precisely the type of proceeding in which it is appropriate to require issue exhaustion. *Sims,* 530 U.S. at 110.

In this case, Plaintiff completely failed to raise its present objections to the Permit before the Department at any time prior to this lawsuit and failed to request a hearing that would have produced a more extensive record on the issues for this Court to review. Plaintiff cannot have it both ways – invoking this Court's appellate jurisdiction while completely circumventing the issue preservation requirements normally placed upon appellants.

The consequences of Plaintiff's failure to preserve its objection are further illustrated by reference to the Federal Rules of Appellant Procedure. *See Olenhouse,* 42 F.3d at 1560 (District court reviewing agency action "should govern itself by referring to the Federal Rules of Appellate Procedure.") Under Fed. R. App. P. 10(b)(2), an appellant arguing that a finding below is unsupported by or contrary to the evidence must include "a transcript of all evidence relevant to that finding or conclusion." Here, no such transcript exists, again because Plaintiffs did not request a hearing that could have developed one.

8

**Supp. App. 0204**

Rather, the Administrative Record in this case reflects an uncontested permit issuance in which NMED published a draft permit, duly responded to all comments received on the draft, provided requisite public notice, and issued the permit in compliance with all procedural requirements.  Specifically, the record includes a 72-page response to the numerous comments the Air Force did make, AR 11261-11334. Because none of the comments relate to the permit conditions now at issue – much less present the same objections Plaintiff now asserts – Plaintiff has failed to preserve its issues. *See Northern New Mexico Stockman's Association v. United States Fish & Wildlife Service* 494 F.Supp.3d 850, 1009–1011(D. N.M. 2020) (issue exhaustion not satisfied by raising general objections). Further, while the record must also include "all other information relied upon by the secretary," 20.4.1.901(H) NMAC, this cannot be read to mean that the Secretary must anticipate every possible objection to the Permit that *could* have been raised but was not and create *sua sponte* an evidentiary record to defend those objections on appeal. Plaintiff should not be allowed to play "gotcha" by hiding their objections until the permit is issued and then pointing to the administrative record's alleged failure to address them.

Finally, it is instructive to consider how Plaintiff's course of action would be addressed in the New Mexico Court of Appeals, the forum designated to hear permit appeals by the HWA. NMSA 1978 § 74-4-14(A).   New Mexico imposes a jurisdictional requirement to exhaust administrative remedies, "based on separation of powers considerations and due respect for the executive branch." *Gzaskow v. Public Employees Retirement Board* 2017-NMCA-064, ¶ 18, 403 P.3d 694, citing "numerous" New Mexico Supreme Court cases, including *New Energy Econ., Inc. v. Shoobridge*, 2010-NMSC-049, ¶ 10, 243 P.3d 746; *Smith v. City of Santa Fe,* 2007-NMSC-055, ¶ 26,171 P.3d 300  ("Under the exhaustion of administrative remedies doctrine, where relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue

of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed.") Accordingly, Plaintiff's appeal would be subject to likely dismissal in New Mexico court.[3]

Although New Mexico's constitutional exhaustion of administrative remedies doctrine may not act as jurisdictional prerequisite to this Court, sitting in federal question jurisdiction, the similar but narrower requirements of issue exhaustion do apply, as discussed above. Because Plaintiff failed to preserve *any* of its present claims, its motion for summary judgment should be denied and the Court should grant New Mexico's cross motion for summary judgment.

## II.   THE PERMIT'S DEFINITION OF HAZARDOUS WASTE IS IN ACCORDANCE WITH LAW AS PROVIDED IN THE NEW MEXICO HAZARDOUS WASTE ACT AND REGULATIONS

The central argument of Plaintiff's motion is that the Permit's definition of hazardous waste for purposes of corrective action is impermissible because it encompasses substances that are not regulatory hazardous waste. MSJ 8-12. Significantly, Plaintiff does not argue that the Permit's definition is contrary to federal law, but rather that it is unauthorized by New Mexico's HWA. MSJ 8-11. Nonetheless, because the HWA and hazardous waste regulations implement the federal RCRA program in New Mexico, it is important to understand that the contested definition is not NMED's invention, but rather reflects New Mexico's adoption of a longstanding federal interpretation.

### A. The definition of hazardous waste for purpose of corrective action comports with longstanding EPA Guidance based on EPA's Interpretation of RCRA

The EPA has long taken the position that the corrective action requirements of RCRA 3004(u) are not limited to regulatory hazardous wastes but rather apply to substances that meet the

---

[3] On February 18, 2019, NMED filed a motion to dismiss the instant case so the matter could be heard in the New Mexico Court of Appeals, citing the importance of preserving the integrity of its exhaustion of administrative remedies requirement. ECF No. 4. However, this Court denied the motion, finding existing abstention doctrines inapplicable. ECF No. 26.

10

broader statutory definition. In a 1990 proposed rule for the RCRA correction action program,

known as "Subpart S," EPA explained:

> [RCRA] Section 3004(u) [42 U.S.C. § 6924(u)] requires corrective action for releases of "hazardous wastes or constituents." **The Agency believes that use of the term "hazardous waste" denotes "hazardous waste" as defined in section 1004(5) of RCRA.** Accordingly, today's proposed rule repeats the statutory definition of "hazardous waste" found in that section. The term "hazardous waste" is distinguished from the phrase "hazardous waste listed and identified," which is used elsewhere in the statute to denote that subset of hazardous wastes specifically listed and identified by the Agency pursuant to section 3001 of RCRA. Thus, the **remedial authority under section 3004(u) is not limited to releases of wastes specifically listed in 40 CFR part 261 or identified pursuant to the characteristic tests found in that section. Rather, it extends potentially to any substance meeting the statutory definition.** 55 Fed. Reg. 30798, 30809 (July 27, 1990) (emphasis added). (Corrective Action for Solid Waste Management Units (SWMUs) at Hazardous Waste Management Facilities)

Although the 1990 proposed rule was not finalized and was later partially withdrawn, EPA

continues to rely on the preamble language of the proposal as guidance. *See* 61 Fed. Reg. 19432,

19443 (May 1, 1996) (*Advance Notice of Public Rulemaking Corrective Action for Releases From Solid Waste Management Units at Hazardous Waste Management Facilities*) ("ANPR") (re-iterating 1990 interpretation of hazardous waste for corrective action); 64 Fed. Reg. 54604, 54607

(Oct. 7 1999) (partially withdrawing Subpart S, and instructing that the 1996 Federal Register

notice "should be considered the primary corrective action implementation guidance.")[4] EPA has

compiled these and other "key rulemakings" related to RCRA corrective action as current guidance

in a web page.[5]

EPA's interpretation of RCRA § 3004 also finds support in case law. In interpreting RCRA

§ 6927 (regarding access to facilities and sampling), the 7th Circuit explained:

---

[4] *See also* "Use of Corrective Action Advance Notice of Proposed Rulemaking as Guidance," Jan. 17, 1997, p. 2, https://rcrapublic.epa.gov/files/14021.pdf

[5] https://www.epa.gov/hw/key-rulemakings-related-resource-conservation-and-recovery-act-rcra-corrective-action-program, (last visited July 13, 2021)

11

**Supp. App. 0207**

> Congress significantly chose the broad, general term "hazardous waste" defined in section 6903(5) …rather than "hazardous waste identified or listed under this subchapter," employed in other provisions. See, e.g., 42 U.S.C. §§ 6924(a), 6925(a).

*Nat'l-Standard Co. v. Adamkus*, 881 F.2d 352, 360 (7th Cir. 1989).  The Court therefore held that

EPA's sampling authority was not limited to sampling regulatory hazardous wastes.  *Id.*  EPA's

interpretation also harmonizes with the fact that § 3004 requires corrective action at solid waste

management units "regardless of whether the solid wastes they treat are also hazardous."  *Owen*

*Elec. Steel Co. of S.C., Inc. v. Browner*, 37 F.3d 146, 148 (4th Cir. 1994)

Finally, EPA's interpretation is also recognized in secondary sources.  *See, e.g.*, *Statutory*

*jurisdiction over nonhazardous waste under RCRA—Corrective action, 1 L. of Solid Waste, Pollut.*

*Prevent. and Recycl*. § 3:8 (2020) ("corrective action obligations can include the cleanup of wastes

that do not meet the regulatory definition of hazardous wastes").

In light of the above guidance, and the fact that Plaintiff has not alleged that the Permit

violates federal law, it is undisputed that the federal definition of hazardous waste for purposes of

corrective action is the statutory definition at RCRA 3004(u) and is not limited to regulatory (i.e.,

listed or characteristic) hazardous waste.

**B. The definition of hazardous waste for purposes of corrective action is consistent with the New Mexico Hazardous Waste Act and Hazardous Waste Regulations**

In arguing that the permit (despite its conformity with federal law as interpreted by EPA)

conflicts with New Mexico law, Plaintiff leans heavily on the proposition that the contested

definition of hazardous waste conflicts with the meaning of "corrective action" as purportedly

limited by the phrase "rules of the board" in NMSA 1978, Section 74-4-3(C) (2000).  MSJ 9-10.

In fact, the rules adopted by the Environmental Improvement Board support the permit's

definition.

12

**Supp. App. 0208**

As part of its implementation of RCRA, New Mexico has adopted by reference the federal regulations at 40 C.F.R. pt.264.  20.4.1.500 NMAC.  Included in Part 264, and not excepted from New Mexico's adoption of it, is 40 C.F.R. § 264.101, which contains the EPA's regulations for corrective action pursuant to RCRA § 3004(u).  *Krafczek v. Exide Corp.* (E.D. Pa., Aug. 9, 2000, No. CIV. A. 00-CV-1965) 2000 WL 1130088, at *3 (noting that promulgation of 40 CFR 264.101 satisfied EPA's duty to issue standards under RCRA 3004(u)).  40 C.F.R.§ 264.101 must be read in light of EPA's interpretation of the definition of hazardous waste for correction action under RCRA § 3004(u), as discussed above, and in adopting 40 C.F.R. § 264.101 by reference, New Mexico has effectively adopted EPA's definition.  Indeed, were NMED to limit the definition of "hazardous waste" for purposes of corrective action to its regulatory meaning, it would run afoul of the HWA's requirement that corrective action requirements be "equivalent to and at least as stringent as" federal regulations.  NMSA 1978, § 74-4-4(A)(5)(h).

Even if the Permit's use of the statutory definition of hazardous waste is not mandated by New Mexico's adoption of 40 C.F.R. § 264.101, it flows from the plain meaning of the HWA. NMSA 1978, Section 74-4-3 contains a definition of hazardous waste, "*as used in the Hazardous Waste Act.*" This statutory definition of "hazardous waste" therefore applies to Section 74-4-4(A)(5)(h) (requiring the Board to adopt rules for "the taking of corrective action for all releases of *hazardous waste* or constituents from a solid waste management unit at a treatment, storage or disposal facility), and Section 74-4-4.2 (B) (mandating that permits for treatment storage or disposal facilities require corrective action for releases of *hazardous waste* at any solid waste management units.  (emphasis added). Moreover, when the Legislature wanted to specify the regulatory meaning of hazardous waste, it knew how to do so.  For example, the Subsection immediately preceding Section 74-4-4.2 (B) requires that permit applications contain estimates of

13

**Supp. App. 0209**

all "hazardous waste *identified or listed* under Subsection A of Section 74-4-4 NMSA 1978."[6]

(emphasis added) *See* NMSA 1978, § 74-4-4.2(A). Plaintiff attempts to evade this clear statutory

structure by inferring a regulatory definition of "hazardous waste" into a section of the statute that

does not even contain those words – the definition of "corrective action."   MSJ 9. (asserting

without authority that the reference to "rules of the board" in the definition of "corrective action"

at NMSA 1978 § 74-4-3(C) means that such rules must include provisions for identifying the

hazardous wastes).   Section 74-4-3(C) reads in full:

> "'corrective action' means an *action taken in accordance with rules of the board* to
> investigate, minimize, eliminate or clean up a release to protect the public health, safety
> and welfare or the environment." (emphasis added)

Under a plain reading of this definition, "rules of the board" refers to rules governing *actions*, and

nothing in this section speaks to rules governing *identification* of hazardous waste.  In any case it

strains credulity to suggest that anything in this section implicitly negates the statute's express use

of the statutory definition of hazardous waste in Sections 74-4-4(A)(5)(h) and 74-4-4.2(B).

In summary, because New Mexico's definition of hazardous waste for purposes of

corrective action is consistent with both the EPA's interpretation of RCRA § 3004(u)  and a plain

reading of similar language in the HWA, NMSA 1978 §74-4-4(A)(5)(h) , it does not conflict with

New Mexico law.

### III.    THE PERMIT'S IDENTIFICATION OF PARTICULAR SUBSTANCES IN THE DEFINITION OF HAZARDOUS WASTES FOR PURPOSES OF CORRECTIVE ACTION IS NOT ARBITRARY OR CAPRICIOUS

In its Motion for Summary Judgment, Plaintiff argues for the first time that the Permit's

identification of particular substances as meeting the statutory definition of hazardous waste is

---

[6] Indeed, the Hazardous Waste Act is replete with sections specifying the regulatory definition in certain contexts by employing the "identified or listed" formulation.  *See eg.* NMSA 1978 §§ 74-4-4(A)(2)(g), (A)(3), (A)(5), (A)(5)(a), (A)(6); 74-4-4.2(A)(1); 74-4-11(A)(1), (A)(2), (A)(6).

**Supp. App. 0210**

unsupported by substantial evidence in the record. MSJ 12-14. As with Plaintiff's legal objections to the Permit discussed above, Plaintiff failed to preserve this issue for appeal. But this fact-based claim should also be rejected for several additional reasons.

*First,* not only did Plaintiff fail to raise this assertion below before NMED, Plaintiff failed to raise it in its Complaint. Instead, the only assertion in the Complaint addressing particular substances is that the definition of contaminant "includes substances that are not hazardous wastes as defined under applicable New Mexico *Regulations*."[7]  Amended Complaint at ¶ 25, ECF 56. (emphasis added). Nowhere does the Complaint allege that the record lacks evidence to support the inclusion of particular substances as meeting the *statutory* definition of hazardous waste.[8] Thus, not only was NMED deprived of an opportunity to respond to this issue below, it had no opportunity to respond to it in its Answer.

Second, by failing to raise this factual issue below, Plaintiff not only forfeited the right to be heard on it now, it failed to define the scope of the administrative record that is subject to review by clearly identifying the areas of contention.

Third, even without the full development of the record that would have occurred if the issue had been raised below, the Administrative Record sufficiently supported inclusion of substances as meeting the definition of hazardous waste. This is particularly true of PFAS, admittedly harmful substances for which the record contains hundreds of pages addressing releases at the permitted facility. AR 34-131, 686-10558. It is also true of the other identified substances, whose toxicity is established by reference to other relevant regulations.

---

[7] This assertion in the complaint is a sub-point of Plaintiff's argument that hazardous waste should be limited to its regulatory definition; it does not go to whether the enumerated substances meet the statutory definition or whether the record supports that finding.

[8] (The Complaint's only reference to the sufficiency of the evidence comes in generic, boilerplate language in the recitation of the Counts and Prayer for Relief

15

**Supp. App. 0211**

Plaintiffs therefore have not established the absence of genuine issues of material fact nor that they are entitled to judgment as a matter of law.

### A. Plaintiffs failed to develop the issue of the evidentiary sufficiency of the record

Plaintiff states that it "does not argue that any or all of the enumerated categories of substances could not meet [the statutory definition of hazardous waste], only that NMED has not shown that they do in the administrative record for this Permit." MSJ 12, note 8. This framing shines a spotlight on Plaintiff's failure to comment on this issue during the administrative proceedings, in order to define the universe of issues that NMED was required to address in the record.

Having failed to object previously to the identification of certain substances in the permit, Plaintiffs grasp at the regulatory requirement for a fact sheet in an attempt to retroactively impose an obligation on NMED to explain its reasoning to Plaintiff's present satisfaction. But the purpose of the fact sheet is not to establish the record for review on appeal. Notably, the fact sheet is not listed as part of the record in 20.4.1.901(H)(2) NMAC. ("The record on appeal shall include the transcript of the hearing, all related correspondence, any responses to comments, and all other information relied upon the secretary in deciding upon the permit action.") Rather, the fact sheet is to be made available at the time public notice is published. 20.4.1.901(D)(3) NMAC. Thus, the fact sheet accompanies the *draft* permit, and serves to inform the public of the salient features of the permit and the procedures for participation in the decision. 20.4.1.901(D)(1) – (2) NMAC.

Plaintiff was well aware of the issuance of the draft permit and the opportunity to comment, as evidenced by its submission of over 200 pages of comments on the draft permit. AR 434-473; AR 506-685. Significantly, the draft permit contained the same conditions that are at issue in this proceeding. Draft Permit, Section 1.12; AR 157-158.

**Supp. App. 0212**

Plaintiff now complains that "[t]he Fact Sheet . . .  does not explain the principal facts and significant factual, methodological and policy questions considered when NMED decided to include the disputed Permit provisions."  Motion at 13.  Plaintiff leaps without support to the conclusion that the disputed Permit provisions are both principal and significant – a conclusion belied by the fact that during the comment period they provided no comments addressing either the conditions at issue or the sufficiency of the fact sheet. *See* AR 434-000473; AR 506-685.

Even if these conditions are subsequently found to have warranted inclusion and discussion in the fact sheet, Plaintiff failed to show how it was prejudiced by their omission. Indeed, errors in administrative actions should not require reversal unless Plaintiff can show that it was prejudiced. *N.M. ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 708 (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993). Based on the Administrative Record, it is impossible to argue that Plaintiff was prejudiced by this omission when it had two opportunities to comment and provided over 200 pages of comments on the draft permit.

## B. NMED sufficiently supported inclusion of substances as meeting the definition of hazardous waste

Plaintiff argues that NMED made no effort to demonstrate that the specific substances referenced in the definition meet the statutory definition of hazardous waste.  MSJ 12.  However, this factual argument fails because NMED did reference appropriate regulations to support inclusion of these substances; and longstanding practice and guidance support inclusion of a wide range of substances within this definition for the purposes of investigation and corrective action.

Plaintiff correctly recites the statutory definition of hazardous waste at NMSA 1978, Section 74-4-3(K). *Id*.  In interpreting and implementing that definition, the Department has consistently cited relevant statutory and regulatory provisions to determine what is included as a hazardous waste for the purposes of a corrective action permit.  *See* Ex.1 (Declaration of Dave

17

Cobrain) [9] at ¶¶ 9 -14.  First, NMED cites to applicable authority for regulatory hazardous waste at 40 C.F.R. § 261.3 and hazardous waste constituents at 40 CFR pt. 261, appendix VII and VIII and 40 C.F.R. Part 264 Appendix IX.  AR 11350, Ex.. 1 ¶ 11.  In addition, the definition includes any contaminant for which the EPA has promulgated a maximum contaminant level (MCL) at 40 C.F.R. parts 141 and 143.  AR 11350.  Such contaminants are included because they have already been determined by EPA to pose a threat to human health and the environment.  Ex. 1, ¶ 13.

Similarly, the definition includes, by reference to New Mexico regulations, substances that the state has determined to pose such threats.  Specifically, the definition incorporates by reference water contaminants at 20.6.2.3103 NMAC and toxic pollutants listed at 20.6.2.WW NMAC.  AR 11350. (The citation to 20.6.2.WW NMAC appears to be to an older version of the regulations that previously listed toxic pollutants at that location.  *See* 20.6.2.WW NMAC (7/16/2006)).  Toxic pollutants are now found at 20.6.2.7(T)(2) NMAC). Among other things, toxic pollutants include perflourinated compounds,[10] perchlorate, methyl tertiary-butyl ether, and PCBs – all of which are specifically identified in the Permit's definition of hazardous waste.  20.6.2.3103 NMAC establishes contaminant standards for groundwater having total dissolved solids concentration of 10,000 mg/l or less.  Numerical standards for certain substances are provided in 20.6.2.3103(A)(1) NMAC.  In addition, 20.6.2.3103(A)(2) NMAC provides a narrative standard for toxic pollutants, as defined at 20.6.2.7(T)(2) NMAC, specifying that such pollutants are prohibited from being present in groundwater at concentrations that, according to credible data, will result in a lifetime

---

[9] Plaintiff may argue that under *Olenhouse* declarations are not permissible, but as noted at note 2 *Supra*, *Olenhouse* is not controlling as to review of state administrative actions.  Moreover, because the State had no opportunity to respond to this issue in its Answer, there can be no argument that the State acquiesced to *Olenhouse*-style record review on this issue.  Accordingly, the usual standards for summary judgment under Rule 56 apply, under which declarations and other evidence are called for.

[10] Including, perflourooctante sulfonate (PFOS) and perflourooctanoic acid (PFOA).  *See* 20.6.2.7(T)(2)(s)(ii)—(iii) NMAC.  These are compounds are specifically named in the definition. AR 11350.

18

**Supp. App. 0214**

risk of more than one cancer per 100,000 exposed persons or have certain other harmful effects to humans or other species.[11]

Therefore, perfluorinated compounds and other substances named in the permit condition[12] have already been identified by regulation as having the potential to cause harm to human health by their inclusion at 20.6.2.7(T)(2) NMAC and by the requirement to further analyze their affects and impose a concentration limit at 20.6.2.3103(A)(2) NMAC. Where such substances are known or suspected to be present at a facility, they are added to the definition of hazardous waste in accordance with NMED's authority under NMSA 1978 § 74-4-3(K).  Ex. 1 at ¶12-13.

Indeed, with respect to PFAS, the recognition of threats to human health is widely acknowledged, as Plaintiff identified in 2017. AR 45. This recognition satisfies the statutory definition of hazardous waste and provides sufficient support for including these substances in the Permit.

## IV.   THE PERMIT'S APPLICATION OF CORRECTIVE ACTION TO "CONTAMINANTS" IS CONSISTENT WITH STATE AND FEDERAL LAW

Plaintiff devotes considerable space to its argument that the Permit's application of corrective action requirements to "contaminants" as defined in the Permit is unlawful.  MSJ 14-17.  However, these arguments add little to the claims that the HWA does not permit the application of corrective action requirements to substances that are not listed or characteristic hazardous

---

[11] Specifically, 20.6.2.3103(A)(2) NMAC provides: "Standards for Toxic Pollutants.  A toxic pollutant shall not be present at a concentration shown by credible scientific data and other evidence appropriate under the Water Quality Act, currently available to the public, to have potential for causing one or more of the following effects upon exposure, ingestion, or assimilation either directly from the environment or indirectly by ingestion through food chains: (1) unreasonably threatens to injure human health, or the health of animals or plants which are commonly hatched, bred, cultivated or protected for use by man for food or economic benefit; as used in this definition injuries to health include death, histopathologic change, clinical symptoms of disease, behavioral abnormalities, genetic mutation, physiological malfunctions or physical deformations in such organisms or their offspring; or (2) creates a lifetime risk of more than one cancer per 100,000 exposed persons."

[12] The Permit also lists dioxins and furans in the definitions of hazardous waste and contaminants.  These are families of chemicals, some of which are hazardous constituents on which the listing of hazardous waste is based.  See, e.g., 40 C.F.R. § 261 App. VII, EPA Hazardous Waste Nos. F020, F021, F022, F023, F026, F028, F032, K174.

19

**Supp. App. 0215**

wastes (addressed in Part II.A & B above) or that NMED did not support the identification of particular substances as statutory hazardous wastes (addressed in Part III above). To the extent Plaintiff's "contaminants" arguments add anything new, they are without merit.

First, as established above, NMED is authorized (and arguably required) by RCRA and the HWA to apply corrective action requirements to releases of substances that meet the statutory definition of hazardous waste. Accordingly, in the definition of hazardous waste for purposes of corrective action the Permit incorporates specific substances as non-regulatory hazardous wastes, either by expressly naming them, or by cross-reference to other regulatory provisions.

In keeping with RCRA's requirement for corrective action for releases of hazardous constituents as well as hazardous waste, the Permit employs the term "contaminants" to denote substances that underlie both the statutory and regulatory meaning of hazardous waste. More specifically, the Permit defines "contaminants" to include the same substances identified in the definition of hazardous waste for corrective action, along with the "constituents" that underlie the definition of regulatory hazardous waste. Thus, the definition of "contaminants" serves the dual purposes of (1) providing an analogous term to "constituents" for non-regulatory hazardous waste,[13] and (2) including constituents as well, in order to provide one term of art that encompasses the substances underlying both statutory and regulatory hazardous waste.

Thus, the Permit's application of corrective action to contaminants flows directly from NMED's authority to extend corrective action to releases of substances other than hazardous waste and constituents. There is, therefore, nothing surprising or unlawful about the fact that the several corrective action permit conditions cited by Plaintiff apply to the release of contaminants.[14]

---

[13] In other words, "contaminants" are to statutory hazardous wastes as "constituents" are to regulatory hazardous waste.

[14] Plaintiff also attacks the Permit's use of the term "contaminant" as resulting in one corrective action requirement that is too narrow in that it applies only to contaminants and not to hazardous waste. MSJ 15, citing Permit Section

20

**Supp. App. 0216**

MSJ 15 (citing provisions related to Investigation Work Plan, Investigation Report, and Corrective

Measures Evaluations). This is simply the means by which the Permit applies corrective action to

both statutory and regulatory hazardous wastes and constituents.

Second, requiring corrective action for the contaminants underlying statutory hazardous

waste is consistent with EPA's interpretation of RCRA 3004(u), which broadened the definition

of hazardous constituent beyond its statutory minimum:

> The term "hazardous constituent" used in section 3004(u) means those constituents found in appendix VIII to 40 CFR part 261. See H. Rep. No. 98-198, 98th Cong., 1st Sess. 60-61, May 17, 1983. In addition, the Agency proposes to include within the definition those constituents identified in appendix IX to 40 CFR part 264. Appendix IX generally constitutes a subset of appendix VIII constituents particularly suitable for ground-water analyses. However, it also includes additional constituents not found on appendix VIII, but commonly addressed in ground-water analysis conducted as a part of Superfund cleanups.

55 Fed. Reg. 30809 (August 6, 1990). Thus, NMED's definition tied to the statutory definition is

in keeping with EPA's interpretation of congressional direction.

Finally, Plaintiff notes at several points that the definition of contaminant contains a so-

called "catch-all" provision, extending the definition to include substances that NMED determines

that monitoring, investigation, or remedy is necessary to carry out the purposes of the permit.

MSJ 9, 11-12, 15. But the possibility that NMED may someday apply that provision in an arbitrary

or capricious manner does not render it facially invalid. *See E.P.A. v. EME Homer City

Generation, L.P.*, 572 U.S. 489, 524, (2014) ("The possibility that the rule, in uncommon particular

applications, might exceed EPA's statutory authority does not warrant judicial condemnation of

the rule in its entirety.") Instead, if the Permittee disputes a future application of the provision, it

"may bring a particularized, as-applied challenge." *Id.*

---

3.10, AR 11375. However, because the definition of "contaminants" includes hazardous constituents, this provision applies to the release of hazardous constituents and by extension hazardous wastes as well.

**Supp. App. 0217**

**V.**     **THE PERMIT'S CITATION TO RCRA OMNIBUS AUTHORITY DOES NOT INVALIDATE THE DISPUTED PROVISIONS**

Plaintiff notes that the "authority" section of the Permit cites (among other things) the omnibus authority to impose conditions necessary to protect human health and the environment at 40 C.F.R § 270.32,[15] and argues that the challenged permit conditions cannot be justified as exercises of that authority because they were not adequately supported in the administrative record. MSJ 17 -19.  This argument is off the mark for several reasons.

First, the omnibus authority is not the *exclusive* authority relied on by the Permit for the contested provisions.  The contested definition of hazardous waste applies "for the purposes of corrective action for solid waste management units and areas of concern conducted pursuant to 74-4-4.2(B) of the HWA, 40 CFR part 264, subpart F, *or* 40 CFR 270.32(b)(2)." (emphasis added). And, as discussed in Part II above,  both NMSA 1978, Section 74-4-4.2 (B)  and (2) 40 C.F.R. part 264, subpart F apply corrective action requirements to statutory hazardous wastes, per EPA guidance.  Thus, the Permit's application of corrective action to non-regulatory hazardous wastes is not dependent on a fact specific finding under 40 C.F.R. § 270.32(b)(2).  (And, the citation of that provision is not superfluous because it may govern future corrective action determinations made pursuant to the Permit.)

Second, with respect to PFAS, corrective action requirements would be justified under the omnibus provision by the administrative record because these are emerging contaminants for which EPA has established a health advisory level (AR 699—700) that are known to be present at the facility in high concentrations.  *See* AR 750 (Summary table in Final Site Inspection Report of

---

[15] Plaintiff states that the permit also "alludes" to NMED's omnibus authority under NMSA 1978 § 74-4-4.2(C), but that appears to be in error.  MSJ 17. That statutory section does not relate to omnibus authority, and the Permit at p. 11, AR 11345 refers only to 40 C.F.R. § 270.32(b)(2).

22

**Supp. App. 0218**

AFFF Release Areas at Cannon AFB, showing PFOS and PFOA concentrations in basewide groundwater of 26.2 µg/L, *374* times the health advisory level of 0.07 µg/L). *See also* Ex. 1 at ¶ 14 (citing NMED *Risk Assessment Guidance for Site Investigation and Remediation*[16]).

Finally, as with Plaintiff's other arguments, any alleged deficiency in the Administrative Record is a function of Plaintiff's failure to raise the issue during the comment period, a failure that cannot be obviated by attempting to transform the fact sheet – a public notice requirement – into a surrogate for an administrative record in a contested proceeding. In that respect, the cases Plaintiff cites do not help Plaintiff's cause, because they demonstrate that the Environmental Appeals Board bases its review of RCRA permits on EPA's *responses* to objections raised by the petitioners. *See In Re Ash Grove Cement Co.*, 7 E.A.D. 387, 1997 WL 732000, at *4 ("Petitioners must clearly identify their objections and explain why the Region's *previous response* to those objections is clearly erroneous or otherwise worthy of review.") (emphasis added, internal quotation marks omitted). Accordingly, the board in *In Re Ash Grove* declined to review an issue that had not been preserved. *Id.* at *13. *See also In Re Caribe General Elec. Products, Inc.*, 8 E.A.D. 696, 2000 WL 136800, at *10 (remanding permit to EPA based on the insufficiency of EPA's previous response to comments). In this case, there is no deficiency in NMED's response to comments because Plaintiff did not comment on the issue. AR 11261-11334.

In sum, nothing in the Permit's citation to the omnibus provision at 40 C.F.R. § 270.32(b)(2) invalidates the contested permit conditions, because those permit conditions are authorized by independent statutory and regulatory provisions. In addition, NMED's response to comments do not attempt to justify application of the omnibus provision simply because the Applicant did not comment on it during the permitting process.

---

[16] Available at https://www.env.nm.gov/wp-content/uploads/sites/12/2016/11/Final-NMED-SSG-VOL-I_-Rev.2-6_19_19.pdf

**Supp. App. 0219**

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be denied,

and Defendants' cross motion for summary judgment should be granted.


Respectfully submitted:

**NEW MEXICO ATTORNEY GENERAL**
**HECTOR H. BALDERAS**

*/s/William G. Grantham*
P. Cholla Khoury
Director, Consumer & Environmental Protection Division
Assistant Attorney General
ckhoury@nmag.gov
William G. Grantham
Assistant Attorney General
wgrantham@nmag.gov
 (505) 717-3520
Post Office Drawer 1508
Santa Fe, NM 87504


**NEW MEXICO ENVIRONMENT DEPARTMENT**
**and JAMES KENNEY, Secretary (in his official**
**capacity)**

*/s/Christopher Atencio*
Christopher Atencio
Assistant General Counsel
christopher.atencio@state.nm.us
Special Assistant Attorney General
New Mexico Environment Department
121 Tijeras Ave. NE
Albuquerque, NM 87102
Phone: (505) 222-9554
Fax: (505) 383-2064

## CERTIFICATE OF SERVICE

I CERTIFY that, on July 16, 2021, I filed the foregoing using CM/ECF which caused the

parties of record to be served by electronic means, as more fully reflected on the Notice of

Electronic Filing.


*/s/William G. Grantham*
William G. Grantham

25

**Supp. App. 0221**

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No.: 2:19-cv-00046-KG-SMV** |
| NEW MEXICO ENVIRONMENT | ) | |
| DEPARTMENT, and JAMES KENNEY, | ) | |
| Secretary (in his official capacity), | ) | |
| | ) | |
| **Defendants.** | ) | |

**DECLARATION OF DAVE COBRAIN**

I, Dave Cobrain, state and declare as follows:

1. I submit this declaration in support of the New Mexico Environment Department's and James Kenney's (in his official capacity) Response to Plaintiff's Motion for Summary Judgment.

2. I am the Permits Management Program Manager with the Hazardous Waste Bureau ("HWB") at the New Mexico Environment Department ("NMED") and have served in that capacity since December 2013.

3. I earned a Bachelor's degree from Utah State University and a Master's degree in geology from the University of North Carolina Chapel Hill.

4. I am a registered professional geologist in Oregon and Wyoming. I have ten years of experience in environmental consulting prior to joining HWB in 1999. I have extensive experience conducting environmental field investigations at industrial and commercial sites including implementation of subsurface investigations, aquifer and remediation system testing, and completion and monitoring of remediation activities. I worked as a

1

**Supp. App. 0223**

project manager for environmental consulting firms where I performed proposal and bid specification preparation, project planning and implementation, and budget management on environmental assessment and remediation projects that included investigation, closure, demolition and monitoring activities. I conducted evaluations of remedial alternatives in accordance with Environmental Protection Agency ("EPA") and state requirements for remedy selection and provided clients with representation to regulatory authorities.

5. I have been an employee at the HWB for 22 years, which has included two years as a Water Resource Specialist, 12 years as a Staff manager, and eight years as a Program Manager. My current duties include preparation, issuance, and enforcement of Resource Conservation and Recovery Act ("RCRA") permits and compliance orders, as well as oversight of corrective action activities at RCRA-regulated facilities. My responsibilities include directing regulated facilities in the implementation of corrective actions to achieve compliance with New Mexico regulations prescribed in permits and orders. I am an environmental professional as defined in 40 C.F.R. § 312.10.

6. I have worked for 18 years as the manager of a technical team at NMED overseeing Cannon Air Force Base ("Cannon"), located near the city of Clovis, New Mexico.

7. In that role, I direct technical staff with regard to RCRA corrective actions; review technical documents, environmental data, and draft permits; and interact with Air Force representative concerning technical and regulatory issues.

8. In that role, I have helped to draft, or drafted myself, RCRA corrective action permits for several facilities, including Cannon. I am familiar with the facts that form the basis of the

2

**Supp. App. 0224**

claims made by the United States against NMED and James Kenney, especially the terms and conditions of the RCRA corrective action permit at issue in this matter.

9.  When drafting a RCRA corrective action permit, HWB includes a list of defined terms within the permit itself.

10. These defined terms include defining the scope of hazardous waste and contaminants subject to corrective action within the scope of the permit.

11. To determine which substances to include within these definitions, HWB first cites to applicable regulatory authority, i.e. 40 C.F.R. 261.3, 40 CFR Part 261, appendix VII and VIII and 40 CFR Part 264, appendix IX and munitions constituents as defined in 10 U.S.C. 2710(e)(3).

12. Longstanding EPA guidance on this regulation states that corrective action is not specifically restricted to identified or listed hazardous wastes.[1] Rather, it extends corrective action to any substance meeting the statutory definition of hazardous waste, identified in New Mexico at NMSA 1978, Section 74-4-3(K) (2018) and 42 U.S.C. 6903(5).

13. As part of this analysis, HWB has interpreted its corrective action authority to include substances listed in 20.6.2.3103 and 20.6.2.7(T)(2) NMAC and constituents for which EPA has promulgated a maximum contaminant level (MCL) at 40 CFR parts 141 and 143 because they have already been determined to pose a threat to human health and the environment. 20.6.2.3103 NMAC includes the standards for groundwater of 10,000 mg/l total dissolved solids concentration or less, meaning it includes human health standards for contaminants that must be met in groundwater that has an existing total dissolved

---

[1] https://rcrapublic.epa.gov/files/14021.pdf

3

Supp. App. 0225

solids concentration of less than 10,000 mg/l. 20.6.2.7(T)(2) NMAC defines toxic pollutants as used in 20.6.2.3103(A)(2) NMAC. When concentrations of these standards exceed amounts listed in 20.6.2.3103 NMAC, the New Mexico Water Quality Control Commission has determined that there is a hazard to public health. 20.6.2.7(H) NMAC. Substances listed in the referenced regulations are therefore added to the definition of hazardous waste for corrective action if they are known or suspected to be present at the facility.

14. In accordance with 40 CFR 270.32(b)(2), HWB reviews constituents that are under consideration by EPA for regulation based on toxicity or other properties determined to potentially pose a threat to human health or the environment. As emerging contaminants, PFAS risk evaluation is evolving as additional data becomes available. Three PFAS compounds were referenced in NMED's 2017 *Risk Assessment Guidance for Site Investigation and Remediation.* Based on updated toxicological data, additional PFAS compounds have been identified as presenting a threat to human health. NMED's updated 2019 *Risk Assessment Guidance for Site Investigation and Remediation* contains 24 PFAS compounds and also compounds designed to replace PFAS compounds (e.g., GenX). As EPA identifies compounds that present a threat to human health or the environment, such compounds are added to the definition of hazardous waste for the purpose of corrective action in New Mexico RCRA permits, if those compounds are known or suspected to be present at a permitted facility in accordance with Section 74-4-3(K) of the New Mexico Hazardous Waste Act and 42 U.S.C. 6903(5) of RCRA.

I declare under penalty of perjury that the foregoing is true and correct.

4

**Supp. App. 0226**

Supp. App. 0227

Executed on ____July 16, 2021_____ (date)

_____(signature)

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

  v.

NEW MEXICO ENVIRONMENT
DEPARTMENT, and JAMES KENNEY,
Secretary (in his official capacity),

      Defendants.

Case No. 2:19-cv-46-KG-SMV

## PLAINTIFF UNITED STATES'
## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
## RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Dated: August 16, 2021

TODD KIM
Assistant Attorney General

ANDREW D. KNUDSEN
JOHN M. CANE
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 353-7466
Andrew.Knudsen@usdoj.gov
John.Cane@usdoj.gov

*Counsel for Plaintiff United States of America*

**Supp. App. 0228**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

GLOSSARY ..................................................................................................................... vii

I.      Judicial Review of the Permit Is Limited to the Administrative Record under the HWA
        and *Olenhouse* ....................................................................................................... 1

II.     The Doctrine of Issue Exhaustion Does Not Bar the United States' Challenges. ............... 3

        A.      The HWA and Implementing Regulations Do Not Require Issue Exhaustion. ............. 3

        B.      Application of Federal Courts' Prudential Issue Exhaustion Requirement Is Not
                Appropriate Here. ...................................................................................... 5

III.    NMED's Corrective Action Authority Does Not Extend to Statutory Hazardous Wastes. .. 7

IV.     NMED Failed to Justify Its Identification of Specific Substances as Hazardous Wastes in
        the Administrative Record. ........................................................................................ 9

V.      NMED's Corrective Action Authority Does Not Extend to "Contaminants." ................... 13

VI.     NMED Has Not Justified the Challenged Permit Terms as an Exercise of Omnibus
        Authority. .............................................................................................................. 16

CONCLUSION ................................................................................................................ 18

**Supp. App. 0229**

# TABLE OF AUTHORITIES

**Cases**

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................................ 11

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) .................................................... 7

*Darby v. Cisneros*, 509 U.S. 137 (1993)........................................................... 5

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)............................................. 10

*Eastern Transp. Co. v. U.S.*, 272 U.S. 675 (1927)........................................................ 5

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ........................................ 10

*Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*,

   124 P.3d 1164 (N.M. Ct. App. 2005)............................................................ 12

*Governor of Kansas v. Kempthorne*, 516 F.3d 833 (10th Cir. 2008) ............................. 6

*Gzaskow v. Public Employees Retirement Board*, 403 P.3d 694 (N.M. Ct. App. 2017) ................ 5

*Heimann v. U.S. Gov't ex rel. Vilsack*, 2016 WL 9777170 (D.N.M. June 30, 2016)..................... 2

*Iowa Tribe of Kansas & Nebraska v. Salazar*, 607 F.3d 1225 (10th Cir. 2010) ........................... 6

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256 (D.N.M. 2015) ..... 2, 3

*Kisor v. Wilkie*, 139 S. Ct. 2400........................................................................ 8

*Library of Congress v. Shaw*, 478 U.S. 310 (1986)........................................................ 5

*Los Alamos Study Group v. U.S. Dep't of Energy*, 692 F.3d 1057 (10th Cir. 2012).................... 16

*McMahon v. United States*, 342 U.S. 25 (1951) .............................................................. 5

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks*, 960 F.2d 911 (10th Cir. 1992) ................. 6

*Mitchell v. Comm'r of Internal Revenue*, 775 F.3d 1243 (10th Cir. 2015) .................................. 8

*N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1138 ............... 2, 10

*NRDC v. EPA*, 907 F.2d 1146 (D.C. Cir. 1990) ......................................................... 14

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994)............................... passim

*Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983) ............................................................. 5

*Scalia v. Wynnewood Refining Co.*, 978 F.3d 1175 (10th Cir. 2020) ............................. 8

*Schreiber v. Cuccinelli*, 981 F.3d 766 (10th Cir. 2020) .................................................. 5

*Sims v. Apfel*, 530 U.S 103 (2000). ................................................................................. 3

*Sw. Research & Info. Ctr. v. N.M. Env't Dep't*, 336 P.3d 404 (N.M. Ct. App. 2014) .................. 12

*United States. v. Sherwood*, 312 U.S. 584 (1941) ........................................................... 5

*United States v. New Mexico*, 32 F.3d 494 (10th Cir. 1994) ........................................... 2

*W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264 (10th Cir. 2013) .................... 13

**Statutes**

42 U.S.C. § 6961 ............................................................................................................... 6

42 U.S.C. § 6961(a) ....................................................................................................... 6, 7

**State Statutes**

N.M. Stat. Ann. § 74-4-3(C) ............................................................................................ 9

N.M. Stat. Ann. § 74-4-4(A) ............................................................................................ 8

N.M. Stat. Ann. § 74-4-14.A ..................................................................................... 1, 4, 11

**Session Laws**

2021 N.M. Laws ch. 133 sec. 3 ......................................................................................... 8

**Rules**

Fed. R. App. P. 10(b)(2) .................................................................................................... 3

Fed. R. App. P. 16(a) ........................................................................................................ 3

Fed. R. Civ. P. 56 .............................................................................................................. 2

## Code of Federal Regulations

40 C.F.R. Part 124 ................................................................................................. 17, 18

40 C.F.R. § 124.13 ...................................................................................................... 4

40 C.F.R. 124.19(a) ................................................................................................... 18

40 C.F.R. § 124.19(*l*)(1) ............................................................................................. 4

40 C.F.R. § 260.10 ...................................................................................................... 9

40 C.F.R. § 261.3 ...................................................................................................... 14

40 C.F.R. Part 261 Subpart D .................................................................................... 9

40 C.F.R. Part 261 Appendix VII ............................................................................... 9

40 C.F.R. Part 261 Appendix VIII .............................................................................. 9

40 C.F.R. § 264.101 ................................................................................................. 8, 9

40 C.F.R. Part 264 Appendix IX ................................................................................. 9

40 C.F.R. § 270.32(c) .................................................................................................. 8

40 C.F.R. 270.41 ....................................................................................................... 17

## State Administrative Code

N.M. Admin. Code § 20.4.1.901 .............................................................................. 4, 18

N.M. Admin. Code § 20.4.1.901.(A)(2) ................................................................... 12

N.M. Admin. Code § 20.4.1.901.A(5) ........................................................................ 4

N.M. Admin. Code § 20.4.1.901.B(1) ...................................................................... 17

N.M. Admin. Code § 20.4.1.901.H ......................................................................... 2, 4

N.M. Admin. Code § 20.4.1.901.(H)(2) ................................................................... 12

N.M. Admin. Code § 20.4.1.1102 ........................................................................... 4, 18

**Administrative Decisions**

*In Re Ash Grove Cement Co.*, 7 E.A.D. 387 (EAB 1997) ...................................................... 17, 18

*In Re Caribe General Elec. Products, Inc.*, 8 E.A.D. 696 (EAB 2000) ........................... 16, 17, 18

**Supp. App. 0233**

## GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| New Mexico Environmental Improvement Board | Board |
| U.S. Environmental Protection Agency | EPA |
| New Mexico Hazardous Waste Act | HWA |
| New Mexico Environment Department | NMED |
| Resource Conservation and Recovery Act | RCRA |
| Solid Waste Management Unit | SWMU |

In its Response, NMED evades the plain text of the statutory and regulatory provisions that constrain its corrective action authority and offers only extra-record rationalizations in support of the challenged Permit terms.  But the HWA and its implementing regulations unambiguously limit NMED's corrective action authority to listed and characteristic hazardous wastes, leaving no room for the contrary interpretation asserted in the Response.  And NMED's attempt to broaden the scope of this Court's review beyond the administrative record only highlights NMED's failure to explain the basis for the challenged terms in the record itself.

Although NMED invokes the doctrine of issue exhaustion, this Court is not barred from considering the United States' challenges.  Neither the HWA nor its implementing regulations required the United States to present its arguments to NMED before seeking judicial review.  And while federal courts generally require issue exhaustion as a prudential matter, doing so here would impermissibly subject the United States to permit terms for which it has not waived sovereign immunity.

I.     **Judicial Review of the Permit Is Limited to the Administrative Record under the HWA and *Olenhouse*.**

NMED disputes that this is a record review case governed by the Tenth Circuit's decision in *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994), suggesting instead that this Court may apply the usual summary judgment standard and consider extra-record affidavits and exhibits.  Resp. 5-6.  NMED is incorrect.  Both the HWA and *Olenhouse* limit this Court's review to the administrative record and prohibit consideration of extra-record evidence.

Contrary to NMED's assertion, the standard of review is not something that the parties "acquiesce[] to."  Resp. 18 n.9.  It is governed by relevant law and precedent.  Here, the plain text of the HWA states that all appeals of agency action under that statute "shall be upon the record before the board or the secretary [of NMED]."  N.M. Stat. Ann. § 74-4-14.A.  Further,

1

**Supp. App. 0235**

New Mexico's regulations governing the issuance of HWA permits provide that permit appeals "shall be as provided by the Hazardous Waste Act" (*i.e.*, based on the record) and specify the contents of the "record on appeal."  N.M. Admin. Code § 20.4.1.901.H.  Unsurprisingly then, both the United States and NMED have consistently represented to this Court that this would be a record review case.  *See* Clerk's Mins. June 17, 2020 Status Conf., Doc. 33 (noting NMED's agreement that case is limited to "an administrative appeal").

Likewise, NMED's attempt to escape the Tenth Circuit's decision in *Olenhouse* fails.[1] NMED's reference to a previous HWA permit appeal is unavailing, as that case predates *Olenhouse*.  *See United States v. New Mexico*, 32 F.3d 494 (10th Cir. 1994) (decided Aug. 18, 1994); *Olenhouse*, 42 F.3d at 1560 (decided Dec. 20, 1994).  And while *Olenhouse* involved a challenge to *federal* agency action under the Administrative Procedure Act ("APA"), the Tenth Circuit's holding and rationale apply equally to appeals from *state* agency action like this one. *See* 42 F.3d at 1564 (stating decision "delineates the standards to which the district court must conform" in "an administrative agency case decided on appeal by a district court").  The court's premise was that the usual standards for summary judgment under Fed. R. Civ. P. 56 are "inconsistent with the standards for judicial review of agency action under the APA"— specifically, the "arbitrary or capricious" standard of review—because they "invite[] (even require[]) the reviewing court to rely on evidence outside the administrative record" and involve

---

[1] Despite NMED's belated objection, Resp. 6 n.2, the briefing structure the parties agreed to here is consistent with *Olenhouse* review.  Courts commonly use cross-motions for summary judgment to brief agency appeals under *Olenhouse*.  *See, e.g.*, *N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1138, 1161 & n.22 (endorsing use of summary judgment to decide challenges to agency action); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 272 (D.N.M. 2015) (noting *Olenhouse* does not "require[e] any one particular form of action"); *Heimann v. U.S. Gov't ex rel. Vilsack*, 2016 WL 9777170 (D.N.M. June 30, 2016) (Gonzales, J.) (considering motions for summary judgment under *Olenhouse* standard).

application of presumptions and burdens of proof that are inappropriate for APA review. *Id.* at 1579-80; *Jarita Mesa*, 305 F.R.D. at 272 (noting that unlike APA, usual summary judgment standards "presume nothing about the merits of the case and divide burdens of proof and production almost equally between the plaintiff and defendant"). The same reasoning applies to this Court's review of the Permit under the HWA's "arbitrary or capricious" standard, which NMED concedes is analogous to APA review.[2] Resp. 5.

## II. The Doctrine of Issue Exhaustion Does Not Bar the United States' Challenges.

The Court should find that the issue exhaustion doctrine does not apply in this case.[3] Nothing in the HWA or its implementing regulations required the United States to present specific issues to NMED before seeking judicial review of the Permit. And while federal courts generally apply a judicially created issue exhaustion requirement even in the absence of statutory or regulatory requirements, doing so would be inappropriate here because strict application of the issue exhaustion requirement would subject the United States to state permit requirements for which it has not waived sovereign immunity, given the absence of state-specific statutory or regulatory exhaustion requirements.

### A. The HWA and Implementing Regulations Do Not Require Issue Exhaustion.

There is no applicable state-specific statutory or regulatory issue-exhaustion requirement in this case, and nothing in the HWA or its implementing regulations bars challengers from

---

[2] NMED suggests that in not requesting an optional public hearing during the permit process, the United States has somehow frustrated this Court's ability to apply the *Olenhouse* standard of review by preventing the creation of an evidentiary transcript for purposes of Fed. R. App. P. 10(b)(2). Resp. 8. Rule 10 applies to appeals from *district court* orders. In actions for review of *agency action*, Rule 16(a) specifies the record that must be provided.

[3] The doctrine of issue exhaustion is distinct from the requirement to exhaust available administrative remedies before seeking judicial review. *See generally Sims v. Apfel*, 530 U.S. 103, 106-08 (2000) (explaining the nuance between issue exhaustion and a requirement to exhaust available administrative remedies).

raising issues in court that were not first presented to NMED. Although New Mexico's HWA regulations largely incorporate the federal rules by reference with regard to applicable substantive standards, New Mexico made a deliberate policy choice to implement permitting procedures that are distinct from the EPA's federal process. In stark contrast to EPA's RCRA permitting regulations, New Mexico's regulations do not include an exhaustion requirement. *Compare* 40 C.F.R. § 124.13 (requiring parties to raise all objections to RCRA permit in comments), *with* N.M. Admin. Code § 20.4.1.901 (adopting state-specific permitting procedures with no issue exhaustion requirement), *and id.* § 20.4.1.1102 (clarifying that references to EPA's permitting rules in EPA regulations incorporated by New Mexico shall be construed to mean New Mexico's permitting procedures). New Mexico's regulations similarly deviate from EPA's regulations by dispensing with the requirement that a party first exhaust administrative appeals for final permits. *Compare* 40 C.F.R. § 124.19(*l*)(1) (requiring administrative appeal of RCRA permit issued by EPA prior to seeking judicial review), *with* N.M. Stat. Ann. § 74-4-14.A ("any person who may be affected by any final administrative action . . . may appeal . . . within thirty days after that action"), *and* N.M. Admin. Code § 20.4.1.901.H.

Contrary to NMED's implication, the availability of an optional public hearing as part of the HWA permitting process does not impose a statutory or regulatory issue exhaustion requirement. Parties are not required to request a public hearing as part of the HWA permitting process. *See* N.M. Admin. Code § 20.4.1.901.A(5). Following notice and comment, NMED may issue, and parties may challenge, a permit decision even when no hearing was requested.

4

**Supp. App. 0238**

The United States cannot be faulted for not raising issues in a proceeding that it was not required to initiate.[4]

### B. Application of Federal Courts' Prudential Issue Exhaustion Requirement Is Not Appropriate Here.

In the absence of a statutory or regulatory issue exhaustion requirement, federal courts apply judicially-created issue exhaustion requirements. But doing so is inappropriate here because barring the United States from arguing that NMED lacks authority under the HWA to impose the challenged Permit terms would have the result of subjecting the United States to state permit requirements for which it has not waived sovereign immunity.

As sovereign, the United States, in the absence of its consent, is immune from suit or state regulation. *Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986) (citing *U.S. v. Sherwood*, 312 U.S. 584 (1941)). RCRA contains a limited waiver of the United States' sovereign immunity that applies to state "requirements, both substantive and procedural . . . respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements." 42 U.S.C. § 6961(a). Waivers of immunity must "be construed strictly in favor of the sovereign" and "not enlarge[d] . . . beyond what the language requires. *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685 (1983) (citing *McMahon v. U.S.*, 342 U.S. 25, 27 (1951); *Eastern Transp. Co. v.*

---

[4] NMED argues in passing that by not requesting a public hearing, the United States failed to exhaust its administrative remedies. Resp. 9-10. That argument fails because such a hearing is purely optional and is not a prerequisite for final agency action. *See* Resp. 8 (acknowledging hearing must only be held "if requested"); *Schreiber v. Cuccinelli*, 981 F.3d 766, 786 (10th Cir. 2020) (noting that in the APA context, "a court may not decline to review final agency action . . . on the ground that the plaintiff had the opportunity to pursue an optional, additional level of administrative review but did *not* do so) (citing *Darby v. Cisneros*, 509 U.S. 137, 146-47 (1993)). To the extent New Mexico's state doctrine of exhaustion of administrative remedies is relevant here, *see* Resp. 9-10, even if a hearing were required, New Mexico case law would not bar those arguments the United States raises that are purely legal. *Gzaskow v. Public Employees Retirement Board*, 403 P.3d 694, 701 ¶ 19 (N.M. Ct. App. 2017).

*U.S.*, 272 U.S. 675, 686 (1927)).  The RCRA waiver does not extend to permit provisions that

NMED lacks authority to lawfully impose—*i.e.*, to terms that are not legitimate "requirements"

of state law.  Thus, to the extent the challenged Permit terms exceed NMED's authority under

the HWA, the United States has not waived its sovereign immunity with respect to those terms.

The Air Force cannot be deemed to have waived the United States' sovereign immunity

to unlawful Permit terms by failing to comment on them in this context.  Only Congress can

waive sovereign immunity, and the Air Force cannot waive the United States' sovereign

immunity to unlawful state permit terms, whether by explicitly consenting to them or by failing

to comment on them in administrative proceedings.  *See Governor of Kansas v. Kempthorne*, 516

F.3d 833, 845 (10th Cir. 2008) ("Nor can the actions of the Secretary, or any government official

or attorney, act as a waiver or abandonment of the United States' sovereign immunity.  Because

waiver must be unequivocally expressed by Congress, officers of the United States possess no

power through their actions to waive an immunity of the United States or to confer jurisdiction

on a court.") (internal quotation marks omitted).

Applying judge-made waiver doctrine to bar the Air Force's objections to the challenged

Permit terms could have the unintentional effect of this Court waiving the United States'

sovereign immunity beyond the scope of 42 U.S.C. § 6961.  "[O]nly Congress, not the courts,

can waive the sovereign immunity of the United States." *Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Jacks*, 960 F.2d 911, 913 (10th Cir. 1992).  "[W]aiver of sovereign immunity does

not turn on judge-made rules but on congressional intent." *Iowa Tribe of Kansas & Nebraska v.*

*Salazar*, 607 F.3d 1225, 1237 (10th Cir. 2010).

The United States does not seek to create a situation where the federal government can

refuse to comply with *lawfully* imposed state-specific requirements, and indeed does not argue

<div align="center">6</div>

<div align="center">**Supp. App. 0240**</div>

such in this reply brief.  Had NMED relied on substantive requirements within the HWA to impose the disputed Permit terms, or if New Mexico had specifically required exhaustion as part of the state's permitting process under the HWA or its implementing regulations, the United States would lack the ability to assert sovereign immunity because the RCRA waiver in this context would have applied to these substantive and/or procedural requirements as contemplated by 42 U.S.C. § 6961(a).  However, in this case, NMED failed to properly apply its substantive legal requirements to the disputed permit terms and cannot cite to a specific statutory or regulatory procedural requirement that would bar the instant claim for lack of exhaustion, making this an appropriate circumstance for the United States to assert sovereign immunity in this limited context.

### III.   NMED's Corrective Action Authority Does Not Extend to Statutory Hazardous Wastes.

In arguing that its corrective action authority extends to all statutory hazardous wastes, NMED fails to engage with the plain text of the HWA and its implementing regulations.  That plain text limits NMED's authority to listed or characteristic hazardous wastes.  Accordingly, the Permit's definition of "hazardous waste" for purposes of corrective action is unlawful.

Where the text of a statute or regulation is clear, that text controls, regardless of an agency's contrary interpretation.  Under *Chevron*, the "judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear [legislative] intent."  *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984).  Likewise, when interpreting regulatory text, "if there is only one reasonable construction of a regulation . . . then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415; *see also Mitchell v. Comm'r of Internal Revenue*, 775 F.3d 1243 (10th Cir. 2015).

NMED argues that "40 C.F.R. § 264.101 must be read in light of EPA's interpretation of the definition of hazardous waste for correction [*sic*] action under RCRA § 3004(u)." Resp. 13. But the regulatory text leaves no room for ambiguity or alternative readings. The plain language of 40 C.F.R. § 264.101 and its associated definitional provisions—which New Mexico has incorporated by reference into its own regulations—limits corrective action to listed or characteristic hazardous wastes. MSJ 4, 9-10. NMED has not identified any ambiguity in the relevant text permitting a different interpretation, and absent such ambiguity, the inquiry must end there. *Scalia v. Wynnewood Refining Co.*, 978 F.3d 1175, 1181 (10th Cir. 2020) (stating Tenth Circuit's "longstanding approach to regulatory interpretation" is to "begin with the text of the regulation, and, if the meaning is clear, look no further"). Thus, there is no merit to NMED's claim that its regulations must be interpreted to reach all statutory hazardous waste in order to ensure that the Board's regulations be "equivalent to" EPA's regulations under RCRA.[5] Resp. 13. Such resort to "extra textual evidence concerning history and purpose" cannot overcome the plain text of the regulation. *Scalia*, 978 F.3d at 1181 (internal quotation marks and alteration omitted).

Instead of addressing the relevant regulations, NMED focuses on EPA's interpretation of a different provision. Resp. 10-12. Notably, the EPA interpretive statements and other authorities that NMED cites do not address the scope of 40 C.F.R. § 264.101 or the other federal regulations New Mexico has adopted by incorporation, but rather the text of RCRA. NMED

---

[5] Although NMED cites the current HWA text stating the Board's regulations must be "equivalent to and at least as stringent as" EPA's, Resp. 13, that language was only enacted in 2021. 2021 N.M. Laws ch. 133 sec. 3. At the time the Permit was issued, the HWA required that the Board's implementing regulations be "equivalent to and no more stringent than" EPA's regulations. N.M. Stat. Ann. § 74-4-4(A) (2019); *see also* 40 C.F.R. § 270.32(c) ("For a State issued permit, an applicable requirement is a State statutory or regulatory requirement which takes effect prior to final administrative disposition of a permit.").

regulates hazardous waste under the HWA and its implementing regulations, not directly under RCRA. Accordingly, NMED's reliance on these interpretive statements is not on point.

NMED also asserts that various provisions of the HWA can be read to authorize applying corrective action requirements beyond listed and characteristic hazardous wastes. Resp. 13-14. But whatever the merits of NMED's reading, whether NMED's corrective action authority under the HWA could reach all statutory hazardous waste in the absence of the applicable regulations is ultimately immaterial. The plain text of the HWA defines the scope of "corrective action" as an "action taken in accordance with rules of the [B]oard." N.M. Stat. Ann. § 74-4-3(C). And those "rules of the [B]oard" unambiguously limit corrective action to listed and characteristic hazardous wastes. MSJ 9-10.

NMED attempts to evade the constraints of section 74-4-3(C) by suggesting that it only refers to the Board's "rules governing *actions*" and not "rules governing *identification* of hazardous waste." Resp. 14. But nothing in that provision suggests that some "rules of the [B]oard" are relevant to defining "corrective action" and others are not. The HWA simply states that corrective action must be "taken in accordance with rules of the [B]oard." N.M. Stat. Ann. § 74-4-3(C). Those rules define not only the actions that must be taken, but also the entities that must take corrective action, the sources of releases that must be addressed, the timing of releases that must be addressed, and—critically—the hazardous wastes that are subject to corrective action. *See* 40 C.F.R. §§ 260.10, 261.3, 264.101. All of these latter criteria are fundamental to defining the scope of corrective action requirements for purposes of section 74-4-3(C).

## IV.   NMED Failed to Justify Its Identification of Specific Substances as Hazardous Wastes in the Administrative Record.

Even accepting *arguendo* NMED's view of its corrective action authority, NMED failed to provide the necessary justification in the record for its determination that the specific

substances enumerated in the Permit's definition of "hazardous waste" for the purposes of

corrective action fall within that authority.[6]  MSJ 12-14.  The after-the-fact explanations and

extra-record evidence proffered in NMED's Response cannot substitute for the reasoned

explanation NMED was obligated to provide in the administrative record.

NMED fails to identify any place in the Permit or any other administrative record

document in which it articulated a basis for finding that the substances enumerated in the

Permit's definition of "hazardous waste" for purposes of corrective action met the statutory

definition of hazardous waste.  Under the "arbitrary and capricious" standard of review

applicable here, courts consider "whether the agency examined the relevant data and *articulated

a satisfactory explanation* for its decision, including a *rational connection* between the facts

found and the choice made."  *N.M. Health Connections*, 946 F.3d at 1162 (quoting *Dep't of

Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019)) (emphases added, internal quotation

marks and alterations omitted).  "[W]here the agency has failed to provide even that minimal

level of analysis, its action is arbitrary and capricious."  *Id.* (quoting *Encino Motorcars, LLC v.

Navarro*, 136 S. Ct. 2117, 2125 (2016)).  Notably, that analysis must be included in the

administrative record of the agency's decision itself.  *Id.* at 1161 ("Our review is limited to the

administrative record . . . ."); N.M. Stat. Ann. § 74-4-14.A (stating review of NMED actions

---

[6] This argument is within the scope of the United States' Amended Complaint.  *See* Am. Comp.
¶¶ 25, 27, 28; Mem. Op. & Order, Doc. No. 26 (finding complaint "sufficiently explained the
Permit is allegedly deficient because its hazardous waste definition exceeds the hazardous waste
definitions in the NMHWA and RCRA").  The United States alleged that the Permit's definition
of "hazardous waste" for purposes of corrective action includes substances that are "not
hazardous wastes as defined under applicable New Mexico regulations."  Am. Comp. ¶ 25.
NMED argues that the applicable regulations must be read to define hazardous waste
coextensively with the statutory definition.  Resp. 13.  While the United States disagrees, it also
argues that *even if* NMED's interpretation were permissible, NMED acted arbitrarily and
capriciously when it concluded that the enumerated substances fall within NMED's reading of
the regulations.  *See* MSJ 12.

"shall be upon the record"); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962) (requiring agency action to "be upheld, if at all, on the same basis articulated in the order by the agency itself"). The court may not "rel[y] on the *post hoc* rationalizations of counsel or attempt[] itself to supply a reasoned basis for agency action without regard to the contents of the administrative record." *Olenhouse*, 42 F.3d at 1580.

NMED's Response offers only *post hoc* rationalizations and an inadmissible extra-record declaration. Resp. 17-19 & Ex. 1. These after-the-fact explanations are unavailing for purposes of this Court's application of the "arbitrary and capricious" standard of review to the administrative record. Indeed, NMED's reliance on these materials only highlights the absence of any explanation from the agency in the administrative record itself.

Specifically, NMED points out that the Permit identifies some of the substances included in its definition of "hazardous waste" for purposes of corrective action by reference to other provisions of New Mexico's regulations listing those substances for *other* regulatory purposes. Resp. 18-19 (discussing Permit's inclusion of "water contaminants [listed] at 20.6.2.3103 NMAC," "toxic pollutants listed at 20.6.2.WW NMAC," and "any contaminant for which the EPA has promulgated a maximum contaminant level … at 40 C.F.R. parts 141 and 143" as hazardous wastes). NMED contends in its Response and in its employee's declaration that those references serve not only to *identify* the substances included in the Permit's definition, but also to indirectly *justify* identifying them as hazardous wastes under the statutory definition. This argument fails for at least two reasons.

First, as noted above, it constitutes an impermissible *post hoc* rationalization for the challenged Permit terms. NMED did not draw a connection anywhere in the record between these substances' presence on the cited lists and the criteria for statutory hazardous waste.

And second, the extra-record justifications NMED offers here are incomplete. For example, NMED asserts that substances it has listed for other regulatory purposes are only included in the Permit's definition of "hazardous waste" if they are "known or suspected to be present at a facility." Resp. 19. But aside from some perfluorinated compounds, NMED can point to no evidence that the enumerated substances are "known or suspected to be present" at Cannon. Likewise, NMED cannot explain why it included dioxins and furans (which are not listed in any of the regulatory provisions NMED cross-references) or the broadly defined term "contaminants" (which, as discussed below, is beyond NMED's corrective action authority).

In an effort to excuse the record's silence on this issue, NMED fixates on whether it was required to explain the basis for including the enumerated substances in its "hazardous waste" definition in the draft Permit's fact sheet. Resp. 16-17. But this argument is beside the point. The United States pointed out in its Motion for Summary Judgment that NMED did not provide an explanation in its fact sheet, which would have been the most logical place to do so. *See* MSJ 13. But that was not the sum total of the United States' argument. NMED's inclusion of specific substances was not arbitrary and capricious because NMED failed to explain it in the *fact sheet* specifically, but because it failed to explain its rationale *anywhere in the record*.[7] NMED's obligation to explain the basis for its action does not arise from its requirement to produce a "fact sheet," but from its fundamental obligation to provide a rational basis for its actions founded in the administrative record. *Sw. Research & Info. Ctr. v. N.M. Env't Dep't*, 336 P.3d 404, 411 (N.M. Ct. App. 2014) (citing *Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*,

---

[7] In addition, NMED's argument that the fact sheet is not part of the administrative record is bizarre given that it was included in the record NMED compiled and produced here, AR000135-42, 000268-75, and that a fact sheet must be sent to the permittee and is thus part of "related correspondence" in the record. *See* N.M. Admin. Code § 20.4.1.901(A)(2), (H)(2).

124 P.3d 1164, 1168 (N.M. Ct. App. 2005)); *see also W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013) (stating agency decision is "arbitrary and capricious" under APA where agency, *inter alia*, "failed to base its decision on consideration of the relevant factors" or "made a clear error of judgment").  Because NMED did not do so, its decision was arbitrary and capricious.

**V.     NMED's Corrective Action Authority Does Not Extend to "Contaminants."**

In its Response, NMED flatly asserts that it has "authority to extend corrective action to releases of substances other than hazardous waste and constituents," with no citation to supporting law.  Resp. 20.  This sweeping claim of authority is wrong.  The HWA limits NMED's corrective action authority to releases of hazardous waste and hazardous constituents, not "contaminants."  MSJ 14-17.  Thus, this Court should hold that the Permit's application of corrective action requirements to "contaminants" is unlawful to the extent that it encompasses substances that are not hazardous wastes or hazardous constituents.

In addition to claiming unchecked authority to reach other "substances," NMED attempts to show that its definition of "contaminant" is coextensive with the hazardous wastes and hazardous constituents for which the HWA authorizes corrective action.[8]  As an initial matter, this is incorrect because the definition of "contaminant" includes substances that NMED believes meet the statutory definition of "hazardous waste" but that are not listed or characteristic hazardous wastes.  As the United States has argued elsewhere, NMED's corrective action

---

[8] As with the substances included in the definition of "hazardous waste" for purposes of corrective action, NMED cannot identify any basis in the record for its decision to apply the Permit's corrective action requirements to "contaminants," relying instead on *post hoc* rationalizations that are beyond this Court's limited standard of review.  Resp. 19-21. Accordingly, NMED's decision was arbitrary and capricious as well as unlawful.

authority under the HWA together with its implementing regulations is limited to listed or characteristic hazardous wastes and hazardous constituents.  *See* MSJ 8-14, *supra* pp. 7-9.

Moreover, the various explanations NMED provides are contradicted by the Permit itself. NMED first argues the Permit uses "contaminant" to provide a single term encompassing "the same substances identified in the definition of hazardous waste for corrective action, along with the 'constituents' that underlie the definition of regulatory hazardous waste."  Resp. 20.  But that is simply incorrect.  The definition of "contaminant" does not include all of the substances included in the Permit's definition of "hazardous waste" for purposes of corrective action. *Compare* Permit at 15, AR011349; *with id.* at 16, AR011350.  Most notably, it omits listed and characteristic wastes identified under 40 C.F.R. § 261.3—*i.e.*, the only hazardous wastes for which NMED is actually authorized to require corrective action under the HWA.[9]  Likewise, the hazardous constituents included as "contaminants" are narrower than the Permit's definition of "hazardous constituent."  *Compare* Permit at 15, AR011349 (defining "contaminant" to include constituents listed at 40 C.F.R. pt. 261 app'x VIII and pt. 264 app'x IX); *with id.* at 16, AR011350 (defining "hazardous constituent" to also include "any constituent identified in 40 CFR Part 261 Appendix VII that causes EPA to list a hazardous waste in 40 CFR Part 261 Subpart D").

NMED then argues that "contaminant" also encompasses a class of substances that serves as an analog to "hazardous constituents" for "non-regulatory hazardous waste."  Resp. 20 & n.13.  NMED appears to have created a new category of "non-regulatory hazardous constituents"

---

[9] Contrary to NMED's assertion, Resp. 20-21 n.14, the inclusion of hazardous constituents within "contaminant" does not automatically subsume these listed and characteristic hazardous wastes.  *See NRDC v. EPA*, 907 F.2d 1146, 1159 & n.12 (D.C. Cir. 1990) (distinguishing hazardous constituents from hazardous waste and noting "[w]astes may be hazardous for other reasons" besides their "concentration of hazardous constituents").

14
**Supp. App. 0248**

from whole cloth, with no reference to any provision of the HWA or implementing regulations that would authorize it to identify or regulate such substances. But even setting aside the lack of legal authority, this argument is implausible on its face because nothing in the Permit's definition of "contaminant" actually does what NMED claims—*i.e.*, "provid[e] an analogous term to 'constituents' for non-regulatory hazardous waste." Resp. 20. NMED fails to identify any language in the text of the definition itself that accomplishes the goal it claims to be pursuing.

NMED is also wrong regarding the effect its use of the term "contaminants" has on other Permit requirements. For example, it is not just "one corrective action requirement" that applies to contaminants in lieu of hazardous waste and hazardous constituents, Resp. 20 n.14, but many. *See* MSJ 15. And while NMED suggests its use of "contaminants" is immaterial because the term is coextensive with "hazardous waste" and "hazardous constituents," *see* Resp. 21, this is demonstrably incorrect, *see supra* p. 14.

Finally, the Response offers no justification for including a catch-all provision in the Permit giving NMED broad discretion to identify other "contaminants" with no reference to the regulatory or statutory criteria for hazardous waste. Instead, NMED suggests that the United States' objections to that provision are unripe and should be preserved for a future as-applied challenge. Resp. 21. To the contrary, that dispute is ripe for decision now. The Court does not need further factual development to determine that NMED's application of corrective action to any unspecified substance that it deems "necessary" exceeds the HWA's clear limitation of corrective action to hazardous waste or constituents, or that NMED's adoption of that provision without explanation is arbitrary and capricious. *See Los Alamos Study Group v. U.S. Dep't of Energy*, 692 F.3d 1057, 1065 (10th Cir. 2012) (stating factors for determining ripeness).

**Supp. App. 0249**

**VI.     NMED Has Not Justified the Challenged Permit Terms as an Exercise of Omnibus Authority.**

Contrary to NMED's assertion, the United States does not argue that NMED relied on omnibus authority as the exclusive authority for the challenged Permit terms, and we reaffirm our position that those terms are unlawful and/or arbitrary and capricious for other reasons. However, though NMED now appears to disclaim direct reliance on the omnibus provision,[10] the United States believes a brief response to NMED's analysis of the omnibus authority is warranted. To the extent NMED relied on its omnibus authority to impose these terms, NMED's invocation of that authority for the disputed permit provisions was not properly supported in the record.

NMED has failed to provide a fact-specific explanation supporting the exercise of its omnibus authority as to a particular area of concern or SWMU.  *See In Re Caribe General Elec. Products, Inc.*, 8 E.A.D. 696 (EAB 2000), 2000 WL 136800, at *7.  For example, with respect to the perfluorinated compounds that NMED included in its definition of "hazardous waste" for purposes of corrective action, NMED points to information found in the Air Force's CERCLA Site Inspection materials that document the Air Force's robust CERCLA response.  Resp. 22-23. But the fact that this documentation can be found in the record does not relieve NMED of its obligation to make the required fact-specific explanation as to the necessity of this particular Permit provision to protect human health and the environment as is required for the use of the omnibus authority.  *See In Re Caribe General Elec. Products, Inc.*, 2000 WL 136800, at *7.

---

[10] NMED's Response leaves some doubt as to whether NMED actually relied on this authority as the basis for the challenged Permit terms.  *See* Resp. 22 (suggesting Permit includes references to omnibus authority "because it may govern future corrective action determinations made pursuant to the Permit").

As to NMED's extra-record justifications, NMED appears to claim that the disputed provisions may be justified under the omnibus authority because they "may govern future corrective action determinations made pursuant to the Permit." Resp. 22. This argument fails for several reasons. First, this argument impermissibly relies on NMED's declaration and other extra-record evidence that is beyond the scope of this Court's review under *Olenhouse*. Resp. 23, n.16; *see Olenhouse*, 42 F.3d at 1574-75. Second, NMED cannot avoid the underlying requirement to justify its invocation of the omnibus authority by pointing to the possibility of changed conditions in the future. Under the HWA and the Permit, the appropriate course of action for responding to new information not available at the time the Permit was issued is for NMED to initiate a permit modification, provided that the new information justifies application of different permit conditions. *See* N.M. Admin. Code § 20.4.1.901.B(1); 40 C.F.R. 270.41; *see also* AR000288.

As discussed in the United States' Motion for Summary Judgment, NMED's invocation of its omnibus authority was not properly supported under the standards articulated in *In Re Ash Grove* and *In Re Caribe*. *See generally In Re Caribe General Elec. Products, Inc.,* 2000 WL 136800; *In Re Ash Grove Cement Co.*, 7 E.A.D. 387 (EAB 1997), 1997 WL 732000. NMED does not grapple with these cases on the merits; instead, it attempts to use them to support its procedural argument that the Air Force failed to comment on the challenged Permit terms. While it is true that these cases were remanded, in part, because of issues that arose during the public comment period for a proposed agency action, the EPA's Environmental Appeals Board framed these holdings in the context of the application of specific notice and comment requirements contained in 40 C.F.R. Part 124. *See In re Ash Grove Cement Co.*, at 13* (stating that a petition for review must include "a demonstration that any issues being raised were raised

17

**Supp. App. 0251**

during the public comment period" contemplated in 40 C.F.R. 124.19(a)); *In Re Caribe General Elec. Products, Inc.*, 2000 WL 136800, at *4 (stating that the standard of review for that proceeding was governed by the procedures established in 40 C.F.R. Part 124).  In contrast, and as stated in greater detail *supra*, the disputed permit terms in this case are governed by the "Permitting Procedures" established in N.M. Admin. Code § 20.4.1.901 and the relevant portions of the federal notice and comment regulations in 40 C.F.R. Part 124 are inapplicable to the instant case.  *See* N.M. Admin. Code § 20.4.1.1102 (stating that "reference to any provisions of 40 CFR Part 124 . . . shall be construed to mean the corresponding provision of section 901 of this Part . . .").  Thus, while *In Re Ash Grove Cement Co.* and *In Re Caribe* are instructive on the requirement for a fact-specific explanation for invoking the omnibus authority, these cases are distinguishable in their application of the federal notice and comment requirements referenced in NMED's Response.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for summary judgment in favor of the United States on Counts I and II of its Amended Complaint.

Respectfully submitted,


Dated: August 16, 2021                        TODD KIM
                                              Assistant Attorney General


                                              */s/  Andrew D. Knudsen*
                                              ANDREW D. KNUDSEN
                                              JOHN M. CANE
                                              U.S. Department of Justice
                                              Environment & Natural Resources Division
                                              Environmental Defense Section
                                              P.O. Box 7611
                                              Washington, DC 20044
                                              (202) 353-7466
                                              Andrew.Knudsen@usdoj.gov
                                              John.Cane@usdoj.gov

                                              *Counsel for Plaintiff United States of America*

19

**Supp. App. 0253**

**CERTIFICATE OF SERVICE**

I certify that on August 16, 2021, a copy of the foregoing PLAINTIFF UNITED STATES'

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO

DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT was served by electronic

means on all counsel of record by the Court's CM/ECF system.


                                     */s/  Andrew D. Knudsen*
                                   ANDREW D. KNUDSEN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

    v.

NEW MEXICO ENVIRONMENT
DEPARTMENT, and JAMES KENNEY,
Secretary (in his official capacity),

      Defendants.

Case No. 2:19-cv-46-KG-SMV

**PLAINTIFF UNITED STATES' RESPONSE TO
DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

Pursuant to Federal Rule of Evidence 201(e), Plaintiff the United States of America

hereby responds to Defendants' Request for Judicial Notice filed on November 5, 2021 (Doc.

63). Defendants the New Mexico Environment Department and Secretary James Kenney

("NMED") request that the Court take judicial notice of an October 26, 2021 letter from the

Administrator of the U.S. Environmental Protection Agency ("EPA") to New Mexico Governor

Michelle Lujan Grisham (the "Letter").

The United States takes no position on whether the Court may take judicial notice of the

Letter as an adjudicative fact under Federal Rule of Evidence 201. However, the United States

does not agree that the Letter supports NMED's defenses in this case. The Letter states EPA's

intent to initiate rulemaking to amend its corrective action regulations, which does not change

NMED's authority to issue the Permit nearly three years ago. For the reasons stated in the

United States' Motion for Summary Judgment (Doc. 58) and Reply (Doc. 60), under the plain

language of governing New Mexico law, the Permit exceeds NMED's authority. *See* U.S. Mot.

at 9-12; U.S. Reply at 7-9. Whether EPA intends to initiate rulemaking to amend its corrective

**Supp. App. 0255**

action rules has no bearing on whether any of the Permit's disputed provisions are valid under

applicable New Mexico law.



Respectfully submitted,


 Dated: December 22, 2021                         TODD KIM
                                                  Assistant Attorney General


                                                  */s/  Andrew D. Knudsen*
                                                  ANDREW D. KNUDSEN
                                                  JOHN M. CANE
                                                  U.S. Department of Justice
                                                  Environment & Natural Resources Division
                                                  Environmental Defense Section
                                                  P.O. Box 7611
                                                  Washington, DC 20044
                                                  (202) 353-7466
                                                  Andrew.Knudsen@usdoj.gov
                                                  John.Cane@usdoj.gov

                                                  *Counsel for Plaintiff United States of America*


**Supp. App. 0256**

**CERTIFICATE OF SERVICE**

I certify that on December 22, 2021, a copy of the foregoing PLAINTIFF UNITED STATES'

RESPONSE TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE was served by

electronic means on all counsel of record by the Court's CM/ECF system.

> _/s/  Andrew D. Knudsen_____
> ANDREW D. KNUDSEN

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made as required by 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3)    the digital submissions have been scanned for viruses with Microsoft Defender, and according to the program are free of viruses.

/s/ *Esther C. Jamison*

Esther C. Jamison
Assistant Attorney General
*Counsel for Appellees*
*New Mexico Environment Department*
*and James Kenney*